Robert B. Sykes (#3180)
C. Peter Sorensen (#16728)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah  84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
***Attorneys for Plaintiffs***

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| AARON JAMES and TIFFANY JAMES, Heirs and Proposed Personal Representatives of the Estate of Zane James, <br><br> Plaintiffs, <br><br> vs. <br><br> CASEY DAVIES, an Officer of the Cottonwood Heights Police Department; and COTTONWOOD HEIGHTS, UTAH, <br><br> Defendants. | **COMPLAINT & JURY DEMAND** <br><br><br> Civil No. _____ <br><br> Judge _____ |

Plaintiffs, by and through their counsel of record, hereby complain against

Defendants, and assert the following allegations in their totality and in the alternative:

## PRELIMINARY STATEMENT

The following allegations are based upon the undersigneds' understanding of

information presently available.  This is a civil rights action in which Plaintiffs seek relief

for the Defendants' violations of the rights of Zane James, guaranteed by the United States Constitution, specifically, the Fourth and/or the Fourteenth Amendments, which rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983 and § 1988. This action also seeks relief under the Constitution of the State of Utah, Article I, Section 14, to the extent applicable under the facts.

On May 29, 2018, Zane James was fleeing law enforcement in Cottonwood Heights, Utah.  He had robbed two stores with an "airsoft" or toy gun loaded with BBs, and had fled on a motorbike.  At the time of the shooting by Defendant Casey Davies, he was running away and was non-threatening.  The Defendant Officer Davies pulled up as Zane was fleeing, opened his car door and shot Zane in the back as he fled, seriously injuring him.  One bullet apparently severed Zane's spinal cord at C-6.  This injury led to his death three days later.  Defendant improperly used deadly force on a fleeing suspect by shooting him in the back.  The shooting violated Zane's rights under the Fourth Amendment to the United States Constitution and Article I, § 14 of the Utah Constitution.

## PARTIES

1.      Plaintiff **Tiffany James ("Tiffany")** is a citizen of the United States and a resident of Salt Lake County, State of Utah.  Tiffany is the mother and an heir of Zane James, deceased, and will be co-personal representative of the Estate of Zane James.

2.     Plaintiff **Aaron James ("Aaron")** is a citizen of the United States and a resident of Salt Lake County, State of Utah.  Aaron is the father and an heir of Zane James, deceased, and will be co-personal representative of the Estate of Zane James.

3.     At all relevant times, Defendant **Casey Davies ("Davies")** was a police officer with the **Cottonwood Heights Police Department ("CHPD"),** which is a department of the City of Cottonwood Heights.

4.     Defendant **Cottonwood Heights ("CH")** is a political subdivision of the State of Utah.

5.     At all times alleged in this Complaint, Davies was acting within the course and scope of his employment.

6.     Plaintiffs are suing Davies in his individual capacity.

7.     The CHPD, acting for CH, made and enforced policies and procedures for police officers in CH, and for Davies.

## JURISDICTION AND VENUE

8.     This action arises under the Fourth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.  Accordingly, the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction of Plaintiffs' state law claims under 28 U.S.C. § 1367.

9.     The claims made in this Complaint occurred and arose in Salt Lake County, State of Utah.  Accordingly, venue is proper under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

10.     On the morning of May 29, 2018, Zane James ("Zane") was a "fleeing felon," having robbed two stores in nearby Sandy, Utah.

### – Zane's History –

11.     Zane was an accomplished high-level competitive hockey player and academic.

12.     He initially showed great promise as a hockey player.

13.     In order to pursue a possible college or professional career, Zane relocated for his senior year in high school to play Junior League hockey in the northwest.

14.     While playing hockey in the northwest, Zane sustained two serious concussions.

15.     In order to deal with the pain and disability from these injuries, medical professionals recommended he terminate his hockey career.

16.     As a result of this recommendation, Zane became severely, clinically depressed, but did complete his high school degree with honors.

17.     Due to prescriptions from medical professionals, Zane became addicted to opiates as he coped with long-term physical and emotional symptoms of his concussions.

18.     Zane attempted several times to extricate himself from the addiction, with some success, and was actively seeking additional treatment at the time of the shooting.

## – Zane's Appearance, Deportment and Injury –

19.     Zane was 19 years old on May 29, 2018.  He was 6'1" tall and weighed 165 pounds.

20.     On 5/29/19, at about 6:00 am, Zane had just robbed a store in Sandy with an airsoft gun loaded with BBs.

21.     No BBs or other ammo were fired at the scene of the robbery.

22.     Zane fled on a motorbike toward his home, located in CH.

23.     He was unable to make a turn due to pursuit by officers.

24.     He crashed his motorbike on a narrow neighborhood street, and slid along until it stopped.

25.     The crash was witnessed by Defendant Davies and one other CHPD officer, Betenson.

26.     Any reasonable officer witnessing this motorbike crash would have known that it would have caused significant injuries.

27.     Zane is believed to have severely injured his knees, and had multiple other injuries caused by sliding on the pavement as he laid his motor bike down.

28.     Zane got up and tried to run, limping seriously as he tried to get away.

## – No Weapon in Hands –

29.     The BB or airsoft gun was not in Zane's hands, but was tucked away in his clothing.

**30.**     It was obvious, or would have been obvious to any reasonable officer, that Zane did not have any weapon(s) in his hands as he ran.

– <u>**No Immediate Threat of Harm**</u> –

**31.**     At no time was Zane threatening to shoot at anybody.

**32.**     At no time was any officer in immediate danger of death or serious bodily injury as Zane fled.

**33.**     At no time was any citizen in immediate danger of death or serious bodily injury as Zane fled.

**34.**     As Officer Davies pulled up, Zane was running away and his back was to Officer Davies.

– <u>**Shooting Details**</u> –

**35.**     Officer Davies stopped his police vehicle, got out to pursue, then went back to his car. Davis then fired four shots fired at Zane.

**36.**     This was a populated area, with homes all around.

**37.**     Two bullets missed Zane.

**38.**     Two bullets struck Zane.

**39.**     One bullet struck Zane in the back of his left shoulder.

**40.**     The second bullet struck Zane in the back of his left thigh.

**41.**     Multiple shots were not necessary.

42.     The bullet that struck Zane in the shoulder traveled in an inside trajectory and struck his spinal cord at C-6, causing immediate and full paralysis, and causing Zane to fall to the ground.

43.     It may be, but is unknown at this time, that Zane was rendered a quadriplegic because that shot damaged his spinal cord.

44.     Eyewitnesses say that at one point, Zane lifted his head. An officer forcibly and roughly shoved his head back to the ground.

45.     Officers roughly flipped Zane over onto his back.

46.     Rough treatment by the police at the scene, including moving Zane, may have contributed to or caused the quadriplegia.

47.     Eyewitnesses also reported that officers at the scene seemed uninterested and indifferent to Zane's condition, and displayed no urgency in attending to his injuries.

48.     This injury resulted in Zane being unable to use his hands or his feet, as well as suffering the loss of the necessary autonomic body functions to survive unassisted, such as heart rate, blood pressure and breathing.

### – Davies' History –

49.     Davies is believed to have graduated from the police academy in about 2010.

50.     He is believed to have been hired by CHPD in about 2008.

51.     Davies is an instructor in tasers, firearms, control defensive tactics, and SWAT.  Despite his training at an instructor level on multiple suppression tactics, including nonlethal tactics, Davies displayed a disregard for disciplined situation control in shooting Zane.

– **Davies' Self Dispatch** –

52.     At approximately 6:10 am, a dispatch went out from the CHPD, which was heard by Officer Davies who was off-duty, announcing the robbery.

53.     There was a general dispatch to officers on 5/29/18 at about 6:12 am. The following is recounted in a report from Sgt. Ricks of the CHPD:

> ... at approximately 0610 hours ... Officer Betenson stated over the police radio that he was behind a dirt bike that matched the description of one that had fled from C.H.P.D. officers previously and it appeared he was trying to evade him. I asked Officer Betenson if he was in pursuit with the motorcycle and he stated no I'm attempting to catch up with just his emergency lights activated. Officer Betenson then advised the subject was fleeing from him and he was terminating the pursuit. Betenson then advised he was just following and I advised him to terminate. A Sandy Police Officer then got on our channel and advised that the suspect on the motorcycle matched the description of an armed robberies suspect that occurred in their area, last night. Officer's Davies and Betenson stated they were pursuing the suspect north bound on 2300 East.

54.     Defendant Davies was never dispatched to the scene.

55.     Davies overheard the general dispatch and decided to join the pursuit.

56.     Davies is believed to have stopped his police vehicle at approximately 6:12 am and shot at Zane from near his vehicle.

57.     Davies was not wearing a lapel camera, as CHPD policy required.

58.     Officer Betenson was not wearing his lapel camera, or had turned it off.

– **Witnesses** –

59.     Nearby residents witnessed the shooting.

60.     Among other things, witnesses stated:

a)      Zane did not have a visible weapon.

b)      Officer Davies pulled his car to a stop and shot Zane in the back, as he was running away.

c)      No effective warning or opportunity to stop was given by either Officer Davies or Officer Betenson.

d)      No citizens or officers were nearby or in danger from Zane.

e)      Zane did not yell any threats at officers or others.

f)      Zane appeared to be injured and limping as he ran.

g)      No officer said anything like "stop or I'll shoot."

h)      Witnesses confirm that Officer Betenson arrived on scene just as Davies fired is fourth shot.

61.     After crashing, Zane began running away from Officers Betenson and Davies.

62.     Zane's back was to Davies as he ran away.

**– <u>No Threats of Arrest or Other Warnings</u> –**

**63.**     Davies drew his handgun and fired four shots at Zane while Zane was running away from him.

**64.**     Based on information and belief, Davies did not issue any warning to Zane to "stop or I'll shoot" before firing four shots.

**65.**     Neither Davies nor Betenson told Zane at any time he was "under arrest."

**66.**     Davies was approximately 25-30 feet away from Zane when he fired the shots.

**– <u>Non-Lethal Options</u> –**

**67.**     Davies had available nonlethal methods of force, including a taser.

**68.**     Davies did not attempt to taser Zane.

**69.**     Davies did not give chase, despite being just a short distance from Zane, who was injured by the crash.

**70.**     Davies did not fire a warning shot.

**71.**     At no time did Davies order Zane to "Stop or I will shoot."

**72.**     Before Davies fired the shots, Davies knew or suspected that Zane had been seriously injured in the crashing and skidding of the motorbike.

**73.**     Before Davies fired the shots, he knew that other officers were nearby and could be of assistance.

**74.** Before Davies fired the shots, he knew that he and other officers could, more likely than not, apprehend Zane without using deadly force.

**75.** When Defendant Davies fired the shots, Zane had no weapon in either hand.

**76.** When Defendant Davies fired the shots, Zane was physically incapable of running very far or resisting, and posed no realistic threat of imminent danger to anyone.

**77.** One of the shots was the paralyzing shot that entered Zane's body at the shoulder, but traveled to the cervical spine, which caused the severe injuries and damage described herein.

**78.** Either shot alone would have been sufficient to injure Zane and keep him from fleeing further or escaping.  It was unnecessary to shoot more than once.

**– <u>Davies' Falsehoods and Cover-Up</u> –**

**79.** After the shooting and death, Defendant Davies engaged in efforts to cover up his unlawful actions.

**80.** For example, Davies reportedly claimed that Zane broke stride like he was reaching for a gun.

**81.** But that claim makes no sense because Zane knew he did not have a real gun, so why would he reach for a toy gun, knowing armed officers were close behind?

**82.** In reality, Zane was not reaching for anything, but was trying to run after a serious injury from the motorbike crash.

83.     Davies refused to make a statement to investigators about his decision to shoot Zane, which is highly unusual.

84.     Other officers gave written and oral statements that day.

85.     CHPD followed the shooting with public statements about Zane being a known violent criminal to support the officer's conduct.

86.     Defendant Davies falsely claimed that Zane was digging through his pockets and "continued to conceal his hands and reach in his pockets."

87.     After the shooting, Davies falsely claimed that he shot Zane to death because he was worried about the threat of Zane shooting him.

88.     There was no immediate threat to an officer or to public safety.

### – **Officer Betenson's Cover Up** –

89.     Officer Betenson was interviewed by Officer Involved Critical Incident (OICI) personnel, as per protocol after a deadly shooting.

90.     Officer Betenson claims to have witnessed the crash of the motorbike and saw Zane skid along the pavement after the crash.

91.     Eyewitnesses dispute that Betenson could have seen the crash.

92.     Officer Betenson, were he a reasonable officer at the time, would have understood that Zane was likely significantly injured by this crash.

93.     Officer Betenson told one investigator that Zane's actions only caused him "concern."  Betenson did not have his gun drawn when Davies fired shots at Zane.  This contradicts Betenson's claims that there was some imminent risk of Zane shooting an officer.

94.     Officer Betenson claimed to OICI investigators that as Zane ran away, he saw his "arms go from a running motion to his hands reaching for something in the front of his body." However, eyewitnesses dispute whether Betenson could have seen this.

95.     The above statement by Officer Betenson is false or exaggerated.

### – Davies' Bullets –

96.     In total, two of Davies' shots struck Zane James:

a.     One bullet penetrated the upper left shoulder, i.e., was a posterior entry, back to front.  This bullet entered the upper back near the neck, and lodged in the spinal cord at C-6.  This may have contributed to Zane becoming a quadriplegic.  Part of the bullet was recovered from the spinal canal at the C5/6 level.

b.     A second bullet perforated Zane's left thigh from the back.  Part of this bullet was likewise recovered in the medial proximal left thigh.

### – Improper and Questionable Investigation –

97.     As part of the protocol for investigating an officer-involved shooting, the Salt Lake County Attorney's Office detached an investigator to the scene within minutes of the shooting.

**98.**     The investigator requested an interview with Davies.  However, "Officer Davies, on the advice of his attorney, did not answer questions or provide a statement or offer information about the OICI to protocol investigators, as is his constitutional right to do so [sic]."  Sam Gill Letter, 10/08/18, p. 6.

**99.**     Davies had obtained legal representation within hours of Zane James' death.

**100.**     All other officers at the scene were interviewed by the investigators on May 29, 2018, the day of the shooting.

**101.**     Since Zane was shot in the back, and did not have his hands on a weapon, the OICI and CHPD were obligated to do a detailed investigation focusing whether there was justification to shoot a fleeing felony suspect in the back.

**102.**     In the entire report of the OICI task force, there is never any significant mention of the fact that Zane was shot in the back by Officer Davies.  See Sim Gill report, October 8, 2018.

**103.**     In fact, the report shows the following: 1) failure to determine why Zane was shot in the back; 2) failure to determine why non-lethal means were not employed and no consideration/acknowledgment that Zane was injured from the motorcycle crash; 3) failure to account for each bullet fired, including the two bullets either of which were capable of stopping Zane from fleeing; 4) inquiry into why there was no collection of eyewitness accounts other than one police officer; 5) inquiry into why Davies and Betenson's body and

dash cameras were not on during the chase and shooting or other officers who arrived on the scene after the shooting; 6) no inquiry into why Officer Davies chose to pursue a suspect while off duty; 7) no inquiry into Officer Davies' past history of use of excessive force; and 8) no inquiry into the danger that Officer Davies presented to the public by firing multiple shots into a residential neighborhood, where the third and fourth bullets fired by Davies would have lodged.

### – <u>Camera Evidence</u> –

104.    It is not clear yet why the other officers did not have body cam or dash cam recordings.

105.    Officers Davies and Betenson did not have body or dash cam on at the time of the shooting, despite having policy for this procedure.

106.    Apparently only Officer Harris was using a body camera.

107.    She arrived at the scene after the bullets had been fired.

108.    Officer Kawa's report said:  "I did not have my department issued body camera on my person during the time of my involvement due to me turning [it in] before the end of my shift which ended at 0600 hours."  This demonstrates that the CHPD culture and practice support lack of body camera usage and condones a practice of self-dispatch.

### – <u>Miscellaneous Facts</u> –

109.    Davies did not use situation management or de-escalation tactics.

110.    Davies was not disciplined in connection with the Zane James incident.

111.    Davies' actions toward Zane were consistent with Cottonwood Heights' policies.

112.    In fact, Davies was awarded a commendation by Cottonwood Heights during the active investigation.

113.    Other officers' actions toward Zane were consistent with Cottonwood Heights' policies.

## – <u>Tragic Consequences and Damages</u> –

114.    Three (3) days after Zane James was shot, Zane confronted the terrifying realization that if he lived, he would be paralyzed for life from the neck down.  This caused him to experience fear and terror in the last three days of his young life.

115.    As a result of these depressing facts, Zane requested no life saving methods be used to preserve his life.

116.    Zane died on May 31, 2018 of the consequences of the shooting.

117.    In addition to any other damages, the Estate of Zane James is entitled to pain and suffering and general and other damages as may be allowed by law, in an amount that is reasonable as determined by a jury.

118.    Zane was much beloved by his mother, Tiffany James, and his father, Aaron James, as well as by his siblings.  They have all been deprived of the society and companionship of Zane, which society and companionship they would have otherwise

enjoyed for many years. Tiffany and Aaron are entitled to an amount for loss of society and companionship that is reasonable as determined by a jury.

119. They are also entitled to any other damages available under law, for either themselves personally or for the estate.

120. Zane's siblings may also, under some circumstances, be entitled to compensation for Zane's loss.

121. The Estate of Zane James and Plaintiffs are entitled to all damages allowed under *Berry v. City of Muskogee,* Okl., 900 F.2d 1489 (10th Cir. 1990), which references are incorporated herein by reference.

122. The actions of Defendant Davies were the result of willful and malicious conduct, and/or manifested a knowing and reckless indifference toward, and a disregard of, the rights and very life of others.

## **CLAIMS FOR RELIEF**

The headings stated under each individual cause of action are for general descriptive purposes only, and are not intended to limit the Plaintiffs' claims for relief. The Plaintiffs reserve the right to assert any legal theory or claim for relief applicable to the facts set forth in this Complaint or an amended complaint pursuant to F.R.Civ.P. 8.

123. The claims for relief asserted herein are asserted individually and/or in the alternative.

## FIRST CLAIM FOR RELIEF

*Deprivation of Federal Constitutional Rights – 42 U.S.C. § 1983*
*Against Defendant **Davies***

124.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

125.    At all times relevant hereto, and in performance of the acts set forth herein, Defendant Davies acted under color of state law.

126.    At all times relevant hereto, and in performance of the acts set forth herein, Davies actively and personally caused the violations of constitutional rights alleged herein.

127.    If deadly force is used, then an officer's use of that force is reasonable only "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

128.    Furthermore, even if deadly force is necessary in the first instance, Tenth Circuit law requires officers to justify each additional bullet after the first bullet.  See *Fancher v. Barrientos,* 723 F.3d 1191, 1201 (10th Cir. 2013) ("Prior to shooting Dominguez, Barrientos stepped back, felt safer, and noticed Mr. Dominguez slump. This allowed him enough time ... to recognize and react to the changed circumstances and cease firing his gun. Under these circumstances, we have no trouble concluding Barrientos lacked probable cause to believe Dominguez posed a threat of serious harm to Barrientos or others at the time he

fired shots two through seven"); *Estate of Fuentes ex rel. Fuentes v. Thomas,* 107 F. Supp. 2d 1288, 1300 (D. Kan. 2000) aff'd sub nom; *Cerca v. Thomas*, 30 F. App'x 931 (10th Cir. 2002) (unpublished opinion) ("The court cannot find that Cpl. Thomas's actions were objectively reasonable because the evidence... is such that a rational fact-finder could infer that the defendant fired the third shot after the threat was abated.  Because Cpl. Thomas has not shown that his actions were objectively reasonable, he is not qualifiedly immune to prosecution").

129.    The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them.  *Tennessee v. Garner*, 471 U.S. 1, 7-8.

130.    CHPD training materials and actual training warned or should have warned Davies that deadly force may only be used where there is an immediate threat of serious bodily injury or death to the officer or others.   "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S. Ct. 1694, 1701 (1985).

131.    Davies' conduct alleged herein, including Davies' use of unreasonable or unnecessary deadly force by shooting Zane in the back, subjected Zane to the deprivation of his rights protected under the Fourth Amendment to the United States Constitution.

132.    If, under the facts, Zane is not deemed to have been "seized" under the *Graham* factors relating to the Fourth Amendment, and not deemed to be in custody, then Defendant Davies' actions deprived Zane of life, liberty, and bodily integrity, as substantively guaranteed to Zane under the Fifth and Fourteenth Amendments.

133.    The unreasonable, excessive, and dangerous deadly force used by Defendant Davies, which directly caused Zane's death as described above, deprived him of a liberty interest without due process of law, in violation of the Fifth and/or Fourteenth Amendments of the U.S. Constitution.

134.    Davies' actions violated Zane's clearly established constitutional rights of which reasonable police officers are or should be aware.

135.    Defendant Davies' actions proximately caused pain and emotional distress to Zane.

136.    Defendant Davies' actions proximately caused Zane's death and the harm alleged by Plaintiffs.

137.    As a result of Davies' unlawful actions, and to remedy misconduct of significant importance to the public, Plaintiffs have had to retain counsel.

138.    Davies' actions manifested malicious, reckless, and callous indifference to the rights and the very life of Zane James.

## SECOND CLAIM FOR RELIEF

*Deprivation of Federal Constitutional Rights – 42 U.S.C. § 1983*
*Against  Defendant **Cottonwood Heights***

139.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

140.    The actions of Defendant Davies toward Zane James were pursuant to, and consistent with, an established policy, practice, or custom of Defendant CH.

141.    The actions of Davies were pursuant to a CHPD policy, practice, and/or custom that consists of arming police officers with deadly weapons and condoning their use without requiring the consideration of less-lethal alternatives, and without providing proper training and/or supervision regarding their safe, reasonable, and appropriate use.

142.    Defendants CHPD and CH were deliberately indifferent toward the proper training, arming, and supervision of its officers and agents.

143.    Among other actions showing deliberate indifference, CHPD is believed to have hired Davies despite a prior known history of using excessive force.

144.    The actions of Defendants CHPD and CH were the proximate cause of pain and suffering to Zane, the death of Zane, and the other damages sustained by Plaintiffs.

145.    As a result of these Defendants' actions, and in order to remedy this important issue of public concern, Plaintiffs have had to retain legal counsel.

## THIRD CLAIM FOR RELIEF

*Violations of Utah Constitution, Art. I, §§ 1,6, 7, 14, 25*
*Against **All Defendants***

146.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

147.     The actions of Defendants described herein violated Zane's rights secured by Article I, Section 1 of the Utah Constitution ("All men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property[.]").

148.     The actions of Defendants described above violated Zane's rights secured by  Article I, Section 7 of the Constitution of the State of Utah ("No person shall be deprived of life, liberty or property, without due process of law.").

149.     The actions of Defendants described herein violated Zane's rights secured by Article I, Section 14, which states in relevant part:  "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated."

150.     The actions of Defendants described herein violated Plaintiffs' rights secured by Article I, Section 25, which states in relevant part:  "This enumeration of rights shall not be construed to impair or deny others retained by the people."

151.    Based upon the text and historical context, case law, and other considerations, the protections and rights afforded by Article I, §§ 1, 7, 14, and 25 are broader than the interests and rights afforded by the United States Constitution.

152.    Defendants' actions described herein amount to flagrant violations of Zane's rights under the Utah Constitution.

153.    There is no other adequate state law remedy for these violations.

154.    Injunctive relief cannot redress Plaintiffs' injuries.

155.    Defendants' actions as alleged herein were the proximate cause of pain and suffering to Zane, of Zane's death, and of the damages sustained by Plaintiffs.

156.    In order to remedy Defendants' unconstitutional conduct, Plaintiffs have had to retain counsel.

## FOURTH CLAIM FOR RELIEF
*(Informational at the Present Time)*

*Intentional Infliction of Emotional Distress*
*Against Defendant **Davies***

157.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

158.    These allegations are informational at the present time.

159.    Under Utah law, Plaintiffs are required to provide notice of causes of action against a governmental entity, beginning with a notice of claim, which will occur, or has occurred, shortly.  The governmental entity thereafter has 60 days in which to respond.

It is anticipated that no response will be made or that this claim will be denied, after which Plaintiffs will seek to add the Fourth and Fifth Claims for Relief as official causes of action, and will do so by the amending process under the Federal Rules of Civil Procedure. Therefore, both the Fourth and Fifth Claims for Relief are for informational purposes only and do not require an answer at this time, but are provided now to assist the Defendants and the Court in knowing what is coming in the future.

160.   Defendant Davies' intentional and/or reckless actions as described above constituted outrageous conduct under the circumstances.

161.   Davies' actions offended generally accepted standards of decency and morality, and were not consistent with the sworn oath of an officer of the law.

162.   Any reasonable person would have known that the intentional and/or reckless actions of Defendant Davies would result in severe emotional distress to Zane and to Zane's parents and siblings.

163.   Zane's parents and siblings have in fact suffered such emotional distress.

## FIFTH CLAIM FOR RELIEF
*(Informational at the Present Time)*

*Willful Misconduct/Wrongful Death*
*Against Defendant **Davies***

**164.**    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth herein.

**165.**    Defendant Davies acted, or failed to act, through willful misconduct that resulted in the wrongful death of Zane.  Among other things, Davies acted with the intent to cause an unconsented harmful and/or offensive contact to Zane.

**166.**    Defendant Davies did in fact commit such unconsented harmful and/or offensive contact against Zane that resulted in Zane's death and other harm to Plaintiffs.

## COMPLIANCE WITH GOVERNMENTAL IMMUNITY ACT OF UTAH

**167.**    Plaintiffs' constitutional claims are not subject to the provisions of the Utah Governmental Immunity Act.

**168.**    With respect to the Fourth and Fifth Claims for Relief, Plaintiffs will, as a precaution, shortly comply with applicable provisions of the Governmental Immunity Act of Utah, Utah Code Ann. § 63G-7-101, et seq., and will provide a Notice of Claim to Defendants.

## JURY DEMAND

Plaintiffs request a jury trial on all issues in this case.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1. For damages for wrongful death due to the unconstitutional conduct and for shooting Zane in the back as he was running away. This includes all economic damages as well all appropriate pain and suffering damages, and damages available under federal common law, as per *Berry v. City of Muskogee, supra.*

2. A declaration and judgment that the actions of Defendant Davies, as well as Defendant Cottonwood Heights' policies and customs regarding the use of lethal force, are and were unconstitutional;

3. Economic and noneconomic damages as provided under applicable law and deemed appropriate by a jury;

4. Attorney fees and litigation expenses pursuant to 42 U.S.C. § 1988, Utah law, and equity, to the full extent provided under applicable law;

5. Punitive damages against Defendant Davies, as provided under applicable law and to the extent deemed appropriate by a jury;

6. Costs as provided under applicable law;

7. Pre-judgment and post-judgment interest as provided under applicable law.

8. All other equitable relief deemed just and appropriate by the Court, including an order (a) requiring CHPD officers to be equipped with and utilize body cameras

and vehicle dash cameras while on patrol, (b) requiring CH's law enforcement officers to carry non-lethal as well as lethal weapons while on patrol, but to prioritize use of non-lethal weapons, (c) to provide and require annual training regarding the use of non-lethal as well as lethal force, and (d) to implement regular training, at least quarterly, on the management of situations such as occurred with Zane, so as to meet federal and state constitutional requirements.

DATED this 16th day of May, 2019.

**SYKES MCALLISTER LAW OFFICES, PLLC**

 */s/ Robert B. Sykes*
ROBERT B. SYKES
C. PETER SORENSEN
*Attorneys for Plaintiffs*

190516.James Complaint.wpd