HEATHER S. WHITE (7674)
DANI N. CEPERNICH (14051)
SNOW CHRISTENSEN & MARTINEAU
Attorneys for Defendants
10 Exchange Place, 11th Floor
Post Office Box 45000
Salt Lake City, Utah  84145
Telephone:  (801) 521-9000
Fax:  (801) 363-0400
hsw@scmlaw.com
dnc@scmlaw.com
*Attorneys for Defendants*

---

### UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

| | |
|---|---|
| AARON JAMES and TIFFANY JAMES, heirs and proposed personal representatives of the Estate of Zane James,<br><br>　　　　　Plaintiffs,<br><br>　vs.<br><br>CASEY DAVIES, an officer of the Cottonwood Heights Police Department; and COTTONWOOD HEIGHTS, UTAH,<br><br>　　　　　Defendants. | **MOTION TO DISMISS**<br><br><br>Case No.  2:19CV341 HCN DBP<br><br>Judge Howard C. Nielson, Jr.<br><br>**ORAL ARGUMENT REQUESTED** |

### **RELIEF REQUESTED**

This case arises out of the shooting of Plaintiffs' son, Zane James (James), on May 29,

2018, as he fled from police after committing an armed robbery.  The Salt Lake District

Attorney's Office investigated the shooting, but declined to file criminal charges against

Cottonwood Heights Police Officer Casey Davies on the basis he could likely show he feared he

was in imminent danger of serious bodily injury or death at the time of the shooting.  (Compl. [Dkt. No.2] ¶¶ 97-103.)

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Cottonwood Heights and Officer Davies (collectively, the Cottonwood Heights Defendants) move to dismiss Plaintiffs' complaint.  Plaintiffs have asserted five claims against the Cottonwood Heights Defendants, under both the United States and Utah Constitutions and Utah common law, based on the alleged excessive force and wrongful shooting of James.  These claims should be dismissed for several reasons.

First, Plaintiffs cannot state a violation of James's constitutional rights under the Fourth Amendment because Officer Davies's use of deadly force was reasonable under the circumstances.  This entitles  Officer Davies to qualified immunity under the first prong of that analysis.  It additionally entitles Cottonwood Heights to dismissal of Plaintiffs' claims against it because a municipality may not be held liable where there was no underlying constitutional violation by any of its officers.

Second, even if Plaintiffs have alleged a cognizable violation of James's rights under the Fourth Amendment, Officer Davies is entitled to qualified immunity under the second prong of that analysis, as it was not clearly established at the time of the incident that the use of deadly force under the circumstances presented was unreasonable.  Cottonwood Heights is likewise entitled to dismissal of Plaintiffs' claims under 42 U.S.C. § 1983 as Plaintiffs have not pled any basis for municipal liability.

Third, for much of the same reasons as with his § 1983 claims, Plaintiffs have failed to state a claim under the Utah Constitution.

Finally, the Court lacks jurisdiction over Plaintiffs' "informational" fourth and fifth causes of action under Utah law for intentional infliction of emotional distress and wrongful death because Plaintiffs have not yet complied with the notice of claim requirement. Even if they had, dismissal would be appropriate because the Cottonwood Heights Defendants are immune from such claims.

## BACKGROUND[1]

At 6:00 a.m. on May 29, 2018, James[2] robbed a store located in Sandy, Utah using an airsoft gun loaded with BBs. (*Id.* ¶ 20.) The following is a photograph[3] of that gun:



After the robbery, James attempted to escape on a motorbike toward his home in Cottonwood Heights. (*Id.* ¶ 22.) Around 6:10 a.m., a dispatch went out to the Cottonwood Heights Police

---

[1] Given that at the motion to dismiss stage, the Court must accept all facts alleged in the complaint as true, *see, e.g. Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016), the following are taken from Plaintiffs' complaint. The Cottonwood Heights Defendants do not admit the truth of any of Plaintiffs' allegations and reserve the right to challenge the same at later stages in these proceedings.

[2] James's identity was not known at the time and was learned only after the shooting. However, for convenience, he is identified by his name in events before the shooting.

[3] Inclusion of this picture does not convert this Motion into a motion for summary judgment. The picture is not offered as evidence, but only to inform the Court as to the appearance of the airsoft gun used by James as mentioned in Plaintiffs' complaint. (Compl. [Dkt. No. 2] ¶¶ 20, 29.)

Department (CHPD) announcing the robbery and that an officer had activated his emergency lights and was in pursuit of James. (*Id.* ¶¶ 52-53.) Officer Davies, who was off-duty at the time, also heard this dispatch. (*Id.*) Shortly thereafter, a Sandy police officer informed the CHPD that James matched the description of an armed robbery suspect from the night before. (*Id.* ¶ 53.) Despite being off-duty at the time, Officer Davies responded to the dispatch and joined the pursuit. (*Id.* ¶ 55.)

James, in his flight from the police, unsuccessfully attempted to execute a turn and crashed his motorbike on a narrow neighborhood street. (*Id.* ¶¶ 23-24.) The crash seriously injured James's knees, in addition to causing other injuries. (*Id.* ¶ 27.) Officer Davies, who had been pursuing James, witnessed the crash. (*Id.* ¶ 25.) James got up from the crash and attempted to continue running from the police, limping due to his injuries. (*Id.* ¶ 28.) The airsoft gun that James had used in his robbery was tucked into his clothing. (*Id.* ¶ 29.)

After witnessing the crash, Officer Davies stopped his vehicle and began to give chase on foot before quickly returning to his car. (*Id.* ¶ 35.) Officers Davies and Betenson both claimed that James's hands appeared to reach for something toward the front of his body while he was running (*see id.* ¶¶ 80, 94), but Plaintiffs contend these claims are either false or exaggerated. (*Id.* ¶¶ 81-82, 95.) In either case, while standing at his vehicle and without giving a verbal warning, Officer Davies fired four shots at James from about 25-30 feet away. (*Id.* ¶¶ 35, 63-66.) Two shots struck James, one in the shoulder and the other in his thigh. (*Id.* ¶ 96.) The shot that entered through James's shoulder entered the upper back and lodged in James's spinal cord, resulting in paralysis. (*Id.*)

Immediately after the shooting, multiple officers appear to have moved to take physical custody of James.  (*Id.* ¶¶ 44-45.)  At some point, James attempted to lift his head and an officer forced his head back down.  (*Id.* ¶ 44.)  Officers also flipped James from his stomach onto his back.  (*Id.* ¶ 45.)  James was transported to a hospital, where he died from his injuries three days later.  (*Id.* ¶¶ 114-16.)

As a result of the foregoing facts, Plaintiffs allege that Officer Davies violated James's constitutional right to be free from excessive force.  They have also stated claims against Cottonwood Heights due to its hiring of Officer Davies and an alleged culture and/or policy that encouraged the violation of constitutional rights.  (*Id.* ¶¶ 124-45.)

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to state a claim to relief that is plausible on its face." *Dorf v. Bjorklund*, 531 F. App'x 836, 837 (10th Cir. 2013) (internal quotation marks omitted).  "Mere labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Id.* (internal quotation marks and brackets omitted).  This requirement has "greater bite" in the context of claims asserted under 42 U.S.C. § 1983, "reflecting the special interest in resolving the affirmative defense of qualified immunity at the earliest possible stage of litigation." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008) (internal quotation marks omitted).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Glover v. Mabrey*, 384 F. App'x 763, 767 (10th Cir. 2010) (unpublished) (internal quotation marks omitted).  Further:

> Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation.  The privilege is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.  Accordingly, qualified immunity questions should be resolved at the earliest possible stage in litigation.  *Even such pretrial matters as discovery are to be avoided if possible, as inquiries of this kind can be peculiarly disruptive of effective government*.

*Martin v. Cty. of Santa Fe*, 626 F. App'x 736, 740 (10th Cir. 2015) (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004)) (emphasis in original).  "The plaintiff must plead that each Government-official defendant, through his own individual actions, has violated the Constitution." *Glover*, 384 F. App'x at 767 (internal quotation marks omitted).

In the context of a motion to dismiss, the plaintiff must "(1) allege sufficient facts showing that the defendant's actions violated a constitutional or statutory law, and (2) show that the relevant law was clearly established when the alleged violation occurred" to survive the defense of qualified immunity,  *Hammett v. Okla. Dept. of Mental Health & Substance Abuse Servs.*, No. 97-6374, 1998 WL 427079, at *2 (10th Cir. July 21, 1998) (unpublished) (internal quotation marks omitted).  To satisfy the clearly-established law standard, the plaintiff must "identify[] an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015).  As the United States Supreme Court recently reiterated, "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted).  Rather, "the clearly established law must be particularized to the facts of the case." *Id.* (internal

quotation marks omitted).  Otherwise, plaintiffs would be able to convert the rule of qualified

immunity into a rule of virtually unqualified liability simply by alleging a violation of extremely

abstract rights."  *Id.* (internal quotation marks and brackets omitted).

<b><u>ARGUMENT</u></b>

## I.     PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983 SHOULD BE DISMISSED.

Plaintiffs have asserted a claim against Officer Davies (first cause of action) and

Cottonwood Heights (second cause of action) under § 1983, alleging a violation of James's right

to be free from excessive force under the Fourth Amendment.  However, the facts asserted by

Plaintiffs, while tragic, fail to allege that Officer Davies violated constitutional law.  Rather, a

review of the law demonstrates that Officer Davies's use of deadly force was reasonable and

justified under the circumstances, despite the terrible outcome.  Therefore, no constitutional

violation occurred and Officer Davies is entitled to qualified immunity under the first prong of

that analysis, which further means Plaintiffs cannot state a claim against Cottonwood Heights.

Even if Plaintiffs' complaint could be read as stating a violation of James's constitutional

rights, Officer Davies is nevertheless entitled to qualified immunity under the second prong of

that analysis.  And, Cottonwood Heights is entitled to dismissal because Plaintiffs have failed to

plead a basis for municipal liability.

### a.  Plaintiffs cannot state a claim for violation of James's Fourth Amendment rights.

"A Fourth Amendment claim of excessive force is analyzed under the objective

reasonableness standard that governs other Fourth Amendment inquiries."  *Cordova v. Aragon*,

569 F.3d 1183, 1188 (10th Cir. 2009).  The inquiry into reasonableness must be from the

perspective of a reasonable officer who is "often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving —about the amount of force that is necessary in a particular situation." *Id.*  There is no strict legal test for determining when an officer's use of force is excessive.  *Id.*

In *Tennessee v. Garner*, 471 U.S. 1 (1985)*,* the Supreme Court provided the framework by which courts are to determine whether the use of deadly force used against a fleeing suspect is reasonable.[4]  There, the Court held:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11-12.  Therefore, a court must determine (1) if the shooting officer had probable cause to believe the suspect he was pursuing posed a threat of serious physical harm to himself or others; (2) if deadly force was necessary to prevent the suspect's escape; and (3) whether the officer gave a warning, if possible, to the suspect before shooting.  *Ryder v. City of Topeka*, 814 F.2d 1412, 1418 (10th Cir. 1987).  However, these ought to be viewed as non-exclusive factors rather than a strict test to determine whether a shooting was excessive.  *See Scott v. Harris*, 550 U.S.

---

[4] Throughout their claims for relief, Plaintiffs allege that the harms to James arise from Officer Davies's use of deadly force and the alleged wrongful polices of Cottonwood Heights. (Compl. [Dkt. No. 2] ¶¶ 124-68.)  However, the complaint earlier makes general allegations of "rough" treatment after James was shot.  (*Id.* ¶¶ 44-46.)  To the extent that Plaintiffs wish to include this conduct in their allegations of excessive force, the alleged treatment of James post-shooting does not rise to the level of excessive force because officers are entitled to use a reasonable degree of force when seizing an armed suspect to ensure their own safety.  *See Atencio v. City of Albuquerque*, No. 15CV343, 2015 WL 13651179, *2 (D.N.M. 2015) (granting qualified immunity to officers who used a flash grenade, released a police dog, and handcuffed a suspect after the suspect had been shot through the chest and lay motionless) (unpublished).

372, 382 (2007) ("*Garner* did not establish a magical on/off switch that triggers rigid

preconditions whenever an officer's actions constitute 'deadly force.'").

       i.    *Officer Davies reasonably feared that James posed a threat of serious harm to himself or others.*

There are "two basic situations that would justify an officer's belief that a fleeing suspect

poses a threat of serious physical harm  (1) where the suspect has placed the officer in a

dangerous, life threatening situation; or (2) where the suspect is fleeing from the commission of

an inherently violent crime." *Ryder*, 814 F.2d at 1419.

Under the second situation, regardless of the level of threat faced by the officer, use of

deadly force is reasonable "where the suspect is fleeing from the commission of an inherently

violent crime." *Ryder*, 814 F.2d at 1419; *see also Garner*, 471 U.S. at 11-12 ("[I]f the suspect

threatens the officer with a weapon *or* there is probable cause to believe that he has committed a

crime involving the infliction or threatened infliction of serious physical harm, deadly force may

be used…") (emphasis added); *Vera v. Rodriguez*, No. CV 16-491, 2018 WL 327236, *7

(D.N.M. 2018) (unpublished) (finding an officer's use of deadly force was reasonable even if not

based upon any specific threat to the officer because of the violent nature of the suspect's crimes

immediately before the shooting and the possible threat posed to others if the suspect attempted

to flee).

Here, Plaintiffs concede that James was fleeing from an armed robbery carried out

immediately before the shooting.  (Compl. [Dkt. No. 2] ¶¶ 10, 20-35.)  In Utah, a person

commits robbery if:

    (a) the  person  unlawfully  and  intentionally  takes  or  attempts  to  take  personal property in the possession of another from his person, or immediate presence,

> against his will, by means of force or fear, and with a purpose or intent to deprive the person permanently or temporarily of the personal property; or
>
> (b) the person intentionally or knowingly uses force or fear of immediate force against another in the course of committing a theft or wrongful appropriation.

Utah Code § 76-6-301.  It is indisputable that a crime with a necessary element of using "force or fear" against another qualifies as an inherently violent crime.  *See Ryder*, 814 F.2d at 1420 ("[T]heft lacks the threat of bodily harm or force that makes robbery such an inherently dangerous and violent crime.").

At the time of the shooting, Officer Davies knew about James's armed robbery and thus had probable cause to believe that James posed a serious risk of harm to others based on the inherently violent nature of James's crime.  *See Garner*, 471 U.S. at 11-12.  This alone is sufficient for the first factor to support Officer Davies's use of force.  Officer Davies, however, additionally had probable cause to believe that James had placed him in a dangerous or life-threatening situation.

In assessing the degree of threat facing officers, the Tenth Circuit "consider[s] a number of non-exclusive factors.  These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Although Officer Davies did not give a verbal warning to James or order him to drop his weapon, James had already manifested non-compliance with police commands because he knew he was being pursued by the police but continued in his escape attempt.  *See Ridgeway v. City of Woolwich Tp. Police Dept.*, 924 F.Supp. 653, 659 (D.N.J. 1996) (finding where a fleeing suspect

knows police are pursuing him and want him to stop that the suspect has notice "continued flight might bring about the use of deadly force by the police to capture him").  Further, issuing a verbal warning and waiting to see if James would comply may not have been appropriate under the circumstances.  From Officer Davies's perspective, James was an armed suspect escaping onto a narrow neighborhood street surrounded by homes.  Officer Davies could have reasonably feared that any delay caused by issuing a warning would allow James an opportunity to escape into or near those homes, placing civilian lives at risk.  *See id.* ("In the split-second reality of a deadly police chase, that warning . . . might permit the suspect to turn and fire a weapon or otherwise facilitate his escape, putting at risk innocent police and civilians who he encounters in the path of his flight.").

Regarding whether James made any hostile motions toward Officer Davies, both Officer Davies and another officer reported having seen James reaching toward something tucked in the front of his waistband.  (Compl. [Dkt. No. 2] ¶¶ 79-95.)  Plaintiffs, however, contend that this did not happen because "[James] knew he did not have a real gun, so why would he reach for a toy gun, knowing armed officers were close behind?"  (*Id.* ¶ 81.)  In reality, there are multiple reasons why this could have occurred.  In any case, this factor is not dispositive regarding whether Officer Davies reasonably feared that James posed a serious risk of bodily harm to himself or others.

At the time of the shooting, Officer Davies was about 25-30 feet away from James as James fled onto a narrow neighborhood street.  (*Id.* ¶¶ 24, 66.)  Given the distance between James and himself, Officer Davies could have had reasonable fear that deadly force was necessary to avoid a risk of serious harm to himself or others.  If Officer Davies attempted to

physically apprehend James without the use of deadly force, the distance between them would have given James ample time to pull out his weapon and aim it at Officer Davies.  Alternatively, given that James was fleeing onto a narrow neighborhood street, Officer Davies could reasonably fear that he would have no way of stopping James if James decided to escape into a home and commit a violent felony against another person.  *See Atencio v. City of Albuquerque*, No. 15CV343, 2015 WL 13651179, *3 (D.N.M. 2015) (unpublished) (crediting an officer's concern that "he had no 'way of stopping' [the suspect] if [the suspect] tried to . . . commit 'some felonious assault'" when the officer pursued suspect from behind and suspect was running toward a neighborhood 100-150 yards away).

The manifest intentions of James regarding any threat toward Officer Davies and others are admittedly unclear, except that Officer Davies believed James to be armed and James had intentionally threatened serious harm to another during a robbery that occurred mere minutes before the shooting.  *See Jones v. Gross*, 675 Fed. Appx. 266 (4th Cir. 2017) (finding qualified immunity for off-duty officer who shot a suspect fleeing from an armed robbery carried out with a BB gun used to trick others into thinking it was a real gun).

When viewed under the totality of the circumstances—and particularly in light of the admitted fact officers knew James had committed an inherently violent crime—at the time of the shooting, Officer Davies could have had a reasonable belief that James posed a significant threat of death or bodily injury to himself or others.

> ii.     *Deadly force was necessary to prevent James's escape.*

Plaintiffs contend that Officer Davies's use of deadly force was unlawful because it was not necessary to prevent James's escape.  (Compl. [Dkt. No. 2] ¶¶ 67-76, 131.)  But it is well

established that the reasonableness standard of the Fourth Amendment "does not require that officers use alternative less intrusive means." *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001).  Furthermore, officers cannot be required to use alternative means to deadly force where those alternative means "present dangers of their own" to the officers or others. *Mullenix v. Luna*, 136 S. Ct. 305, 310 (2015) (finding no duty for officer to wait and see if spike strips would successfully stop suspect fleeing in vehicle before officer shot the suspect).

As discussed above, the fact that James was escaping into a narrow neighborhood street surrounded by residential homes plays an important role in determining whether Officer Davies acted reasonably.  Officer Davies could have reasonably feared that any delay caused by using an alternative means to apprehend James would result in a delay that would allow James to escape into a home and commit a violent felony against another person.  *See Atencio*, 2015 WL 13651179 at *3 (crediting an officer's concern that "he had no 'way of stopping' [the suspect] if [the suspect] tried to . . . commit 'some felonious assault' when the officer pursued suspect from behind and suspect was running toward a neighborhood 100-150 yards away"); *see also Forrett v. Richardson*, 112 F.3d 416, 419-20 (9th Cir. 1997) (finding that officers acted reasonably when they shot suspect fleeing a violent crime into a residential area); *Carter v. Shires*, 56 F.3d 60, *2 (4th Cir. 1995) (unpublished) ("With homes and elementary school children in the vicinity, the flight of a presumably armed robber created an explosive situation).

Furthermore, using an alternative means of apprehension would have also resulted in significantly increased risk for Officer Davies.  Although James was injured from his motorbike crash, there is no allegation that his injuries were so severe that he would be unable to pull a gun from his waistband, aim it at a pursuing officer, and pull the trigger.  *Contrast with Fancher v.*

*Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (denying qualified immunity where officer

shot suspect, saw the suspect slump and become completely immobile, and then fired six

additional shots seven seconds later).  James was 25-30 feet away from Officer Davies at the

time of the shooting, and that level of distance would have provided plenty of time for James to

draw and shoot his weapon if Officer Davies attempted to close the gap.  *See Ridgeway*, 924

F.Supp. at 659 (finding that even a small delay caused by giving a warning could give a suspect

enough time to draw his weapon on a pursuing officer).  Although Officer Davies did have a

Taser available when he shot James (Compl. [Dkt. No. 2] ¶ 67), Tasers often do not work to stop

a fleeing suspect.  *See, e.g. Wilkerson v. City of Akron, Ohio*, 906 F.3d 477, 480 (6th Cir. 2018)

(police Taser fails to stop fleeing suspect); *Foster v. City of Indio*, 908 F.3d 1204, 1208 (9th Cir.

2018) (police Taser fails to stop fleeing suspect because only one dart hit suspect while other

dragged on ground).  It is not unreasonable for an officer in an intense and constantly evolving

situation to determine that deadly force is necessary when the alternative is chasing down an

armed suspect while limiting himself to a non-deadly and sometimes unreliable means of force.

> iii.   *Under the circumstances, it was reasonable for Officer Davies not to verbally*
> *warn James before using deadly force.*

As explained above, Officer Davies's failure to give a verbal warning to James before

using deadly force was reasonable under the specific circumstances of this case.  James had

already proven noncompliant with police commands because he knew he was being pursued by

the police but continued in his escape attempt.  *See Ridgeway*, 924 F.Supp. at 659 (finding where

a fleeing suspect knows police are pursuing him and want him to stop that the suspect may have

notice "continued flight might bring about the use of deadly force by the police to capture him").

Further, issuing a verbal warning and waiting to see if James would comply may not have been

appropriate under the circumstances.  From Davies's perspective, James was an armed suspect escaping onto a narrow neighborhood street surrounded by homes.  Davies could have reasonably feared that any delay caused by issuing a warning would allow James an opportunity to escape into or near those homes, placing civilian lives at risk.  *See id.* ("In the split-second reality of a deadly police chase, that warning . . . might permit the suspect to turn and fire a weapon or otherwise facilitate his escape, putting at risk innocent police and civilians who he encounters in the path of his flight.").

For the foregoing reasons, Plaintiffs cannot establish a violation of James's constitutional rights.  As a result, Officer Davies is entitled to qualified immunity under the first prong of that analysis.  Cottonwood Heights is likewise entitled to dismissal of Plaintiffs' § 1983 claims.  *See Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." (citing *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (additional citations omitted)).

**b. Even if Plaintiffs have alleged a violation of James's constitutional rights, their § 1983 claims should nevertheless be dismissed.**

*i. Officer Davies is entitled to qualified immunity under the second prong of the qualified immunity analysis because there was no clearly established law warning him his conduct was unconstitutional.*

Even if this Court accepts that Officer Davies's actions as alleged by Plaintiffs may be unreasonable and satisfy the threshold for excessive force, Officer Davies is still entitled to qualified immunity because there was no clearly established law at the time that would have alerted him his actions were "plainly incompetent or . . . knowingly violate[d] the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986)

The Supreme Court recently cautioned courts against relying on broad, general principles when determining whether a right is clearly established, specifically admonishing courts for turning *Garner*'s "general" test that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" into a strict rule.  *Mullenix*, 136 S. Ct. at 309 (citing *Brosseau v. Haugen, 543 U.S. 194, 199 (2004)*).  Instead, a court should conduct an inquiry into the specific facts of each case to determine whether the conduct was reasonable and, if not, "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the situation she confronted."  *Id.* (quotation marks and brackets omitted).

Here, the proper inquiry is whether there is clearly established law from either the Supreme Court or the Tenth Circuit that prohibited Officer Davies's conduct:  shooting a suspect he reasonably believed to be armed with a deadly weapon as that suspect fled from an inherently violent crime into a residential neighborhood.  As discussed above, what relevant law there is in the Tenth Circuit supports the position that Officer Davies's conduct was reasonable.

Indeed, cases from other jurisdictions analyzing factual circumstances similar to those presented here have held that the officers were entitled to qualified immunity on the grounds that their use of deadly force was reasonable and did not violate the Fourth Amendment.  *See Jones v. Gross*, 675 Fed. Appx. 266 (4th Cir. 2017) (granting qualified immunity for off-duty officer who acted reasonably when he shot a fleeing suspect who had just participated in an armed robbery); *Clark v. McGuire*, 693 F. App'x. 649 (9th Cir. 2017) (unpublished) (granting qualified immunity to officer who shot suspect fleeing a violent crime even though police dogs were available for use as a reasonable, non-deadly alternative); *Forrett*, 112 F.3d 416 (9th Cir. 1997) (finding

qualified immunity for officer who acted reasonably by shooting violent criminal suspect fleeing into a residential neighborhood).

Because the law was not clearly established at the time of the events in question that Officer Davies's use of deadly force was plainly incompetent or knowingly violated the law, Officer Davies is entitled to qualified immunity under the second prong of that analysis.

      ii.  *Plaintiffs fail to plead any basis for municipal liability with respect to Cottonwood Heights.*

The United States Supreme Court decided long ago that municipalities may not be held liable for the allegedly unconstitutional actions of their employees based on the theory of respondeat superior. *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). They can be held liable in a § 1983 suit only where their policies are the moving force behind the alleged constitutional violation. *Id.* at 694. Therefore, to establish liability against Cottonwood Heights, Plaintiffs must plead and prove (1) the existence of an unconstitutional Cottonwood Heights policy or custom; and (2) a direct causal link between the unconstitutional policy or custom and the alleged injuries. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

"To survive a motion to dismiss, [a municipal liability] claim must allege sufficient facts to show that a specific policy or custom was the moving force behind the alleged violation." *Dalcour v. City of Lakewood*, 492 F. App'x 924, 930 (10th Cir. 2012) (unpublished) (evaluating an official capacity claim, which requires the same showing). "The plaintiff cannot simply allege there is a policy [or custom] in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy [or custom] exists." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015).

Plaintiffs have asserted a § 1983 claim against Cottonwood Heights (second cause of action).  They have failed, however, to specifically identify a written or unwritten formal policy of Cottonwood Heights that is both unconstitutional and the moving force behind the alleged constitutional violations.  (*See* Compl. [Dkt. No. 2] ¶¶ 140-41 (referring only generally to "an established policy, practice, or custom" and  "a CHPD policy, practice, and/or custom").)

Plaintiffs likewise have failed to allege any *facts* showing "continuing, persistent and widespread" unconstitutional acts by Cottonwood Heights employees, as required to establish a "practice" or "custom."  *See Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008).  With respect to the allegedly unconstitutional practice of Cottonwood Heights, Plaintiffs have merely alleged,

> 140.   The actions of Defendant Davies toward Zane James were pursuant to, and consistent with, an established policy, practice, or custom of Defendant CH.

> 141.   The actions of Davies were pursuant to a CHPD policy, practice, and/or custom that consists of arming police officers with deadly weapons and condoning their use without requiring the consideration of less-lethal alternatives . . . .

(Compl. [Dkt. No. 2] ¶¶ 140-41.)

There are no additional facts supporting these allegations.  Importantly, there is no identification of prior instances of unconstitutional conduct, let alone any indication that any such "prior grievances were the same or substantially similar to the plaintiffs' constitutional injury."  *Watson v. City of Kansas City*, No. CIV.A.99-2106-CM, 2002 WL 922155, at *5 (D. Kan. Apr. 12, 2002), *aff'd sub nom. Watson v. Unified Gov't of Wyandotte Cty.*, 70 F. App'x 493 (10th Cir. 2003); *see also* Carney v. City & Cnty. of Denver, 534 F.3d 1269, 1274 (10th Cir. 2008) ("In attempting to prove the existence of . . . 'continuing, persistent and widespread'

custom, plaintiffs most commonly offer evidence suggesting that *similarly situated individuals were mistreated by the municipality in a similar way*." (emphasis added)).

This District (Judge Waddoups) recently held in the context of a supervisory liability claim under § 1983 that nearly identical allegations to Plaintiffs' are insufficient to state such a claim based on policy, practice, or custom, explaining,

> Plaintiffs' complaint is merely conclusory: defendants allegedly had a "practice, custom and policy that led and allowed . . . officers to deprive Plaintiffs of their constitutional rights;" they "developed and maintained policies and customs using deliberate indifference to the constitutional rights of persons;" and "it was the policy and/or custom" of the defendants "to inadequately supervise and train its police officers." . . . As a result, plaintiffs' allegations about practices, customs, and policies are conclusory, not plausible, and therefore must be dismissed, even if they had successfully pled a constitutional violation by the supervisors' subordinates.

*Yocum v. Utah*, No. 1:16-CV-00098, 2017 WL 448586, at *6 (D. Utah Feb. 2, 2017) (unpublished).

Finally, Plaintiffs have likewise failed to allege sufficient facts supporting a § 1983 claim against Cottonwood Heights based on an alleged failure to train.  The facts regarding Cottonwood Heights' training are limited to the following:

> 141.   The actions of Davies were pursuant to a CHPD policy, practice, and/or custom that consists of arming police officers with deadly weapons and condoning their use without requiring the consideration of less-lethal alternatives, and *without providing proper training and/or supervision regarding their safe, reasonable, and appropriate use*.

> 142.   Defendants CHPD and CH were deliberately indifferent toward the proper training, arming, and supervision of its officers and agents.

> 143.   Among other actions showing deliberate indifference, CHPD is believed to have hired Davies despite a prior known history of using excessive force.

(Compl. [Dkt. No. 2] ¶¶ 141-44 (emphasis added).)  Notably, some of these allegations are

blatantly contradicted by other facts alleged in the complaint.  For example, Plaintiffs allege that

Cottonwood Heights did not properly train regarding use of deadly force or the use of less-lethal

alternatives, but also allege that Officer Davies himself is an instructor in "tasers [sic], firearms,"

and "nonlethal tactics."  (*Id.*  ¶¶ 51, 141.)

 "To state a claim for failure to train officers . . . a plaintiff must show 'the need for more

or different training is so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers of the [county or city] can reasonably said to have

been deliberately indifferent to the need.'" *Yocum*, 2017 WL 448586 at *6 (quoting *City of

Canton v. Harris*, 489 U.S. 378, 390 (1989)).  "[T]he Tenth Circuit also requires the plaintiff to

show more than negligent failure to act, but that defendants were 'on notice of the need for more

or different training." *Id.* (quoting *J.V. ex rel. C.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289,

1298 (10th Cir. 2016)).

 Again, this district recently held that nearly identical facts to those alleged by Plaintiffs

are insufficient to establish a supervisory liability claim under § 1983 based on a failure to train

theory.  In *Yocum*, the court explained,

> Plaintiffs' failure to train allegations are conclusory restatements of the elements
> devoid of factual allegations.  For example, they allege, in count one, that Summit
> County and Syracuse City "failed to properly train officers . . . in the proper basis
> for detaining residents and children during the execution of a search warrant," and
> in count two, that plaintiffs failed to properly train officers "in the proper execution
> of search warrant consistent with Constitutional safeguards and principles" and "in
> the proper conduct of interviews and requests for consent."  In count three, plaintiffs
> claim that defendants "knowingly, recklessly, and with deliberate indifference and
> callous disregard . . . failed to instruct, supervise, control and/or discipline on a
> continuing basis" concerning duties to refrain from a list of behaviors that appear
> to relate solely to Mr. Yocum rather than to the named plaintiffs.  Count three also
> alleges that defendants did not "provide appropriate in-service or retraining" of

officers.  These are alleged to be part of an "institutional culture" that "supports and encourages" constitutional violations.

*Id.*  The Court concluded, "Even if plaintiffs had successfully alleged a constitutional violation by the supervisors' subordinates, because plaintiffs' failure to train and/or supervise allegations are conclusory and thus not plausible, the court finds them insufficient and dismisses them."  *Id.* Plaintiffs' failure to train theory fails for the same reason here.

Because Plaintiffs have failed to plead any facts supporting that Cottonwood Heights had an unconstitutional formal policy, informal policy or custom, or was deliberately indifferent to the need for more training, they cannot maintain their § 1983 claims against Cottonwood Heights.

## II.   PLAINTIFFS' CLAIMS UNDER THE UTAH CONSTITUTION FAIL UNDER THE *SPACKMAN* TEST.

"The Utah Constitution does not expressly provide damage remedies for constitutional violations." *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 57, 250 P.3d 465.  "And the Utah Code does not include a statute akin to 42 U.S.C. § 1983." *Id.*  "As a result, a plaintiff's remedy for [a] state constitutional violation rests in the common law." *Id.*  In *Spackman ex rel. Spackman v. Board of Education*, 2000 UT 87, 16 P.3d 533, the Utah Supreme Court "recognized that the common law gives Utah courts the authority to accord an appropriate remedy to one injured from the violation of a constitutional right." *Jensen*, 2011 UT 17, ¶ 57 (internal quotation marks omitted).

"In order to recover damages for the violation of a constitutional provision under *Spackman,* a plaintiff must clear two hurdles." *Id.* ¶ 58.  "First, the plaintiff must prove that the constitutional provision violated is 'self-executing.'" *Id.*  "Next, a plaintiff must establish the

following three elements:  (1) the plaintiff suffered a 'flagrant' violation of his or her constitutional rights; (2) existing remedies do not redress his or her injuries; and (3) equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."  *Id.* (internal quotation marks omitted).

The Utah Supreme Court recently held that where a plaintiff has asserted a claim under the Utah constitution against a municipality, such that it is "seeking to prove that a municipality committed a flagrant violation," the plaintiff "must show an action pursuant to official municipal policy of some nature caused a constitutional tort." *Kuchcinski v. Box Elder Cnty.*, 2019 UT 21, ¶ 32, --- P.3d ----.  "[I]n order for an action pursuant to an official municipal policy to constitute a flagrant violation, the plaintiff must show (1) the existence of a municipal policy or custom, (2) that this policy or custom evidences a 'deliberate indifference to the plaintiff's constitutional rights, and (3) that this policy or custom was closely related to the ultimate injury." *Id.*

Here, Plaintiffs have failed to allege a flagrant violation of James's constitutional rights and have not pled the requisite "action pursuant to official municipal policy" so as to state a claim against Cottonwood Heights.

"The test measuring the flagrance of a state constitutional violation is the same test which determines qualified immunity under § 1983." *Cardall v. Thompson*, 845 F. Supp. 2d 1182, 1197 (D. Utah 2012).  That is, the "flagrant violation" element "is not satisfied unless the conduct violates clearly established constitutional rights of which a reasonable person would have known." *Id.* (internal quotation marks omitted).  "A right is not clearly established unless its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotation marks omitted).

Plaintiffs have alleged violations of Art. I, §§ 1, 7, 14, and 25 of the Utah Constitution.[5]

(*See* Compl. [Dkt. No. 2] ¶¶ 146-56.)   The Cottonwood Heights Defendants are unaware of any

authority interpreting these provisions more broadly than the Fourth, Fifth, and Fourteenth

Amendments in the context at issue in this case.  *See State v. Jackson*, 937 P.2d 545, 549 (Utah

App. 1997) (declining to interpret Art. I, § 14 of the Utah Constitution more broadly than the

analogous Fourth Amendment because the Utah Supreme Court does so only when necessary to

"shield[] Utah citizens 'from the vagaries of inconsistent interpretations given to the fourth

amendment by the federal courts.'").  As a result, for much the same reasons discussed above in

connection with Plaintiffs' § 1983 claims, Plaintiffs have failed to state a flagrant violation of

James's rights under the Utah Constitution against either Officer Davies or Cottonwood Heights.

With respect to Cottonwood Heights, Plaintiffs' state constitutional claims fail for the

additional reason they have failed to allege an "action pursuant to official municipal policy."

The Utah Supreme Court's articulation of the three-part test for such an action in *Kuchcinski*

closely resembles the requirement for municipal liability under § 1983.  Thus, for much the same

reasons discussed above in connection with Plaintiffs' § 1983 claim against Cottonwood

Heights, they have failed to allege Cottonwood Heights committed a flagrant violation of

James's rights under the Utah Constitution.

---

[5] In Plaintiffs' Third Claim for Relief, the heading alleges a violation of Art. I § 6 of the Utah
Constitution.  (Compl. [Dkt. No. 2].)  However, Plaintiffs do not mention Art. I § 6 anywhere
else in the Third Claim for Relief, including when listing the other parts of the Utah Constitution
allegedly violated.  (*See id.* ¶ 151.)  Art. I § 6 of the Utah Constitution deals with the right to bear
arms, and does not appear to be at issue in the present case.  Therefore, the Cottonwood Heights
Defendants are treating its inclusion in the heading as erroneous.

### III.     THE COTTONWOOD HEIGHTS DEFENDANTS ARE IMMUNE FROM PLAINTIFFS' CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND WRONGFUL DEATH.

Plaintiffs have included in their complaint two "informational" claims under Utah law:

an intentional infliction of emotional distress claim (fourth cause of action) and a wrongful death

claim (fifth cause of action).  As Plaintiffs recognize, they have not yet complied with the notice

of claim requirement of Utah's Governmental Immunity Act, which (with respect to state law

claims) is a jurisdictional prerequisite to filing suit against a governmental entity or its

employees. *Anderson v. Eyre*, 2015 UT App 148, ¶ 4, 353 P.3d 170.  (*See* Compl. [Dkt. No. 2] ¶

168.)  Due to this failure, the Court lacks subject matter jurisdiction over Plaintiffs' fourth and

fifth causes of action, whether pled for "informational" purposes or otherwise.

Even if the Court had jurisdiction over those claims, they should nevertheless be

dismissed, as the Cottonwood Heights Defendants are entitled to immunity.  In Utah, "each

governmental entity and each employee of a governmental entity are immune from suit for any

injury that results from the exercise of a governmental function" unless immunity has been

waived.  Utah Code Ann. § 63G-7-201(1).  To determine whether immunity has been waived,

courts engage in a three-part inquiry.  *Pigs Gun Club, Inc. v. Sanpete Cnty.*, 2002 UT 17, ¶ 11,

42 P.3d 379.  First, courts ask whether the alleged conduct is a governmental activity or function.

*Id.*; Utah Code § 63G-7-201(1).  Second, courts consider whether the Legislature has waived

immunity for a particular activity.  *Pigs Gun Club*, 2002 UT 17, ¶ 11.  Finally, courts must ask

"whether the Act contains an exception to that waiver that would result in the retention of the

immunity[.]"  *Id.*  A straightforward application of this three-step analysis demonstrates that the Cottonwood Height Defendants retain immunity from liability for Plaintiffs' state law claims.

As to the first step, Utah Code Ann. § 63G-7-102(5) broadly defines "governmental function" as "each activity, undertaking, or operation of a governmental entity" or a "department, agency, employee, agent, or officer of a governmental entity" including "a governmental entity's failure to act."  Utah Code Ann. § 63G-7-102(5).  Even prior to the adoption of this broad definition of "governmental function," police protection and activities were long recognized as "governmental functions."  *See e.g.*, *Lehi City v. Meiling*, 48 P.2d 530, 545 (Utah 1935) (Hansen, C.J., concurring) (explaining "police and fire protection" have been recognized as "perhaps most fundamentally governmental"); *Peck v. State*, 2008 UT 39, ¶ 8, 191 P.3d 4 (explaining, "there is no dispute that UHP troopers were undertaking a governmental function" when they pulled over and arrested the plaintiff); *see also Swasey v. W. Valley City*, No. 2-13-CV-00768-DN, 2015 WL 476110, at *2 (D. Utah Feb. 5, 2015) (unpublished) (holding the actions of police officers and police chief fall within the definition of governmental function).

According to the allegations of the complaint, Officer Davies was responding to a dispatch of a suspect fleeing from a robbery.  (Compl. [Dkt. No.2] ¶¶ 20, 22, 52, 55.)  This conduct is the type of police activity with the "purpose of maintaining or safeguarding the public health and welfare" that has historically been considered a governmental function.  *See Gilmor v. Salt Lake City*, 89 P. 714, 715 (Utah 1907).  Because Officer Davies was engaged in a "governmental function," the Cottonwood Height Defendants are immune from suit unless immunity has been waived.  If it has, the question then is whether an exception to that waiver applies.

Second, a review of the GIA reveals it does not waive immunity for intentional torts, such as Plaintiffs' claims of intentional infliction of emotional distress and wrongful death based on Officer Davies's use of force, which must be predicated on intentional conduct.  *See P.J. ex rel. Jensen v. Utah*, No. 2:05-CV-00739, 2006 WL 1702585, at *2 (D. Utah June 16, 2006) (unpublished) ("The UGIA . . . waives immunity only for negligent, not for intentional, torts."). The limits of this waiver are fatal to Plaintiffs' fourth and fifth causes of action because both are for intentional torts.  *Id.* ("The limits of this waiver are fatal to the Jensens' two tort causes of action—intentional infliction of emotional distress and wrongful initiation of process—because both are intentional torts."); *Nguyen v. IHC Health Servs., Inc.*, 2010 UT App 85, ¶ 9 n.2, 232 P.3d 529 (explaining a requirement of an intentional infliction of emotional distress claim is that the "defendant intentionally engaged in some conduct toward the plaintiff"); *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 n.7 (10th Cir. 1995) ("Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983.").

For the purpose of this motion, the Cottonwood Heights Defendants concede that an action may ordinarily be brought for an injury caused by the negligence of a government employee committed within the scope of employment.  Utah Code Section 63G-7-301(2)(i). However, even if Plaintiffs' intentional infliction of emotional distress and wrongful death claims could be classified as stemming from Officer Davies's negligence, the GIA retains immunity for the Cottonwood Heights Defendants in the circumstances alleged here.

If an injury is "proximately caused by a negligent act . . . of an employee," but "arises out of, in connection with, or results from . . . assault, battery, [or] infliction of mental anguish," the

governmental entity retains immunity.  Utah Code Ann. § 63G-7-201(4)(b).   The death of

James—specifically included within the definition of "injury," Utah Code § 63G-7-102(6)—and

the emotional distress to his parents and siblings fall squarely within the exception for assault

and battery and infliction of mental anguish.  *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304,

1323 (10th Cir. 2009) (affirming summary judgment for the government because the injury arose

out of the battery that occurred when a man was shot and killed by officers and governmental

immunity applied); *Kontgis v. Salt Lake City Corp.*, No. 2:11CV1078 DAK, 2012 WL 4343866,

at *6 (D. Utah Sept. 21, 2012) ("Because Plaintiff's claim is based on injury arising out of, or in

connection with, or resulting from mental anguish, the City is immune from Plaintiff's claim for

negligent infliction of emotional distress.").

      Finally, the statute of limitations has expired for Plaintiffs' state law claims.  The GIA

requires a claimant to file a notice of claim setting forth a brief statement of the facts, the nature

of the claim asserted, the damages incurred, and the name of the negligent employee within one

year of the of when the claim arises.  Utah Code Ann. §§ 63G-7-401 & 402.  That time has now

passed and Plaintiffs have failed to do so, rendering any claims subject to the GIA time barred.

      Thus, to the extent the Court has jurisdiction over the James's "informational" state law

claims, those claims should be dismissed.

## <u>CONCLUSION</u>

      For the foregoing reasons, each of Plaintiffs' claims against Officer Davies and

Cottonwood Heights should be dismissed with prejudice.

## **REQUEST FOR ORAL ARGUMENT**

The Cottonwood Heights Defendants respectfully request oral argument. This Honorable Court would benefit from a face-to-face discussion of the complex legal and factual issues involved in this case.

DATED this 18th day of June, 2019.

SNOW CHRISTENSEN & MARTINEAU

*/s/ Heather S. White*
Heather S. White
Dani N. Cepernich
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of June, 2019, I electronically filed the foregoing

MOTION TO DISMISS with the Clerk of the Court using the CM/ECF System:

Robert B. Sykes
C. Peter Sorensen
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah 84111
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com

*Attorneys for Plaintiff*

*/s/ Annette Gamero*