



**Ralph Chamness**
*Chief Deputy*
*Civil Division*

**Lisa Ashman**
*Administrative*
*Operations*

# SIM GILL
## DISTRICT ATTORNEY

**Jeffrey William Hall**
*Chief Deputy*
*Justice Division*

**Blake Nakamura**
*Chief Deputy*
*Justice Division*

October 8, 2018

**BY HAND DELIVERY**

Chief Mike Brown
Salt Lake City Police Department
475 South 300 East
Salt Lake City, UT 84111

Chief Robby Russo
Cottonwood Heights City Police Department
2277 Bengal Blvd
Cottonwood Heights, UT 84121

|  |  |
|---|---|
| Re: | *Officer Davies' Use of Deadly Force* |
| Incident Location: | 6675 South 220 East, Cottonwood Heights, Utah |
| Incident Date: | May 29, 2018 |
| DA Case No.: | 2018-1284 |
| SLCPD Case No.: | 18-93824 |
| CHPD Case No.: | 18X003056 |

Dear Chief Brown and Chief Russo:

This letter addresses Cottonwood Heights Police Department ("CHPD") Officer Casey Davies' discharge of his firearm at Zane Anthony James on May 29, 2018. Mr. James died from the injuries he sustained as a result of Officer Davies' use of deadly force.

Officer Davies' actions resulting in Mr. James' death constituted the "use of a dangerous weapon," which is defined under Utah law as "a firearm or [] object that in the manner of its use or intended use is capable of causing death or serious bodily injury." Utah Code Ann. § 76-2-408(1)(a), (d). As a result, the law enforcement agency with jurisdiction over Officer Davies' conduct, CHPD, initiated what is known in Utah as the "Officer Involved Critical Incident" ("OICI") protocol. *See* Utah Code Ann. § 76-2-408(2)-(3). Accordingly: (i) a law enforcement agency other than the agency employing Officer Davies, here, Salt Lake City Police Department ("SLCPD"), was called in to investigate Officer Davies' weapon discharge; and (ii) SLCPD's independent investigative findings were presented to the Salt Lake County District Attorney's Office ("D. A.'s Office"), which has the constitutional and statutory mandate to screen such matters for possible criminal charges.[1]

---

[1] Utah Const. Art. VIII, section 16; Utah Code Ann. §§ 17-18a-203; *see also id.* at § 77-2-2(1) (defining "screening" as the "process used by a prosecuting attorney to terminate an investigative action, proceed with prosecution, move to dismiss a prosecution that has been commenced, or

Letter to Chief Brown and Chief Russo
October 8, 2018
Officer McLelland OICI
Page 2

## SUMMARY OF FACTS AND FINDINGS[2]

The following facts were developed from the OICI protocol investigation. Should additional or different facts subsequently come to light, the opinions and conclusions contained in this letter may likewise be different.

On May 29, 2018, Zane Anthony James led police on a chase through Cottonwood Heights City, Utah. Mr. James, a suspect in two recent armed robberies earlier the same day and at least one prior pursuit, crashed the motorcycle he fled on. As Mr. James continued to flee on foot, officers saw him reaching into and digging through his pockets and clothing. Officers ordered Mr. James to stop. Mr. James continued to conceal his hands and reach in his pockets. Officer Davies fired his weapon at Mr. James, who later died from gunshot wounds. Officers later found a black and silver semi-automatic style handgun in Mr. James' pocket which officers later discovered was a pellet gun.

Based on the facts presented, and as further detailed below, we do not intend to file criminal charges against Officer Davies. Assuming Officer Davies' trial testimony, if any, would be consistent with the physical and photographic evidence collected by protocol investigators, as well as the statements provided by witnesses, we believe Officer Davies would be legally entitled to the affirmative defense of "justification" under Utah State law. In other words, that Officer Davies would be able to claim successfully at trial that he believed the "use of deadly force [wa]s necessary to prevent death or serious bodily injury to the officer or another person." Utah Code Ann. § 76-2-404(1)(c).

## RELEVANT LEGAL STANDARDS

As relevant here,[3] law enforcement officers such as Officer Davies are legally "justified" in using deadly force when (*see* Utah Code Ann. § 76-2-404(1) (emphases added)):

---

cause a prosecution to be diverted"). "Commencement of prosecution" is further defined as "the filing of an information or an indictment." *Id.* at § 77-2-2(3).

[2] The factual background and the conclusions set forth in this letter are based on the evidence of which we are currently aware. If additional facts become available, these conclusions may change.

[3] Also relevant, but less so given Officer Davies' status as a law enforcement officer, is the articulation of "justification" in Utah State law that applies to individuals more generally, including civilians (*see* Utah Code § 76-2-402(1) (emphases added)):

(a) A <u>person is justified</u> in threatening or using force against another <u>when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person or a third person against another person's imminent use of unlawful force.</u>

    (b)    <u>effecting an arrest</u> or preventing an escape from custody following an arrest, <u>where the officer reasonably believes that deadly force is necessary to prevent the arrest from being defeated by escape</u>; and

        (i)    the <u>officer has probable cause</u> to believe that the <u>suspect has committed a felony offense involving the infliction or threatened infliction of death or serious bodily injury</u>; or

        (ii)    the <u>officer has probable cause</u> to believe the <u>suspect poses a threat of death or serious bodily injury to the officer or to others if apprehension is delayed</u>; or

    (c)    the <u>officer reasonably believes</u> that the <u>use of deadly force is necessary to prevent death or serious bodily injury to the officer or another person</u>.

Based on this statute, the legal defense of "justification," then, may be available where a law enforcement officer "reasonably believes that the use of deadly force is necessary to prevent death or serious bodily injury[4] to the officer or another person." Utah Code § 76-2-404(1)(c). That affirmative defense may also be available where a law enforcement officer "reasonably believes that deadly force is necessary" to prevent a suspect's escape and the officer had probable cause to believe the suspect posed "a threat of death or serious bodily injury to the officer or to others if apprehension is delayed." *Id.* at § 76-2-404(1)(b). In determining whether the use of deadly force was "justified" under Utah law, courts may consider several factors, including: (i) the nature of the danger; (ii) the immediacy of the danger; and (iii) the probability that the unlawful force would result in death or serious bodily injury. *See* Utah Code Ann. § 76-2-402(5).

Although Utah statutory law does not fully differentiate standards of "reasonableness" as between law enforcement officers and civilians, *compare* Utah Code § 76-2-402(1) (universal application), *with* Utah Code § 76-2-404(1) (application to law enforcement officers only), the Supreme Court of the United States did exactly that in *Graham v. Conner*, 490 U.S. 386 (1989). In *Graham*, the Supreme Court instructed that "reasonableness" for law enforcement officers must be assessed in light of a "reasonable officer on the scene, rather than with the 20/20 vision

---

(b) A <u>person is justified</u> in using force intended or likely to cause death or serious bodily injury [i.e., deadly force] <u>only if the person reasonably believes that force is necessary to prevent death or serious bodily injury to the person or a third person as a result of another person's imminent use of unlawful force</u>, or to prevent the commission of a forcible felony.

[4] "Serious bodily injury" is defined, in turn, as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." Utah Code § 76-1-601(11).

Letter to Chief Brown and Chief Russo
October 8, 2018
Officer McLelland OICI
Page 4

---

of hindsight." *Id.* at 396 (internal citations omitted). The Supreme Court held that this determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests . . . against the countervailing governmental interests at stake." *Id.* Finally, the *Graham* court instructed (*id.* (internal citations omitted; emphases added)):

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," . . . its <u>proper application requires careful attention to the facts and circumstances of each particular case</u>, including the severity of the crime at issue, <u>whether the suspect poses an immediate threat to the safety of the officers or others</u>, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.

## RELEVANT ETHICAL STANDARDS

The D. A.'s Office files cases that satisfy ethical standards and considerations in addition to legal standards for filing.[5] Honoring ethical standards ensures that everyone affected by the criminal justice system—suspects, defendants, victims, the community, and the system itself—is treated fairly, honorably, and respectfully.

Among the ethical standards we consider before the D. A.'s Office will commence a case is whether there is a reasonable likelihood of success at trial. It is not enough that the technical elements of crime may be met if, when presenting those facts to a jury, the prosecution strongly believes no reasonable jury would unanimously convict the defendant based on those facts. Accordingly, any screening decision by the D. A.'s Office includes careful consideration of the various factors a jury may consider when weighing testimony, evaluating evidence, applying the law, and rendering a verdict.

## FACTS DEVELOPED DURING OICI INVESTIGATION

As noted previously, following Officer Davies' use of deadly force, CHPD properly initiated the OICI protocol, *see* Utah Code Ann. § 76-2-408(2)-(3), such that: (i) protocol investigators were called in to conduct an independent investigation of Officer Davies' weapon discharge; and (ii) the protocol investigation's independent investigative findings were presented to the D. A.'s Office to screen for possible criminal charges.

---

[5] Among the legal standards a prosecutor must follow is the requirement that "probable cause" must exist to believe an offense (i) was committed and (ii) was committed by the accused. *See, e.g.,* Utah R. Crim. P. 4(b). In making that determination, the DA's Office must evaluate all evidence that will be legally admissible for or against the accused, but may disregard evidence that likely will not be admissible at trial (e.g., a coerced confession).

The following facts were developed from the OICI protocol investigation. Should additional or different facts subsequently come to light, the opinions and conclusions contained in this letter may likewise be different.

On May 27, 2018 at about 11:20 p.m., CHPD Officers Croft and Betenson watched a motorcycle make a U-turn at 1850 East, Creek Road in Cottonwood Heights. The officers saw the motorcycle did not have any lights. Officer Croft turned on his overhead lights to stop the motorcycle but the driver sped off and fled. Officer Croft noted that the motorcycle driver was a white male wearing dark clothing and a backpack, and the motorcycle was a dirt bike style with a loud, high-pitched muffler. Officers did not pursue the motorcycle at that time due to safety concerns for the public and the rider. Furthermore, the equipment violation observed was insufficient cause to pursue based on the CHPD pursuit policy.

On May 29, 2018 at about 3:20 a.m., a white male with a "scruffy" face, wearing a dark jacket and tan pants, black Vans shoes and purple gloves displayed a black and silver handgun and robbed the Smith's grocery store located at 2039 East, 9400 South in Sandy, Utah. The store employees called the police and reported the armed robbery.

Less than three hours later that same morning, at 6:04 a.m., a white male with "some facial hair," wearing a black hoodie displayed a silver handgun and robbed the Macey's grocery store at 7850 South, 1300 East in Sandy, Utah. Store employees called the police and reported the armed robbery.

About five minutes later, at 6:09 a.m., CHPD Officer Betenson heard and then saw a motorcycle in the area of Camino Way and 2300 East. Officer Betenson described the motorcycle and rider to dispatch and turned on his overhead lights to pull over the motorcycle for an equipment violation. The rider sped off and fled. Officer Betenson terminated the pursuit and didn't follow. Very shortly thereafter, Sandy City Police officers, who were monitoring CHPD radio traffic, broadcast over the police radio that they believed the motorcycle driver Betenson described, and who fled, was a suspect in armed robberies at a Macey's and a Smith's grocery store hours earlier.

Officer Betenson re-initiated the pursuit of the motorcycle and gave chase. Officer Betenson pursued the motorcycle through a neighborhood. CHPD Officer Davies joined the pursuit and took the lead. The officers followed the motorcycle north on 2300 East and then west on 6675 South.

At about 6:12 a.m., the motorcycle driver wrecked at 6675 South and 2200 East. The driver immediately got up and ran from the officers. As the driver ran, officers saw him reaching into and digging through his pockets and clothing. Officers ordered the driver to stop and show his hands but the driver continued to dig in his pockets and clothing with his hands.

As the driver was in the front yard of a home at 2209 East, 6675 South, Officer Davies fired two shots at the driver, subsequently identified as Zane Anthony James. Both shots hit Mr. James who was transported to the hospital and eventually died from the injuries.

## Witness Statements

### Officer Davies

Officer Davies, on the advice of his attorney, did not answer questions or provide a statement or offer information about the OICI to protocol investigators, as is his constitutional right to do so.

### Officer Betenson

On May 29, 2018, OICI protocol investigators interviewed CHPD Officer Betenson. Officer Betenson said that on May 29, 2018, CHPD Officer Garcia contacted Officer Betenson and asked him to look at a call on his computer: a reckless driving call on a motorcycle with no lights driven by a male with a dark jacket. Officer Betenson said he thought it may be the motorcycle driver who had fled from him two days ago. Officer Betenson said he first heard and then saw the motorcycle at about 7600 South and Highland Drive. Officer Betenson as the motorcycle driver passed him, he looked right at Officer Betenson and slowed and made a U-turn. Officer Betenson said he believed the driver was the same person who previously fled from him.

Officer Betenson said he turned around to follow the motorcycle and turned on his overhead emergency lights to stop the driver. Officer Betenson said the motorcycle driver sped off and fled. Officer Betenson said he terminated the pursuit and didn't follow the driver. Officer Betenson said he broadcast the description of the driver and his motorcycle, his location and said it was the same person who fled from him previously.

Officer Betenson said he heard a Sandy Police officer on the radio say that the motorcycle driver was likely a suspect in two armed robberies earlier that morning, the second of which had just occurred. Officer Betenson said he drove in the direction the motorcycle driver fled and soon saw him again. Officer Betenson said he reengaged the pursuit and was soon joined by CHPD Officer Davies who took the lead. Officer Betenson said the pursuit went north on 2300 East and turned west on 6675 South.

Officer Betenson said the motorcycle driver hit a speed bump and wrecked. Officer Betenson said immediately after the motorcycle went down, the driver got up and ran. Officer Betenson said he and Officer Davies tried to block the driver with their cars but the driver continued to run away. Officer Betenson said as the driver ran, he saw the driver's arms go from a running motion to his hands reaching for something in the front of his body. Officer Betenson

said as the male was reaching for something and running, Officer Betenson said he saw at least one paper money bill fall from the male's front.

Officer Betenson said that when the driver got to the front yard of the home at 2209 East, 6675 South, the driver was digging for something in his pockets. Officer Betenson said he couldn't see the driver's hands.

Officer Betenson said he heard Officer Davies fire his gun and heard two or three shots. Officer Betenson said he approached the driver who was on the ground, face down. Officer Betenson said the driver's hands were in front of the driver, under the driver's body. Officer Betenson said he had to pull the driver's hands out from under him and put him in handcuffs.

Officer Betenson said he and other officers started first aid on the driver. Officer Betenson said as they administered first aid, one of the officers pulled a black and silver handgun out of the male's front pocket.

OICI protocol investigators asked Officer Betenson if the driver did anything to make Officer Betenson consider using deadly force. Investigators asked whether the driver's actions caused Officer Betenson to consider using deadly force. Officer Betenson replied that when the driver reached in his front for something he was concerned. Officer Betenson said he was worried that he couldn't see the driver's hands and that he knew the driver had reportedly just used a handgun in an armed robbery.

Protocol investigators asked Officer Betenson if Officer Davies had not fired at the driver what would Officer Betenson have done. Officer Betenson replied that he would have drawn his weapon out of his holster and fired at the driver.

*Officer Kawa*

On May 29, 2018, OICI protocol investigators interviewed CHPH Officer Kawa. Officer Kawa said he heard Officer Betenson on the radio call out that he saw a suspect who had recently fled from him. Officer Kawa said he heard Officer Betenson say that he terminated the pursuit of the motorcycle when the driver fled.

Officer Kawa said he heard Sandy City police officers on the radio say that the motorcycle driver Officer Betenson just saw was a suspect in an armed robbery earlier that morning. Officer Kawa said he heard Officer Betenson on the radio say that he was reengaging the pursuit and heard the pursuit's direction of travel. Officer Kawa said he started to drive towards the pursuit. Officer Kawa said he heard an officer on the radio say that the motorcycle wrecked and then that shots were fired and the driver was down.

Officer Kawa said he arrived in the area of the OICI and saw several police officers near the driver with guns drawn. Officer Kawa said the suspect was lying face down and handcuffed. Officer Kawa said he heard Officer Davies say that the suspect reached for something on the left side of the suspect's body. Officer Kawa said he heard Officer Davies say that he believed two of his shots hit the suspect and one missed.

Officer Kawa said he searched the suspect's left side and pulled out a handgun. Officer Kawa said he was not sure whether the gun was in a pocket; Officer Kawa said he found a hole in the suspect's clothing and pulled the gun out. Officer Kawa said the gun did not feel or weigh like a normal firearm would, nor did the gun have normal handgun markings on the outside. Officer Kawa said that the magazine appeared to be for "BBs." Officer Kawa said he set the gun on the grass and rendered first aid with other officers until other medical personnel arrived.

### *Officer Croft*

On May 29, 2018, OICI protocol investigators interviewed CHPD Officer Croft. Officer Croft said he heard Officer Betenson on the police radio say that he had encountered a suspect who had fled from him the other day and was fleeing again. Officer Croft said he heard Officer Betenson initiate a pursuit and then quickly terminate it.

Officer Croft said he heard Sandy City Police officers on the police radio say that the motorcycle driver that Officer Betenson just encountered was a suspect in two armed robberies, one of which just occurred. Officer Croft said he heard Officer Betenson resume the pursuit and heard Officer Davies join the pursuit. Officer Croft said he heard Officer Betenson call out the pursuit's location and Officer Croft said he joined the pursuit.

Officer Croft said he arrived in the area where the pursuit ended and got out of his patrol car. Officer Croft said he drew his handgun and approached on Officer Davies' left side. Officer Croft said he saw Officer Betenson off to his right. Officer Croft said he did not see or hear the gunshots.

Officer Croft said he asked Officer Davies if he was ok. Officer Croft said Officer Davies replied that he was good. Officer Croft said he asked Officer Davies what happened. Officer Croft said Officer Davies replied that the suspect was reaching. Officer Croft said he asked Officer Davies where the suspect's gun was. Officer Croft said Officer Davies replied that the gun was still on the suspect.

Officer Croft said he and the other officers kept their weapons pointed at the suspect until the suspect was handcuffed. Officer Croft said he got a trauma kit from his vehicle and went to the suspect. Officer Croft said while he and the other officers performed first aid, Officer Kawa rolled the suspect on his side and Officer Kawa searched the suspect's clothing. Officer Croft said Officer Kawa pulled a handgun out of the suspect's clothing. Officer Croft said the gun

looked like a Smith & Wesson brand chromed .40 caliber firearm with a black polymer frame and chrome slide. Officer Croft said the gun was marked with "40" on the slide.

### *Sgt. Ricks*

On May 29, 2018, protocol investigators interviewed CHPD Sgt. Ricks. Sgt. Ricks said he had just pulled into the police department when he heard Officer Betenson say on the radio that a motorcycle driver was fleeing from him and he was pursuing the driver. Sgt. Ricks said he asked Officer Betenson his location, speed and the location of the motorcycle driver. Sgt. Ricks said Officer Betenson said he was trying to catch up to the fleeing motorcycle and Sgt. Ricks said he told Officer Betenson to terminate the pursuit.

Sgt. Ricks said immediately after he told Officer Betenson to stop the pursuit, he heard Sandy City Police officers on the radio say that the motorcycle driver was likely the suspect in an armed robbery that had just occurred. Sgt. Ricks said he heard Officer Betenson resume the pursuit. Sgt. Ricks said he drove his patrol car to the area where the pursuit was occurring.

Sgt. Ricks said that while he was driving to join the pursuit, he heard an officer on the radio say the motorcycle driver was down. Sgt. Ricks said he assumed that the motorcycle driver crashed, so Sgt. Ricks said he asked police dispatchers to send medical personnel to the area.

Sgt. Ricks said when he arrived at the OICI scene, he saw who he presumed was the motorcycle driver face down on the ground. Sgt. Ricks said he made contact with Officer Davies and they both approached the suspect. Sgt. Ricks said as he got close to the suspect, he saw a black and gray handgun lying on the grass.

Sgt. Ricks said Officer Davies gave a public safety statement to Sgt. Ricks; Officer Davies told Sgt. Ricks he fired three or four times in a northwest direction. Sgt. Ricks said he placed Officer Davies in his police car as additional officers secured the OICI scene.

### *Officer Harris*

On May 29, 2018, protocol investigators interviewed CHPD Officer Harris. Officer Harris said she heard Officer Betenson on the police radio say that he was behind a motorcyclist who had fled from Officer Betenson earlier in the week. Officer Harris said she also heard a Sandy Police officer on the radio say that the motorcycle driver was a suspect in an armed robbery that had just occurred in their city. Officer Harris said she heard Officer Betenson on the radio say that he was pursuing the fleeing motorcyclist.

Officer Harris said she heard Officer Betenson on the radio state the progress of the pursuit and heard Officer Betenson say the motorcyclist had crashed. Officer Harris said she

Letter to Chief Brown and Chief Russo
October 8, 2018
Officer McLelland OICI
Page 10

---

drove her patrol car towards the location of the pursuit. Officer Harris said while en route to the pursuit, she heard an officer on the radio say that shots had been fired.

Officer Harris said she arrived at the OICI scene and saw a suspect face down on a lawn, handcuffed. Officer Harris said as she approached the suspect, she saw officers looking over the suspect for injuries and one of the officers pulled a handgun out of the suspect's left side area. Officer Harris said as the officer pulled the gun out of the suspect's clothing, she heard Officer Davies say: "that's where he was reaching."

***Physical Evidence***

Officer Davies was not wearing a body-worn camera during the OICI. Protocol investigators determined that no video recording of the OICI exists as far as they know at this time. Protocol investigators obtained and reviewed the recordings from CHPD Officers Harris' body-worn camera. Officer Harris' body-worn camera recorded Officer Kawa asking Officer Davies: "Where's the gun at?" to which Officer Davies replied: "He kept reaching with his left hand up in that front area." The body-worn camera also recorded Officer Betenson saying: "He was reaching in the front."

OICI protocol investigators obtained and reviewed surveillance video from a 7-11 convenience store at 9400 South Raintree Dr. The video recorded the events of May 29, 2018. The video recorded a male who entered the store at about 3:10 a.m. The video shows a man wearing a dark pullover with a hood and tan pants. According to the clerks, the man entered the store and asked for a plastic grocery bag. The video recorded the man riding a small motorcycle with yellow or gold forks.

OICI protocol investigators obtained and reviewed surveillance video from a Smith's grocery store at 2039 East, 9400 South in Sandy, Utah. The video recorded the events of May 29, 2018. The video recorded a male who entered the store at about 3:20 a.m. The video shows a man who appears to be the same person shown in the 7-11 video discussed above. The Smith's video shows the man with a silver colored handgun in the store. According to store employees, the man asked to exchange money and pulled a handgun and demanded cash. The employees said the man left the store on a dirt bike style motorcycle.

OICI protocol investigators obtained and reviewed surveillance video from a Macey's grocery store at 8750 South, 1300 East in Sandy, Utah. The video recorded the events of May 29, 2018. The video recorded a male who entered the store at about 6:04 a.m. The video shows a male wearing a hoodie and tan pants; the man appears to be the same person shown in the 7-11 video and the Smith's video discussed above. The video shows the man with a silver handgun. According to store employees, the man asked to exchange four five dollar bills for a twenty dollar bill. The employee said when the till opened, the man displayed a handgun and demanded

Letter to Chief Brown and Chief Russo
October 8, 2018
Officer McLelland OICI
Page 11

all the cash which the employee gave the man. Store personnel said the man left on a small dirt bike style motorcycle.

OICI protocol investigators reviewed photographs taken of Mr. James' clothing, some of which was removed by medical personnel at the OICI scene. Some of the photographs show large amounts of cash in the pocket of Mr. James' dark pullover. The photos also show Mr. James' tan pants and other articles of clothing which appear to be those worn by the man depicted in the surveillance video recordings discussed above.

OICI protocol investigators reviewed photographs of Mr. James' motorcycle where it came to rest in the street. Photographs of the motorcycle appear to depict the same motorcycle as that shown in the surveillance videos discussed above and consistent with the description provided by Officer Betenson and the employees of the stores that were robbed earlier that morning.

OICI protocol investigators inspected, documented and photographed the scene of the shooting and the surrounding area. Investigators photographed and examined the gun that Officer Kawa removed from Mr. James' clothing.

## LEGAL ANALYSIS

As noted previously, Officer Davies declined to provide a statement to investigators, as is his constitutional right. Without Officer Davies' explanation of his use of deadly force against Mr. James, we don't know his reasons for his decision to fire his weapon. We are therefore left to infer the rationale for Officer Davies' decision to use deadly force based on other evidence we received, as well as the reasonable inferences to be drawn from that evidence. In similar situations where a shooting officer has not provided a statement, we have proceeded in this manner. In doing so, however, we have never strayed from the objective evidence or testimony of other witnesses, nor do we do so here.

In considering whether to charge Officer Davies with a criminal offense, we try to ascertain whether Utah's broad affirmative defense of "justification," particularly as applied to law enforcement officers, effectively precludes criminal prosecution based on the facts before us. In other words, whether Officer Davies could establish at trial that he believed the "use of deadly force [wa]s necessary to prevent death or serious bodily injury to the officer or another person." Utah Code Ann. § 76-2-404(1)(c).

As discussed more fully above, statements provided by other officers on scene, as well as the reported and recorded statements of Officer Davies, together with physical evidence recovered at the scene, all point toward a statutory defense of "justification." Specifically, the police officers responded to and were aware of two armed robberies in which witnesses saw Mr. James with a gun; police officers reasonably believed the motorcycle driver they pursued was the

armed robber; witness officers saw Mr. James reaching into his waistband and making motions consistent with drawing a weapon from a waistband; and Mr. James' gun was found on in his clothing in the area he was reaching when he was shot.

Here, if criminal charges were brought against Officer Davies, the D. A.'s Office would be required to prove beyond a reasonable doubt that Officer Davies, intentionally and without legal "justification" as defined by statute, shot and killed Mr. James; in other words, that Officer Davies did not "reasonably believe[] that the use of deadly force [was] necessary to prevent death or serious bodily injury to the officer or another person," e.g., officer Davies himself and/or other police officers on scene. *See* Utah Code § 76-2-404(1)(c) (emphases added).

As the United States Supreme Court instructed in *Graham*, assessing "reasonableness" in the Fourth Amendment context "requires careful attention to the facts and circumstances of each particular case, including . . . whether the suspect poses an immediate threat to the safety of the officers or others." 490 U.S. at 496 (emphases added). Assuming the witnesses officers mentioned above would testify consistently with their prior statements and facts described above, and assuming Officer Davies (if he testified at all) would articulate a fear for his safety and the safety of his fellow officers (consistent with the fears expressed by witness officers) we believe Officer Davies could successfully argue he "reasonably" believed the "use of deadly force [wa]s necessary to prevent death or serious bodily injury to ... another person." Utah Code Ann. § 76-2-404(1)(c). We further believe, based on the foregoing, that no reasonable jury would unanimously conclude that Officer Davies did not reasonably believe that deadly force was necessary to prevent his death or serious bodily injury or that of his fellow officers.

In short, paying "careful attention to the facts and circumstances" of this case, and considering the totality of the evidence and reasonable inferences to be drawn therefrom, we conclude Officer Davies' use of deadly force likely falls within the definition of "justification" set forth in Utah State law.

## CONCLUSION

As noted previously, the facts and conclusions set forth in this letter are based on the evidence of which we are currently aware. If additional facts become available, these conclusions may change. Based on all the totality of evidence presented to date, however, and the reasonable inferences to be drawn from that evidence, we conclude Officer Davies could likely establish at trial that he believed the "use of deadly force [wa]s necessary to prevent death or serious bodily injury to the officer or another person." Utah Code Ann. § 76-2-404(1)(c). In that event, Utah State law would effectively immunize him from criminal liability in connection with this incident. Accordingly, we do not intend to pursue criminal charges against Officer Davies.

Very truly yours,

Sim Gill
Salt Lake County District Attorney