```
1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

5   _____
    AARON JAMES and TIFFANY JAMES,  )
6   Heirs and Proposed Prsonal       )
    Representatives of the Estate    )
7   of Zane James,                   )
                                     )
8                                    )
                   Plaintiffs,       )
9                                    )
          vs.                        ) Case No. 2:19-CV-341
10                                   )            HCN
                                     )
11  CASEY DAVIES, and COTTONWOOD     )
    HEIGHTS,                         )
12                                   )
                   Defendants.       )
13  _____)

14

15

16

17      BEFORE THE HONORABLE HOWARD C. NIELSON, JR.

18              DATE:  OCTOBER 15, 2019

19        REPORTER'S TRANSCRIPT OF PROCEEDINGS

20               ARGUMENT ON MOTIONS

21

22

23

24

25              Reporter:  REBECCA JANKE, CSR, RMR
                           (801) 521-7238
```

```
 1
 2                        A P P E A R A N C E S
 3
 4   FOR THE PLAINTIFF:     SNOW, CHRISTENSEN & MARTINEAU
 5                          BY:  HEATHER S. WHITE, ESQ.
 6                          10 EXCHANGE PLACE, 11TH FLOOR
 7                          SALT LAKE CITY, UTAH 84145
 8
 9
10
11   FOR THE DEFENDANT:     SYKES, MCALLISTER LAW OFFICES
12                          BY:  ROBERT B. SYKES, ESQ.
13                          311 SOUTH STATE, SUITE 240
14                          SALT LAKE CITY, UTAH 84111
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    OCTOBER 15, 2019                    SALT LAKE CITY, UTAH
 2                        P R O C E E D I N G S
 3                              *  *  *
 4         MR. SYKES:  Judge, my clients are having
 5    trouble parking.  They are on their way.  They may
 6    come in a little bit late.
 7         THE COURT:  All right.  Thank you for letting
 8    me know that.  If it's all right, though, we will
 9    proceed.
10         MR. SYKES:  Sure.
11         THE COURT:  All right.  Very good.  We're
12    here for a hearing on the motion to dismiss in the
13    case of James vs. Davies, 19-CV-00341.  Are we all in
14    the right place except for your clients, I guess, who
15    are on their way?
16         MR. SYKES:  But they are on the way, yeah.
17         THE COURT:  Very good.  Let's have
18    appearances, then.
19         MS. WHITE:  Heather White for the defendants.
20         MR. SYKES:  Robert Sykes for the plaintiff
21    and responding parties.
22         THE COURT:  Very good.  Thank you.  All
23    right.  I would like to wrap this up before noon, if
24    that's all right.  With that in mind, I anticipate
25    approximately 30 minutes for each side.  So, since
```

1  it's the defendants' motion, we will start with

2  Ms. White, and then, if you would like to reserve some

3  time for rebuttal, that would be fine.

4  　　　　MS. WHITE:  Thank you, Your Honor.  And

5  please interrupt me if you have any questions that

6  are -- at any time that you want.  I have prepared

7  remarks, but the most important thing for me is to

8  make sure that I answer any questions that you have.

9  　　　　THE COURT:  Well, I appreciate the

10  invitation, but regardless, I probably would.

11  　　　　MS. WHITE:  Excellent.  So we are here on a

12  motion to dismiss this Section 1983 civil rights claim

13  that the Jameses have filed against Cottonwood City

14  and officer Casey Davies.  I appreciate counsel's

15  excellent briefing on the matter because I think it's

16  helped distill the issues down to some very narrow

17  issues for the Court to resolve.

18  　　　　The first that is raised is the governing

19  standard on a motion to dismiss, and they have raised

20  the argument that it needs to be converted to a motion

21  for summary judgment because there is extraneous

22  information that is included in the briefing.  And I

23  just briefly wanted to point out, as we did in our

24  reply, the two items that they focus in on.  The first

25  is the photograph of the gun, and the second is the

1    DA's report.  The photograph of the gun was --

2         THE COURT:  Before you spend too much time on

3    this, do you wish me to rely on either the photograph

4    or the content of the report?

5         MS. WHITE:  No.  And that --

6         THE COURT:  Then I don't think you need to

7    spend on any time on it.

8         MS. WHITE:  Perfect.  Thank you.  I

9    appreciate that.  And the next thing that becomes very

10   important is the standard that applies on the

11   qualified immunity claims.  Qualified immunity, as the

12   Court is aware, applies only to the claims against

13   Officer Davies and not the city.  And the relevant

14   inquiry there is, was there a constitutional violation

15   and was that alleged violation based on clearly

16   established law?

17        So, as we start talking about that, they can

18   be taken, as the Supreme Court has directed, in either

19   order.  But I want to start on the constitutional

20   violation because we believe there has neither been a

21   constitutional violation alleged or clearly

22   established law.  So the law that applies to the

23   Section 1983 cases, the seminal case is the Graham v.

24   Connor case, and it established long ago that an

25   officer's use of force is to be determined whether it

1    was objectively reasonable under the totality of the

2    circumstances, all the facts and circumstances known

3    to the officer at the time.  And, because we're on a

4    motion to dismiss, it's as pleaded in the Complaint.

5            We have the additional layer of Garner, and

6    so that applies specifically to deadly force.  And so

7    when we look at that, it's whether the officer -- and

8    we have to look at, under Graham, the officer's

9    perspective based at the time, recognizing that

10   officers are required to make these split second

11   decisions in rapidly evolving circumstances.

12           THE COURT:  Or perhaps, more accurately, not

13   the officer but an objectively reasonable officer.

14           MS. WHITE:  Right.  That's correct.  And so

15   the officer -- adding Garner to the mix of the Graham

16   determination, we look at whether the officer had

17   probable cause to believe the suspect that he or she

18   was pursuing posed a threat of serious physical harm

19   to the officer or others.

20           And then, the second inquiry is whether

21   deadly force was necessary to prevent the suspect's

22   escape; and, third, whether the officer gave a

23   warning, if feasible.

24           THE COURT:  All right.  Now, may I ask you

25   about that?  On the first prong, I'm not sure that's

1    exactly how Garner stated that prong.  I think Garner

2    essentially recognizes a presumption of danger or at

3    least arguably recognizes a presumption of danger

4    where there is an inherently felony -- inherently

5    dangerous felony that has been committed.

6          MS. WHITE:  That's correct.  And that goes

7    into the Ryder case as well.

8          THE COURT:  Yeah.  But, regardless of that,

9    let's assume for current purposes that deadly force

10   was justified under, you know, if we're looking at

11   each of these three aspects of Garner.  And I

12   recognize that under Graham and subsequent cases, this

13   is not necessarily an absolute test.  These are maybe

14   more like factors.  But let's assume that, under the

15   facts of this case, the first prong of Garner is

16   satisfied, that because, you know, the suspect had

17   committed armed robbery, or at least he was suspected

18   of having committed armed robbery, that that part was

19   satisfied.

20         Let's look at the other two factors, though,

21   and I'm fairly troubled by both of them.  Garner says

22   where the deadly force -- it speaks to the deadly

23   force being necessary to -- to prevent an escape.

24         MS. WHITE:  Right.

25         THE COURT:  And plaintiffs here allege that

1    Mr. James was badly injured from the motorcycle crash,

2    that he was visibly limping and that Mr. Davies could

3    have -- Officer Davies could have fairly easily caught

4    up with him.  And we will accept that for current

5    purposes.  I realize that you may -- may well dispute

6    those facts, you know, if this were to move beyond

7    the --

8              MS. WHITE:  Certainly.

9              THE COURT:  What's your best authority for

10   the proposition that deadly force isn't necessarily

11   only limited to cases where it's the only option for

12   stopping, where it might not be strictly necessary in

13   the sense that, you know, there might have been other

14   means of stopping?  You know, could you speak to that

15   first for a minute?

16             MS. WHITE:  Yes.  So, I believe it's the

17   Forrett vs. Richardson case talks about how you don't

18   have to -- the officers don't have to wait until their

19   lives are actually placed in danger or that they are

20   shot at or those things.  We have -- and I see where

21   the Court's concern is, is that there have been

22   allegations that he was limping away, that he was

23   injured, and that the -- he didn't have a gun out, so

24   was deadly force necessary?

25             And, under the clearly established case law,

1   both from the Tenth Circuit, the Supreme Court and the

2   weight of other jurisdictions, we have a broad

3   understanding that the suspects -- if someone is

4   injured, they are still able -- limping in this

5   case -- to pull out a weapon and shoot an officer.

6   So, you know, children can do that.  Elderly people

7   can do that.  It takes but a -- less than a split

8   second for someone who is armed to be an actual lethal

9   threat to the officer, justifying the officer's use of

10  that deadly force.

11          THE COURT:  So -- so what are your best cases

12  from this body of law that you're referring to that

13  hold that an officer can shoot someone to prevent his

14  escape, even if they might be able to -- or fairly --

15  not just might, probably could just catch up to them

16  and subdue them through other means?

17          MS. WHITE:  The Forrett vs. Richardson

18  case --

19          THE COURT:  Okay.

20          MS. WHITE:  -- is a good example.  And in

21  that case, the Court ruled that the use of deadly

22  force to capture a suspect was objectively reasonable,

23  even if the capture was inevitable.  And if I can go

24  down to the language of that --

25          THE COURT:  Well, what is the citation for

1   that as well?

2          MS. WHITE:  You bet.  It is 112 F.3d 416,

3   Ninth Circuit, 1997.

4          THE COURT:  All right.  Thank you.

5          MS. WHITE:  And there are other cases that

6   we've cited.  I think both in our brief and in our

7   reply I think there's some Tenth Circuit -- and I'm

8   just missing the names of the cases, but I'm sure that

9   they are cited in there, that stand for the same

10  proposition, that just because a suspect may

11  eventually be caught does not preclude the officer's

12  use of deathly force because there is an immediate

13  need to stop the danger to the community.

14          And here, the facts that were pleaded in the

15  Complaint sufficiently allege that that was a problem.

16  When we look to really the operative facts of the

17  Complaint, they are distilled down to a few

18  paragraphs.  At paragraph 20, they acknowledge at

19  about 6:00 a.m. James had just robbed a store in Sandy

20  with an air soft gun.  At paragraph 22, they establish

21  James fled from the scene on a motor bike, which

22  establishes that first prong that we talked about.

23          Then, the next is found at paragraph 52.

24  Officer Davies heard dispatch announce the robbery.

25  Then paragraph 55.  Hearing dispatch, Officer Davies

1    decided to join the pursuit.  At paragraphs 23 and 24,

2    and here's where it gets into that they allege that he

3    crashed his motor bike during the pursuit on a narrow

4    neighborhood street -- and this was at around 6:10 in

5    the morning, as earlier alleged in the Complaint --

6    and that at paragraph 60 B, Officer Davies shot James

7    as he is running away.

8            So those are really the operative facts that

9    we are dealing with.  And it's important to understand

10   that --

11           THE COURT:  Before you get to that point,

12   there's some reference in the argument to an armed

13   robbery the night before and the report that James

14   matched the description of the suspect from that

15   previous robbery.  Is that properly part of these

16   allegations, or are we limited to the armed robbery

17   that occurred that morning?

18           MS. WHITE:  If I recall the allegations of

19   the Complaint correctly, I'm not sure they referenced

20   the -- specifically the robbery the night before.  I

21   think that's in the DA's report, which is referenced

22   in the Complaint, so, technically, the Court has

23   discretion to consider that, but I don't think it's

24   necessary for the Court to use that.  I think the

25   immediacy of the robbery that just took place at 6:00

1    o'clock a.m., just minutes before this pursuit of

2    Mr. James ensued, is enough to establish that the

3    officers had probable cause to believe that he was a

4    danger to -- a lethal threat to others and could

5    pursue and use deadly force to prevent his escape.

6         THE COURT:  All right.  Let me ask you also,

7    we talked a little bit about the second Garner prong,

8    about knowing whether in fact the deadly force was

9    necessary to prevent an escape.  What about lack of a

10   warning here?  Again, I find that somewhat troubling.

11        MS. WHITE:  And the case law is fairly clear.

12   If you look to the Ridgeway case that we've cited

13   in -- on pages 11 and 12 of our opening memorandum --

14        THE COURT:  Is that the District Court

15   decision from New Jersey?

16        MS. WHITE:  New Jersey, yes.  They presume

17   that notice of deadly force is presumed by flight.

18   There are other cases as well, that -- and the Forrett

19   case may be one additionally.  They focus in on the

20   fact that the notice that is required is that the

21   person understand that they are being pursued by an

22   officer and that they are required to stop.  And once

23   that is in place, once there is that understanding,

24   then that is the warning.  It's not a

25   stop-or-I'll-shoot warning that is required.  It's the

1    warning that they are being detained by the police.

2            THE COURT:  They are being pursued?

3            MS. WHITE:  They are being pursued, exactly.

4    And so here, the allegations of the Complaint are

5    sufficient to establish that because he -- he had --

6    was being pursued by these officers.  He was running

7    from them.  There are no allegations to the contrary,

8    that he -- he was trying to get away from the police.

9            THE COURT:  All right.  So if -- if it's the

10   case that the second prong of Garner doesn't really

11   require that the deadly force be necessary, and the

12   third prong doesn't really require a warning in the

13   case where there's active pursuit, how much is left of

14   Garner?  I mean, Garner essentially rejected the

15   common law rule that, you know, you could shoot at a

16   fleeing felon, the fleeing felon rule.  Has it really

17   just come down to the fact that that rule is too broad

18   in covering all felonies, as opposed to inherently

19   dangerous felonies?

20           MS. WHITE:  No.  In fact, one of the cases

21   that we cite talks about how it's a different

22   situation where someone maybe has robbed a home at

23   night and burgled a home, hasn't threatened any person

24   and is running away and has no reason to believe.  And

25   so it distinguishes the situation between this armed

1    robbery, where there's threat and harm potential to

2    people, as opposed to where there has not been the

3    violence that -- or threat of violence that has

4    occurred.

5             THE COURT:  Well, that's what I'm asking.  Is

6    that really all that Garner stands for then is just

7    that the fleeing felon rule is limited to inherently

8    violent felonies and in Garner the Court didn't

9    believe that a nighttime burglary was such?

10            MS. WHITE:  I think under -- and perhaps that

11   goes to one of the questions, and the qualified

12   immunity standard that the Court --

13            THE COURT:  We're on prong one here.  We're

14   talking about the constitutional violation still.

15            MS. WHITE:  Right.  But the qualified

16   immunity prong -- qualified immunity applies to that

17   first prong, too, is that whether there was a

18   constitutional violation, did the officer -- could the

19   officer have understood that his or her conduct was,

20   beyond debate, plainly incompetent or knowingly

21   violated the law.

22            THE COURT:  Well, that goes to the second

23   prong of whether there's qualified immunity, correct?

24   That doesn't go to the issue of whether there was a

25   constitutional violation.  And the violation doesn't

1    come --

2           MS. WHITE:  I see what you're saying.

3           THE COURT:  -- unless there is subjective

4    knowledge or intent.  It depends on whether the force

5    was objectively reasonable.

6           MS. WHITE:  Yes.  I see what you're saying,

7    and I do agree with you that there is that

8    distinction.  So, you know, I -- the way that the

9    cases have interpreted Garner is it's very fact

10   specific.  I think Garner is still the preeminent use

11   of force case, and I don't think it's been gutted, I

12   think it's just been interpreted many times over and

13   is applicable and is applicable law, and maybe I'm not

14   answering your question or understanding it.

15          THE COURT:  No.  No.  That's fine.  Let me

16   ask it a different way.  Leaving aside the qualified

17   immunity for a moment and just talking about the

18   constitution.

19          MS. WHITE:  Okay.

20          THE COURT:  Is it your position that an

21   officer can shoot a fleeing individual who has

22   committed a violent -- an inherently violent felony,

23   period?

24          MS. WHITE:  If the officer -- yes.  If the

25   officer has probable cause to determine that is the

1  case and that not using deadly force to prevent escape

2  could -- could present that danger to others.  I think

3  that's what Garner stands for.

4       THE COURT:  All right.  And then, on that

5  second part, the qualification you added that the

6  officer could reasonably think that there was a

7  danger, is it your position that that is satisfied any

8  time that there has been an inherently violent felony

9  committed and the individual is fleeing?

10       MS. WHITE:  No.  I think there has to be a

11  factual determination as to what the situation was

12  that confronted the officer in that moment.  So, I

13  don't think it's a broad rule that can apply across

14  the board and that it makes anything okay.  I think

15  the case law is very clear because some cases come

16  down on one side and some cases come down on the

17  other.

18       THE COURT:  All right.  Are you aware of any

19  case that finds a constitutional violation where the

20  police have shot someone who is fleeing after

21  committing an inherently violent felony?

22       MS. WHITE:  No.  And I don't think the

23  plaintiffs have met that burden that they have on the

24  qualified immunity --

25       THE COURT:  Well, I was just asking --

1      MS. WHITE:  -- either to present that.

2      THE COURT REPORTER:  Please stop talking when

3  the Judge is talking.

4      MS. WHITE:  Oh.  I apologize.

5      THE COURT:  I was asking that question

6  because you said the cases come down on both sides,

7  and I was just wondering whether that really is true.

8      MS. WHITE:  What I -- what I -- I didn't

9  choose my language very carefully, and I apologize.

10  The cases analyze the facts of deadly force very

11  specifically.  I am not aware of a case and have not

12  found one in our briefing and in searching, that

13  shooting a fleeing felon under circumstances similar

14  to this one, where there has been a violent crime that

15  has been recently committed, has -- where they have

16  concluded the officer was not justified in using

17  deadly force.

18      THE COURT:  All right.  Thank you.

19      MS. WHITE:  You know, and I -- and backing up

20  just briefly to your question about the necessity of

21  deadly force, I think the Ridgeway case makes a very

22  good point, and if I can quote from that case, the

23  Court says:  In the cool aftermath, it is deceptively

24  easy to say, "What harm can come from giving a

25  warning?"  In the split-second reality of a deadly

1   police chase, that warning, whether verbal or a shot

2   in the air, might permit the suspect to turn and fire

3   a weapon or otherwise facilitate his escape, putting

4   at risk innocent police and civilians who he

5   encounters in the path of his flight.

6          And so any -- that goes to the -- both the

7   necessity of using deadly force to escape, because it

8   talks about possible danger to others and the officer

9   and then the -- whether giving a warning beyond the

10  knowledge that the person is being pursued will

11  actually have the intended effect of getting someone

12  to stop.

13         And I think the Courts have come down that it

14  does not.  And they point out, you know, that injured

15  people can and have shot people and killed and injured

16  officers.  And there's no dispute that he had, and it

17  was reported that he had robbed a gun with a store (as

18  spoken) and threatened those individuals with that gun

19  and could, at any moment, whether he was limping or

20  not, whether he had fallen to the ground or not, can

21  still be a lethal force to the -- a lethal threat,

22  excuse me, to the officer.

23         Say, for example, hypothetically, that he

24  fell and the officers, under plaintiffs' theories in

25  the Complaint, not the facts alleged, could have

1   chased him down or tasered him.  There is nothing that

2   prevents him, on the ground, you know, injured on the

3   ground, from pulling out that weapon and shooting the

4   officers as they approach.  So, it's -- it's -- that's

5   the split second decisions and the deadly encounters

6   that the Supreme Court is talking about when -- that

7   these officers face on a daily basis, and it's formed

8   really the genesis of the broad allowance that the

9   Courts give to officers in these circumstances.

10        As for the fact -- as for -- there are

11  additional problems that are posed, and that is

12  allowing him to escape into this neighborhood pose

13  problems such as he could have escaped into a home and

14  barricaded himself or taken someone hostage.  There's

15  the possibility of stray gunfire.  He had a gun, and

16  it can go into neighboring homes and hurt or kill

17  people in the neighbors.

18        And so, based on that information and the

19  training that's provided and the circumstances as they

20  presented themselves to Officer Davies at the time, it

21  was reasonable for him to weigh all of those things

22  and to weigh the relative culpability, too, of

23  protecting the innocent people versus the person who

24  is fleeing from an inherently violent felony.

25        And it's important to remember aspects about

1    the neighborhood as well can additionally add to an

2    ability of a suspect to escape from the officer if not

3    stopped with the deadly force.  There are fences and

4    homes and structures such as -- structures in which to

5    hide, such as garages, out buildings, sheds, which

6    could further enable him to hide or escape, and those

7    very same -- those very same structures also apply to

8    danger against the officers.  They can -- those

9    barriers, those fences, those structures in which they

10   can hide also can permit the suspect to ambush an

11   officer, to hide in there if the officer continues to

12   pursue, you know, someone once they haven't been seen

13   anymore, which they would do, they could be shot and

14   injured or killed.

15         So the need to stop him and the need to

16   immediately do so is very clear to this officer under

17   the circumstances.  And I don't think that there's

18   anything that has been pleaded in the Complaint that

19   is contrary to that, so I think that addresses the

20   constitutional violation portion.  And unless the

21   Court has further questions on that, I wanted to move

22   to the clearly established law.

23         THE COURT:  No.  You can proceed.

24         MS. WHITE:  Okay.  So, as the Court is aware,

25   that as soon as the qualified immunity defense is

1    raised by a defendant, the burden then shifts to the

2    plaintiff to come forward with clearly established law

3    from either the Supreme Court, the governing

4    jurisdiction, which here is the Tenth Circuit Court of

5    Appeals, or the great weight of other jurisdictions

6    that shows that the officer -- the officer's conduct

7    was -- and I believe the words used in the White vs.

8    Pauly case was "beyond debate."  And going back to the

9    Malley vs. Briggs case, "plainly incompetent or

10   knowingly violates the law."

11        And if you think about that standard, that is

12   a very high threshold to meet.  It must be -- also be

13   fairly fact specific to the officer's conduct so that

14   the officer -- you can say that the officer was put on

15   notice that his or her conduct violated the law.  And

16   the plaintiff spent some time talking about how it

17   doesn't have to be an identical case, and that is

18   true.  It doesn't.

19        But in the recent years, we've seen the

20   Supreme Court in the Mullenix case, in the White v.

21   Pauly case, and case's before that -- White v. Pauly

22   was just two years ago -- have really broadened the

23   scope of this clearly established law so that --

24   because there have been a lot of circuits that have

25   concluded that the generality set forth in Garner and

1   Graham are all that are needed.

2          And they have continually reminded the

3   Circuit Courts that those general propositions are not

4   sufficient to put officers on notice of what conduct

5   is acceptable and what conduct is not and that there

6   has to be -- that the -- to be clearly established

7   factual scenarios that closely follow what -- the

8   factual scenarios in this case.

9          And the plaintiffs have not cited a single

10  case in which that has occurred.  They -- and that

11  alone is a basis for granting the motion for summary

12  judgment -- or excuse me -- the motion to  dismiss.

13         We have cited several cases in our briefing

14  from other jurisdictions that have shown that Officer

15  Davies' conduct was consistent with clearly

16  established law, and while they are from other

17  jurisdictions, we couldn't find the very factual

18  pattern or scenario in the Tenth Circuit which, alone,

19  is enough to grant the motion based on qualified

20  immunity.

21         But when you even look outside for persuasive

22  authority and you look to the Jones, the Clark and the

23  Forrett cases, which are all cited in our briefing,

24  they establish factual scenarios that are consistent

25  and similar to that in this case.  So, it is our

1    position that the plaintiffs have failed to meet that

2    clearly established burden.

3          If that is the basis for the Court's ruling,

4    then the Court would then need to additionally address

5    the claims against the city, and that goes back to the

6    standard that I talked about initially.  If there is

7    found to be no constitutional violation, that is not

8    the case because, where there is no constitutional

9    violation, there can be no municipal liability.

10          THE COURT:  Right.  I understand the

11    relationship of these issues.

12          MS. WHITE:  And then -- so, on the Monell

13    claims, they are called Monell claims after the case

14    that established that.  They require that any

15    liability must be predicated on wrongful conduct by

16    the city itself and not its employees.  And to do so

17    they have to prove two things, that there was a

18    policy, pattern or practice that was the moving -- the

19    second is the moving force.

20          THE COURT:  Right.  Now, you can spend time

21    on this if you want, but my understanding is your

22    position is essentially that the allegations are just

23    inadequate to establish the Monell claim.  Is that not

24    correct?

25          MS. WHITE:  That is correct.  And if you look

1   specifically to paragraphs 140 to 143 of the

2   Complaint, that is where you'll see the allegations

3   against the city.  And based on all of the case law

4   and the arguments that we have made in our briefing,

5   they do not establish a policy, pattern or practice.

6   They are simply allegations and not factually

7   supported, and I don't want to belabor the point if

8   the Court doesn't have any questions about or concerns

9   about that.

10          THE COURT:  Let me ask you just quickly, back

11  to your qualified immunity argument.  You cited James

12  and Clark.  Do those cases -- do either or both of

13  those involve cases where there was no warning given

14  or where the force wasn't strictly necessary?

15          MS. WHITE:  If I recall correctly -- let me

16  just see.

17          THE COURT:  Let me rephrase that.  The force

18  may not have been strictly necessary.

19          MS. WHITE:  So in the Forrett case, this is

20  what --

21          THE COURT:  We have discussed that.  James

22  and Clark were the other two you mentioned.

23          MS. WHITE:  Excuse me.  Sorry.  I've got

24  Carter right here, and I'm not pulling up Clark really

25  quickly, and I apologize.  Let me see if I can pull

1    that up.  So the Clark case granted qualified immunity

2    to an officer who shot a suspect fleeing a violent

3    crime, even though there were other non-deadly

4    alternatives.  As for the warning question, I cannot

5    remember specifically, in that case, whether a warning

6    was given or not.

7              THE COURT:  All right.

8              MS. WHITE:  And then the other case was the

9    Jones case that you asked about; is that correct?

10             THE COURT:  Right.  I think those were the

11   three you mentioned.  In your talking about qualified

12   immunity, you talked about Forrett, Jones and Clark, I

13   think.

14             MS. WHITE:  And the same applies.  I'm not

15   sure specifically if a warning was given in the Jones

16   case, but in that case there was a finding of

17   qualified immunity for an officer who shot a fleeing

18   suspect from an armed robbery that was carried out

19   with a BB gun that was used to trick others into

20   thinking it was a real gun.

21             THE COURT:  And that's the Fourth Circuit,

22   correct?

23             MS. WHITE:  It is.  It's the Fourth Circuit.

24   And I'm just scrolling through briefly to see if I can

25   find whether there was a warning, but I don't want to

1    waste the Court's time with this.

2         THE COURT:  All right.  Well, I can look as

3    well.

4         MS. WHITE:  Okay.

5         THE COURT:  But thank you.  Do you have any

6    other points you would like to make or --

7         MS. WHITE:  Do you have any questions on the

8    Monell and the pleading standard for the claims

9    against the city?

10         THE COURT:  I do not, no.

11         MS. WHITE:  Okay.  Then the only remaining is

12    the state constitutional claims, and the same as the

13    Court is aware from the Kashinsky case that was just

14    decided by the Utah Supreme Court.  The same standard

15    applies in determining whether there was flagrant -- a

16    flagrant violation of the law and so I don't want to

17    belabor those arguments.

18         THE COURT:  All right.  No.  I understand.

19         MS. WHITE:  It's the same as clearly

20    established.  The last point is that the plaintiffs

21    did not respond to the common law claims and so that

22    we are immune from those claims.  And then the

23    provisional claims, the Statute of Limitations is

24    expired on those.  And so, to the extent that those

25    have or could be asserted, should be dismissed as a

1   matter of law as.

2           THE COURT:  All right.  Thank you.

3           MS. WHITE:  Thank you, Your Honor.

4           THE COURT:  All right.  Mr. Sykes?

5           MR. SYKES:  Your Honor, how much time did you

6   want me to take?  I know you want to be out of here by

7   noon.

8           THE COURT:  You can have as much as your

9   opposing counsel had, if you need it.  I want to keep

10  it balanced in terms of time, and we went just a

11  little bit longer.

12          MR. SYKES:  All right.  I apologize.  I'm

13  getting over a cold still, so I might have a little

14  hacking here.  Excuse me.  Judge, I would like to

15  first talk about the facts of the case because I think

16  the facts are going to determine the outcome here.

17  Excuse me just one second.  I need some water.

18              One thing I've seen as I've read dozens of

19  cases -- and we do a lot of civil rights in the office

20  and so we get a lot of cases with Ms. white, actually,

21  believe it or not.  But we get a lot of cases

22  involving shootings and the like.  It happens

23  frequently.  So, I've had a chance over the years to

24  read most of these cases that have been cited in the

25  briefs, and here's what I take away from all of that.

1          The timing of the use of force is critical.

2    Okay?  The timing of the use of force is critical in

3    these cases.  It's like the Rodney King case, where he

4    leads deputies and police officers on a wild chase

5    through L.A. County, putting dozens of lives at risk,

6    a horribly irresponsible thing, crashes his car, he's

7    out in the field, and an officer goes out there when

8    he's now, you know, outside of his car, which was his

9    weapon, and bangs him over the head and gives him a

10   brain injury.

11         It was held to be improper, obviously, and so

12   the timing of the force is important.  And here's what

13   I see in this case.  And, again, there's been no

14   discovery done, but Zane James crashes his bike in the

15   street, okay?  Officer Betenson claims to have seen

16   that.  We don't know whether or not Officer Casey saw

17   that or not, because he raised his Fifth Amendment

18   right not to give a statement to his own department or

19   to investigators when he shot somebody dead.

20         So we don't know what his position is going

21   to be on that, but I think there -- just the inference

22   from these facts that are admitted in a motion to

23   dismiss is that maybe he did see that.  Okay?  Anyway,

24   the bike is, I don't know, 40 feet away on the

25   pavement from where he was shot in the front yard.

1          Now, he's limping away.  That's been alleged.

2    Undisputed.  There were many officer's on the way,

3    there are sirens, okay, going off.  The witness that

4    we have that saw this whole thing from her front

5    yard -- we recount in paragraph 60 of the Complaint --

6    said it's what woke her up.  She's out there and she

7    sees the whole thing from 40 or 50 feet away.  Okay?

8    There's no one else around.  Okay?  And there are

9    people in their homes, undoubtedly, but there's no one

10   else around.  That's an important thing.  His hands

11   are visible.

12         Now, they imply -- and they want you to weigh

13   these facts on the motion to dismiss -- they imply

14   that he was going for his gun, maybe his hand was near

15   his waist or something like that, but our witness says

16   no.

17         THE COURT:  Right.  And I understand the

18   rules that apply to a motion to dismiss.

19         MR. SYKES:  Sure.

20         THE COURT:  I'll take your allegations as

21   they are made.

22         MR. SYKES:  No weapon is visible.  Okay?

23   After they shot him and paralyzed him, they found it

24   tucked in his clothing somewhere.  A BB gun is what

25   they found.  Now, there are no hostile motions by

1    Zane.  None.  There are no threats uttered by Zane

2    against officers.  There are no sudden movements by

3    Zane.  Okay?  There is no warning, "Stop or I'll

4    shoot."  Okay?  And he was never told he was under

5    arrest.  Now, those are facts which pop up in all of

6    these cases in one form or another.  They just pop up.

7    Okay.

8           And here's -- this is Weinstein vs. McClone.

9    I think it's a very good case, a Seventh Circuit case,

10   but the cite is 787 F3d 444, 2015.  787 F3d 444, 2015.

11   But they talk about the Graham factors.

12          And here's what they say on page -- if I can

13   find it -- excuse me one second here.  I'll find it in

14   a minute.  But here's what they say after citing the

15   Graham factors:  In other words, a person has a right

16   not to be seized through the use of deadly force

17   unless he puts another person, including a police

18   officer, in imminent danger or he is actively

19   resisting arrest and the circumstances warrant that

20   degree of force.  As applied to the present case, this

21   means that Jerome -- that was the man shot -- has a

22   constitutional right not to be shot on sight if he did

23   not put anyone else in imminent danger or attempt to

24   resist arrest for a serious crime.

25          Now --

1          THE COURT:  What were the facts of Weinstein?

2          MR. SYKES:  The facts were -- it was domestic

3     disturbance.  Give me half a second.  I think his wife

4     Susan called 911, November of '07, told dispatch that

5     her husband was in the garage, he was threatening to

6     kill himself and he had access to a long gun.  Okay?

7     Susan did not know if he had any ammunition.  The

8     disptacher relayed all the information to Deputy

9     McClone.  Ms. Weinstein -- Weinmann vs. McClone.

10    McClone shows up, decides to force entry into the

11    garage.  He peered in, deduced that Jerome was in the

12    southwest corner of the structure -- it was the only

13    area not visible -- knocked on the door of the garage.

14    No response.  Forced entry.  At that point, Jerome was

15    sitting in a lawn chair with a shotgun across his lap

16    resting on the arm rests or just above them.

17          THE COURT:  All right.  I recall that now.

18    Thank you.

19          MR. SYKES:  And so, you know, my point is

20    that time and place makes a huge differences.  Now, if

21    you go to Tennessee vs. Garner, cited by both

22    parties -- excuse me.  I think this principle -- and,

23    by the way, Tennessee vs. Garner has been cited

24    thousands of times by -- in many different contexts.

25    But I think it's important to look at the facts.  I

1    mean, the kid was shot.  He committed a burglary.

2    Tennessee defended it by saying, well, burglars are

3    dangerous, and he could have had a weapon, kind of

4    thing, you know.

5            THE COURT:  Right.  No --

6            MR. SYKES:  You're aware of the --

7            THE COURT:  I am well aware of the facts.

8            MR. SYKES:  The use of deadly force to

9    prevent the escape of all felony suspects, whatever

10   the circumstances, is constitutionally unreasonable.

11   And all due respect to my esteemed colleague,

12   Ms. White, that's what she's arguing.

13           THE COURT:  Now, let me -- let me --

14           MR. SYKES:  In a nut shell, she's arguing

15   that.

16           THE COURT:  Now let me ask you a couple of

17   questions.

18           MR. SYKES:  Sure.

19           THE COURT:  I think, when you line this case

20   up with Garner, you know, obviously there's a

21   difference in the crime, but Garner gives, as an

22   example of when deadly force might be appropriate, I

23   guess it has three things it says.  It says, first of

24   all, when there's a danger posed to the officer or

25   when an inherently violent felony has been committed;

1   second, when it's necessary to prevent escape; and,

2   third, you know, when a warning, if feasible, has been

3   given.

4           It gives that as an example of when it might

5   be appropriate.  And, as I said to your opposing

6   counsel, I -- you know, as a constitutional matter

7   under Garner, I'm quite troubled by the absence of a

8   warning here, and I'm quite troubled by the -- you

9   know, the issue of whether it was really necessary.

10  That said, though, I have a question for you.

11          MR. SYKES:  Sure.

12          THE COURT:  Which is, are you aware of any

13  case where a Court has found a constitutional

14  violation when someone has committed an inherently

15  violent felony, when the officer could have reasonably

16  believed that they were armed and when they were

17  fleeing from the police?

18          MR. SYKES:  You know, some of the cases that

19  we cited in our briefing I think approach that.  It's

20  a very good question.  And, you know, I think it would

21  be helpful at some point, if you are okay with it, to

22  give us time to look at that specifically as you

23  phrased it.  But, you know, I think that the cases

24  that we -- I mean -- and on page 11 of document 16 of

25  our briefing we talk about the King case, the domestic

1    disturbance.  He's on the porch.

2           THE COURT:  That's different in at least a

3    couple of respects.

4           MR. SYKES:  He wasn't fleeing.

5           THE COURT:  He wasn't fleeing, and it wasn't

6    an inherently violent felony.

7           MR. SYKES:  No.  That's true.  And I'm not

8    sure, by the way -- I know this may sound odd, but it

9    was an armed robbery, but there was no violence

10   committed.  I mean, if the facts had been different,

11   you know, if he had shot people or shot the gun, even,

12   you know, that's different.  I know that using a gun

13   is obviously a potentially violent felony, but the

14   facts were that he didn't commit violence.  He

15   committed a violent felony perhaps, but no violence,

16   if that makes sense.

17          THE COURT:  All right.  No.  I understand

18   your point, but I think that might be a bit of an

19   uphill battle for you.

20          MR. SYKES:  It may be an uphill battle,

21   but -- but he didn't do any harm with his BB gun.

22          THE COURT:  Right.  I understand that.

23          MR. SYKES:  And so, those facts are -- are I

24   think important.  Now, let's see.  I did cite also --

25   you know, as far as having the exact facts, I don't

1   recall one where --

2            THE COURT:  Well, I don't need the exact

3   facts, I just need those three facts.

4            MR. SYKES:  That he left, that he -- one

5   where they left the scene, I -- Zuchel vs. Spinharney,

6   disturbance at a restaurant.  Kid pulled out a nail

7   clippers, told the officers it was a knife.  She got

8   shot four times.

9            THE COURT:  Again, it doesn't look as though

10  he was fleeing, and it's not clear that there was an

11  inherently violent felony.

12           MR. SYKES:  Yeah.  Well, you know, Estate of

13  Lopez vs. Gelhaus, Ninth Circuit case.  Toy gun

14  resembling an AK47.

15           THE COURT:  Again, not fleeing, no inherently

16  violent --

17           MR. SYKES:  Yeah.  No violent felony.  I, you

18  know, at this point, as I stand here, Judge, I can't

19  give you a case exactly like that.

20           THE COURT:  Right.  And --

21           MR. SYKES:  And I don't think it's required

22  under these rules, but it's a great question.

23           THE COURT:  No.  I --

24           MR. SYKES:  It's a great question.

25           THE COURT:  No.  I understand, you know, we

1   certainly have cases that, you know, like I guess the

2   hitching post case is the classic example where the

3   Court finds that the violation is clear enough, but as

4   your co-counsel said, the Supreme Court has made

5   clear, or at least it's indicated on a number of

6   occasions recently, that it doesn't view Garner and

7   Graham as being clear enough, absent a really easy

8   case.  And so, you know, if this were a case like

9   Garner itself, where there was, you know, not an

10  inherently violent felony, or at least that's what the

11  Court concluded in Garner, that might be one thing.

12          But I'm having a little bit of -- just like

13  I'm having trouble accepting, you know, the

14  constitutional argument made by your opposing counsel,

15  I'm having a little bit of trouble on your side

16  finding how you get past qualified immunity on the

17  second prong if there is -- if it is in fact the case.

18          MR. SYKES:  The second prong meaning?

19          THE COURT:  The clearly established law.

20          MR. SYKES:  Well, Judge, we -- you know, and

21  you have the black robe and I don't, but I think

22  Tennessee vs. Garner -- I mean, I read you the one

23  quote.

24          THE COURT:  Right.

25          MR. SYKES:  But, you know, while the suspect

1    poses no immediate threat to the officer and no threat

2    to others, the harm resulting from trying to apprehend

3    him does not justify the use of deadly force to do so.

4    He was fleeing.  And Tennessee said it was a violent

5    crime.

6            THE COURT:  Right.

7            MR. SYKES:  You know.  I mean, you can differ

8    on that.  The Supreme Court kind of poo-poo'd that.

9    It's just a burglary, but, you know, a lot of

10   burglaries end up in death because people get shot.  I

11   mean, you know, a lot of burglars are shot in Utah by

12   people defending their homes under the Second

13   Amendment.  It is no doubt -- it is no doubt

14   unfortunate, when a suspect who is in sight escapes,

15   but the fact that the police arrive a little late or

16   are a little slower afoot does not always justify

17   killing a suspect.  A police officer may not seize an

18   unarmed, non-dangerous suspect by shooting him dead.

19           THE COURT:  Yeah.

20           MR. SYKES:  I don't know how that could be

21   anymore clear.  You know, this young man, Zane, age

22   20, I think, maybe 19.  His parents can probably tell

23   me.  You know, as far as that officer -- he had

24   nothing in his hands.  He's limping away from the

25   scene of a crashed motor bike, you know.  And putting

1   his name in, officer, the defendant, may not seize

2   Zane, who's unarmed.  He doesn't have any arms --

3   maybe something tucked away, but he doesn't have

4   anything in his hands.  And, at that point, he's

5   non-dangerous.  He can't shoot him dead, see?

6          It is not, however, unconstitutional on its

7   face, where the officer has probable cause to believe

8   that the suspect poses a threat of serious physical

9   harm.

10         Now there's a comma there.  I think that's a

11  question of fact that needs to be fleshed out in

12  discovery.  You know, I'd like to get this guy under

13  oath.  I don't know that he can raise his Fifth

14  Amendment right anymore, okay?  And I know a jury

15  wouldn't take very kindly to it, if it gets to a jury

16  trial.  So I think he needs to explain what he was

17  thinking to see if he's a reasonable officer or not.

18  We don't know that.

19         THE COURT:  And particularly about whether he

20  really thought there was a danger.

21         MR. SYKES:  Yeah.  And to believe that the

22  suspect poses a threat of physical harm either to the

23  officer or to others.  It is not constitutionally

24  unreasonable to prevent escape by using deadly force.

25  Thus, if the suspect threatens the officer with a

```
1   weapon -- did not happen.  Okay -- or there is
2   probable cause to believe he has committed a crime
3   involving the infliction or threatened infliction of
4   serious physical harm.  Now, I think that's up in the
5   air.
6          I think a jury should hear that under
7   the cir -- we haven't interviewed those people that
8   were in the store that day, you know.  He did pull out
9   a BB gun.  No question, you know, but I think they
10  should be subjected to a deposition.  Deadly force may
11  be used if necessary to prevent escape and if, where
12  feasible, some warning has been given.  There was
13  clearly an opportunity to give a warning.  Okay?
14         Let's suppose he had a gun.  In some of the
15  cases I've read, they have a weapon, like the guy who
16  had a shotgun on the porch.  Give him a warning.  Put
17  that weapon down or I'll shoot or I'll tase you.
18         THE COURT:  Right.  So under Garner, you
19  would say, on the first part of that, that it's a
20  factual question whether there was a danger or whether
21  the armed robbery really involved a threat of
22  violence.
23         MR. SYKES:  Yeah.  Under the circumstances.
24  Don't forget, you know, Judge, if we're there at the
25  store -- let's suppose you're there at the store.
```

1   You're an off-duty officer, and you see this.  Those

2   facts might be different.  You don't know if he's

3   going to shoot or not.  Maybe at that point, you know,

4   he's got a weapon in his hand.  You don't know if it's

5   a BB gun.  It was.  But, you know, maybe that's

6   different.  But here we're talking about, you know,

7   ten minutes, seven or eight, ten minutes later, you

8   know, and he's injured and he's limping off, and he's

9   got his back to you.  You can see his hands and he's

10  got no weapon.

11          THE COURT:  Right.  So under the first prong

12  you'd say that there is a factual issue as to whether

13  he presented any threat or whether he committed --

14          MR. SYKES:  Yeah.

15          THE COURT:  -- a crime involving a threat of

16  course.  You'd say on the second part that it wasn't

17  necessary to prevent escape and, on the third part

18  you'd say that no warning was given, but it should --

19  that it could and should have been.  Is that

20  essentially what your position is?

21          MR. SYKES:  Exactly.  And arguably I think we

22  fit under Garner.  Now -- and let me just say this.  I

23  know time is a wasting here, and there are a lot of

24  other cases that have come our way since Garner, and

25  with apologies to my good friend Jim McConkie who is

1    in the audience here, I'm going to quote a case that

2    he lost called Clark vs. Boca, 2017.   Tenth Circuit

3    case, reported case.

4         They discuss all of these issues.   The young

5    man had relieved himself on the side of the road.

6    Officers had to pull him over.   He takes off.   He gets

7    into, I think, a cul-de-sac or something.   The officer

8    blocks his exit with a car and gets out of the car.

9    And, unfortunately, the young man was driving toward

10   him with his car.   He got within inches.   Okay.   Now,

11   those are the facts that the Court relied upon.

12        And then they cite The Estate of Larsen.

13   Okay?   And they cite the -- the case of Sevier City

14   vs. Lawrence, Lawrence, Kansas, 60 F3d 695.   I think

15   that's cited in the briefing.   But here's what they

16   say, citing Sevier, which was an older case.   It's a

17   90's case.   Here's what they say.   They quote it:

18        The reasonableness of an officer's actions

19   depends both on whether the officers were in danger at

20   the precise moment -- that's the language they use --

21   at the precise moment that they used force and on

22   whether the officer's own reckless deliberate conduct

23   during the seizure unreasonably created the need to

24   use such force.

25        Well, we don't have that, necessarily, but we

1   do have, at the precise moment.

2          And then it cites the estate of Larsen

3   Factors, 2008 case.  Now, I don't think the Tenth

4   Circuit can modify Garner, but it can certainly do an

5   exposition on its principles, and here's what it said,

6   which I think is very relevant to our -- to your

7   decision here today and whether to grant, in essence,

8   a summary judgment.

9          It says:  In assessing the degree of threat

10  the suspect poses to the officer, we consider factors

11  that include but are not limited to, one, whether the

12  officers ordered the suspect to drop his weapon and

13  the suspect's compliance with police commands;

14  semicolon.

15         That's crucial here.  And I don't even think

16  they are claiming that he did.  The witness -- our

17  witness says he didn't, you know.

18         Two, whether any hostile motions were made

19  with the weapon toward the officers.

20         No hostile motions.  He's limping off,

21  significantly injured.

22         Three, the distance separating the officers

23  and the suspect.

24         Well, you know, 30 to 40 feet here, I think.

25         And, four, the manifest intentions of the

1    suspect.

2          Well, you see nothing from his intentions, as

3    shown by his actions, to harm anybody.  And so, in

4    closing, I would say that there is -- what my esteemed

5    colleague -- I have a great deal of respect for

6    Heather White, by the way.  What she's asking you to

7    do is to weigh the evidence prematurely.  She's

8    saying, Judge Nielson, weigh the evidence in favor of

9    my client and find qualified immunity.

10         And I'm saying you don't have to do that.

11   Give us some time to do discovery.  She can reopen all

12   this under a summary judgment motion if she can prove

13   it.  I don't think she can.  And I'm saying defer

14   ruling on the facts.  Deny this -- this motion.  Let

15   us do some discovery.  Let us take the deposition of

16   this officer who claimed the Fifth Amendment.

17         I've been doing this for a long time, okay,

18   these kind of cases for a long, long time, okay, and I

19   have never had a case -- and I'm sure there are others

20   out there maybe -- I have never had a case where the

21   officer who has injured somebody has taken the Fifth

22   Amendment.  This is the first time in my career that

23   I've had one.  Now, I think that this officer needs to

24   be exposed to the greatest engine of truth in American

25   law as my -- Ken Star said on TV the other night, and

44

1    that is cross examination.  Okay?  He's not the first

2    that said it, by the way.

3            THE COURT:  No.

4            MR. SYKES:  But he said it last -- a few

5    nights ago.  Cross examination.  Let's expose this

6    case to the cross examination and the search light of

7    truth here and find out what really happened, and

8    that's all I ask you to do.  Thank you very much.

9            THE COURT:  All right.  Thank you.

10           Ms. White, do you have any rebuttal remarks

11   you'd like to make?

12           MS. WHITE:  Yes.  Just very quickly, three

13   quick points, Your Honor.

14           MR. SYKES:  I thought she used her 30 minutes

15   up.

16           THE COURT:  I'll give her just a couple, and

17   if you have any strong objections to what she says,

18   I'll give you another couple as well.

19           MR. SYKES:  Thank you.  Thank you, Judge.

20           MS. WHITE:  The first is that we are not

21   asking the Court to weigh facts.  We have approached

22   the briefing and the argument assuming everything

23   pleaded in plaintiff's Complaint is true, and so it's

24   our argument that, taking the four corners of that

25   Complaint and applying it to the law is insufficient

1   under the law.  So that's the first point that I

2   wanted to just clarify and ensure that the Court

3   understands.

4          THE COURT:  Yes.  Thank you.

5          MS. WHITE:  And the second goes -- and the

6   second two points goes to -- go to questions that you

7   asked me about cases on warning and on necessity of

8   stopping.  I wanted to just point out the language in

9   the Forrett case on the question you had about the

10  necessity.  And it goes to whether the deadly force is

11  necessary or not.  And at paragraph 6 of that opinion,

12  which was on page 420, it states, quote:  Even if

13  Forrett's capture was inevitable, it does not follow

14  on these facts that the use of deadly force was

15  unnecessary.  The Fourth Amendment does not require

16  law enforcement officers to exhaust every alternative

17  before using justifiable deadly force.

18          And I think that goes to some of the things

19  that Mr. Sykes was arguing and the feasibility of

20  that -- of the -- excuse me, not the feasibility of

21  the warning, but the necessity of stopping in

22  conjunction with all of the other factors we argued

23  with the location and escape and hostages and other

24  people.

25          The second point, I wanted to point the Court

1   to the Ridgeway case, and it talks about feasibility

2   of a warning, and in that case the Court really

3   focused on paragraph 10 of that opinion.  It says --

4   it focuses in on whether the suspect is aware that the

5   police are trying to apprehend him.  And in that same

6   paragraph, it talks about the fact that there were

7   police cars with lights and sirens and there was

8   continued flight, and that -- that that is sufficient,

9   that continued flight is sufficient to put a fleeing

10  suspect on notice that the -- and here's the

11  quotation, quote:  That the use of deadly force by the

12  police to capture him, end quote, would occur.

13          And so that's the cases.  I talked about the

14  fact that it's implied if they know the police are

15  pursuing them and not stopping, that that is a

16  possibility.  That is the warning that is the

17  feasibility and that is talked about in Garner, not

18  the words "stop or I'll shoot".

19          THE COURT:  All right.  Thank you.

20          MS. WHITE:  Thank you.

21          THE COURT:  Do you feel like you need to

22  respond to any of that, Mr. Sykes?

23          MR. SYKES:  No.  Not really.

24          THE COURT:  All right.

25          MR. SYKES:  Could we approach the bench

```
1   briefly, though?  I just want to make a comment off

2   the record about this.

3           THE COURT:  All right.  I guess both of you

4   can do that.

5           MR. SYKES:  I might not have a chance later.

6               (Discussion off the record)

7           THE COURT:  All right.  The case is submitted

8   and the Court is adjourned.

9           MR. SYKES:  Thank you, Judge.

10          MS. WHITE:  Thank you, Your Honor.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          (Whereupon the proceedings were concluded.)
```

```
 1

 2                   REPORTER'S CERTIFICATE

 3   STATE OF UTAH            )

 4                            ) ss.

 5   COUNTY OF SALT LAKE      )

 6

 7          I, REBECCA JANKE, do hereby certify that I

 8   am a Certified Court Reporter for the State of Utah;

 9          That as such Reporter I attended the hearing

10   of the foregoing matter on October 15, 2019, and

11   thereat reported in Stenotype all of the testimony and

12   proceedings had, and caused said notes to be

13   transcribed into typewriting, and the foregoing pages

14   numbered 1 through 47 constitute a full, true and

15   correct record of the proceedings transcribed.

16          That I am not of kin to any of the parties

17   and have no interest in the outcome of the matter;

18          And hereby set my hand and seal this 12th

19   day of August, 2020.

20

21

22

23

24          _____

25                  REBECCA JANKE, CSR, RPR, RMR
```