# E X H I B I T   1

Robert B. Sykes (#3180)
C. Peter Sorensen (#16728)
Christina D. Isom (#17244)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 South State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
christina@sykesmcallisterlaw.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| AARON JAMES and TIFFANY JAMES, Heirs and Proposed Personal Representatives of the Estate of Zane James, | Case 2:19-cv-00341 |
| Plaintiffs, | **DECLARATION OF TIFFANY JAMES** |
| vs. | |
| CASEY DAVIES, and COTTONWOOD HEIGHTS; | Judge Howard C. Nielson, Jr. Magistrate Judge Dustin B. Pead |
| Defendants. | |

STATE OF UTAH )
                ) ss.
County of Utah )

        1.     **Mother of Zane James**. My name is Tiffany James. I am a resident of

Cottonwood Heights, Utah. My address is 2881 East Palma Way, Cottonwood Heights, Utah

84121. I am the mother of Zane Anthony James. My son, Zane, was shot in the back on May 29,

1

2018, by Cottonwood Heights Police Department Officer Casey Davies. He passed away two days later. My husband is Aaron James.

2.  **Met With Cottonwood Heights Mayor and City Manager**. Aaron and I met in person with the Cottonwood Heights Mayor and City Manager on *November 12, 2018* at City Hall to request that the City complete an internal investigation into our son's shooting death. In that conversation with the Mayor and City Manager, we expressed our alarm that Officer Casey Davies was allegedly off duty at the time of the shooting and that he did not have on a car or body camera when he shot our son, nor did any of the other three officers who were the next to arrive at the scene. We also expressed to them our concern that certain eyewitness testimony, that we knew to exist, may not have been provided to the District Attorney during his investigation of the shooting, because it was not included in the District Attorney's report of October 8, 2018. The Mayor and City Manager indicated they were sorry they could not speak to us due to the potential for litigation and they further stated that their camera policy was not mandatory.

3.  **Requested Video Information Via GRAMA**. Aaron and I requested records from Cottonwood Heights Police Department regarding our son's shooting (Case 18X003056) as part of a GRAMA request dated *November 13, 2018*. We specifically requested all video associated with the case. We received a response on December 11, 2018 that the processing of requested video was "in progress." Later, we were provided only video of the aftermath of the shooting.

4.  **Why Were Officers Not Wearing Body Cameras?** Aaron and I thought it was very strange that none of the four (4) officers initially at the scene had body cameras. We had separate opportunities to talk to the Mayor, the City Manager, Police Chief Russo and Lt. Dan

2

Bartlett. We asked them why there was no body camera video of the actual shooting. My husband and I were told by each of them that body cameras were "not mandatory" and neither Officer Davies or Officer Betenson (second on the scene) were wearing body camera equipment at the time of the shooting. I relied on these discussions with Cottonwood Heights officials, as well as the information provided through our GRAMA request, as being a true and complete explanation of the facts as we attempted to understand the full story surrounding our son's shooting death. I forwarded the information we had been able to gather to our attorney who also relied upon that information as being a true and complete explanation. We told our attorney that there was no video of the shooting.

     5.     **My Relationship with Councilwomen Mikell and Bruce.** Prior to June 8, 2020, I had never met or spoken to Councilwoman Tali Bruce. I have had a limited professional relationship with Councilwoman Christine Mikell since September 2017. She and I participate with an industry group that meets quarterly. Prior to my contacting the two councilwomen in June 2020 to seek their support for a request to the City Council for CHPD policy reform, I had never discussed with either Councilwoman the shooting death of my son Zane by Officer Davies.

     6.     **Conversations with Councilwomen Bruce and Mikell.** My discussions with Councilwomen Bruce and Mikell initially began on or about June 8, 2020. I was seeking their support for changes to CHPD's formal policies and other general practices our family wanted to propose to the City Council. I made the decision to approach the two Councilwomen after the protests in Salt Lake City and nationwide on May 29, 2020 after George Floyd's death. Not only did these protests begin on the two-year anniversary of the shooting death of our son, but we also believed the specifics of his case could clearly demonstrate the importance for reform. Between

3

June 8th and August 4th, I corresponded with both Councilwomen numerous times regarding reform proposals and other related activities via e-mail, text and over the phone.  The focus of all my conversations were solely on local policy reform ideas and possible collaboration with state lawmakers to accomplish reforms to certain laws associated with use of lethal force by police officers and qualified immunity.  We also discussed how best to influence a return to community policing through mandated demilitarization and more rigorous training.

7.      **Specific Conversations with Christine Mikell**.  I had a number of verbal and written communications with City Councilwoman Christine Mikell as follows:

(a)      **June 8, 2020.**  I had a three-way text conversation with Ms. Tali Bruce and Christine Mikell regarding working together for police reform in Cottonwood Heights.  Based on an introduction by Tali, I asked both councilwomen if they were able to work with me.  Christine responded "Tiffany, Absolutely will help."  After receiving this response, I continued to communicate with Christine as time allowed through June and July on CHPD policy and state law reform ideas.  We also discussed traumatic brain injury (TBI) advocacy as part of the other work my husband and I were interested in pursuing given how Zane's pre-shooting TBIs had led to his addiction.

(b)      **June 26, 2020.**  During the quarterly industry meeting held online, Christine thanked me publicly in front of the group for all the positive work I was doing in our community.  The week before, June 15, 2020, I had spoken at a rally for police reform at the Cottonwood Heights City Hall.

(c)      **July 21, 2020.**  I spoke during the public comment period of the Cottonwood Heights City Council meeting on July 21, 2020 about the need for police reform.  Just

4

after I spoke, and still during the meeting, Christine sent me a personal text expressing her frustration with the unfair treatment I received from the City Manager during my comment and gave me advice on how to ask for more time in future meetings.

(e)     **July 28, 2020.** I had a follow up call with Christine to discuss her interest in participating in planned discussions of state-level legislative reform the following weekend (August 8 or 9). I was surprised when she said she would consider it but indicated she was not sure if she could participate because of the legal conflict presented by the lawsuit we had pending against Cottonwood Heights City and Casey Davies after Zane's death. I said I think we can work around that. She asked at that time what we were asking for in terms of a monetary settlement. I said that policy reform was our goal.

Ms. Mikell and I discussed that it was an appropriate time for CHPD to engage in policy reform discussions, citing as evidence the many stories of troubling CHPD behavior shared by community members during public comment periods at the Council meeting I had recently attended. Her response to me was to say she understood what CHPD was capable of and acknowledged that CHPD was heavy handed. She explained that she, as a Councilwoman, had recently received a misdemeanor trespassing charge by CHPD for her dog being off leash on her neighbor's yard when the situation could have been handled differently. We also talked about how Tali was a target of criticism by Chief Russo, the Mayor and other City Councilmembers. Because of how Tali was being treated by other City officials, Christine suggested that she may have a better chance at introducing reform ideas to the Council rather than Tali. She agreed to think about participating in an upcoming meeting on police reform with a group of state legislators.

5

(c)      **August 4, 2020 Phone Conversation.** I called Councilwoman Mikell to ask for her support in a request I intended to make in a public hearing later that night. I was going to ask that the Mayor, City Manager and City Council drop all criminal charges that were being filed against the August 2, 2020 marchers/protestors for police reform until there was an investigation into the CHPD response. Ms. Mikell asked me very pointedly to tell her again about "what we were asking" in our lawsuit against the city. Ms. Mikell specifically asked what amount of monetary damages we were looking for – I said we were expecting to recoup legal fees but it was about policy reform for us. Then she asked specifically what amount in damages we were seeking. I said I didn't know – that we had spent a significant amount both on the civil case and defending our son against wrongful charges for the five robberies he was accused of in 2017. The charges were dismissed due to finger prints and other physical and video evidence from the police file that proved Zane did not commit the robberies he was charged with. She then said something like "so like $200,000 for the attorney's fees." I was taken back by her question, the statement, and the dry tone of her voice and I told her that we have spent around $200,000 - $250,000 but that I was not prepared to give her a number.

She then wanted to know more about our interaction with the CHPD the morning of Zane's shooting. She asked me to explain what had happened "when we had gone to the City looking for help." Before I answered, I first asked if she was talking about the morning of Zane's shooting by CHPD or when we met in person in November, 2018 with the Mayor and City Manager to ask that they re-open the investigation into the shooting because of all the inconsistencies we were finding in evidence. She asked about the morning of the shooting. I was surprised by this question because I didn't know that she knew about our asking for help the

morning of the shooting.  Then I began, in detail, walking her through our interactions with CHPD the morning of the shooting:  My husband, Aaron went to the CHPD office Tuesday, May 29th, the day after Memorial Day, around 8:30 a.m. to ask for help finding Zane.  We were deeply concerned for his safety because he had relapsed the week before as part of a series of relapses following a four month period of sobriety.  He did not show up for his court date the previous Friday.  Zane had never missed a court date, even if he was in a relapse.  We knew the CHPD could help us as Zane would typically stay within a few miles of our house and they knew him very well.

After asking if they would help us find Zane, Aaron was told by Lt. Dan Bartlett in the lobby of the police station that Zane had been shot that morning around 6:00 a.m.  I told Christine that Lt. Bartlett said this to Aaron in front of a shocked-silent office full of CHPD Officers and staff that were looking on.  I told her how shocked we were that they hadn't called us because we knew that they knew who we were and where we lived.  While I was describing all of this to Christine, it occurred to me that she did not seem to know any of these details about CHPD telling us they didn't know where Zane was.  I knew that I had never recounted to her, personally, the full circumstances of Zane's death relative to the CHPD because I had been careful to keep this separate from my professional interaction with her.  She had also been adamant up to this point that she could not talk about Zane's case because she felt legally conflicted.

As I continued my description of the next events that morning, Christine began to seem really upset.  She told me about her own frustrations in dealing with CHPD referencing back to the inappropriate nature of the misdemeanor charge involving her dog and how a "ride along" with Chief Russo had been less than satisfactory.  I went on to explain how Lt. Bartlett told my

7

husband that we would have to find the hospital to which Zane had been taken because CHPD did not know the location. I then related how we arrived at the hospital and were barred from access to his room by a CHPD detective who told us that officers were guarding Zane due to an "active investigation." I told Christine that we were in complete shock, feeling as if we were watching a cover up unfold, because when we gained access to Zane's room we discovered he was shot in the back twice and paralyzed from the neck down. The nurse told us she had argued with the detective to let us in to see our teenage son as there was an immediate concern that Zane would not survive long. I told Christine of our disbelief as we were finding all this out, and then to see the public statements issued by the CHPD, some by Chief Russo personally, that Zane was a "known violent criminal" who had been shot after robbing a store at gunpoint but was in stable condition and expected to survive.

I was explaining how there was no mention to the media by CHPD or in the District Attorney's report that Zane was shot twice in the back, and that neither Officer Casey Davies nor the other three officers were wearing body cameras, or had car cameras on, during the time of the shooting. As I explained this, Christine seemed to become more frustrated. At one point, she interrupted, asking pointedly, "So, you have not seen the video?" Because I had fully accepted both CHPD's and the DA's statements to our family that there was no body camera video of the shooting, I felt confused and asked "Do you mean of the actual shooting? We were told there was no video of the actual shooting, just after the shooting." Christine answered very sarcastically and scoffed, *"Oh yeah, there is a video."*

(d)     **August 12, 2020**. On August 12, 2020, after having had three conversations with Ms. Tali Bruce regarding the video, I texted Christine Mikell asking to speak with her about

8

coming forward publicly to give a statement about the video. She texted back that she was not available to talk at the time I suggested, because she was traveling. Christine failed to contact me later about my request. I had no further communication with Ms. Mikell after that text. I took that as a clear message to me that Ms. Mikell did not want to be a part of anything that might create any further reason for her to be targeted, as Tali had been, by CHPD, Chief Russo, the Mayor and other City Councilmembers.

8.    **Specific Conversations with Tali Bruce.** I had multiple conversations with Tali Bruce regarding a video:

(a)    **August 2, 2020.** On August 2, 2020, Councilwoman Bruce and I were standing with a group of women making casual conversation before a political event for police reform in Cottonwood Heights. As the event started, the group dispersed. Councilwoman Bruce turned to me and hurriedly asked, "So, you have not seen the video?" I replied, "We have only seen video of after Zane's shooting. Is there other video of the shooting?" Tali replied back decidedly, "There is video. I'll get you a copy." That was the end of our conversation. Both of us quickly moved away toward the front of the event because I was going to be speaking.

(b)    **August 4, 2020.** On or about August 4, 2020, I contacted our legal counsel and related to him that, based on what Ms. Mikell and Ms. Bruce had told me, I believed there may be a video of the actual shooting. This is something that had never occurred to me because we accepted as fact that there was "no video," as we had been told by the City and by CHPD.

(c)    **August 6, 2020.** I called Tali Bruce on August 6, 2020 to ask her if she would tell me confidentially if there was an actual video of my son being shot by Officer Casey Davies. We discussed her predicament relative to Utah closed meeting law. She had been given

very direct instructions by City officials not to divulge information learned in closed meetings. She told me that she was concerned that city officials would press charges against her if she divulged information from their closed meetings. She explained that she had been on the phone all morning trying to understand closed meeting laws and was still not sure if she could disclose information about the videos she saw in an executive session of the City Council. So, I asked her that if, hypothetically, there was a video shown in an executive session, what would it show? She said it would show an officer pull up, get out of his car and shoot four times at a person running away. I asked if the person had a gun in his hands. She said that he did not. I started sobbing and thanked her for telling me and she just repeated, "I am sorry, I am so, so sorry."

(d)     **August 11, 2020.** On August 11, 2020, Ms. Bruce and I had a conversation that gave me the first indication that communications were happening within Cottonwood Heights City management regarding the video of the shooting. I asked Ms. Bruce to discuss the video of the shooting and see if she was willing to go public with the information. Ms. Bruce explained that, after our August 2nd discussion, she had asked the City Manager, Tim Tingey, about the video. Describing the conversation, she expressed frustration and open disbelief that Tim Tingey told her he believed her recollection of the video was of another shooting victim – a teenager shot under a bridge along a main thoroughfare in 2017. She also stated that Christine Mikell had been told the same information. I asked if it could be that what she saw was a different video? She answered, without hesitating, that she was not mistaken. She explained that Tingey was thinking of another video, a very different video. She went on to share with me the content of the 2017 video, that it was of an African American teenager who was shot under a bridge and not in a neighborhood with narrow streets and other brick houses. I asked her if she could tell if the video she saw of Zane's

10

shooting was from a body camera or a car camera. She answered that it looked as if it was from the perspective of a first-person shooter, a body camera. Then she added, frustrated that Tingey would suggest she might have been thinking about the wrong video, **"I saw it through Mommy eyes and it is burned into my brain. I saw what I saw."** She said she was going to talk to her attorney again about making a public statement.

(e)     **August 12, 2020**. On August 12, 2020, I was contacted by a reporter with the Salt Lake Tribune who had been told by Tim Tingey that the reported video was not of Zane's shooting, it was actually video of another, entirely different, non-fatal shooting by a CHPD officer. I called Ms. Bruce to ask her if she was certain about the other shooting video the City Manager was talking about and then asked, again, if she might have been mistaken. She told me in a positive tone that Tim Tingey had committed to pulling the recordings of the executive sessions from the City files to resolve the issue, once and for all, of what shooting video had been shown to the City Council. Ms. Bruce emphatically reiterated that she was not mistaken and began to describe in more detail what she had seen. She said the officer pulled up in his car, got out and fired four times at Zane without warning as he ran away. I asked her to confirm again that she did not see a gun in Zane's hand. She said there was no gun in his hands; that he was hobbling away and that his hands were moving like he was injured and was trying to run away.

(e)     **August 13, 2020, specific details of the shooting.** On August 13, 2020, I had another call with Ms. Bruce. She was very downhearted and reported that Tim Tingey told her that he couldn't find any information about a video because there were no recordings or transcripts of the closed session when a video was shown. Tali also said that Ms. Mikell had stopped responding to her texts about both the subject of the video and Tali's request to Tingey to

obtain a video copy or recorded transcript of the executive session when it was shown. To support her point that she had seen a video, she gave me the most vivid detail to date about the scene of the shooting and the aftermath of what she had witnessed in the video. She described in much greater detail what the neighborhood looked like, the houses, how Zane was holding his left hand away from his body like it was injured, how the four shots were fired without warning, how the second officer arrived shortly after Zane was shot and laying face first on the ground on the lawn, how the officers searched roughly through his pockets and turned him over as they looked for a gun, talking to each other about where the gun might be, that no aid was given by these officers until the other officers showed up. Ms. Bruce also told me she just remembered feeling shocked that there was no warning to Zane. The Officer just got out of his car and shot. She didn't understand why the Officer didn't just tackle him as he was so close to him and it was clear he was injured.

(f)     **August 24, 2020.** On August 24th, my husband Aaron and I met together with Ms. Bruce. In this conversation she said she was asked to sign a declaration by the City Attorney Shane Topham that was prepared by the City. In the declaration, Ms. Bruce was asked to state, under oath, that the video she saw in the executive session was not a video of Zane being shot by Officer Casey Davies but a different video. She told Mr. Topham that she would not sign, and could not sign, that statement. In this conversation with Aaron and me, she also confirmed that Tim Tingey had told her that there were no meeting minutes or recordings of the closed meeting in which the video of the shooting might have been shown. Ms. Bruce told me at this meeting that she was worried that she would be singled out; that her disclosure of the video might

make things worse given the lawsuit Chief Russo had recently filed against her for her reporting incidents of CHPD intimidation and harassment since 2018.

During our conversation and others, Ms. Bruce expressed extreme concern about CHPD. She described many incidents of intimidation and harassment by Chief Russo and CHPD which, even though she had reported them, had not been addressed by City officials in authority. She said it started shortly after her Council term began in January 2018, after she questioned aspects of the CHPD budget during a routine budget review in a City Council meeting, and I observed in later conversations that it seems to have intensified after she questioned aspects of CHPD's behavior regarding Zane's dismissed robbery charges in 2017 and his shooting.

9. **Ms. Bruce's Testimony Is Consistent With Other Eyewitnesses**. On August 2, 6, 11, 12, and 13, 2020, Ms. Bruce described to me very specific details about our son's shooting by Officer Davies that were nearly identical to the descriptions provided to me by two separate eyewitnesses to the shooting. Tali described to me the entire sequence of Officer Davies shooting Zane and then searching Zane along with other officers who arrive on scene after the shooting. This is significant because an eyewitness who spoke to me saw the shooting from directly across the street facing east. Heather Dodd reported to me that she saw Zane hobbling away, his arms down close to his sides with both hands visible and his left hand held out slightly like it was badly injured. She saw the officer drive up, get out of his vehicle and, without warning, shoot four times at Zane. She saw Zane fall to the ground. At this point another police vehicle arrived at the scene and she no longer had a direct line of sight. Another eyewitness, Jamie Vesterfelt, told Salt Lake City police investigators that he saw Zane crash his motorcycle and begin running. He could see Zane running away from the officer, his arms moving back and forth in a

13

running motion. He did not see anything in his hands. He was not making any threatening moves. Only seconds later he heard three gun shots. The officer who fired the shots began searching Zane. Several more officers arrived shortly afterward and continued to search Zane before they provided first aid. These eyewitnesses, from two different vantage points, corroborate what Tali Bruce had related about the morning of May 29th. I believe the only way Tali Bruce could have known the detail she described to me is if she saw a video of the actual shooting. Therefore, the only video that could have captured the entire sequence would have been one recorded from Officer Davies' body camera.

10.       **Complete Confidence That Ms. Bruce Has Seen A Video**.

In my opinion, the many facts about the sequence of events that spans both the shooting and after the shooting could only have been known by someone who was an eyewitness or by someone who had seen video footage of the actual events of the shooting. What Ms. Bruce told me matches so closely what both eyewitnesses have related. This gives me complete confidence that Ms. Bruce has most assuredly seen a video of the shooting by Officer Davies. Adding to my confidence is the consistency in the details she provided during the multiple conversations over the course of three weeks. So, even as new details emerged during our conversations, the previous details provided by Tali remained the same throughout our conversations and the additional details aligned her description more and more closely with the very specific statements made by the two eyewitnesses I have actually met or whose statements I have read.

14

I declare under criminal penalty under the law of Utah that the foregoing is true and correct.

DATED this 6th day of November, 2020.

_____
TIFFANY JAMES, Affiant