1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF UTAH

3                 CENTRAL DIVISION


4    _____
                                    )
5    JAMES, ET AL.,                 )
                                    )
6          Plaintiffs,              )
                                    )   Case No. 2:19-cv-00341-HCN-DBP
7    vs.                            )
                                    )
8    DAVIES, ET AL.,                )
                                    )
9          Defendants.             )
     _____)

10

11      **EVIDENTIARY HEARING VIA ZOOM BEFORE THE HONORABLE**

12            **JUDGE HOWARD C. NIELSON, JR.**

13

14            Wednesday, November 18, 2020

15

16            Time:  1:07 p.m. to 6:42 p.m.

17

18

19

20

21   Reported by Teena Green, RPR, CRR, CBC

22        United States Courthouse
          351 South West Temple, 7.430
23        Salt Lake City, Utah  84101
          (801) 910-4092
24        teena_green@utd.uscourts.gov

25

**APPEARANCES**

FOR THE PLAINTIFF:

ROBERT B. SYKES, ESQ.
CHRISTOPHER PETER SORENSEN, ESQ.
SYKES MCALLISTER LAW OFFICES
311 State Street, Suite 240
Salt Lake City, Utah   84111-2320
(801) 533-0222
bob@sykesmcallisterlaw.com

FOR THE DEFENDANT:

HEATHER S. WHITE, ESQ.
DANICA N. CEPERNICH, ESQ.
SNOW CHRISTENSEN & MARTINEAU
10 Exchange Place, 11th Floor
PO Box 45000
Salt Lake City, Utah   84145-5000
(801) 521-9000
hsw@scmlaw.com

FOR OFFICER CASEY DAVIES:

JEFFREY CHRISTIAN JENSEN, ESQ.
NELSON JONES PLLC
8941 South 700 East, Suite 203
Sandy, Utah   84070
(801) 981-8779

FOR NATALIE BRUCE:

MICHAEL W. YOUNG, ESQ.
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
PO Box 45898
Salt Lake City, Utah   84145-0898
(801) 532-1234
myoung@parsonsbehle.com

# I N D E X

**Witness:**                                          **Page**

NATALIE B. BRUCE

Direct Examination by Mr. Sykes                        12
Cross-Examination by Ms. White                         38
Redirect Examination by Mr. Sykes                      93
Recross Examination by Ms. White                       95

**Witness:**                                          **Page**

CHRISTINE MIKELL

Cross-Examination by Mr. Sykes                         99
Redirect Examination by Ms. White                      115

**Witness:**                                          **Page**

CASEY ALLEN DAVIES

Cross-Examination by Mr. Sykes                         117
Redirect Examination by Ms. White                      135

**Witness:**                                          **Page**

ERNEST ROBERT RUSSO

Cross-Examination by Mr. Sykes                         141

**Witness:**                                          **Page**

TIFFANY JAMES

Cross-Examination by Ms. White                         146
Redirect Examination by Mr. Sykes                      181

August 25, 2020                                        1:07 p.m.

**P R O C E E D I N G S`**

  **THE COURT:**  Good afternoon.  We're here today for an evidentiary hearing in the matter of *Aaron James, et al., versus Casey Davies, et al.*, and that's Case No. 2:19-cv-341.

  Let's begin by having appearances of counsel for the record.  I know you've discussed that already with the courtroom deputy, but we're on the record now.

  We'll start with plaintiffs.

  **MR. SYKES:**  Robert Sykes and Peter Sorensen, let me show him over here, for the plaintiff.

  **THE COURT:**  All right.  Welcome, Mr. Sykes and Mr. Sorensen.

  How about for the defendants?

  **MS. WHITE:**  Heather White and Dani Cepernich on behalf of the defendants.

  **THE COURT:**  All right.  Welcome.  Thank you.

  I understand that we have a lawyer here making a limited or special appearance for Officer Davies as well?

  **MR. JENSEN:**  That is correct, Your Honor.

  **MS. WHITE:**  Can you hear Mr. Jensen?  Let me have him come over here.

  **MR. JENSEN:**  J.C. Jensen on behalf of Casey Davies, Your Honor.

  **THE COURT:**  All right.  Welcome, Mr. Jensen.

1          And do we have the attorney for Ms. Bruce on the line

2   yet?

3          **MR. YOUNG:**  Yes, Your Honor, Michael Young here.

4   Tali Bruce is with me in our conference room, making my limited

5   appearance.

6          **THE COURT:**  All right.  Thank you.  And that was

7   Mr. Young; correct?

8          **MR. YOUNG:**  Correct.

9          **THE COURT:**  All right.  Welcome.  Thank you.  I can

10  see you as well.

11         All right.  Very well.  Are there any other attorneys

12  who need to make an appearance?

13         Hearing none.

14         All right.  We need to be quite careful today, given

15  the fact that we're doing this by Zoom.  As an evidentiary

16  hearing, we want to have a clear and accurate transcript, so

17  please try to speak slowly.  And if appropriate, please state

18  your name and role when you begin speaking, unless I've

19  specifically asked you to speak or unless the context makes

20  clear who you are.

21         And, again, except for objections and things, please

22  try not to speak over each other or interrupt and please speak

23  only when directed to.

24         Finally, put your microphone on mute when you're not

25  speaking or actively involved to reduce background noise.

Now, just some logistical things at the outset.

What I envision is that this is going to be a little different from a usual hearing because we're not going to do direct examination for most of the witnesses, I'm going to rely on the declarations instead. And I have read the declarations, all of them, and I've reread the ones of the witnesses who are appearing here today. I've also read Ms. White's objections to the declaration of Ms. James and I will take those under consideration.

I think we'll start with plaintiffs and I will let the plaintiffs, number one, question Ms. Bruce. And then also, cross-examine any of the defendants' witnesses that they would like to, who are here.

With regard to Ms. Bruce, I think, Mr. Sykes, I'm going to start out treating her as if she were your witness and as if this were a direct examination. So the usual rules governing leading questions and so forth will apply.

**MR. SYKES:** Understood.

**THE COURT:** Right. If things develop in a way that makes it seem that I should not treat her as a friendly witness to you, then I will let you take a more adversarial approach, more like a cross-examination.

Then, also, with Ms. Bruce, Ms. White, you or your colleague can cross-examine Ms. Bruce after Mr. Sykes is through. Then for each of the witnesses of yours that

1   Mr. Sykes cross-examines, you can have some redirect, if you
2   would like.
3         Now, Mr. Sykes, we're in an unusual context here
4   where we've not moved past the motion to dismiss stage. And as
5   you know, you're very familiar with qualified immunity cases,
6   it seems like you're a frequent litigant in that context. The
7   doctrine is designed in part to protect defendants who are
8   entitled to assert qualified immunity from the burdens of
9   discovery. So because of that, I'm going to be quite strict
10  when you cross-examine Mr. Davies that, number one, your
11  cross-examination needs to be limited to the matters raised in
12  his deposition, as well as matters that are relevant to whether
13  or not there is a video recording.
14        So this is not -- I'm not going to allow you to get
15  into broader matters about the incident in general and the sort
16  of things that you would be entitled to discovery on if we get
17  past the motion to dismiss stage. Is that clear, what I'm
18  saying, Mr. Sykes?
19        **MR. SYKES:** Yes. I've got about three minutes of
20  direct for him.
21        **THE COURT:** Right. Well, it's actually cross,
22  technically, but yes. Right. That's fine.
23        But, again, I just want to make clear that this is
24  not -- you know, if you survive the motion to dismiss, you'll
25  have a chance to depose him and ask him about anything that's

1  potentially relevant to the case.  But today, you need to stay

2  focused on matters that are relevant to the possible existence

3  of a video and other matters that he addressed in his

4  declaration.

5      **MR. SYKES:**  I understand.

6      **THE COURT:**  All right.  After you've done that,

7  Mr. Sykes, after you've examined Ms. Bruce and cross-examined

8  any of the other witnesses that you would like, other than, you

9  know, any of the defendants' witnesses, and then after -- as I

10  said, after you've examined each witness, I'll give Ms. White

11  or her colleague a chance to either do cross or redirect,

12  depending on which witness it is.

13      Then we will turn to Ms. White and Ms. Cepernich, and

14  we will let you cross-examine Ms. James if you wish to do so,

15  and then I think that's the only witness of Mr. Sykes's that's

16  here today.  Is that correct, Mr. Sykes and Ms. White?

17      **MR. SYKES:**  I have questions for Christine Mikell.

18      **THE COURT:**  Oh, yes.  We'll treat that -- I'm going

19  to treat her as one of the city's witnesses.  So you can

20  cross-examine her about her declaration at the beginning, after

21  you talk to Ms. Bruce and as you talk to the other declarants.

22      **MR. SYKES:**  I have a -- a very few questions for

23  Casey Davies.  I have about two or three minutes of questions

24  for Mr. -- Officer Betenson, and maybe two or three minutes for

25  Chief Russo.  That's all.

1    **THE COURT:**  Okay.  That's very good.

2         And, Ms. White, do you anticipate -- other than the

3    redirect -- the cross of Ms. Bruce and the redirect of any of

4    the individuals Mr. Sykes just mentioned, do you anticipate

5    anything other than just cross-examining Ms. James?

6         **MS. WHITE:**  No, that's it, Your Honor.

7         **THE COURT:**  All right.  Very good.

8         Now, in terms of objections and so forth, I think,

9    number one, let's follow the usual rules that -- you know, one

10   attorney per side per witness.  So, you know, if -- you know,

11   either Ms. White or Ms. Cepernich can be making objections --

12   or Mr. Cepernich [sic] can be making objections to questions

13   asked by Mr. Sykes or Mr. Sorensen, but not both.

14        And because this is a videoconference, it's a little

15   bit unwieldy, so please try to -- how do I say this? -- limit

16   your objections to things that really matter.  Keeping in mind

17   here that we don't have a jury, the court is quite capable of

18   evaluating -- you know, distinguishing what's relevant from

19   what's not.  And also -- so it's possible that --

20        Sometimes, in a trial, there's probably two or three

21   times as many objections as there really need to be.  And

22   you're welcome to make them, I'm not telling you you can't

23   object, but please try and limit them to the most -- to things

24   that really matter, just because it's hard to keep track of, on

25   the screen, who's talking at the same time and so forth.

And also, raise your hand if you don't mind, while you object, so I can have a visual clue, as well. We're not in a courtroom, so standing up won't have the same effect as it would in court.

All right. Before we proceed, are there any questions about any of that?

**MS. WHITE:** No, Your Honor.

**THE COURT:** All right. And now, of course, as I said, we're going to limit the objections to one attorney per party, but I understand for the testimony of Ms. Bruce, of course, Mr. Young, you're free to object, as well as the appropriate party for the -- you know, either the city or the plaintiff.

And with respect to Officer Davies, I suppose, Mr. Jensen, the same goes for you.

Everyone got that? All right. As I said -- and then, Mr. Young, if you have an objection, raise your hand first and then take -- and I think just for -- if we have enough -- if we can keep the ambient noise down, I think the people who might potentially be raising objections during testimony should probably take their microphones off mute as well as the witness and the questioning lawyer. Sometimes in the heat of action, it's easy to forget that you're on mute. And, you know, if you do have an objection, you might not be noticed if we can't hear you.

1              So with that, Mr. Sykes, I will let you proceed, you

2    know, essentially, as if we were in court.  You can call them,

3    the witnesses, one at a time and then either engage in direct

4    with Ms. Bruce or with cross with the others.

5              **MR. SYKES:**  I would call Tali Bruce.  Do you want to

6    have her sworn in here?

7              **THE COURT:**  We will.

8              And, Michelle, can you do that?

9              **THE COURTROOM DEPUTY:**  Yes.

10             Raise your right hand, please.

11             You do solemnly swear that the testimony you shall

12   give in the case now before the Court to be the truth, the

13   whole truth and nothing but the truth, so help you God?

14             **THE WITNESS:**  I do.

15             **THE COURTROOM DEPUTY:**  Thank you.  If you will please

16   state your full name and spell it for the record.

17             **THE WITNESS:**  My full name is Natalie Bruce.  I go by

18   Tali Bruce.

19             Do you want me to spell "Natalie" or "Tali"?

20             **THE COURTROOM DEPUTY:**  Natalie, please.

21             **THE WITNESS:**  N-A-T-A-L-I-E, B-R-U-C-E, Bruce.

22             **THE COURTROOM DEPUTY:**  Thank you very much.

23             **MR. SYKES:**  Okay.  And just for the record, you spell

24   Tali T-A-L-I?  That's your nickname?

25             **THE WITNESS:**  Yes.

1    **MR. SYKES:**  Now, I've got Michelle front and center

2    on my screen.  I'm not seeing the witness at all.  Is there

3    something we can do about that?

4          **THE COURT:**  Usually there's a setting where you can

5    adjust so that you have everyone's picture on the --

6          **MR. SYKES:**  I've got speaker view.

7          **MR. YOUNG:**  Bob, I think she'll pop up once we start

8    speaking.

9          **MR. SYKES:**  That's good.  That's good.  I've got it

10   now.  Thanks.

11                      **NATALIE B. BRUCE,**

12   called as a witness for and on behalf of the plaintiffs, being

13   first duly sworn, was examined and testified as follows:

14                      **DIRECT EXAMINATION**

15   **BY MR. SYKES:**

16   **Q.**   Ms. Bruce, just by way of background for the Court, where

17   did you grow up, how long have you been in Utah, how old are

18   you, that sort of thing?

19   **A.**   I was born and raised in Utah.  I grew up in Sandy.  I'm

20   52 years old.

21   **Q.**   Okay.  I would have thought 32 but --

22   **A.**   Thank you, Bob.

23   **Q.**   Was your maiden name Curtis?

24   **A.**   Curtis.

25   **Q.**   Greg Curtis is your brother; right?

**A.**    He is.

**Q.**    Where were you educated and how far did you go in education?

**A.**    I attended Brighton High School, graduated from Alta High School, and graduated from Brigham Young University with a business management degree.

**Q.**    Okay.  What year did you graduate from BYU?

**A.**    1991.

**Q.**    And you couldn't get into the U so you went there?  Second choice?

**A.**    I started at the U, Bob, I started at the U.  I graduated from the Y.

**Q.**    Tell us about your experience in business, if you would.

**A.**    I currently own seven sports pubs called Bout Time Pub & Grub and one Italian --

**Q.**    Bout Time?

**A.**    Bout Time.

**Q.**    Are they all the same name, Bout Time?

**A.**    Yeah.  They're all doing business as Bout Time Pub & Grub.

**Q.**    Where are they located generally?

**A.**    Mostly in the Salt Lake Valley, one in Ogden, one in Kimball Junction.

**Q.**    And to whom are you married?

**A.**    I'm married.

**Q.**    What?

1    **A.**    I'm married.

2    **Q.**    And to whom?

3    **A.**    Oh.   William Bruce is my spouse.

4    **Q.**    Tell us briefly about your city council service, when you

5    got elected and when you served.

6              **MS. WHITE:**   Your Honor, I've not objected and given

7    quite a bit of leeway, but as Your Honor mentioned at the

8    outset, we really are focused in on the video recording, and it

9    seems like we're just getting far afield of that.

10             **THE COURT:**   All right.   Well, Ms. White, I'm going to

11   give -- this seems like kind of harmless introductory material

12   and I'll let Mr. Sykes go on with it for a little bit more, but

13   we do need to eventually get to the video.

14             **MR. SYKES:**   We will.   And I would just say, Judge,

15   her city council service -- the defendant raised the objection

16   that comments made about the video were outside the scope of

17   her service as a city council person, and I'm laying the

18   foundation to show that they were not.

19             **THE COURT:**   All right.

20             **MR. SYKES:**   It's highly relevant.

21             **THE COURT:**   Okay.   You can proceed, Mr. Sykes.

22   BY MR. SYKES:

23   **Q.**   Go ahead, Ms. Bruce.   Tell us about your city council

24   service, when you were elected and what you've done in the city

25   council, just very quickly.

1   **A.**   I was sworn into office January of 2018.

2   **Q.**   Okay.

3   **A.**   I represent District 3 in the city.

4   **Q.**   District 3?  Which generally is where?

5   **A.**   East of Highland Drive, kind of between I-215 and Bengal

6   Boulevard.

7   **Q.**   Okay.  And is it a four-year term?

8   **A.**   It's a four-year term.

9   **Q.**   You ran for office in 2017, were elected in November of

10  2017?

11  **A.**   Yes.

12  **Q.**   And your term expires in November of 2021; right?

13  **A.**   January 1, 2022.

14  **Q.**   '22, okay.

15      And in the course of your experience in the city council,

16  did you take an interest in police reform?

17  **A.**   Yes.

18  **Q.**   Okay.  Did you take an interest in government

19  inefficiency?

20  **A.**   Yes.  Yeah, government efficiency.

21  **Q.**   Did you take an interest in reform of the Cottonwood

22  Heights Police Department as part of that process?

23  **A.**   Yes.

24  **Q.**   Okay.  Did you make a recommendation at some point that

25  the city, Cottonwood Heights -- there are five council people;

1  right?

2  **A.**  Four and a mayor, yes.

3  **Q.**  Four and a mayor, okay.

4  **A.**  People voting, yes.

5  **Q.**  Okay.  Equal voting for all five; is that right?

6  **A.**  Correct.

7  **Q.**  And you have a city manager?

8  **A.**  Yes.

9  **Q.**  Okay.  So just so the Court has an understanding, that's

10  called a weak mayor form of government, isn't it?

11  **A.**  Correct, yeah.

12  **Q.**  The city manager does the day to day and the mayor is a

13  figurehead?

14  **A.**  Yes.

15  **Q.**  Okay.  All right.

16  **A.**  He's a voting member.

17  **Q.**  Pardon me?

18  **A.**  He's a voting member.

19  **Q.**  Voting member, okay.

20      And did you make a recommendation at some point that the

21  city look at contracting out its police functions to the

22  Unified Police Department?

23  **A.**  I did not make the recommendation but I did advocate that

24  we do a cost benefit analysis.

25  **Q.**  Okay.  Now, tell us briefly about your relationship with

1    Tiffany James.

2        When did you meet and what were the circumstances?

3    A.    I met Tiffany James in the summer of 2020.  She reached

4    out to me to inquire if I would be supportive of police reform

5    policies that she was advocating for.

6    Q.    Okay.  Do you remember about what month -- we'll talk

7    about June, July, August, what month?

8    A.    June, early June, I believe.

9    Q.    Okay.  And can you tell us briefly, by way of foundation

10   here, what kind of things you were discussing at that time?

11   A.    Yeah.  She wanted to bring some legislation.  She was also

12   reaching out to Senator Reibe and Councilwoman Mikell, and she

13   wanted support.

14   Q.    For some legislation to do what, if you can remember?

15   A.    Just modify police policy.

16   Q.    Okay.  Was it specifically -- was part of that discussion

17   you were having to modify police policy in Cottonwood Heights?

18   A.    I believe she wanted to pursue statewide modifications.

19   Q.    Okay.  Was part of it Cottonwood Heights also?

20   A.    Yes.

21   Q.    Did you discuss this with her in your official capacity as

22   a Cottonwood Heights city council member?

23        MS. WHITE:  Objection to the qualification of

24   "official capacity," calls for a legal conclusion.

25        THE COURT:  All right.  Let's see.  Mr. Sykes, why

1    don't you -- you can ask her whether she -- you know, you can

2    ask her about that, just in terms of her own understanding.  I

3    think at least --

4    **BY MR. SYKES:**

5    **Q.**   Ms. Bruce, what was your understanding, as you were having

6    these discussions, as to what your capacity was as you were

7    having the discussions?

8    **A.**   She reached out to me because I was her city councilwoman.

9    She would not have reached out to me otherwise.

10   **Q.**   Was she in your district?

11   **A.**   That's in my district.

12   **Q.**   Okay.  All right.

13        And what kind of -- just generally -- this is my last

14   question on the foundation, but generally, what kind of

15   reforms, if you can remember, were in the discussion milieu?

16   **A.**   I know that she wanted to advocate for better training,

17   requirement of body cam usage, deescalation tactics, things of

18   that nature.

19   **Q.**   Okay.  Did you become aware at some point that she was the

20   mother of a young man that was shot by Cottonwood Heights

21   police?

22   **A.**   I did, yes.

23   **Q.**   Okay.  When did you come to that knowledge and how?

24   **A.**   I believe Anna McNamer invited her to speak at the police

25   reform rally.  And she was there in the capacity of the mother

1   who was -- of the teenager that was shot.

2   **Q.**   Would you spell Anna's last name?

3   **A.**   M-C-N-A-M-E-R.

4   **Q.**   Thank you.

5       Now, I'm going to ask you about three possible videos of

6   three possible incidents.  I'm going to name them one, two and

7   three so we can be very clear.  Okay?

8       I'm going to ask you if you've seen any of these in just a

9   minute, okay, and how you saw them.  But number one would be a

10  video of a 2017 nonfatal shooting by Cottonwood Heights Police

11  Department at night under a bridge.  I'll call that number one,

12  2017.  Okay?

13  **A.**   Okay.

14  **Q.**   Have you ever seen a video of that, ever, and how?

15  **A.**   Yes, I have, via the Internet.

16  **Q.**   Over the Internet, okay.  That's posted publicly, is it

17  not?

18  **A.**   Yes.

19  **Q.**   Okay.  Number two would be a video on 5/29/2018, of the

20  Zane James shooting.  If a video exists, I know that's

21  contested here, but that would be number two and I'll ask you

22  about that in a minute.

23      And number three would be 5/29/18, the aftermath of the

24  shooting when Officer Harris, I think it is, arrives and takes

25  a video of Zane on the ground.  That would be number three.

1   Okay?

2        So are you clear about that, one, two and three?

3   **A.**   Yes.

4   **Q.**   Okay.  Have you seen number three --

5   **A.**   Yes.

6   **Q.**   -- of the aftermath?

7   **A.**   Yes.

8   **Q.**   Where did you see that and what were the circumstances?

9   **A.**   Oh, we were shown, I believe, June 12th in the closed

10  session at city council.

11  **Q.**   Let me go to that June 12th meeting.  You're talking about

12  the Cottonwood Heights city council met on June 12th, 2018; is

13  that correct?

14  **A.**   Correct.

15  **Q.**   Almost exactly two weeks after the Zane James shooting; is

16  that right?

17  **A.**   Yes.

18  **Q.**   Okay.  And by the way, have you ever been deposed or

19  examined before like this ever?

20  **A.**   No.

21  **Q.**   And you're doing a good job.  You just need to make sure

22  you answer everything audibly because when you shake your head

23  I can understand that, the Judge can, but the record might not.

24       So there was a closed meeting on that day, was there?

25  **A.**   Yes.

**Q.** Was there an open meeting that preceded the closed meeting?

**A.** Yes.

**Q.** And what was represented to you and by whom with respect to why this meeting needed to be closed?

**A.** To the best of my recollection, it was to assess the character and competency of Officer Davies.

**Q.** Okay. That's what you were told?

**A.** That is my recollection of my -- the reasoning in my head.

**Q.** And [inaudible] at this meeting, Ms. Bruce, did you see a video of the shooting of Zane James?

**MR. YOUNG:** Bob, you're kind of crackling.

**THE WITNESS:** Your microphone is a little crackly.

**MR. YOUNG:** Are other people having that issue or is that on our end?

**THE COURT:** No, I'm hearing it as well. I think we're having some feedback or maybe you're not close enough to your microphone.

**MR. SYKES:** Is that better?

**MR. YOUNG:** No. Bob, do you have two speakers going on in that room? Because it sounds like feedback.

**THE COURT:** And it was very clear until after just a few -- just a couple of minutes ago, so something is --

(Discussion held off the record.)

**MR. SYKES:** Tell you what. Give me half a second.

1    I'm going to switch.  I've got my TV in the background and I'm

2    going to switch to [inaudible].

3                Can you hear me now?

4                **THE COURT:**  Not well.

5                **MR. SYKES:**  Can you hear me now?  Can you hear me

6    now?

7                **MR. YOUNG:**  Same issue.  I don't know what you

8    changed.  It barely started.  The first part of the examination

9    was fine and then we started getting the feedback or the

10   crackling.

11               **MR. SYKES:**  Can you hear me now?

12               **THE COURT:**  Keep speaking a little bit.

13               **MR. SYKES:**  Is that better now?

14               **THE COURT:**  It seems to be.

15               **MR. SYKES:**  Perfect.  Let me try that.  I'm sorry

16   about that.

17   **BY MR. SYKES:**

18   **Q.**   Let me reask that question.

19        I'm talking about now video number two, a potential video

20   of the shooting of Zane James.  Did you see a video like that

21   in the June 12th meeting?

22   **A.**   Yes, I did.

23   **Q.**   Okay.  Would you describe for the Court what you saw,

24   please.

25   **A.**   The video of the shooting began with an image of a

1  crumpled motorcycle on the right-hand curb of the street and it

2  quickly panned to the left, where you could see Zane James

3  hobbling on the grass.  He was attempting to run away, but was

4  clearly injured and hobbling.  His right arm was visible,

5  extended down the side of his body.  His left arm was quite

6  folded and held up, clearly indicating an injury.

7       He -- his pants were sliding down on his hips, you could

8  see the waistband of his underwear.  And his left arm went

9  back, to me it looked evident that he was going to pull up his

10 pants, which were dropping as he was attempting to flee.

11      At that point, you hear, pow-pow, pow-pow, and he went

12 down, face down into the grass.  The officer approached the

13 body and in my mind, I was thinking check for a pulse, check

14 for a pulse, but he immediately began to search the pockets,

15 pulled out a gun and threw it on the grass with a flick of his

16 wrist, demonstrating there's a gun.  And the video ended after

17 that.

18 **Q.**   Was the video a first-person video, meaning the shooter,

19 or was it like from a car or another person standing to the

20 side?

21 **A.**   I believe it was first person.

22 **Q.**   Okay.  So your belief is that the person -- that the video

23 camera was on the person doing the shooting?  Is that what

24 you're saying?

25 **A.**   I believe so.

1    **MS. WHITE:**  Objection.

2    **THE COURT:**  Okay.  Ms. White, go ahead.

3    **MS. WHITE:**  Objection, calls for speculation.

4    **THE COURT:**  Right.

5    Mr. Sykes, why don't you ask just what -- why she

6    thinks that and what she saw about it, and the way it appeared

7    that made her believe that.

8    **MR. SYKES:**  I'm having trouble hearing you now,

9    Judge.  Would you state that again?  I'm sorry.  I apologize.

10   **THE COURT:**  Right.  Why don't you ask Ms. Bruce just

11   the basis for why she thought it was a first-person video.  You

12   know, what it was about the video, you know, things of that

13   sort.

14   **BY MR. SYKES:**

15   **Q.**   What's the basis of your view that it was a first-person

16   video and not [inaudible] side or something like that?

17   **A.**   Right.  The video was in motion.  I do recall seeing a gun

18   in the bottom left peripheral of the view.  And like I said,

19   the video was in motion, approaching the body.

20   **Q.**   Okay.  I know it's been two years.  Did you hear the

21   officer that did the shooting utter any warning, like, "stop or

22   I'll shoot," anything like that?

23   **A.**   He absolutely did not because I remember thinking -- at

24   the time, I held a belief from my white privileged childhood

25   that officers always say "stop or I'll shoot," and he did not

1    say anything.  There was no verbal command.

2    **Q.**    No warning of any kind?

3    **A.**    No warning of any kind.

4    **Q.**    Was Zane James shot in the back?

5    **A.**    He was.

6    **Q.**    Did he have a weapon in his hands?

7    **A.**    He did not.

8    **Q.**    Did you see a weapon tucked in his pants that were falling

9    down?

10   **A.**    You could not see a weapon.

11   **Q.**    Did he appear to be injured as he was hobbling away before

12   he got shot?

13   **A.**    He was clearly injured.

14   **Q.**    How close was he, approximately, in your mind to the

15   shooter?

16   **A.**    Maybe 35 feet.  It was -- he was quite close.  In my mind,

17   I thought he could tackle him.

18   **Q.**    And I think we all agree it was Zane that got shot, so

19   I'll use his name.

20        Was Zane James showing any aggression to anybody, anybody

21   at all, when this shot -- when these shots were fired?

22   **A.**    No.

23   **Q.**    How did you feel as a person when you saw this shooting?

24   **A.**    I watched the video through the lens of a mother, the

25   mother of a teenage son.  I felt devastated.

1  **Q.**   I think you already said you saw video number three, the

2  aftermath that same night; right?

3  **A.**   Yes.

4  **Q.**   Tell us about the conversations.  If you need to take a

5  minute, take a minute.

6         **MS. WHITE:**  I can't hear anything.

7         **MR. YOUNG:**  I can't hear anything either.

8         **MR. SYKES:**  Just a second.

9  **BY MR. SYKES:**

10 **Q.**   Can you hear me now?

11 **A.**   Yes.

12 **Q.**   Is it coming through clearly?

13        **THE COURT:**  It is.  Before you proceed, I'm going to

14 ask whichever user is on as Blake, RIP Zane, you're going to

15 have turn off your video.  We're not going to have signs during

16 the Zoom conference.  Thank you.

17        **MR. SYKES:**  Okay.  Judge, and I apologize.  I've had

18 a lot of -- I've got an iPhone and a black screen in front of

19 me.  I can't see the witness again, but I've had a lot of Zoom

20 depositions and hearings and never had this problem before, so

21 I do apologize for that.

22 **BY MR. SYKES:**

23 **Q.**   Now, Ms. Bruce, if you could say something, I want to get

24 you back on the screen in front of me.  I'm seeing "iPhone."

25        Yeah, that's good.  Thank you.

1    Okay.  Now, tell us if you would, did you have

2  conversations in, say, July and August of 2020 with Tiffany

3  James about the shooting you've just described?  In other

4  words, video number two, the first-person shooting, did you

5  have conversations with Tiffany James over here?

6  **A.**   Yes.  Yes, in August.

7  **Q.**   Okay.  Tell us about the first conversation you remember

8  with Tiffany James where you talked about this video.

9         **MS. WHITE:**  Objection, hearsay and relevance.

10        **MR. SYKES:**  Judge, I'm sorry, I am not hearing you.

11        **THE COURT:**  I don't know why -- I was muted there for

12 a minute.  I don't know why.

13        I don't think it's hearsay if she's talking about a

14 conversation that she participated in and what she said and

15 heard, so I'm going to overrule that.

16        **MR. SYKES:**  Thank you.

17        **THE COURT:**  On relevance, I -- to the extent it

18 corroborates the existence of a video, it might be relevant.

19 I'll reserve ruling on that and see where we go.

20 **BY MR. SYKES:**

21 **Q.**   Okay.  Ms. Bruce, go ahead and answer that question.  Tell

22 me about the conversations with Tiffany James about video

23 number two, the first-person shooting that you talked about a

24 minute ago.

25 **A.**   On August 2nd, there was a rally held to commemorate Zane

James.  And there was a brief exchange between she and I where video was referenced.  I don't recall the exact words that were exchanged and it didn't register to me as profoundly significant in that moment because, as of August 2nd, it was beyond my comprehension that she did not have in her possession the video of Zane James's shooting.  But that was our first exchange.

August 3rd, you, Bob, held a press release at the same park to talk about the event of August 2nd.  That day, you approached me and asked if I had seen the actual shooting of Zane James.  Between August 2nd and August 3rd -- sorry, the evening of August 2nd, I saw Aaron James in the news.  And he was talking about the importance of body cam usage and the fact that it would have been significant for them to have had video of the shooting of their son.  And it was the evening of August 2nd that I made the realization that they did not have a copy of that video.

So August 3rd, you asked me to confirm if I had seen that video.  And I told you at the park that I could not confirm or deny what I had seen in closed session, and it was now registering to me that you and the family did not have that video in your possession.

And then approximately a week later, Tiffany James brought me Utah Code that explained that you're free to talk about something that you witness or hear in a closed session if you

1  believe that it is tied to a crime.  And so she presented me

2  with that code, I read that code very closely, and I confirmed

3  to her that I had seen the video of her son being shot.

4  **Q.**   The only time you and I talked was on that, I think,

5  August 3rd time?

6  **A.**   August -- August 3rd, yes.

7  **Q.**   Very briefly, as you've described; right?

8  **A.**   Right.

9  **Q.**   Okay.  All right.

10     Now, did you have other conversations with Tiffany just

11  briefly about the existence of video number two?

12  **A.**   Yeah, a half dozen times, we've spoken.

13  **Q.**   All right.  Now, since that, what's developed since that

14  time, have there been any efforts by anybody to change your

15  mind about what you saw and gaslight you, so to speak, into

16  thinking you saw a different video?  Has that happened?

17  **A.**   Oh, considerable efforts in that regard, yes.

18  **Q.**   Please give us a few chapters of that book briefly.

19  **A.**   When I became aware that the video was not in the hands of

20  the family, I contacted the city manager that we now have, who

21  is different than the city manager at the time, and I asked him

22  to research whether there was a video shown that night.

23  **Q.**   Now, that would be Tim Tingey?

24  **A.**   That would be Tim Tingey, yes.  Yeah.

25  **Q.**   Just before you go on, he wasn't at the original

1 meeting --

2 **A.** Correct.

3 **Q.** -- on the 12th of June 2018; right?

4 **A.** Right.

5 **Q.** It was a different gentleman, John Park?

6 **A.** Right.

7 **Q.** So continue on. Tim Tingey.

8 **A.** Tim Tingey came back to me, and his story kind of evolved

9 as he was saying it. First he suggested that what I was

10 recalling was a different video, and he said it was the video

11 of the shooting of the teenager in the underpass that occurred

12 in 2017.

13 And --

14 **Q.** That would be video number one --

15 **A.** Yes.

16 **Q.** -- from my definition?

17 **A.** Yes. Correct.

18 **Q.** Okay. Keep going. Keep going.

19 **A.** And then I told him I wasn't even on council in 2017. And

20 then he evolved to say, "Well, you're recalling the after- --

21 the aftermath video?" But it was the way that that

22 conversation was delivered, it very much felt like gaslighting.

23 Subsequently, the former mayor has called into city

24 council meeting for public comment and aggressively tried to

25 gaslight me regarding having seen this video.

**Q.**   Okay.

**A.**   And it was --

**Q.**   I'm sorry, I didn't mean to cut you off.

**A.**   No, I -- no, I'm good.  Sorry.  Go ahead.

**Q.**   Any other attempts to persuade you that you saw a different video?

**A.**   Yes.  I mean just repeatedly, amongst staff and council, it has been back to me that I'm confusing the video I saw with the video of after.

**Q.**   Give some examples.  You said staff and council.

**A.**   Oh, I don't remember exact exchanges as clearly as I do the exchange with Tim Tingey and then the exchange -- or then the delivery of the message from Mayor Cullimore, previous Mayor Cullimore.

I did have a brief exchange with Christine Mikell, I believe it was August 3rd at the park.  She came to me and said, "There is a video; right?  I'm not crazy.  Right?"

And I said, "You're not crazy, there is a video."

And then she subsequently changed her story.

**Q.**   But that day, you're telling the Court that Christine Mikell -- by the way, it's M-I-K-E-L-L; right?

**A.**   Mikell.

**Q.**   She says Michael (pronouncing) not Mikell; right?

**A.**   Correct.

**Q.**   Mikell, okay.

1       Christine Mikell acknowledged to you that there was a

2  video, video number two, of the actual shooting; right?

3           **MS. WHITE:**  Objection, Your Honor, hearsay.

4           **THE COURT:**  Overruled.  It's a conversation she was

5  party to, it's -- I'm not going to consider it for the truth of

6  the matter asserted, but I can consider it and will consider it

7  for the fact that the statement was made.

8  **BY MR. SYKES:**

9  **Q.**   Go ahead and answer.

10 **A.**   Yes.  Yes.  Correct.

11 **Q.**   Did any other items of -- was -- were you harassed over

12 this by anybody?  If you were -- in other words, harassed

13 because you told people there was a video of the actual

14 shooting.

15      Did you suffer harassment by Cottonwood Heights personnel

16 of any kind?

17 **A.**   So throughout 2018, well, to present, really, I have kept

18 a journal of abuse by CHPD.  And the night of June 12th, when

19 we saw the videos, our council meeting, which started I believe

20 at 6:00 p.m., we did not get out until after 1:00 in the

21 morning --

22 **Q.**   Wow.

23 **A.**   -- on the -- yeah, on the 13th.

24      As I left the building that night, I was harassed in the

25 parking lot by CHPD.  As I went to leave --

**Q.** Now, by the way, and maybe you were going to get to this, when you say you were harassed, I want you to tell the Court everything about that harassment that you can remember, please. It would be the morning of June 13th, early in the morning, right, after midnight?

**A.** Correct.

**Q.** So tell the Court everything about that incident of harassment, please.

**A.** There was some hooting and noises as I left the building and entered my vehicle. And then as I went to leave the parking lot, an officer truck pulled out immediately in front of me. And then as we proceeded forward, another one pulled out immediately behind me, and a third was shining its brights. And as we left the parking lot, the two trucks sandwiched me. And I thought maybe they're going somewhere, even though it's after 1:00 in the morning, but they didn't turn on their lights or accelerate or head away, they just sandwiched my vehicle as we proceeded down 2300 East.

**Q.** By "sandwich" you mean like if you're an ice cream sandwich, you're the white ice cream in the middle and they're the chocolate on each side of the ice cream sandwich; right?

**A.** Correct.

**Q.** That closely?

**A.** Yes.

**Q.** And how far did that -- was that just 100 feet or was it

1   more than that?

2   **A.**   It was multiple blocks.

3   **Q.**   Multiple blocks.  How did you feel about that?

4   **A.**   I was incredibly intimidated, terrified.  I began to

5   question if our city council room was bugged.  Why would these

6   officers know the exact minute that I was leaving the building

7   when their department and offices are in an opposite corner of

8   the building?

9   **Q.**   Okay.  Any other harassment by Cottonwood Heights PD?

10      **THE COURT:**  Your opposing counsel isn't objecting

11  here, but this does seem like it's pretty far afield.

12      **MR. SYKES:**  But it's related.  I'm sorry.

13      **THE COURT:**  Well, are there incidents after the

14  discussion of the video became disputed in August?  That would

15  be more interesting to me if there's something like that.

16      **MR. SYKES:**  Good question.

17  **BY MR. SYKES:**

18  **Q.**   I'd like you to jump ahead to August 3rd, okay?  After it

19  became known to the James as you have described, about the

20  existence of the shooting video, video number two.

21      Have there been incidents of harassment by Cottonwood

22  Heights PD after that time?

23  **A.**   There have.  I would have to refer to my notes.  There's

24  been so many incidences that they blur in terms of the

25  timeline.

**Q.** Okay. Give us your best estimate of about which month and what happened. Give us the top two or three or four.

**A.** I mean I've had a lot of patrol vehicles on my street when it's -- my street is a horseshoe-shaped street, it doesn't lead to anything. There's been an abundance of patrol vehicles on our street after August. Gosh, yeah, I'm just drawing a blank on dates.

**Q.** Has Chief Robby Russo done anything to intimidate you?

**A.** Yeah. So there was an occasion where I was leaving for city council and an officer was parked right on my curb. And as I -- so I backed out and then proceeded this direction, pulled adjacent to him, window to window, and he pretended to take a cellphone call and refused to look at me. It was like a telltale indicator that he was just there to intimidate me as I headed to city council.

When they had the conversation about whether Chief Russo should get a $17,000 pay increase, the back of the room was lined with officers and it felt intimidating as the voice speaking out that we should have a job performance evaluation.

But, no, I'm sorry, you asked if Chief Russo directly -- it was not him on the curb or at the back of the room.

**Q.** Okay. Let me ask you one final question.

How certain are you that on the evening of June 12th, or the morning of June 13th at city council in a closed meeting, how certain are you that you saw a video of the actual

shooting, video number two?  How certain are you?

**A.**   I'm 100 percent certain.  I watched it through a very

critical lens.  I made judgments about the video as it

transpired.  I gauged that he was close enough that he could

have been tased.  I gauged that he was close enough that he

could have been tackled.  I gauged that he was wounded and not

moving very fast.  I perceived that he was reaching to pull his

waistband up when his left arm moved backward.  The shots rang

out immediately after that.  I watched him fall face first into

the grass.  I'm 100 percent certain that I saw a video that

night.

            **MR. SYKES:**  That's all I have, Your Honor.

            You know, Your Honor, could I have just ten seconds

to consult at counsel table?

            **THE COURT:**  You may.

            **MR. SYKES:**  Okay.

**BY MR. SYKES:**

**Q.**   Okay.  I do have one more question for you, if I could.

      Did Chief Russo threaten to arrest you on August 2nd or

August 3rd?

**A.**   He did.

**Q.**   Tell us the circumstances.

**A.**   The group that was there to honor Zane James had the

intention to walk from the park to the home where he was shot

and then back to the park.  We had left the park and were

1    immediately met by officers.  There was a brief discussion

2    about whether or not the group could occupy the street or the

3    side -- or had to be on the sidewalk.

4         There were conflicting messages about whether the group

5    could spill into the street.  The group proceeded to move

6    again.  I had now fallen to the very back of the group.  I saw

7    Chief Russo turn the corner and approach the group from behind.

8    And I approached his vehicle to the passenger's side window to

9    try to clarify from his perspective, could the group occupy the

10   street or did it need to be on the sidewalk?

11        He immediately met me with a very agitated response,

12   hostiley, telling me, "Get on the sidewalk or I will arrest

13   you."  He threw his car into park and jumped out and charged me

14   to the sidewalk.

15        Dan Bartlett had to somewhat physically turn him away from

16   me with his arm around his shoulder.  I had no idea what was

17   about to transpire.  And --

18   **Q.**   We have a video -- we have a video of that and you're on

19   the sidewalk, are you not?

20   **A.**   I am, yes.

21        **MR. SYKES:**  No further questions.

22   **BY MR. SYKES**

23   **Q.**   Sorry, I didn't mean to cut you off.  Go ahead.

24   **A.**   I was live streaming the whole time, so there is video

25   that I took of the entire incident.

1    **MR. SYKES:**  Okay.  No further questions, Your Honor.

2    **THE COURT:**  All right.  Thank you, Mr. Sykes.

3    Before I turn the time over to Ms. White, again,

4    we're in a virtual courtroom here and I don't allow, in any

5    case, signs or things of that nature.  So, again, I'm going to

6    ask -- we have a participant in the call, Mr. Braden Stevenson,

7    you have a picture of -- yeah.  Let's take that -- you have a

8    picture of Zane James showing on the -- on your video.  Please

9    take that down.  Thank you.  It looks like you've done that.

10   No, it's back.

11   Yeah, and again, that's not intended to state a view

12   of the matter.  It's just in my courtroom, either in the actual

13   courtroom or virtually, we just don't allow things in the

14   nature of physical displays of support for one party or the

15   other.

16   All right.  Now, Ms. White, you can proceed with the

17   cross-examination of Ms. Bruce.

18   **MS. WHITE:**  Thank you, Your Honor.

19   <u>**CROSS-EXAMINATION**</u>

20   <u>**BY MS. WHITE**</u>:

21   **Q.**   Ms. Bruce, what did you do to -- what did you review in

22   preparation for your testimony here today?

23   **A.**   I scrolled back through my calendar and reread some of the

24   notes from my Cottonwood Heights journal of abuse.

25   **Q.**   Did you review your September 17, 2020, declaration?

1  **A.**   I did not.

2  **Q.**   Did you meet with anyone from the James family or anyone

3  from their attorney's office?

4  **A.**   Sorry.  Ask me the one about the declaration again.

5  **Q.**   Did you review your declaration?

6  **A.**   I apologize, yes, I did.  Yeah.

7  **Q.**   And did you meet with anyone from the James family or

8  anyone from their attorney's office?

9  **A.**   In preparation for today?

10  **Q.**   Yes.

11  **A.**   No, just my attorney, Michael Young.

12        **MS. WHITE:**  Your Honor, I just want to clarify that

13  we do not need to lay any foundation or move for the admission

14  of any of the declarations as we proceed today?

15        **THE COURT:**  That's correct.

16  **BY MS. WHITE:**

17  **Q.**   Ms. Bruce, let's have you turn to your September 17th

18  declaration.  We're going to show that to you.

19  **A.**   Okay.

20  **Q.**   Now, you've reviewed that in preparation for today.

21        In that declaration, you did not say anything in it about

22  seeing a recording of the James shooting, did you?

23  **A.**   I did not.

24  **Q.**   In fact, today is the first time you've given a statement

25  under oath about seeing a recording of the shooting?

1    **A.**    Under oath, yes.

2    **Q.**    Okay.  And why didn't you include that information in your

3    declaration of September 17, 2020?

4    **A.**    I believed I would get the opportunity to tell it in

5    person.

6    **Q.**    And it wasn't important enough for you to include it in

7    that declaration with the Court; correct?

8    **A.**    I wouldn't say that.

9    **Q.**    Now, you testified that you saw a recording of Zane

10   James's shooting on June 12th in a closed session.  June 12th,

11   was that of 2018?

12   **A.**    2018.

13   **Q.**    Okay.  And who was there with you in that closed session?

14   **A.**    The entire council, Chief Robby Russo, Dan Bartlett, Shane

15   Topham, Paula Melgar, Bryce Haderlie, John Park and Dan

16   Metcalf.

17   **Q.**    And who were the city council members in that session?

18   **A.**    Myself and Christine Mikell, Mike Shelton, Mayor Peterson

19   and Scott Bracken.

20   **Q.**    How long was the video that you saw that you've described

21   that has been identified to you as video two, the actual

22   shooting of Zane James?

23   **A.**    Oh, I don't know the exact length but it was not very

24   long.

25   **Q.**    Well, can you give us an estimate?

1  **A.**    Just a few minutes.

2  **Q.**    Three minutes?

3  **A.**    Yeah, maybe less.

4  **Q.**    Okay.  And does that include the recording number three

5  that you identified in your direct testimony, the aftermath of

6  the shooting?

7  **A.**    No, the aftermath video was a separate video.

8  **Q.**    And how long was the aftermath video?

9  **A.**    Oh, again, I'm not sure.

10  **Q.**    Do you have any type of an estimate?

11  **A.**    I don't.

12  **Q.**    Okay.  Were recordings two and three separate or were they

13  one continuous recording?

14  **A.**    No, they were separate, distinctly separate videos.

15  **Q.**    And was there a point at which you could tell video two

16  cut off and video three began?

17  **A.**    I don't think they were even shown sequentially.  I

18  believe there was conversation after each.

19  **Q.**    Tell me about what format you saw the recording in.

20  **A.**    They were projected on to a screen.

21  **Q.**    And did anyone narrate or explain as you reviewed it?

22  **A.**    Not as we reviewed it.  It was -- the video was set up

23  before it was shown.  I believe it was Dan Bartlett that gave

24  the explanation.

25  **Q.**    And do you recall what Lieutenant Bartlett said?

**A.**    I recall him explaining that the law affords an officer

the right to shoot a suspect if that officer knows assuredly

that that suspect has just been involved in an armed robbery

and is leaving the scene of such incident, such that that

officer knows they are carrying a weapon; that the officer may

shoot them to stop them from potentially putting the public in

harm's way.

**Q.**    And so all the people that you have named that were

present during that closed city council session would have seen

this as well; correct?

**A.**    Yes.

**Q.**    Now, 18 months of city council minutes and recordings have

been produced to plaintiffs' counsel from the date of the

shooting through 2019.

Did you review any of those in preparation for your

testimony today?

**A.**    I did, yes.

**Q.**    And who provided those to you?

**A.**    Paula Melgar.

**Q.**    When did you obtain them?

**A.**    Just about a month ago.

**Q.**    And did anything in them refresh your recollection of what

was shown?

**A.**    No, none of them talked about the specifics.  There are no

specific meetings of a closed session when you're discussing an

1  individual.

2  **Q.**   Okay.  Now, all the other people who would have been in

3  the same meeting with you have testified that they never saw

4  such a recording.

5       Do you have any explanation for that?

6  **A.**   I'm very familiar with the power of gaslighting.

7  **Q.**   What -- you used that term on direct.

8       What is gaslighting?

9  **A.**   When an individual makes you feel crazy for believing

10  something that you saw.  It's quite effective when someone that

11  you admire accuses you of being crazy for knowing that you saw

12  something.

13  **Q.**   And you claim that people have done that to you?

14  **A.**   Attempted to, yes.

15  **Q.**   Who are those people?

16  **A.**   Fellow council members, city manager, former Mayor

17  Cullimore.

18  **Q.**   Give us their names specifically, please.

19  **A.**   Specific incidents that I recall were with Tim Tingey

20  and --

21  **Q.**   Specific names.

22  **A.**   Tim Tingey and Kelvyn Cullimore.

23  **Q.**   And what did Tim say to you to gaslight you?

24  **A.**   That I -- that I must be mistaken, that the video I'm

25  recalling is of a different shooting, that the video I'm

1    recalling is of an aftermath, not the active shooting.

2    **Q.**    Is that everything?

3    **A.**    Yes.

4    **Q.**    What about Mayor Cullimore, what did he say?

5    **A.**    Mayor Cullimore, on public comment, said that how dare I

6    have the audacity to claim something that the other council

7    members are stating is not true or doesn't exist?  His

8    technique was classic gaslighting.

9    **Q.**    And could those statements from Mr. Tingey and

10   Mr. Cullimore have occurred because the recording does not in

11   fact exist?

12   **A.**    I can't speak to that.  I know what I know.

13   **Q.**    Did you ever discuss the recording of the actual shooting

14   that you've claimed you've seen with anyone, other than Tiffany

15   James?

16   **A.**    Just Christine Mikell.

17   **Q.**    And you've relayed everything of the conversations you've

18   had with her about those as well?

19   **A.**    I believe I've already relayed that.

20   **Q.**    Have you read the complaint in this case?

21   **A.**    I think I have, from the complaint that the James family

22   filed.

23   **Q.**    When did you read it?

24   **A.**    Within the last couple of weeks.

25   **Q.**    Did you read it any time before then?

**A.**    Not that I recall.

**Q.**    Now, you have talked with Tiffany James about the James'
version of what they think happened during the shooting;
correct?

      **THE COURT:**  Let me pause you just for a minute,
Ms. White.

      It looks like our reporter got disconnected just a
moment ago and I want to make sure we get a transcript of this
so let's get her back on the line.  So if everyone could just
hold tight for just a couple of minutes.

      (Discussion off the record.)

      **MR. SYKES:**  Judge, would this be a good time to take
a short break, maybe ten minutes?

      **THE COURT:**  Yeah, why don't we do that.

      I apologize, Ms. White, you're kind of in the rhythm
and I know it's not great to be interrupted when you're in the
middle of your cross-examination so I apologize for that, but
we will take a five-minute -- let's even take a ten-minute
break to 2:25.  And again, with apologies to Ms. White.  But we
need to get our reporter back on and we might as well take a
brief break anyway, since we otherwise have to wait.

      So you can -- please stay on the line, but feel free
to mute yourself to stop your video.  And then if you need to
take care of anything, you know, you'll have a few minutes.

      (A recess was taken.)

1          **THE COURT:** All right. I think we will resume, if

2    everyone is back.

3          Ms. White, looking back through the transcript that

4    I'm seeing from my reporter, it looks like she dropped right

5    before you asked Ms. Bruce to describe her specific

6    interactions with Tim Tingey that you and the witness were

7    referring to as gaslighting.

8          So I'd like, if you could, just to repeat that

9    question.

10         And then, Ms. Bruce, if you could answer that again.

11         Yes, go ahead, Counsel, Mr. Young.

12         **MR. YOUNG:** Yeah, during the break, Ms. Bruce sort of

13   raised an issue with me that she had recalled that one of her

14   prior answers was incomplete and so she just wanted an

15   opportunity to clean that up for the record. We can do that

16   now or if you want to do the pending question first, Ms. White,

17   we can do that. Either way. I just wanted to raise that

18   issue.

19         **THE COURT:** All right. Thank you. I guess what I'd

20   like to do, then, is, Ms. White, why don't you ask about --

21   repeat what we'll refer to as the gaslighting questions with

22   the specific individuals. And also, why don't you ask if she

23   wants to clarify one of her answers. In fact, I'll do that

24   first before we go on.

25         Ms. Bruce, I understand that you want to clarify or

1  complete one of your previous answers.

2         What was the question that you felt that you didn't

3  completely answer?

4         **THE WITNESS:** Ms. White asked if I had discussed the

5  video with anyone -- or she asked me to name the individuals

6  that I had discussed the video with. And besides Tiffany James

7  and Councilwoman Mikell, I also called Sim Gill.

8         After I became aware that the family had not had in

9  their possession the video for the last two years, I called Sim

10  to see if he knew if the video had been lost, if he had had the

11  video in his possession. And Sim indicated that he was not

12  aware of the existence of a video.

13         So I did make that phone call. I just wanted to

14  clarify, he would be the third individual that I talked to

15  about the video.

16         **THE COURT:** All right. Thank you, Ms. Bruce.

17         Now, Ms. White, I'm going to return to you. You can

18  do this in any order that you want, but I'd like you to repeat

19  the questions that you asked about the witness's specific

20  interactions with Mr. Tingey and others that she referred to as

21  gaslighting. And then also, the question you were asking when

22  I interrupted you. But basic -- and if you want to follow up

23  on what Ms. Bruce just said about the third individual, you can

24  do that as well, but basically, it's back to you.

25         **MS. WHITE:** Thank you, Your Honor.

1    Can you hear me okay?  We were having some microphone

2    difficulties on the break and I want to make sure that we've

3    resolved those.

4         **THE COURT:**  I can hear you.

5         Ms. Bruce, can you hear Ms. White all right?

6         **THE WITNESS:**  Yeah.  Yeah.

7    **BY MS. WHITE:**

8    **Q.**   Ms. Bruce, so you had defined for us what gaslighting

9    means to you.  And I had asked you who had tried to gaslight

10   you, and you identified Tim Tingey and Mayor Cullimore.

11        Please explain to us what conversation you had with Tim

12   Tingey that led you to conclude that he was gaslighting you.

13   **A.**   The way he phrased the questioning, "Are you sure it's not

14   this other video of this other teenager that you're recalling

15   having seen?" trying to change the narrative in my mind.  I

16   felt like it was gaslighting.

17   **Q.**   Did he ever threaten you?

18   **A.**   No.

19   **Q.**   Did he ever tell you to change your testimony?

20   **A.**   No.

21   **Q.**   Or your statement?

22   **A.**   No.

23   **Q.**   And what did Mayor Cullimore tell you?

24   **A.**   He called in to public comment and used stronger

25   gaslighting techniques, very accusatory, "How dare you have the

1    audacity to say that something exists when all of these other

2    people are signing sworn statements that it does not exist?"

3    It was very classic in his technique, like trying to make me

4    feel crazy.

5    **Q.**    When did that occur?

6    **A.**    It was a council meeting late this summer.

7    **Q.**    And he was no longer the mayor at that point; correct?

8    **A.**    Correct.

9    **Q.**    Is it possible that Mr. Tingey and Mayor Cullimore, former

10   Mayor Cullimore, would have said those things to you because

11   the video does not -- of the actual shooting does not exist?

12          **MR. SYKES:**  Objection, speculation.  I don't know how

13   she would know what Cullimore is thinking.

14          **THE COURT:**  Okay.  I'll sustain that.

15   **BY MS. WHITE:**

16   **Q.**    All right.  So did you ever read the complaint in this

17   case?

18   **A.**    Yes.

19   **Q.**    When did you first read the complaint?

20   **A.**    I don't honestly recall.

21   **Q.**    Well, do you have some type of an estimate that you can

22   provide to us?

23   **A.**    No.

24   **Q.**    Was it -- you can't tell us whether it was more than a

25   year ago?

**A.**   It definitely was more recent than that.  I don't -- I don't know that there was a case a year ago.

**Q.**   All right.  So you're not even sure when this case was filed?

**A.**   No.

**Q.**   And did you read the complaint before the August 2nd, 2020, protest?

**A.**   No.

**Q.**   So it was sometime after that that you first read it?

**A.**   I believe so.

**Q.**   When did you first hear that a complaint had been filed?

**A.**   I don't recall.

**Q.**   And what do you recall hearing about what the Jameses were claiming in their complaint?

**A.**   I remember the James family expressing that they initially just very much wanted a conversation with the city, that they wanted --

**Q.**   [Inaudible] I want to back up and ask that question and make sure you respond to that one.

My question is --

    **MR. YOUNG:**  Let's let her finish her answer first and then if you've got another question, go ahead.

    **MS. WHITE:**  Well, that wasn't responding to my question.

    **THE COURT:**  It's cross-examination, so I will allow

1  Ms. White to control the questioning.  So please go ahead,

2  Ms. White.

3        **MS. WHITE:**  Thank you, Your Honor.

4  **BY MS. WHITE:**

5  Q.   My question was:  When did you first learn about what the

6  Jameses were claiming had happened to Zane in their complaint?

7  **A.**   There was a police reform rally in June and Tiffany James

8  was a speaker at that event.  And that's when I heard her

9  narrative.

10 Q.   Okay.  And what do you recall that narrative being?

11 **A.**   That their son had had negative interactions with the

12 police force, that they felt some of their rights had been

13 violated.  Police had entered their backyard without

14 permission.  Their son felt targeted and harassed and not

15 supported in his earnest efforts to be clean from drugs and

16 move forward with his life.

17 Q.   And that was approximately, then, two years after you saw

18 the recording of the actual shooting of Zane James; correct?

19 **A.**   Correct.

20 Q.   All right.  And during that time, did you ever report to

21 the James family that you had seen a copy of a recording

22 showing the actual shooting?

23 **A.**   It was beyond my wildest imaginations that they did not

24 have that video.

25 Q.   So the answer to the question is no?

**A.** No. I hadn't even met the James family until 2020.

**Q.** And had you ever mentioned it to anyone else?

**A.** No.

**Q.** Did you ever have any conversations with Aaron James about a recording of the shooting of Zane James?

**A.** Not that I recall.

**Q.** When did you first meet Tiffany James?

**A.** When she was a speaker at the police rally.

**Q.** And that was in June of 2020?

**A.** Correct.

**Q.** How many times have you talked with her since then?

**A.** Half a dozen probably.

**Q.** And what have you talked about?

**A.** Well, she did have questions about my witnessing the shooting. We've also talked about police reform in general and the legislative efforts that she was pursuing. And we talked about her and her husband's consideration of opening a restaurant, being that that's my industry.

**Q.** And police reform was one of the things you talked about with her?

**A.** Yes.

**Q.** And did you tell Tiffany James that you had seen a video of the actual shooting of her son?

**A.** I did eventually tell her that, yes.

**Q.** When did you first tell her that?

**A.**   After she provided me the Utah code language, that I could speak about what I had seen in closed session.

**Q.**   When did that happen?

**A.**   Approximately a week after the August 2nd rally.

**Q.**   Where were you when you told her that?

**A.**   At a coffee shop.

**Q.**   A coffee shop?  Was that yes?

**A.**   Yes.  Yes.

**Q.**   And was anyone else present with you for that discussion?

**A.**   No.

**Q.**   What prompted you to tell her about it?

**A.**   I thoroughly read the code that she provided and felt it was appropriate to be honest.

**Q.**   And why didn't you tell her about it sooner?

**A.**   I had seen it in closed session and our first brief encounter about the video, I think I had mistakenly let her know of the existence of the video.  It was beyond my comprehension that she didn't know about the video.  So our first exchange was confusing and brief.

**Q.**   Are there any other members of the James family that you've talked to?

**A.**   I've met two of their children.

**Q.**   And have you talked with them about the recording at all?

**A.**   No.

**Q.**   What about other city officials?  You've mentioned already

1    Tim Tingey and Mayor Cullimore.  Did you talk with any of those

2    other people who were in the city council meeting with you on

3    June 12th, when you saw the recording of the actual shooting?

4    **A.**    No.

5    **Q.**    Why not?

6    **A.**    We don't talk about things that we've seen in closed

7    session.

8    **Q.**    You never discussed whether there was a crime that was

9    committed, I believe you described it on your direct

10    examination?

11    **A.**    I was unaware that this video was not in its proper

12    channels until the summer of 2020.

13    **Q.**    All right.  Well, let's talk a little bit about that.

14        I want to go to the District Attorney's Office.  You are

15    aware that the District Attorney's Office had concluded the

16    shooting was justified; correct?

17    **A.**    I believe I was aware of that.

18    **Q.**    Okay.  When did you become aware of that?

19    **A.**    I don't recall exactly.

20    **Q.**    Do you have some sort of estimate that you can provide us?

21    **A.**    I would be guessing.

22    **Q.**    Let me pull up the District Attorney's October 8th, 2018,

23    report and see if that helps refresh your recollection.

24        Do you see this letter that is on the screen for you?

25    **A.**    Yes.

**Q.** Your counsel has been provided copies of these, so he may have those. Do you need me to scroll through that letter or do you have a copy that you can take a look at?

**A.** Can you scroll through?

**Q.** Yes.

Did you ever read -- well, do you recognize that document?

**A.** Before that -- it looks familiar. I -- I did not read it back in 2018.

**Q.** But you have read it at some time?

**A.** I'm not entirely sure. I mean the letterhead looks familiar.

**Q.** Okay. And you're not sure if you've read it or not?

**A.** I'm not sure.

**Q.** Do you need a minute to read through the letter to see if that will help refresh your recollection?

**A.** Okay.

**MS. WHITE:** Mr. Young, can you provide her with a copy of the letter so that she can read through it?

**MR. YOUNG:** I'll have to pull out the exhibits, if you guys want to take a break. I mean I think she's already said she doesn't really have a recollection, but we can either --

**THE WITNESS:** I'm familiar that Sim Gill -- to the best of my knowledge, there's never been a police officer in the state of Utah that's been found in the wrong in shooting to

1    kill or shooting and killing.

2    **BY MS. WHITE:**

3    **Q.**   Well, that's not really my question and it's really off

4    topic.  So what my question to you is:  I want to know if you

5    need to read through this to help refresh your recollection if

6    you've ever read it.

7            **MR. YOUNG:**  Your Honor, at this point, I'd ask for a

8    little guidance here.  My understanding is she would be

9    responding to questions about her declaration and the documents

10   that were provided therein.  We understood generally what this

11   hearing was about.  I don't -- I mean if you want us to take a

12   minute and have her read letters and then answer questions

13   about letters that she's now testified she doesn't recall

14   reading, we can, but this feels a bit outside the scope of what

15   I understood we were here to do today.

16           **THE COURT:**  All right.  Ms. White, please let me --

17   you may be heard, Ms. White, go ahead.

18           **MS. WHITE:**  The purpose of this is to go to the

19   credibility of her testimony that she has seen the body camera

20   and her reporting or failure to report that.  And it's clearly

21   relevant to her credibility of the testimony that she's given

22   today.  And she went far afield of her declaration on the

23   direct examination and I am cross-examining her on that

24   statement, on that testimony that she gave here today.

25           **THE COURT:**  All right.  How long is this letter or

1  report?

2          **MS. WHITE:**  It is, I think, about ten pages and it

3  details what the DA found.

4          **MR. YOUNG:**  And again, I would just respond that I'm

5  not sure how a letter from a third party to another third party

6  is within the purview of what she was here to testify about

7  today.

8          **MS. WHITE:**  Well, and I'll get to that, I'll hook

9  that up, Your Honor, if -- and that's why I provided these

10  exhibits to all counsel yesterday.

11          **THE COURT:**  Ms. White, can you find the -- does she

12  have to look through the whole thing?  Are there specific

13  passages that might refresh her recollection?

14          **MS. WHITE:**  Well, I suppose we could that.

15  **BY MS. WHITE**

16  **Q.**  Let's go to page 10.  And you can see where we've

17  highlighted on there a portion where the DA says, "Officer

18  Davies was not wearing a body worn camera during the OICI" in

19  the October 2018 letter.

20          Do you recall reading that?

21  **A.**  No, I do not.

22  **Q.**  And he also states that there was no recording of the

23  shooting, only after.  Can you see that?  The next sentence.

24  It's not highlighted.

25  **A.**  Okay.

**Q.**    Do you see that in the report?

**A.**    Okay.

**Q.**    Is that yes?

**A.**    I see it, yes.  I see it.

**Q.**    And did you ever read -- does that help refresh your recollection if you've ever read the report?

**A.**    Yeah, I have not read the report.

**Q.**    Okay.  So if you haven't read the actual report, did you ever hear from anyone that the DA had concluded there was no body camera or recording, other type of recording of the shooting?

**A.**    I had not heard that or, if I did, it didn't register --

        **MR. SYKES:**  Your Honor, this is Bob Sykes.  I object.  That misstates the evidence.  What he says is, "No video recording of the OICI exists as far as they know at this time," is what it says.  Not that they found that there was no recording, they didn't know of any at the time they wrote it.  So it's --

        **THE COURT:**  All right.

        **MR. SYKES:**  -- misstating the evidence.

        **THE COURT:**  All right, Mr. Sykes.  I think, though, the witness has testified that she didn't read that or doesn't recall reading that.

        And so, Ms. White, I will let you ask if she had heard anything about this finding.

**BY MS. WHITE**

**Q.**   Would you please respond to that question, Ms. Bruce?

**A.**   I don't recall hearing anything about there not being a body cam in existence.  If I did hear something along those lines, it would not have registered as -- it never occurred to me as a possibility, that a video that I knew I saw could vanish and not be in the proper channels and the proper hands moving forward in time.  That was just a possibility that never ever crossed my mind.

**Q.**   That wouldn't have startled you had you heard that?

**A.**   Only if it registered with my brain.  Like I said, it was out of my realm of comprehension.

**Q.**   So are you -- is your testimony that you did learn at some point that the DA concluded Officer Davies was not wearing a body camera and did not locate a recording of the shooting?

**A.**   Well, I think like Bob Sykes just indicated, they didn't conclude that there was not a video.  They concluded that there was no video in their possession at the time of this writing.

**Q.**   That wasn't my question.  My question specifically said that they had not located any type of recording.

**A.**   Sorry.  That's a statement.

Can you rephrase the question?

**Q.**   Yes.

My question is:  Did you learn at some point that the DA concluded Officer Davies was not wearing a body camera and they

1  had not located a recording of the shooting?

2         **MR. SYKES:**  Object to the form of the question,

3  Judge.  That's a false predicate.  There's no evidence in the

4  record that the DA ever concluded that.  What they said was

5  there was no video recording as far as they know at this time.

6  That's what was said in the letter.  So she's putting a

7  false predicate in there and asking the question.

8         **THE COURT:**  All right.  The first sentence does say,

9  "Officer Davies was not wearing a body worn camera during the

10  OICI."

11         So I'm going to overrule that.  I don't want to

12  spend -- I'll let you get the answer to this question, but at

13  that point, Ms. White, you know, absent some evidence or

14  indication that the witness recalls ever seeing this, I don't

15  want to go much further down this path, I don't think.

16         So you can get an answer to the question you just

17  asked and then let's -- and then we'll see where you want to go

18  from there.

19         **MS. WHITE:**  Thank you, Your Honor.

20  **BY MS. WHITE**

21  **Q.**  My question was, Ms. Bruce, did you ever learn at some

22  point that the DA concluded Officer Davies was not wearing a

23  body camera and the DA had not located any recording of the

24  shooting?

25  **A.**  Oh.  What I learned was directly from my conversation with

1    Sim Gill in August of this year.  After August 2nd, when I

2    became aware that the family did not know a video existed, I

3    called Sim Gill and he indicated that he also was not aware

4    that a video existed.  So at that time, I learned that Sim did

5    not believe that a video existed.

6    **Q.**   And that was the first time you had learned from any

7    source that that is what the DA had concluded?

8    **A.**   I didn't even go to the point in the conversation that I

9    knew that there was a conclusion.  I'm sorry.  I didn't really

10   follow the case and know that conclusions had been drawn versus

11   open and out there.  I didn't know the status.

12              **THE COURT:**  Ms. White, if I may, I just -- I'll just

13   ask Ms. Bruce.

14              Have you heard anything about what she's asking now,

15   about what the DA -- anything that the DA said or found about

16   the camera or the video footage?  Had you heard anything about

17   that before the hearing today?

18              **THE WITNESS:**  I don't think so.

19              **THE COURT:**  All right.  Okay.  Thank you.

20              I think -- Ms. White, I think that's the answer you

21   were looking for.

22              **MS. WHITE:**  Thank you, Your Honor.

23   **BY MS. WHITE:**

24   **Q.**   And so you claim that you called Mr. Gill in August of

25   2020, after August 2nd of 2020, to talk to him about the

1   recording, is that what I understand?

2   **A.**   Yeah. I called him to question if his office also did not

3   have the recording as I had learned that the family had not

4   seen it.

5   **Q.**   All right. And when did you contact him, do you recall?

6   **A.**   Somewhere in the second week of August.

7   **Q.**   Okay. Of 2020?

8   **A.**   Yes.

9   **Q.**   And who did you speak with?

10   **A.**   Sim Gill.

11   **Q.**   And was that by telephone?

12   **A.**   Yes.

13   **Q.**   Did he ever interview you about that recording that you

14   now claimed exists, that he had earlier found did not -- a body

15   camera video that he found did not exist?

16   **A.**   We had that phone conversation. That was it.

17   **Q.**   So he never followed through with you about getting a copy

18   of that recording from you?

19   **A.**   I wouldn't have a copy of that recording.

20   **Q.**   My question is: He never followed through with you about

21   your claim that a recording existed?

22   **A.**   We had the phone conversation and that was the extent of

23   it.

24   **Q.**   And he's never reopened, to your knowledge, the

25   investigation of that?

1    **A.**    Not that I know of.

2    **Q.**    Have you ever personally spoken with Attorney Robert Sykes

3    or anyone in his office?

4    **A.**    I had that brief exchange with Bob Sykes August 3rd, at

5    the press release.

6    **Q.**    And you're referring to a press conference that occurred

7    following the August 2nd, 2020, protests?

8    **A.**    Correct.

9    **Q.**    I want to show you a photo of you with him and the James

10   family at that and ask you some questions about that.

11          Is that you on the right-hand side?

12   **A.**    Yes.

13   **Q.**    And then who is sitting to your right in the photograph?

14   **A.**    Aaron James.

15   **Q.**    And then to his right is Mr. Sykes?

16   **A.**    Correct.

17   **Q.**    And then Tiffany James is on the far right?

18   **A.**    Yes.

19   **Q.**    Okay.

20          **MS. WHITE:**   You can take that down, Jennifer.

21   **BY MS. WHITE**

22   **Q.**    The press conference took place on August 3rd, the day

23   after the protest; correct?

24   **A.**    Correct.

25   **Q.**    And how did you learn about it?

**A.**    I'm not sure.  I think -- it might have been a phone call
or a text.  I really don't remember.

**Q.**    Who informed you about it?

**A.**    I'm not entirely sure on that one either.  I just remember
there was a lot of activity that day.

**Q.**    Okay.  And you have no idea who may have told you about
there being a press conference?

**A.**    It was probably Tiffany but I'm speculating.

**Q.**    And why did you appear?

**A.**    I was -- the press conference was related to the
August 2nd event.

**Q.**    What was your purpose of being there?

**A.**    I wanted the truth to come out about the August 2nd event.

**Q.**    And who invited you to sit at the table?

**A.**    I think it was Bob.

**Q.**    And why did you sit at the table with Mr. James,
Ms. James, and Mr. Sykes?

**A.**    I wanted the truth to come out about the August 2nd event,
so I was willing on take questions if they were applicable to
me.

**Q.**    Have you ever sent or received any e-mails from Mr. Sykes
or anyone in his office?

**A.**    Not that I recall.

**Q.**    And I want to be crystal clear about this.  You swear
under oath today that you have never sent to or received any

1    e-mails from the Jameses' attorney, Robert Sykes?

2    **A.**    I know that I intend to reach out to his office. He had

3    two paralegals that were in attendance August 2nd, and I wanted

4    to capture their statements regarding that event.

5    I can't remember if I've already e-mailed the office or if

6    it's still on my to-do list, but there's not an exchange that's

7    jumping out.

8    **Q.**    So I think -- and you correct me if I'm wrong, I thought

9    you testified that you have not exchanged any e-mails with

10    Mr. Sykes or anyone in his office. Is that correct?

11    **A.**    I may have and I'm just not remembering.

12    **Q.**    So initially you thought you didn't, but now you think you

13    may have?

14    **A.**    I still think I probably haven't. I don't recall.

15    **MS. WHITE:** Your Honor, we're receiving some

16    background noise and maybe I think it's best to wait to ask

17    questions until the person who is on is off -- is muted.

18    **THE COURT:** Yeah. Let's --

19    **MR. SYKES:** Judge, it was Eden Taylor and they

20    just muted it so I think we're okay.

21    **THE COURT:** Okay. Very good.

22    All right. You can proceed.

23    **MS. WHITE:** All right.

24    **BY MS. WHITE:**

25    **Q.**    Now, if I'm not mistaken, the first time you mentioned

1   anything about seeing the recording of the shooting, the actual

2   shooting, was to Tiffany James at the August 2nd, 2020,

3   protest; is that right?

4   **A.**   I believe so.

5   **Q.**   All right.  Now, after you were elected in November 2017

6   to your current position as a city council member, you proposed

7   looking into eliminating the city's police department and

8   contracting out for law enforcement services; correct?

9   **A.**   I did not propose that action.  I proposed that we do a

10   cost benefit analysis of keeping our own force versus merging

11   with UPD.

12   **Q.**   Yeah, that was my question.  You proposed looking into

13   that?

14   **A.**   I did.

15   **Q.**   Okay.  And that created some contention with the police

16   department, didn't it?

17   **A.**   It did.

18   **Q.**   Including with the chief?

19   **A.**   Yes.

20   **Q.**   And then after that, you publicly posted on social media

21   that the city lost the case that cost the city $60,000, didn't

22   you?

23   **A.**   I posted that.

24          **MR. YOUNG:**  Your Honor, I'm going to lodge an

25   objection as to relevance.  There is another lawsuit pending

between Mr. Russo, the City of Cottonwood Heights and

Ms. Bruce. I'm having a hard time figuring out the relevance

of this, vis-a-vis whether there was a video or not, which is

what I understood Ms. Bruce was here to testify about. So

we're going to -- I'm going to object on the basis of

relevance.

**THE COURT:** All right. Thank you, Mr. Young.

Ms. White, please respond. Why is this relevant to

what we're discussing today?

**MS. WHITE:** We have numerous individuals who have

testified via declaration that this recording never existed and

they've never seen it. This goes to Ms. Bruce's motive to

state that she either -- that she saw a video that doesn't

exist. It goes to her credibility. It is admissible under

Rule 613 as a prior statement that she has made. And it's

critical to show that she has a motive to make this up when all

the other people and the logs of -- the camera logs themselves

are showing this recording never existed.

**THE COURT:** All right, Ms. White. How many -- I

understand, for want of a better word, that there's some

history or some bad blood here between Chief Russo and

Ms. Bruce. How long do you intend to spend on this? How much

do you have here? Because it seems like -- I understand what

you're saying, but it also seems like to get into too many of

the particulars of it might not be a very productive use of our

1  time.

2        **MS. WHITE:**  I just have a few questions on the face

3  of the post.  There are some other issues as well that I want

4  to go into that also establish the motive and credibility.

5        **MR. YOUNG:**  And, Your Honor, we're happy to proffer

6  and stipulate that Chief Russo and Ms. Bruce are currently in a

7  lawsuit against each other.  They clearly probably have no

8  great feelings towards each other.  To the extent, you know,

9  that lawsuit would motivate Ms. Bruce in a way Ms. White is

10 suggesting, she can argue that.

11       The issue I have is we're now eliciting testimony

12 that's going to touch upon issues in another lawsuit that

13 really has a significant chance to prejudice Ms. Bruce in that

14 lawsuit.  And so I think that, you know, the merits weigh

15 against delving into this testimony when we all know they don't

16 like each other.  That's fine.

17       The fact that they don't like each other may provide

18 her a motive, that's fine, we could stipulate to that as well.

19 I just don't want to put my client in a position where she's

20 prejudiced by what is really tangential questioning to the

21 issues that we're here to talk about today.

22       **MS. WHITE:**  Your Honor, this is not tangential.  This

23 is critical to her motive.  And the plaintiffs have claimed

24 that all of these people are engaged in a great conspiracy to

25 hide and destroy and corrupt information, and it is crucial to

1    the defenses against those assertions.

2              **MR. YOUNG:**  Yeah, and I think --

3              **THE COURT:**  Mr. Young, tell me specifically how these

4    lines of questioning might be problematic for your client in

5    the other lawsuit.

6              **MR. YOUNG:**  Well, because you have the very claims

7    that Chief Russo has raised regarding defamation.  And

8    candidly, they're a bit unclear and those claims are subject to

9    a motion to dismiss right now, but claims of defamation and

10   essentially sabotage of his position at the city.  Ms. Bruce,

11   of course, has counterclaims, specifically an anti-SLAPP claim,

12   that speaks to his claims in that lawsuit as well.

13             So at this point, we're eliciting testimony that

14   would speak to motivations of both of the parties, whether it

15   be defamation under Mr. Russo's claims or the anti-SLAPP claims

16   that Ms. Bruce has raised.

17             And again, I would be sympathetic to Ms. White's

18   position if we were before a jury.  I think Your Honor is fully

19   capable of understanding the context and the dynamic here

20   between the parties.  And in an effort to preserve Mrs. Bruce's

21   rights in the other lawsuit, I think we should just avoid this

22   line of questioning with an understanding that they don't like

23   each other, and that's fine.

24             **THE COURT:**  All right.  And, Mr. Young, just to be

25   clear, are statements like this, the one that's on the screen

1  right now, potentially the statements that, in the other

2  lawsuit, Chief Russo might be saying constitutes defamation?

3      **MR. YOUNG:**  I would assume so.

4      Now, if Chief Russo is willing to stipulate here

5  under oath that he is not going to use any of the statements

6  that Ms. White -- or any of the evidence that Ms. White intends

7  to put forward today, as evidence in the other lawsuit, then

8  I'm happy to let Ms. Bruce answer questions about this, but

9  when we start talking about the context of that lawsuit versus

10 the hearing today, we've got to be careful about how things can

11 sort of get spun out down the road, particularly in what I --

12 like I said, I think is sort of a tangential issue.

13     **THE COURT:**  All right.  Ms. White, what I'd like to

14 do is why don't you show us, without asking questions, any of

15 the statements or documents that you would like to ask

16 questions about.  I see one.  Why don't you just walk -- just

17 walk me through them and then I'll decide whether I'm going to

18 let you pursue this or not.  I see this one here.

19     **MS. WHITE:**  Well, first is this Facebook post,

20 Your Honor, which misstates facts in a way that shows that

21 Ms. Bruce was upset with Chief Russo and the police department,

22 and thought that the police department was costing the city

23 more money than the alternatives, which she has said she wanted

24 to explore.

25     It also shows on credibility that she misstates what

1  happens, which goes to her credibility here.  The city did not

2  lose the case, it settled it.  And her statement that it lost

3  the case was not a true statement.

4        **THE COURT:**  All right.  So that's that post.  Do you

5  want to walk me through anything else that you --

6        **MS. WHITE:**  Yes, Your Honor.

7        The other, I just wanted to confirm with her that

8  Chief Russo filed a lawsuit against her in May 2020, alleging

9  that she has harassed him in his efforts to run the Cottonwood

10  Heights Police Department, and that she deleted or redacted

11  emails he sought in a GRAMA request.  In response, on

12  August 5th, 2020, she asserted a counterclaim against him,

13  alleging he harassed and intimidated her because of her efforts

14  to disband the Cottonwood Heights Police Department.

15        **THE COURT:**  All right.  Thank you.

16        Mr. Young --

17        **MR. YOUNG:**  Yeah.

18        **THE COURT:**  Would you stipulate to the fact that that

19  was Ms. Bruce's Facebook post that we just saw?

20        **MR. YOUNG:**  Yeah, we're happy to stipulate to the

21  Facebook post, as well as the complaint and the counterclaims.

22  I would just request that it's made clear on the record that

23  Your Honor is not making any determinations as to the

24  characterizations that Ms. White has sort of made associated

25  with that evidence, whether it was a misstatement, untruth or

1   whatever.  We're happy to stipulate that these documents exist.

2       **THE COURT:**  Right.  And do you think that -- leaving

3   aside the Facebook post, I certainly understand why you

4   wouldn't want to stipulate to her characterization of it.  Do

5   you think that Ms. White's -- and I'm asking you, not your

6   client, so this is not binding on her.  She is not answering

7   it.  Do you think Ms. White accurately -- reasonably accurately

8   stated the positions of the two parties in the other case?

9       **MR. YOUNG:**  Yes, I think that's fine.  I mean I think

10  the documents probably speak for themselves and whoever wants

11  to -- you know, you can pull out of the documents what you want

12  in terms of what they mean.  But yes, he sued for harassment,

13  she sued -- he sued for defamation and harassment, she's

14  countersued for harassment and anti-SLAPP.  That's a fair

15  characterization of the lawsuit.

16      **THE COURT:**  All right.  I think -- Ms. White, I think

17  I understand what's going on here in terms of why there would

18  be potentially, you know, some tension and some bad blood

19  between Ms. Bruce and Mr. Russo and I think you're free to

20  argue based on that, you know, if you feel like that

21  establishes a motive for Ms. Bruce to -- you know, to

22  perhaps -- you're free to argue that that casts some kind of a

23  cloud on her testimony, but I don't -- given that -- I'm not

24  going to have her testify under oath here about things that

25  could, you know, potentially be evidence in a pending lawsuit

1    in another case.

2              **MS. WHITE:**  Your Honor, I would like to move for the

3    admission of the Facebook post here.

4              **THE COURT:**  Unless -- is there any objection from --

5    either from Mr. Sykes or Mr. Young to that?

6              **MR. SYKES:**  I have no objections.  This is Bob Sykes.

7    I have no objection to it.

8              **THE COURT:**  Mr. Young, I assume you don't either

9    since you stipulated it was her post.

10             **MR. YOUNG:**  Yes.  And I guess -- I guess in

11   conferring with my client, I just needed to clarify one thing.

12   She mentioned that she did later correct the post on the issue

13   that it was settled, not that they lost the lawsuit.

14             **THE COURT:**  Okay.  All right.  And if -- you know, if

15   you want to -- if you or Mr. Sykes wants to offer that post,

16   you know, I'd accept that, too.

17             All right.  Anyway -- and I assume the filings in the

18   other case are public records, I assume.  I could take judicial

19   notice of them, whether I admit them or not, but absent any

20   objection, I will admit those as well.

21             Mr. Sykes, Mr. Young, do either of you object to my

22   either taking judicial notice of or admitting those filings

23   that Ms. White showed in the other case?

24             **MR. SYKES:**  We have no objection, Judge.

25             **MR. YOUNG:**  We have no objection either.  If

1  Your Honor would like, we can also provide the motion to
2  dismiss that's pending.
3         **THE COURT:**  All right.  Very well.  Thank you.
4         All right, Ms. White, why don't you move to other
5  lines of questioning if you have them.
6         **MS. WHITE:**  Thank you.  I want to move to the
7  August 2nd, 2020, protest related to the shooting of Zane
8  James.
9  **BY MS. WHITE:**
10 **Q.**   Did you participate in the organization of it, Ms. Bruce?
11 **A.**   [No audible response.]
12        **MR. YOUNG:**  Answer again.
13        **THE WITNESS:**  Sorry, I did not, no.
14 **BY MS. WHITE**
15 **Q.**   Did you speak at it?
16 **A.**   No.
17 **Q.**   You created a video recording of what transpired when
18 Cottonwood Heights Police Department officers arrived, didn't
19 you?
20 **A.**   I started the video well before their arrival.
21 **Q.**   And that included what transpired when Cottonwood Heights
22 Police Department officers arrived?
23 **A.**   It did.
24 **Q.**   I'm going to play just a short portion of one of the
25 recordings for you and ask you some questions about it.

1           **MS. WHITE:**  Jen, could you play that now, please.

2           (Playing video.)

3           **MS. WHITE:**  Jennifer, you can stop it now.  Jen, can

4 you stop the recording now, please.  Thank you.

5 **BY MS. WHITE:**

6 **Q.**    All right.  So the recording that you hear yelling

7 throughout that, things such as, "Oh, my gosh, that's BS, I

8 don't have to get back," that's your voice, isn't it?

9 **A.**    It is.

10 **Q.**    And this is what you recorded on your phone?

11 **A.**    Yes.  This is some time into the recording, but yes, I

12 recorded this.

13           **MR. SYKES:**  Judge, this is Bob Sykes again.  I don't

14 really see how this is relevant.  You know, this was set for a

15 three-hour hearing.  Ms. White's been going over an hour and a

16 lot of this is totally irrelevant.  I mean I think it helps us,

17 but I think it's irrelevant.  I want to get on with the

18 hearing.

19           **THE COURT:**  I'll let her ask some questions about the

20 video, but you make a fair point, Mr. Sykes, that this has been

21 going on for a while.  I think there's no question that

22 Ms. Bruce's testimony is -- I mean she's one of the key

23 witnesses here, so -- but yeah, I understand.  So let's --

24           You can ask some questions about this, Ms. White, but

25 tell me about how much more you have for Ms. Bruce.

1              (Outside audio interference.)

2         **MS. WHITE:**  Sorry.  We've --

3         **THE COURT:**  Let's -- we need the people who are not

4    participating here to be on mute.  All right.

5         All right.  Ms. White, do you have an estimate of

6    about how much more time you're likely to need with Ms. Bruce?

7         **MS. WHITE:**  Probably about a half an hour, and I

8    believe Mr. Sykes went about an hour.  We also have to remember

9    that we had a ten-minute break, so I haven't been going nearly

10   as long as he went with Ms. Bruce.

11        **THE COURT:**  And then, Mr. Sykes, you wanted to

12   call -- remind me who you wanted -- you wanted to talk to

13   Ms. Mikell; right?  Mr. Sykes?

14        **MR. SYKES:**  Yes.  I wanted to -- Ms. Mikell, but

15   these are very brief, by the way.  I want to do Officer Davies

16   and Chief Russo and Betenson, but I've got less than five

17   minutes, more like three minutes of questions for each.

18        **THE COURT:**  Okay.  I think we're okay for a little

19   bit longer, Ms. White, but you know -- and I recognize that

20   Ms. Bruce's testimony is important, so you can have a little

21   bit longer, but do be mindful that, you know, we're well into

22   the allotted time here.

23        **MS. WHITE:**  Yes, Your Honor.  Thank you.

24   **BY MS. WHITE:**

25   **Q.**  And that was you, Ms. Bruce, arguing with the officers

1   about their authority, wasn't it?

2   **A.**   No.  I was not arguing about their authority.  I very much

3   wanted to see who they were tasing at the top of the driveway.

4   I was very concerned for the safety and well-being of my

5   constituents.

6   **Q.**   Well, that's an interesting point you make because you

7   claim that the officer right in front of you was tasing

8   someone, didn't you?

9   **A.**   No, the officer right in front of me was not the one with

10  the taser.

11  **Q.**   Who were you claiming was tasing someone?

12  **A.**   At the top of the driveway, you can pause it and see the

13  taser streams coming off the body.

14  **Q.**   Okay.  But you were arguing with the officers about their

15  authority to do so, weren't you?

16          **MR. YOUNG:**  I'm going to lodge an objection.  It

17  misstates the evidence.

18          Go ahead.

19          **THE COURT:**  All right.  I'll let Ms. Bruce just

20  respond by saying what she thinks was going on, if she thinks

21  that's an inaccurate characterization.

22          **THE WITNESS:**  Yeah, I was not arguing about police

23  authority.

24  **BY MS. WHITE:**

25  **Q.**   Really?  Because I heard you say, "You have no right to do

1    this."  Do you not hear that on the recording?

2    **A.**    I would agree that that was an overreach of power, to tase

3    and arrest people because of water droplets from a squirt gun.

4    **Q.**    But my question to you was:  You were arguing with them

5    about their authority to do what they were doing in the moment,

6    weren't you?

7    **A.**    I don't know.  I've never characterized it that way in my

8    own mind.

9    **Q.**    And you were interrupting them as they were trying to

10   address a very hostile and volatile crowd, weren't you?

11   **A.**    Can I consult with my lawyer for a second?

12   **Q.**    No.  There's a pending question.  You need to answer.

13          **THE COURT:**  All right.  You can answer the question

14   and then you can consult.

15          **MR. YOUNG:**  Your Honor, I'm going to have to lodge an

16   objection.  The city has lodged criminal charges against

17   Ms. Bruce that touch upon this very instance.  And so I think

18   I'm probably obligated to tell her not to answer, given that

19   she has a right to a defense in that case.  And I don't --

20   again, I'm straining to find the relevance to the issues that

21   we're talking about here today.

22          **MR. SYKES:**  Your Honor, this is Bob Sykes.  I would

23   add to that objection.  I think Ms. White's gone far afield,

24   far afield on this.  It's a desperate attempt to try to make

25   someone look bad who is telling the truth.

1        **MS. WHITE:** Your Honor, we don't have a problem with

2    her not answering the question based on the instruction of her

3    counsel to plead the Fifth, but we are entitled to an adverse

4    inference then to specific questions that we ask.

5        **THE COURT:** You're entitled to request an adverse

6    inference.

7        **MS. WHITE:** [Inaudible] Your Honor.

8        **THE COURT:** All right. Okay. And I think that's

9    fair enough, if there's potentially criminal charges relating

10   to that. You know, what I said with regard to the civil

11   lawsuit would apply with even greater force here then.

12       So I listened to the video, I heard what I heard.

13   Ms. White, I'll let you, if you want to take one minute to kind

14   of make -- point out anything that you want me to notice about

15   the video, that's fine, but I'm not going to require the

16   witness to answer specific questions given that it might be

17   relevant to a criminal case.

18       **MS. WHITE:** Okay. So, Your Honor, the adverse

19   inference that we would ask the Court to take is that Ms. Bruce

20   was hostile and interrupting the officers as they were trying

21   to deal with a very hostile and volatile crowd. She was

22   expressing her displeasure with their actions, arguing with

23   them about their authority, and that she continued to advance

24   on them and not follow their instructions to stay back as they

25   were trying to get the crowd under control.

1          **THE COURT:**  All right.  Thank you.  I'll take that

2     request under advisement and you can continue with your

3     cross-examination.

4          **MS. WHITE:**  We would also move for the admission of

5     the recording.

6          **THE COURT:**  Are there any objections to that,

7     Mr. Sykes, Mr. Young?

8          **MR. SYKES:**  This is Bob Sykes, Judge.  I'm sorry

9     Michael, I didn't want --

10         **MR. YOUNG:**  Go ahead, Bob.

11         **MR. SYKES:**  Okay.

12         I object on the grounds of relevance.  I do not see

13    how that is relevant to whether this woman saw a video on

14    July 12th or -- June 12th or 13th, 2018.

15         **THE COURT:**  All right.  Thank you.  I'll take that

16    under advisement.

17         **MR. YOUNG:**  Your Honor, and I'm sorry, I don't mean

18    to gum up the works, but I'm not Ms. Bruce's defense counsel.

19         I think a ruling on an adverse inference in this

20    case, again, could be used in the other civil lawsuit.  I'm not

21    sure how it could potentially be used in a criminal case

22    because I'm not a criminal lawyer.  I'm wondering if Your Honor

23    would indulge a ruling on just the relevance of that

24    questioning.  If Your Honor finds that it's not relevant today,

25    then I don't have to instruct her not to answer and then we

1    don't have this adverse inference issue.

2          Otherwise, I think I'm going to have to request leave

3    to brief the adverse inference issue because I don't, again,

4    want to prejudice Ms. Bruce in either the criminal or the other

5    pending civil lawsuit for questions that, again, we did not

6    anticipate being asked about today, given that her declaration

7    was very narrow.

8          **THE COURT:**  All right.  No, I understand.

9          All right, Mr. Young, if you would like to submit a

10   brief on that, you may do so, no later than -- well, we have

11   Thanksgiving coming up.

12         Do you think you could provide whatever you think is

13   necessary by close of business next Wednesday or do you need

14   more time than that?

15         **MR. YOUNG:**  We'll get it done.

16         **THE COURT:**  All right.  Thank you.  Then you're free

17   to submit a brief on that by that point.

18         The city is free to respond, let's say within --

19   let's say a week from November 30th, so I'm not going to make

20   you work over Thanksgiving, Ms. white.  So if Mr. Young submits

21   a brief on the 25th, I'd ask you to submit any response, if you

22   have one, by December 7th.

23         **MS. WHITE:**  And is that on the admission of the

24   recording that we just played, Your Honor?

25         **THE COURT:**  I think it's on whether or not an adverse

1  inference of any sort is appropriate here.

2          **MS. WHITE:**  Okay.

3          **MR. SYKES:**  Judge, Bob Sykes here.  I'm not invited

4  to respond to that, am I?  I don't want to.

5          **THE COURT:**  You're welcome to if you'd like but

6  you're not required to.

7          **MR. SYKES:**  I'll pass.  Thank you.

8          **THE COURT:**  Okay.  Thank you.

9          Okay, Ms. White, please proceed.

10          **MS. WHITE:**  Your Honor, I've moved for admission now

11  of the recording that we just showed of the section of the

12  protest.

13          **THE COURT:**  And Mr. Sykes has objected on the grounds

14  of the relevance and I've said I'll take that under advisement.

15          **MS. WHITE:**  Okay.  And may I please add the bases for

16  why I think it is admissible in response to Mr. Sykes?

17          **THE COURT:**  You may.

18          **MS. WHITE:**  It is admissible under Rule 613 as a

19  prior statement.  It is relevant to show her credibility and

20  her motive under 404(b)(2).  And it is also admissible under

21  803(1) as a present sense impression.

22          **THE COURT:**  All right.  I don't understand Mr. Sykes

23  to be really disputing the points of its potential

24  admissibility, other than just on the grounds of its -- what he

25  says is its fairly attenuated relevance, but I understand your

1    response to that is it would create a motive, perhaps --

2            **MS. WHITE:**  Thank you.

3            **THE COURT:**  -- to be less than candid.  Thank you, I

4    understand your argument.

5            **MR. SYKES:**  Yeah, I would just say, Judge, under

6    613 -- hold on a second.  Let me just get myself -- excuse me,

7    Judge, I'm just a country lawyer.  I'm still getting used to

8    this Zoom stuff.

9            **THE COURT:**  You say that a lot.  You say that a lot.

10           **MR. SYKES:**  But a prior statement has to be

11   inconsistent with something she's saying here today to come in

12   under that rule and it's not.  You know, it's a totally

13   different event.  It's an event about police misconduct on

14   August 7th to try to squelch a protest, you know.  And it has

15   nothing to do with anything she said about the existence of a

16   video of the Zane James shooting, which has been covered up.

17   And so I don't see the relationship there and I don't think 613

18   applies for that reason.

19           **THE COURT:**  All right.  Thank you.

20           **MR. SYKES:**  That's my humble country lawyer opinion.

21           **THE COURT:**  All right.  Thank you, Mr. Sykes.

22           Again, I'm not going to rule on that right now, but

23   I'll take it under consideration with the points that both of

24   you have made.

25           **MR. SYKES:**  Thank you.

1    **THE COURT:**  Ms. White, please move on.

2    **MS. WHITE:**  Yes.  Thank you, Your Honor.

3    BY MS. WHITE:

4    **Q.**  All right.  Ms. Bruce, you also recorded yourself leaving

5    the protest, didn't you?

6    **A.**  Leaving the protest?  Sorry.  There was a bleep.

7    **Q.**  You also created a recording of yourself as you were

8    driving away, leaving the protest; correct?

9    **A.**  Correct.

10   **Q.**  All right.  I want to play that for you and ask you a

11   couple of questions about that.

12   **MS. WHITE:**  Jennifer, can you please play that?

13   **MR. YOUNG:**  And again, your Honor, I'm happy for her

14   to ask her questions but I'm just -- we're straining relevance

15   at this point.  So I'm just going to renew the objection for

16   the same reasons of the previous video.

17   **THE COURT:**  Understood.  I'll listen to this and then

18   I'll decide.

19   **MR. SYKES:**  Judge, I just want to also add my

20   objection.  I think it's irrelevant and possibly prejudicial to

21   this witness who has sacrificed a lot to come here, in view of

22   all the threats and the intimidation she's had.  I just don't

23   think it's relevant.

24   **THE COURT:**  Okay.  I understand.  I'm going to listen

25   to it, though, and I'll let Ms. White say why she thinks it's

1    relevant and then I will decide about that as well.

2             (Playing video.)

3             **MS. WHITE:** Your Honor, I'm wondering if I, instead

4    of asking the questions, need to proffer what it is we think

5    this shows and how it's relevant.

6             **THE COURT:** Why don't you proffer that first and then

7    we'll decide.

8             **MS. WHITE:** All right.

9             We are offering this recording and would move for its

10   admission, because it shows that -- contrary to the prior

11   recording, she claimed in the prior recording she almost fell

12   to the ground.  In this recording, she claims she was punched

13   in the throat and shoved to the ground.  And so her statement

14   in this recording, that she was shoved to the ground, is not

15   true and shows her -- and it goes to her credibility as well as

16   the motive for her statements.

17            **THE COURT:** Okay.  Mr. Sykes, do you want to respond

18   to that, or Mr. Young?

19            **MR. SYKES:** Yeah, I object, Your Honor.  I think,

20   number one, it's irrelevant, and number two, it isn't connected

21   up to whether or not there's a video.  I mean, you know, maybe

22   she lied -- maybe she lied and said she voted for Joe Biden but

23   she really voted for Trump.  So what?  It doesn't make any

24   difference, you know.

25            And so this is really irrelevant and takes us far

1  afield on a day where we're consuming precious court time.  I

2  object.

3       **THE COURT:**  Thank you.  And to the extent that the

4  purpose is just to show some inconsistency between the

5  statements in the two videos, I do think that is too far afield

6  to be helpful.

7       To the extent that, you know, this is further

8  evidence of, you know, potential bad blood, if you will,

9  between Ms. Bruce and the police department, sure, it shows

10  that, but this is getting awfully cumulative.

11       Ms. White, do you want to speak to that?

12       **MS. WHITE:**  Yes, Your Honor.

13       If she makes a statement just moments -- about a

14  recording that happened just moments earlier, that she had a

15  copy of it, and that wasn't true, then how are we to believe

16  what she said she saw, an alleged recording of a shooting

17  almost two and a half years earlier was true?

18       **THE COURT:**  All right.  Thank you.  I understand your

19  argument.  But, no, I'm not -- I think both of these videos are

20  taken at a time of emotional stress, which is obviously a lot

21  going on.  If there's some inconsistencies with them, I'm just

22  not going to -- I'm not going to make too much of that.  I

23  think in the heat -- you know, when things are unfolding,

24  people sometimes describe things in different ways.

25       And I don't see some kind of really huge discrepancy

1  that would -- that seemed -- certainly not enough to be

2  particularly relevant here.  I will -- you know, I'll consider

3  this as well, you know, along with the other video for

4  relevance, to just potential motive.  But as I said, I think

5  we're getting pretty close to cumulative stuff at this point.

6          **MS. WHITE:**  Okay.

7          **THE COURT:**  Ms. White, do you have anything else?

8          **MS. WHITE:**  Well, yes, she made a complaint that she

9  referenced to the DA.  And in it, she made additional

10  inconsistent statements about what happened, claiming what the

11  officers did.  And so I mean I'd like to go into that, but I'm

12  concerned that the Court, you know, is -- I don't want to --

13          **THE COURT:**  If you want to -- within seven days, if

14  you want to just outline what you think the inconsistencies --

15  I assume -- are there any -- well, okay.  I mean other than

16  under relevance, I understand you're going to object, but,

17  Ms. White, if you want to just make a proffer, just showing on

18  the face of these documents why you think they're inconsistent

19  with one another, you're welcome to do that, the document and

20  the two videos.

21          **MS. WHITE:**  Okay.  And the complaint to the DA and

22  the DA's declination?

23          **THE COURT:**  Yes.  Right.  You can address any

24  inconsistencies between the complaint and the two videos.

25          **MS. WHITE:**  Do you want me to do that now or in

1  writing later?

2        **THE COURT:**  You can just do it now.  You can show me

3  the complaint and tell me what the inconsistencies you think

4  are.

5        **MS. WHITE:**  All right.

6  **BY MS. WHITE:**

7  **Q.**  So, Ms. Bruce, on August 5th, 2020, you submitted a

8  complaint to the District Attorney's Office about your

9  treatment at the protest; correct?

10        **THE COURT:**  I'm not going to have her answer that.

11        You don't have to answer that, Ms. Bruce.

12        Just show me the complaint.  I assume you have it as

13  an exhibit and tell me why you think it's inconsistent.

14        **MS. WHITE:**  All right.

15        **MR. SYKES:**  By the way, Judge, I join in that

16  objection.  This is Bob Sykes.

17        **THE COURT:**  And the objection -- actually, there

18  hasn't been an objection, but I'm assuming that you and

19  Mr. Young are going to object on the grounds of relevance

20  again.  Is that correct?

21        **MR. SYKES:**  Yes.  And unduly cumulative also.

22        **THE COURT:**  Yeah.  And I'll take those under

23  advisement.

24        Go ahead.  Show me what you think is inconsistent,

25  Ms. White.

1    **MS. WHITE:**  Jennifer, can you scroll down please to

2  where she states that -- that she claims the officer "walked

3  briskly towards me and shoved my left shoulder," causing her to

4  stumble backwards."

5    She says nothing about an officer punching her in the

6  throat or shoving her to the ground as she claimed in the

7  recording she made in the car leaving the protest.

8    **THE COURT:**  All right.

9    **MR. YOUNG:**  Other than she does say that above.

10    **MS. WHITE:**  I'm sorry, what?

11    **MR. YOUNG:**  I mean this is sort of the issue; right?

12  We're being forced to litigate really issues that are unrelated

13  but, literally, in the document right above, she talks about

14  getting shoved in the throat.  So -- and this is why -- you

15  know, we can brief adverse inferences and stuff like that, but

16  now we're kind of getting forced to litigate stuff that --

17    **THE COURT:**  Yeah.

18    **MR. YOUNG:**  -- quote-unquote, is relevant because it

19  may speak to her credibility?

20    **THE COURT:**  Yeah, it does say right there.  It says,

21  "At that point Kelly Taylor yelled get back and inserted his

22  left arm, striking me in the neck under my jaw."

23    **MR. SYKES:**  Judge, Bob Sykes.  I want to join in that

24  objection.  I mean this is really beyond the pale.

25    **THE COURT:**  Yeah, we're getting far afield.  Okay.

1    I'll consider this -- I'll consider -- I'll take this and both

2    videos under advisement, Ms. White.  But what else do you have?

3                MS. WHITE:  Okay.  Thank you.

4                The last one is a recording of her at a police rally

5    on police reform.  And this goes to the heart of her motive,

6    and it's important for us to be able to show this recording and

7    ask about it.  It doesn't have anything to do with the

8    August 2nd protest or any criminal charges related to that.

9                THE COURT:  What's the date of the video or of the

10   event that's being videoed?

11               MS. WHITE:  I need to ask her those questions.

12               THE COURT:  All right.  How long is the video?

13               MS. WHITE:  It's four minutes long.

14               THE COURT:  Okay.  I'll let you show it, but I'll

15   reserve -- are there objections, first of all?  Again,

16   Mr. Sykes, Mr. Young?

17               MR. SYKES:  Yes, Your Honor --

18               MR. YOUNG:  I don't know what the video is.

19               MS. WHITE:  We provided copies of it to you

20   yesterday.

21               MR. SYKES:  This is your favorite country lawyer, Bob

22   Sykes, and I object for all the same reasons that we've already

23   stated, Your Honor.  We're going far afield.

24               And by the way, we got dropped on us, I don't know, a

25   whole bunch of videos and other things just yesterday, and your

1     order was to provide it last week, you know.  And so I object

2     to all this and trying to ambush a witness with something that

3     has no relevance to what she saw, you know.  And so I object

4     for all those reasons.

5               **THE COURT:**  All right.  Thank you.

6               I'll let you show it and then I'll decide what to

7     make of it.  I don't -- I haven't seen the video either, so...

8          **MS. WHITE:**  And, Your Honor, if I may respond to

9     Mr. Sykes's objections, it's impeachment and we're not required

10    to provide it, but out of an abundance of caution, to be open

11    and transparent, did provide it yesterday ahead of time, even

12    though we weren't required to under --

13              **THE COURT:**  Okay.  Thank you.  You can show the

14    video.

15              **MS. WHITE:**  Jennifer, can you please play that now.

16              (Playing video).

17              **THE COURT:**  Okay.  We've seen that now, Ms. White.

18    Why is that relevant?  I mean I don't think anyone here would

19    dispute, number one, that Ms. Bruce is an advocate for police

20    reform or, number two, that, you know, she's had some specific

21    issues and disagreements with Chief Russo and the Cottonwood

22    Heights police, but what does this video add to that?

23              **MS. WHITE:**  Because it encapsulates the entire theory

24    that when he said "starting over," she agreed with it.  And

25    that starting over, with the Cottonwood Heights Police

1  Department, would be easier for her to accomplish if she were

2  able to show that the Cottonwood Heights City Police Department

3  lied about the existence of a recording of the Zane James

4  shooting, if they failed to provide it, if they destroyed it,

5  if they assaulted peaceful protesters and they criminally

6  charged peaceful protesters.  And proving all those things

7  would help her accomplish her goal of disbanding the Cottonwood

8  Heights Police Department.

9          **THE COURT:**  All right.  I understand your theory.

10  I'll take -- I'm going to decide whether I consider these

11  various videos and recordings and so forth, but I'll ask

12  Ms. Bruce a couple of questions after you finish.  Well, I'll

13  let Mr. Sykes see if he has recross -- or redirect.  But do you

14  have any additional questions for Ms. Bruce?

15          **MS. WHITE:**  The only thing, Your Honor, is to move

16  for the admission of the recording that we just played,

17  referencing Karl Moore and Tali Bruce.

18          **THE COURT:**  All right.  I'll take that under

19  advisement.

20          **MS. WHITE:**  Thank you, Your Honor.  With that, I

21  don't have any further questions.  Thank you.

22          **THE COURT:**  Thanks.

23          Mr. Sykes, do you have any redirect?  Do you have

24  any --

25          **MR. SYKES:**  Yes, Your Honor.  Briefly.

1 <u>**REDIRECT EXAMINATION**</u>

2 <u>**BY MR. SYKES**</u>:

3 **Q.**    Ms. Bruce, have you been threatened by anybody since

4 August, or even before, I guess, but with some kind of adverse

5 legal action if you told the public or anybody about that video

6 number two, the actual Zane James shooting?  Were you

7 threatened?

8 **A.**    No.

9 **Q.**    Did anybody say that it was illegal for you to talk about

10 it?

11 **A.**    No.  Illegal?

12    Sim Gill, when I discussed it with him, cautioned me to

13 consult my attorney regarding closed session.

14 **Q.**    Okay.  Did Shane Topham ask -- now, that's the city

15 attorney for Cottonwood Heights; right?

16 **A.**    Right.

17 **Q.**    Okay.  And he's a lawyer; correct?

18 **A.**    Correct.

19 **Q.**    Yeah.  Did he ask you to sign a statement to the effect

20 that you had not seen a video of the shooting?

21 **A.**    Yes, he did.

22 **Q.**    Okay.

23     **MR. SYKES:**  A couple more questions, Judge.

24 **BY MR. SYKES**

25 **Q.**    In your declaration that you filed in this court you said,

"Why was a taser not used in the pursuit?"

Okay?  Now, I think this is a day or two -- let me double-check that.

**A.**   It was the morning after.

**Q.**   Yeah.  I'm looking at your e-mail of June 13th at 8:13 a.m., and that is Exhibit 2 to your declaration; correct?

**A.**   Correct.

**Q.**   Okay.  You say, "Was a taser not an option with the pursuit?"

Why did you ask that?

**A.**   I had tossed and turned all night after having watched the video, wondering why he didn't just tase him when he was in such close proximity.  And I -- I was so mentally and emotionally exhausted by the time we left, at 1:00-something in the morning.  So when I woke up the next morning, I sent that e-mail.

**Q.**   And this e-mail was addressed to Mayor and Council, right, and copied to Robby Russo; is that correct?

**A.**   Correct.

        **MR. SYKES:**  No further questions.  Thank you.

        **MR. YOUNG:**  Your Honor, you're muted.

        **THE COURT:**  I apologize.  There was some background noise that I was trying to avoid.

        Now, Ms. White, that probably went beyond the scope of your cross and should have been on direct, so do you have

1    anything you want to ask about those specific topics or --

2         **MS. WHITE:**  Yes, just briefly, the affidavit that

3    Mr. Topham asked Ms. Bruce to sign.

4                      <u>**RECROSS-EXAMINATION**</u>

5    <u>BY MS. WHITE</u>:

6    **Q.**   He asked you that.  Did he threaten you in any way when

7    you declined to sign it?

8    **A.**   No.  I guess we were talking about gaslighting.  There was

9    some pressure like, hey, everyone else is signing, but no,

10   there was no threat.

11   **Q.**   And in fact, Mr. Topham asked you then, "what would you

12   like to put in your declaration," didn't he?

13   **A.**   I don't recall him asking.

14   **Q.**   Well, you don't recall specifically, either by e-mail or

15   by conversation, Mr. Topham or someone else [background

16   noise] giving you an opportunity to [inaudible]?

17   **A.**   I don't remember Mr. Topham asking.

18         **MR. SYKES:**  Heather, would you mind re-asking that

19   question.  We had some interference from Ben I, whoever that

20   is.  So would you mind re-asking that question.

21         **MS. WHITE:**  Sure.

22         **MR. SYKES:**  Thank you.

23   BY MS. WHITE:

24   **Q.**   Do you deny that you were given an opportunity to say

25   anything you wanted to in the declaration to submit to the

1    Court?

2  **A.**    I don't deny that.

3            **MS. WHITE:**  Okay.  Nothing further.  Thank you.

4            **THE COURT:**  All right.  Thank you.

5            Ms. Bruce, I'm just going to ask you two or three

6  questions in a way that doesn't in any way prejudice your other

7  litigation and so forth.

8            I gather you don't dispute that you're an advocate of

9  police reform and that you've been quite critical on occasion

10 of the Cottonwood Heights police force; correct?

11           **THE WITNESS:**  Correct.

12           **THE COURT:**  And you don't dispute that you've had

13 some specific negative interactions with Chief Russo and some

14 of the other officers; is that correct?

15           **THE WITNESS:**  Correct.

16           **THE COURT:**  Is that -- does your advocacy -- does

17 your desire to see the Cottonwood Heights police force

18 reformed, or perhaps eliminated and merged into the Unified

19 force, or just more general, your desire for police reform, has

20 that colored your testimony in any way today about the video?

21           **THE WITNESS:**  No.  Absolutely not.  I have a hard

22 time seeing how these are even associated.  Officer Davies

23 works for Herriman and has for a couple of years now.

24           **THE COURT:**  All right.  Thank you.  And have the

25 negative interactions that you've had with Chief Russo or --

1    and other -- you know, potentially other members of the

2    Cottonwood Heights police force, has that colored your

3    testimony in any way today?

4            **THE WITNESS:**  No, absolutely not.

5            **THE COURT:**  Okay.  All right.  Thank you.

6            I think, Mr. Sykes, if you want to move on to your

7    next witness, we'll do that.

8            **MR. SYKES:**  Judge, will it be possible to take a

9    five-minute break?

10           **THE COURT:**  Yeah, it would.  Absolutely.

11           **MR. YOUNG:**  And, Your Honor, I understood the

12   exclusionary rule has been invoked.  I don't know if that

13   necessarily excludes Ms. Bruce, but I think we're prepared to

14   log off unless you need us.

15           **THE COURT:**  Ms. White or Mr. Sykes, is there any

16   reason why we can't let Ms. Bruce go at this point?

17           **MS. WHITE:**  No, Your Honor.

18           **THE COURT:**  All right.  Well, Ms. Bruce, thank you

19   for your testimony today.

20           **MR. SYKES:**  We have no objection, Judge.  We have no

21   objection.

22           **THE COURT:**  All right.  Thank you.  Ms. Bruce, thank

23   you for your testimony.  You're excused now and I appreciate

24   your willingness to speak with us today.  Thank you.

25           **THE WITNESS:**  Thank you.

1    **MR. YOUNG:**  Thanks, Your Honor.

2    **MS. WHITE:**  Could we please know who the next witness

3    is so that we can get that person ready?

4    **THE COURT:**  Let's do that.

5    Mr. Sykes, why don't you let them know and then we'll

6    take our break.

7    **MR. SYKES:**  Judge, I was thinking Christine Mikell.

8    **MS. WHITE:**  We'll have her ready to go then.

9    **THE COURT:**  All right.  Very well.  Thank you.

10   **MS. WHITE:**  Thank you.

11   **THE COURT:**  We will come back at -- how about at

12   4:00.

13        (A recess was taken.)

14   **THE COURT:**  All right.  Mr. Sykes, why don't you

15   formally call the witness and then we'll have the courtroom

16   deputy place her under oath.

17   **MR. SYKES:**  Okay.  I call Christine Mikell.

18   **THE COURTROOM DEPUTY:**  Please raise your right hand.

19   You do solemnly swear that the testimony you shall

20   give in the case now before the Court to be the truth, the

21   whole truth and nothing but the truth, so help you God?

22   **THE WITNESS:**  I do.

23   **THE COURTROOM DEPUTY:**  Thank you.  If you'll please

24   state your full name and spell it for the record.

25   **THE WITNESS:**  Christine Watson Mikell,

1  C-H-R-I-S-T-I-N-E, Watson, W-A-T-S-O-N, Mikell, M-I-K-E-L-L.

2  **THE COURTROOM DEPUTY:**  Thank you.

3  <u>**CHRISTINE MIKELL**</u>,

4  called as a witness for and on behalf of the plaintiffs, being

5  first duly sworn, was examined and testified as follows:

6  <u>**CROSS-EXAMINATION**</u>

7  <u>**BY MR. SYKES**</u>:

8  **Q.**  Ms. Mikell, if you could just briefly tell us who you are.

9  And by the way, do you have an attorney representing you here

10  today?

11  **A.**  I do.

12  **Q.**  Who is that?

13  **A.**  Heather Smith.

14  **Q.**  Heather who?

15  **A.**  Oh, White.  I'm sorry.  Oh, my gosh.  Heather White,

16  sorry, with Snow, Christensen & Martineau.  I'm sorry.  I've

17  never had to do one of these before.  I apologize.

18  **Q.**  She goes by a lot of names.

19  So Heather White is your attorney for this proceeding?

20  **A.**  That's correct.

21  **Q.**  All right.  And just tell the Court briefly, if you would,

22  a little bit about your background, your -- you know, your

23  business background, et cetera.

24  **A.**  Sure.

25  As I said, my name is Christine Mikell and I'm a small

1    business owner in Sandy, Utah.  I have my own renewable energy

2    company that I've had for about -- almost ten years.  Before

3    that, I worked for a smaller developer.  Before that, I worked

4    for the State of Utah and started their renewable energy

5    program for the state.

6    **Q.**    Try to do a better job this winter so we have better air

7    to breathe, if you would.  Okay?

8    **A.**    Yes.

9    **Q.**    Just teasing.

10        All right.  Have you had conversations with anybody about

11    the existence of a video -- did you hear my examination of

12    Ms. Bruce?

13    **A.**    I did not.

14    **Q.**    Okay.  I'm going to refer to three possible videos, three

15    incidents.

16        Number one would be a 2017 incident where a young

17    African-American male was shot by Cottonwood Heights police

18    under a bridge at night.  That's video one.  Okay?

19        Video two is the one that we're contesting here, would be

20    a video of a shooting of Zane James on May 29, 2018.

21        Video three would be a video of the aftermath of the

22    shooting when Zane is on the ground.  Okay?

23        Those are three incidents.  So if I refer to video one,

24    two and three, you know what I'm talking about.  Okay?

25    **A.**    Yes.

1    **Q.**    Does that make sense?  Thank you.

2         Talking about video two now, okay, the allegation that

3    there is a video of Zane James's shooting by a Cottonwood

4    Heights police officer, have you had -- have you told people at

5    any time that there was such a video?

6    **A.**    No.

7    **Q.**    Never?

8    **A.**    Of video two, you're asking me?

9    **Q.**    Video two, yeah, of Zane James's shooting.

10   **A.**    No, I have not.  If I had seen a video like that, that

11   would be indelible in my mind and I could not ever erase it.

12   **Q.**    Okay.  Didn't you tell Mayor Petersen, at a -- at some

13   point, that you had -- at least you thought you had seen such a

14   video?

15   **A.**    I don't recall that, sir, no.

16   **Q.**    You don't recall, okay.

17        Did you ever tell Tali Bruce that you had seen such a

18   video?

19   **A.**    No, sir.

20   **Q.**    Okay.  Hold on one second here.

21        What about Tiffany James, did you ever tell her you'd seen

22   such a video?

23   **A.**    Tiffany and I had a discussion and in the discussion I had

24   mentioned that I had seen a shooting incident or something like

25   that.  And that discussion, as soon as it came out of my mouth,

1    I realized that was -- I'd seen something in a closed session.

2    And so I quickly was scared and nervous, because I'm not one

3    who likes to get in trouble, and I knew that if I had said

4    something out of a closed session, that that's cause for some

5    type of litigation potentially.

6        And so as soon as I said that, I became nervous.  And she

7    said she hadn't seen a video, and that's what I remember in the

8    call, and my mind spinning, because I thought, whoa, she hasn't

9    seen a video.

10       After that, I went and did some research and found that

11   that video that I had seen, video number three, was in fact the

12   video that I had seen by doing Google search.  It was shown at

13   the Deseret News.  It was widely shown on YouTube.  So then I

14   felt better that I did not share with others this idea of a

15   video two.

16   **Q.**   Let me see if I understand what you said here.

17       When you initially had the conversation with Tiffany

18   James, you told her that there was a video of the shooting but

19   then you later determined that that was an error; is that a

20   fair statement?

21   **A.**   No.  I feel badly that perhaps my statements have been

22   misinterpreted by Ms. James.  I feel badly that it's led to

23   this meeting here, with so many people having to spend days on

24   a comment I'd made.  If Ms. James had reached out to me, other

25   than saying things like, you know, you need to -- "you're

1    allowed to say what you saw," I never saw the actual shooting

2    of James, video two, as you call it.  What I saw in the closed

3    session was video three.

4    **Q.**   Who told you that you could not talk about a video of a

5    police shooting just because it was shown to you in a closed

6    meeting?  Who told you that?

7    **A.**   No one told me that.

8    **Q.**   You said you got real nervous, thinking you had

9    violated some --

10           **MS. WHITE:**  Mr. Sykes, let her finish her answer,

11   please.

12           **THE WITNESS:**  What we're told, when we have a closed

13   session, that the contents of that meeting are to stay in that

14   meeting.  That's what we're told.  Those are private

15   discussions and we are not to share those discussions, because

16   they're of importance that need to be confidential.

17   **BY MR. SYKES:**

18   **Q.**   Well, you're in court and you can share it now.  Okay?

19        Now, what happened in that closed meeting on June 12 and

20   June 13, 2018?  What happened that day?

21   **A.**   I don't recall the exact date of the closed meeting.  I

22   remember -- and this was a couple of years ago.  I believe I

23   was a new council member.  This is not something that we think

24   of as happening in Cottonwood Heights, a small town.  And I

25   recall seeing a video and being told by our chief of police

1   what happened that day.

2       I think that for all of us, it was a sad day.  I know it

3   was.  I think all of us probably had tears in our eyes to see

4   the aftermath of this.  And that's what I recall, is a

5   terrible -- all I remember is seeing the woman and hearing the

6   steps of the police officer and ripping the shirt and that was

7   what I saw.

8   **Q.**   Why was -- I guess what I'm asking, why was the meeting

9   closed?  What is it about seeing a video of -- by your

10  testimony, of the aftermath of a shooting that would cause this

11  to be a closed meeting, please?  Tell me.

12          **MS. WHITE:**  Objection.  It calls for a legal

13  conclusion.  She can -- I think she can testify as to her

14  understanding, but as to why it was actually closed,

15  Your Honor, I think that's a legal conclusion.

16          **THE COURT:**  That's fair.

17          Mr. Sykes, why don't you just modify your question to

18  ask about her understanding.

19          **MR. SYKES:**  Yeah.

20  **BY MR. SYKES:**

21  **Q.**   You were apparently told it was a closed meeting and you

22  couldn't talk about it; right?

23  **A.**   Sir, I -- it's been a few years, but I believe that's

24  what -- I'm testifying I believe that's what it was, a closed

25  session.  I wasn't allowed to talk about it when I was speaking

1  to Ms. James.  When I mentioned it, I was horrified that I

2  wasn't supposed to say anything.  And that's -- that's how it

3  occurred in my memory, so --

4  **Q.**  Give us your best recollection of what was told to you and

5  by whom on the night of June 12th, 2018, when this meeting

6  started --

7  **A.**  I'm sorry.

8  **Q.**  -- about closing it.

9  **A.**  I don't recall what the contents of that were.  I assume

10  that Shane Topham said that we're about to see something that

11  occurred in our -- you know, within our police force, and this

12  is a closed meeting.  And when I hear "closed meeting," that

13  means that that's -- those contents are supposed to be

14  maintained in my brain and not shared with others.

15  **Q.**  So your recollection is that Shane Topham said something

16  about it at the closed meeting and you relied on his opinion;

17  is that the idea?

18  **A.**  That's -- yes.  He's our city attorney, he sits at all of

19  our meetings and usually reminds us, if it's a closed meeting,

20  what the requirements are from us.

21  **Q.**  As you were watching the video, did it ever occur to you

22  at that time that, why on earth would this be closed, the

23  public has a right to know?  Did that ever occur to you?

24  **A.**  I believe I was elected at the end of 2017.  I was sworn

25  in in 2018.  I was a fairly new elected official.  As I said,

1    I'm a small business owner.  I have three children and this is

2    a city council position, I take it seriously, but I -- I would

3    assume that my city attorney would tell me [inaudible glitch in

4    audio] and that's what I was relying on.

5    **Q.**   Okay.  Now, let me ask you this:  When Tiffany James

6    approached you and wanted to talk to you, was her stated

7    objective to talk to you about police reform in general?

8    **A.**   That's correct.

9    **Q.**   Did she also say, "I want to talk to you about police

10    reform in Cottonwood Heights City"?

11    **A.**   I don't recall exactly what she said.

12    **Q.**   Okay.  Now, let me read you something from her declaration

13    and see if that refreshes your recollection.

14       Now, this is a declaration she filed a few days ago, last

15    week.  And if you have it there, I'm on page 8.  I don't think

16    I can call that up easily, but --

17       **MS. WHITE:**  I have a copy.  Hold on, let me pull it

18    up.

19       **MR. SYKES:**  It's a very short passage.

20       **MS. WHITE:**  Are you referring to the November 9th

21    declaration, Bob?

22       **MR. SYKES:**  Yes.

23       **MS. WHITE:**  And what page are you and what paragraph?

24       **MR. SYKES:**  Page 8.

25       **MS. WHITE:**  Page 8 and what paragraph?

1    **MR. SYKES:** There's -- that many fingers, page 8.

2    Okay?

3    **BY MR. SYKES**

4    **Q.** Bottom paragraph, I'm going to read this to you, and ask

5    you if this refreshes your recollection of a conversation.

6    This is Tiffany now talking about a conversation with you.

7    "I was explaining," and I think she means to you, "how

8    there was no mention to the media by CHPD or in the District

9    Attorney's report that Zane was shot twice in the back, and

10   that neither Officer Casey Davies nor the other three officers

11   were wearing body cameras or had car cameras on during the time

12   of the shooting."

13   Okay? Are you with me?

14   **A.** I am with you, yes, sir.

15   **Q.** "As I explained this, Christine seemed to become more

16   frustrated. At one point she interrupted asking pointedly,"

17   and this is in quotation marks, "'So you have not seen the

18   video?' Because I had fully accepted both CHPD's and the DA's

19   statements to our family, that there was no body camera video

20   of the shooting, I felt confused and asked," this is in quotes

21   now, "'do you mean of the actual shooting? We were told there

22   was no video of the actual shooting, just after the shooting.'"

23   "Christine answered very sarcastically and scoffed, 'Oh,

24   yeah, there is a video.'"

25   Do you see that?

1    **A.**    I do, sir.

2    **Q.**    Do you recall that conversation?

3    **A.**    I think I shared with you what was going through my mind.

4    I think of myself as an honest person and I am the type of

5    person that feels passionate about things.  And if there was an

6    actual video of the shooting, I would fight for Ms. James or

7    for Zane and his family with all of my heart.  I think anybody

8    who knows me would know that about me, that I would do that,

9    but that's not what I saw.  I saw a video, video number three.

10    I'm not -- I don't believe that I'm going to respond

11    sarcastically or scoffing, I don't believe that's me.  There

12    could be several things going on when she called me, but I

13    don't believe that to be me.  And I mentioned that once I

14    mentioned this video, I felt very uncomfortable, thought I may

15    have revealed confidential information.

16    **THE COURT:**  Yes, Ms. White?

17    **MS. WHITE:**  We couldn't hear Bob for a minute.  Were

18    we the only people that lost that sound?

19    **BY MR. SYKES:**

20    **Q.**    Have you ever read the play Hamlet?

21    **A.**    Have not.

22    **Q.**    My question was very simple.

23    Did you or did you not say the things that I just quoted

24    you from Tiffany James's sworn affidavit?

25    **A.**    I've read Tiffany James's sworn affidavit and I would say

that there are many items in her affidavit that I don't recall

or believe are accurate.  Some of the detail that she provides

in here I am quite certain I was never privy to or heard from

her.  And when I read it, it seemed to be new information.

I know Ms. James is suffering.  This is a horrible time

for everyone, but I don't believe -- as I said, as we -- as I

read the contents of her affidavit, I don't believe that some

of the things that she said in here were said to me.  So I

don't believe that that is the kind of reaction I would have,

in terms of scoffing and feeling frustrated.

**Q.**   That's your answer to my question.  Right?

**A.**   That's my answer.

**Q.**   Me thinkest thou protesteth too much.

    **MR. SYKES:**  Judge, can I have one second?

    **MS. WHITE:**  Your Honor --

    **MR. SYKES:**  I'm almost done.

    **MS. WHITE:**  Objection, argumentative, Your Honor.

    **MR. SYKES:**  I'll withdraw it.

    **THE COURT:**  All right.  You can have a second,

Mr. Sykes.

**BY MR. SYKES:**

**Q.**   I have another question for you but it will be very brief.

Mayor Petersen's declaration, okay, and I think he's the

current mayor, and not the past mayor, says, and I quote, "At a

separate closed session of the Cottonwood Heights City Council,

1  I heard Councilmember Mikell say that she had seen a video of

2  the shooting of Zane James."

3  　　　Now, is he mistaken when he said under oath that he had

4  heard you say you had seen a video of a shooting of Zane James?

5  Is he mistaken?

6  **A.**　　I believe he is mistaken.  I've never -- I don't recall

7  ever talking to him about this case at all.

8  **Q.**　　I think it's document 50 or 56 -- document 50, dash,

9  whatever, Judge, I think it's 11 -- but anyway, it continues on

10 then, Ms. Mikell --

11 　　　　**MS. WHITE:**  Your Honor, hold on.  Can I pull up a

12 copy of this?  Because I think it may have been misquoted and I

13 need to --

14 　　　　**MR. SYKES:**  I hope not.

15 　　　　**THE COURT:**  What's the paragraph number and the --

16 it's the -- you know which declaration it is, Ms. white;

17 correct?  What's the paragraph number?

18 　　　　**MR. SYKES:**  Give me a half a second, Judge.

19 Paragraph 4 -- paragraph 5.  I'll read it again.

20 　　　　**MS. WHITE:**  Hold on.  Can you wait until I get to it,

21 please.

22 　　　　**MR. SYKES:**  Sure.  Absolutely.  Absolutely.

23 　　　　**MS. WHITE:**  Thank you.

24 　　　　**MR. SYKES:**  Absolutely.

25 　　　　**MS. WHITE:**  And are you referring to the August 13th

1  or the November 4th?

2      **MR. SYKES:**  I think it's November 4th, November 4th.

3      **MS. WHITE:**  Sorry, that's Doug Petersen.  You're

4  referring to Michael Petersen?

5      **MR. SYKES:**  Michael Petersen.  Looking right at it.

6      **MS. WHITE:**  November 2nd or August 13th?

7      **MR. SYKES:**  He signed it November 2nd.

8      **MS. WHITE:**  November 2nd, okay.  And what paragraph?

9      **MR. SYKES:**  Exhibit 11, paragraph 5.

10 **BY MR. SYKES**

11 **Q.**  I'm going to read this again, Ms. Mikell.

12      Are you with me?  Are you with me?

13 **A.**  Yes.

14 **Q.**  Okay.  Good.

15      "At a separate closed session of the Cottonwood Heights

16 City Council, I heard Councilmember Mikell say that she had

17 seen video of the shooting of Zane James."

18      Now, my question was:  Is that an accurate statement by

19 Michael Petersen, Mayor?

20 **A.**  I don't recall ever saying that I had seen the shooting of

21 Zane James.  The only thing that I could think of that would be

22 where somebody could have misconstrued what I said is something

23 along the lines of -- and I believe that this could have

24 happened to Tali, if she read the brief, was if you read the

25 brief that was written by the James family about the shooting,

1  that you could conjure up what it would look like.  But I've

2  never said, to my recollection, to Mr. Mike Petersen, that I

3  had seen the shooting of Zane James.  And if I had, then

4  perhaps he misunderstood it for what I call video three.

5  **Q.**  Isn't it true that what happened that night, at that

6  meeting that Mike Petersen is referring to, is that they

7  gaslighted you and convinced you that you had seen a video of a

8  September 2017 shooting?  Isn't that what happened that night?

9  **A.**  I'm -- I'm a very independent person.  I'm from

10  New Jersey.  I played soccer in college.  I was a center

11  halfback.  I'm short, but I'm feisty.  I'm not going to let

12  somebody gaslight that.  I think anybody who knows me, who sits

13  in council meetings, know that.

14      I was not gaslighted.  Tali called me at one point and

15  said, "They got to you, they called you, you've been gaslit."

16  Nobody's ever called me to tell me that I shouldn't say that --

17  you know, to say there's no video.  I've not heard from

18  anybody.  There is no gaslighting.  And that's --

19  **Q.**  I'm sorry, were you done?  I didn't mean to interrupt you.

20  Were you done?

21  **A.**  There has been no gaslighting.  There's been no

22  intimidation.

23  **Q.**  Let me read you the rest of the paragraph.

24      The same page, paragraph-- page 2, paragraph 5.  "To the

25  best of my recollection, one or more members of the city

1    council clarified that such video did not exist and that she

2    must have been either referring to footage of the post-shooting

3    response or else footage related to a separate officer-involved

4    shooting in September of 2017."

5        That's what Mayor Petersen said under oath.  Do you agree

6    or disagree with that?

7    **A.**   I don't recall the session where we discussed this, but I

8    have told you repeatedly that the video that I've seen is video

9    three, the aftermath.

10   **Q.**   Okay.  Did you have a conversation with Tali Bruce about a

11   possible video shown that night, video number two?

12   **A.**   I don't recall.  I believe she tried to -- the only

13   recollection I have is what I would identify as her trying to

14   convince herself that there was a video number two in a call

15   that we had.

16       **MR. SYKES:**  Judge, I'm sorry, I accidentally hit the

17   wrong button here.  Can I have just ten seconds?  Hold on a

18   second.

19       **THE COURT:**  You may.

20   **BY MR. SYKES:**

21   **Q.**   Let me ask you this -- oh, did we lose your attorney?

22   Shall I wait?

23       **THE COURT:**  Wait just one moment.  Okay.  Very well,

24   you may proceed now.

25

**BY MR. SYKES:**

**Q.**   I'm sorry.  Did you or did you not have a conversation with Tali Bruce, on or about August 3rd, about the existence of the shooting video, video two?

**A.**   I don't recall a date or time of when I had a conversation with Tali.  My recollection is that she told me I had been gaslighted.  And it seemed to me that she kept trying to convince herself that there was a video two there, and it seemed like she was doubting herself.  I even said, "Well, Tali, maybe you read the briefing of Ms. James and that's what you're recalling, sort of merging the two."

**Q.**   Let me ask -- I'm sorry.

**A.**   My recollection is that Tali Bruce was trying to recall that there was a video two, and I didn't get the impression that she really believed there was a video two.  And I told her repeatedly that I had seen the aftermath of the shooting, as I've shared with you.

**Q.**   You're giving me very long answers to some things I'm not even asking but let me be -- and it's probably just because I'm a country lawyer and don't know how to ask the question, but let me try again.  Okay?  And I'll be very specific.

Did you tell Tali Bruce, on August 3rd, okay, as I think she just testified to, that you told her, "Was there a shooting video or am I just crazy?"

Didn't you make that comment to Tali Bruce?

1    **A.**   I don't believe I did so, sir.

2        **MR. SYKES:**  No further questions.

3        **THE COURT:**  All right.  Thank you, Mr. Sykes.

4        Ms. White, do you have any -- I guess at this point

5    we call it redirect?

6        **MS. WHITE:**  Yes, just a couple, Your Honor.

7                **REDIRECT EXAMINATION**

8    **BY MS. WHITE:**

9    **Q.**   Ms. Mikell, when you had discussions with others about the

10   video relating to the James incident, what term did you use to

11   describe it?

12   **A.**   I think I probably referred to it as the James shooting

13   incident or something like that.

14   **Q.**   Okay.  And when you were using the words "the James

15   shooting incident or something like that," to what were you

16   referring of the videos Mr. Sykes has asked you about, video

17   one, two or three?

18   **A.**   Video three.

19   **Q.**   Okay.  Now, have you seen a recording of the actual

20   shooting of Zane James?

21   **A.**   No.

22   **Q.**   And do you have any information that one exists?

23   **A.**   I do not.

24        **MS. WHITE:**  I have nothing further.  Thank you.

25        **THE COURT:**  All right.  Thank you.

1          Mr. Sykes, do you have anything else you need to ask?

2          **MR. SYKES:**  Nothing further, Judge.

3          **THE COURT:**  All right.

4          Ms. Mikell, thank you for your testimony.  We

5     appreciate it and you're excused.

6          **THE WITNESS:**  Thank you.

7          **MS. WHITE:**  Is Officer Betenson next?

8          **THE COURT:**  Mr. Sykes, who would you like next?

9          **MR. SYKES:**  Officer Davies.  Officer Davies.

10         **MS. WHITE:**  Okay.  What I'm handing Officer Davies is

11    just the attachments of the exhibits to the brief, in case he

12    needs those for reference.

13         **THE COURT:**  All right.  Mr. Sykes, do you want to

14    formally call him and we'll have the courtroom deputy swear

15    Officer Davies in.

16         **MR. SYKES:**  I'd like to call Officer Casey Davies, I

17    think of the Herriman Police Department.

18         **THE COURT:**  All right.

19         **THE COURTROOM DEPUTY:**  Raise your right hand, please.

20         You do solemnly swear that the testimony you shall

21    give in the case now before the Court to be the truth, the

22    whole truth and nothing but the truth, so help you God?

23         I assume that was a yes?

24         **THE WITNESS:**  Yes, I do.

25         **THE COURTROOM DEPUTY:**  Thank you.

```
1          Will you please state your full name for the record

2    and spell it.

3          THE WITNESS:  Casey Allen Davies, that's C-A-S-E-Y,

4    A-L-L-E-N, D-A-V-I-E-S.

5          THE COURTROOM DEPUTY:  Thank you.

6               CASEY ALLEN DAVIES,

7    called as a witness for and on behalf of the plaintiffs, being

8    first duly sworn, was examined and testified as follows:

9               CROSS-EXAMINATION

10   BY MR. SYKES:

11   Q.   Officer Davies, you -- on May 29, 2018, you shot Zane

12   James in the back, did you not?

13         MR. JENSEN:  Objection, Your Honor.  This has not

14   been permitted by Your Honor at the outset of this hearing.

15   We're not going to get into what my client -- my client's body

16   cam and the use of it.

17         THE COURT:  Right.  I am going to sustain that,

18   Mr. Sykes.  You are going to need to confine yourself to the

19   things that are specific to the camera, especially with Officer

20   Davies.

21         MR. SYKES:  Okay.  Let me do this, if I can find it.

22   Where is it here?

23         Hold on one second, Judge.  I need to find this.

24         (Discussion off the record.)

25         MR. SYKES:  Just one second, Judge, I'm working
```

1    through a screen sharing problem here.  Just give me half a

2    second.

3            THE COURT:  All right.

4            MS. WHITE:  Bob, if you're trying to reference any of

5    the exhibits that you attached to your brief, we have them

6    right here in hardcopy form.

7            Bob, do you want to tell me what you're looking for

8    and I can pull it up?  Can you hear us?

9            MR. SYKES:  Yeah.  I wanted to show the Judge

10   document 31.3.  And I'm trying to find it but I can't seem to

11   find it.

12           THE COURT:  What is that document, Mr. Sykes, just --

13           MR. SYKES:  Well, here.  I'll just go without showing

14   it.  He can look at it there and I will just narrate it.  Okay?

15           MS. WHITE:  Can you tell me what it is, please.

16           MR. SYKES:  Yeah.

17   BY MR. SYKES:

18   Q.   Officer Davies, did you sign a declaration on August 14,

19   2020, Document 31-3?  Do you have it there in front of you?

20   A.   Yeah, I believe I do.

21   Q.   Okay.  Turn to paragraph 3 of that.

22   A.   I'm there.

23   Q.   Okay.  Let me read what you wrote there.

24        "I was not wearing my body camera during the incident

25   involving Zane James on the morning of May 29, 2018.  I had

1   been on my way to work at the time and had not yet gotten to

2   the police station to pick up my body camera."

3       Is that what you wrote?

4   **A.**   I actually didn't write it.  I just signed the document

5   that I was asked to sign.

6   **Q.**   Was that a falsehood when you signed it?

7   **A.**   I'm sorry, what?

8   **Q.**   Was that a false statement?

9   **A.**   No, it wasn't a false statement.  The way, when I read

10  that, I understood that as I hadn't picked up my body camera

11  yet.

12      Right above it, in paragraph No. 2, where it stated I was

13  an employee with Cottonwood Heights, I fixed that and put my

14  initials on it.  And then at the bottom, when I read that, I'd

15  have to apologize to you that I misunderstood what that was

16  saying, but I had not picked up my body camera yet but I was at

17  the police department.

18  **Q.**   You misunderstood what you were saying here?

19  **A.**   I misunderstood what I was reading, yes.

20  **Q.**   This is a two-page declaration; right?

21  **A.**   Yes, sir.

22  **Q.**   Okay.  And you knew it was under oath; right?

23  **A.**   Yes, sir.

24  **Q.**   And you wrote, "I was not wearing my body camera during

25  the incident involving Zane James on the morning of May 29,

1  2018.  I had been on my way to work at the time and had not yet

2  gotten to the police station to pick up my body camera."

3       That's what you signed; correct?

4  **A.**   Yes, sir, that's what I signed.

5  **Q.**   Okay.  Why did you lie to the Court?

6            **MS. WHITE:**  Objection, Your Honor.  It's

7  argumentative.

8            **THE COURT:**  Sustained.

9  **BY MR. SYKES:**

10 **Q.**   Why did you make a false statement to the Court?

11 **A.**   I wasn't making a false statement.  What I understood when

12 I read that -- what I understood that I was signing was the

13 fact that I thought we were addressing the issue I hadn't

14 picked up my body camera yet, because I was getting ready for

15 work.

16 **Q.**   Well, the statement that you signed under oath says that

17 you were on your way to work and you hadn't picked it up yet;

18 right?

19 **A.**   Yes, sir.  And like I said, I'd have to apologize that I

20 misunderstood that numbered paragraph.

21 **Q.**   Are you aware that that same story went out to the press

22 under Lieutenant Bartlett's statement and under Chief Russo's

23 statement in 2018?

24            **MS. WHITE:**  Sorry, you cut out, Bob, halfway through

25 your question.  Could you please ask it again.

**BY MR. SYKES:**

**Q.**   Are you aware that that same statement went out under

Lieutenant Bartlett's signature or a statement to the press, as

did a similar statement at a different time go out under Chief

Russo's --

          **MS. WHITE:**  Objection, hearsay and relevance.

          Go ahead.

          **THE COURT:**  You can ask if he's aware of that, yeah.

So overruled.

**BY MR. SYKES:**

**Q.**   Are you aware of that?

**A.**   Can you repeat your question?

**Q.**   Yeah.  Well, Exhibit -- just a minute here -- 4, from our

memorandum, page 3, and this is -- was this Bartlett or Russo?

Bartlett, on June 13th to KSL News, "No video was recorded of

the officer, who was on his way to work, firing at James after

police say he fled on a dirt bike, and then on foot the morning

of May 29th."

**A.**   So what's your question, sir?

**Q.**   Well, that's what Lieutenant Bartlett said to the press.

"No video is recorded of the officer who was on his way to

work."

      Is that untrue?

**A.**   I can't really say what he said, if it is or not.  I can

tell you that day I hadn't talked to him yet, so I'm not aware

1    what he knew or what he didn't know.

2    Q.    Okay.  Let me read to you Exhibit 5, Chief Russo, and that

3    was on October -- it's our Exhibit 5, October 9th, 2018,

4    page 3, Cottonwood Heights Police Chief Robby Russo said,

5    "Davies was on his way to work when the shooting happened -

6    he'd not yet made it to the police station to pick up his

7    camera."

8          Now, was Chief Russo wrong about that?

9    A.    I would have to say he was wrong.

10   Q.    Yeah.  Isn't it true that you regularly misrepresented

11   what happened that morning, telling multiple people that you

12   hadn't yet been to work and that's why you didn't have your

13   camera on?

14         MR. JENSEN:  Objection, calls for speculation,

15   Your Honor, we don't know what multiple people or multiple

16   situations are.

17         THE COURT:  Do you want to be more specific,

18   Mr. Sykes?

19   BY MR. SYKES:

20   Q.    Isn't it true, that you regularly misrepresented to

21   multiple people that you didn't have your camera on at the time

22   of the shooting because you were on your way to work?

23         MR. JENSEN:  Same objection, Your Honor.

24         THE COURT:  What's the basis of the objection?

25         MR. JENSEN:  Lack of clarity, Your Honor.  We don't

1    know who's -- who he's referring to, what people [inaudible]

2    situation.

3              **THE COURT:**  Well, why don't you just say "did you

4    tell anyone that" or something like that.  Why don't you

5    clarify it just a little bit, Mr. Sykes.

6    **BY MR. SYKES:**

7    **Q.**   Well, didn't you tell multiple people?

8              **THE COURT:**  That's the problem that he's objecting

9    to, is the "multiple people."

10   **BY MR. SYKES:**

11   **Q.**   Well, didn't you tell Chief Russo that you were on your

12   way to work and, therefore, you didn't have your camera?

13   **A.**   No, I didn't.  I remained silent the day it happened.

14   **Q.**   Well, you told them that afterward, didn't you?

15   **A.**   That what?

16   **Q.**   All right.  And isn't it true you told Lieutenant Bartlett

17   that you didn't have your camera on because you were on your

18   way to work?

19   **A.**   That's not true.

20   **Q.**   Okay.  Now, I don't think I can call this up.  Your

21   counsel gave us this just yesterday.

22             **MR. SYKES:**  And, Judge, I learned this yesterday

23   afternoon.  That's how recently it is.  Okay?  And I'm

24   referring to the defense exhibits, Exhibit 10.

25

**BY MR. SYKES:**

**Q.** Interview with Casey Davies, June 18, 2018, okay? He had -- this is what they call a Garrity interview. And I think you know what that is, but he had his attorney with him named Bret Rawson. Okay?

Officer Davies, turn to page 1 of that exhibit, would you, please.

**A.** Yes, sir.

**Q.** And I'm down to about line 36. Okay? Actually, line 30. Okay, so that morning --

**MR. SYKES:** And, Judge, it might be helpful, because I can't show it on the screen, if you can find that. I think it would be easier for you to follow it if you have it handy.

**BY MR. SYKES**

**Q.** Okay, line 30.

"So that morning, I think it was Tuesday morning, I came in a little bit earlier than normal on my day off to work a ten-hour -- to work a ten-hour seatbelt shift. So I was -- all my -- all my gear and my uniform I keep in the locker room."

Did I read that accurately?

**A.** Yes, sir.

**MR. JENSEN:** Your Honor, my client is not going to respond to any inquiries obtained from here in a statement. The purpose of Garrity v. New Jersey, which is a 1967 case, is to protect what is stated in that interview from being used in

a criminal proceeding.

Now, in the event any inquiries are made of my client in this proceeding, and my client addresses those, he is waving that Garrity protection.

**THE COURT:**  All right.  So you're going to instruct your client not to respond to questions about the content of that interview; correct?

**MR. JENSEN:**  That is correct, Your Honor.

**THE COURT:**  All right.  Well, I'm going to sustain that objection.

**MR. SYKES:**  Okay.  Let me read a little bit more, if I could.

**MR. JENSEN:**  Your Honor, my objection is going to be the same for that entire Garrity document.

**MR. SYKES:**  Your Honor, I don't think that Garrity protects him from having to answer questions in a civil context.  Okay?  I've seen no law on that that he's claiming. And what I would recommend -- this is extremely important, it goes right to the heart of the video.  Okay?  Let me ask the questions, take it under advisement and then make your ruling at a later time.  Because we have very little time here, I'd like to ask these questions --

**THE COURT:**  Can you ask the questions without reading them from the interview?

**MR. SYKES:**  I could but it's helpful to read it from

1    the interview, you know.  I could do it either way.

2         **THE COURT:**  The problem is, my understanding of the

3    nature of the objection is that there's a potential waiver

4    issue.  And I guess my concern there is, yes, ordinarily, where

5    I'm not sure about admitting evidence, I can take it under

6    consideration but, you know, if there really is a waiver issue,

7    as Mr. Davies's lawyer is arguing, the cat would be out of the

8    bag once he answers the questions, I gather.

9         **MR. SYKES:**  Well, let him object and tell him not to

10   answer then.

11        **THE COURT:**  Okay.

12        **MR. JENSEN:**  Okay.

13        **MR. SYKES:**  Tell him not to answer.

14        **THE COURT:**  All right.

15   **BY MR. SYKES**

16   **Q.**  And if you want to answer of some these, you can.  If you

17   don't, you don't have to.  Okay?

18       Line 36, "So I came in a little bit early, got ready for

19   work, was getting changed.  While I was putting my uniform on,

20   I heard Officer Betenson call out that he was following a

21   motorcycle that was believed to have been the same one that ran

22   from Officer Croft, I believe."

23       Now, I've read lines 36 through 39.  Did I read that

24   accurately?

25        **MR. JENSEN:**  Your Honor, my client's not going to

1  answer that question.

2  **MR. SYKES:** Okay.

3  **THE COURT:** All right.

4  **BY MR. SYKES:**

5  **Q.** Let me continue, just like a few minutes more and we're

6  done.

7  **MR. JENSEN:** Your Honor, I --

8  **BY MR. SYKES:**

9  **Q.** Lines 43 through 45.

10  "At that time, I just continued to get ready because I was

11  listening to the radio where, but at the time, if it was going

12  to -- a chase again, I figured it's going to get shut down. I

13  mean I'm not going to hurry out just for nothing. So --"

14  Did I read that accurately?

15  **MR. JENSEN:** He's not going to answer that question,

16  your Honor. And with my objection I would ask that these

17  questions be stricken [inaudible] and that the articulation

18  also be stricken from the record.

19  **THE COURT:** Why is that?

20  **MR. JENSEN:** (Inaudible. Two people talking at the

21  same time.)

22  **MR. SYKES:** Judge, let me just say, too, that this

23  has already been provided to us so I think they've waived --

24  **THE COURT:** Just a moment, the reporter is having

25  trouble so let's be careful. I guess we're talking over each

1    other.

2    So to be clear about the basis of your objection for

3    even having the questions answered, or -- even having them

4    asked, or even have the document read, what is the basis for

5    that, Mr. Johnson [sic]?  Is it Jensen or Johnson?  I wrote

6    two.

7    **MR. JENSEN:**  You're fine, Your Honor.

8    It goes against the holding in Garrity v. New Jersey.

9    Again, it opens my client up to potential litigation.  When

10   this is read into the record, that makes it part of this civil

11   matter, and that's going to be able to be obtained from anybody

12   who wants to get access to it.

13   Like I said, the holding in Garrity protects my

14   client so what he says cannot be tainted and used in another

15   proceeding.  And I understand that's specifically a criminal

16   proceeding, but by it now being read into the record in this

17   civil proceeding, my concern is it is opening that criminal

18   proceeding.  Hence, my objection, and hence, the reason I ask

19   that it be stricken.

20   If Your Honor wants to take this document under

21   advisement and make a ruling on it at a later time, I think

22   that would be more appropriate, rather than having this thing

23   read into the record.  It will also preserve the judicial

24   economy.  We're getting close to the 5:00 hour.

25   **THE COURT:**  All right.  Now, the -- I guess the

1    defendant has already provided this document to the Court and

2    to Mr. Sykes.  So is it not already in the record?

3                    **MR. SYKES:**  It is.

4                    **MS. WHITE:**  I don't know that it's in the record,

5    Your Honor.  It hasn't been admitted.  We haven't asked any

6    questions about it.  It's been provided to counsel.

7                    **THE COURT:**  It's on the docket sheet; right?

8                    **MS. WHITE:**  It is not.

9                    **THE COURT:**  It is not on the docket sheet?

10                   **MR. SYKES:**  Of course, it would be.  It was submitted

11   yesterday.

12                   **MS. WHITE:**  No, we -- we gave courtesy copies of

13   potential exhibits to counsel yesterday.  Nothing has been --

14                   **THE COURT:**  Right.  So it hasn't been admitted.

15                   **MR. SYKES:**  I would move to admit it, Your Honor,

16   it's extremely important.

17                   **THE COURT:**  Well, it sounds like Mr. -- that

18   Mr. Davies's counsel is going object to that.  And honestly,

19   that's something -- these are significant enough issues being

20   raised that I would probably want to have briefing on that or

21   have a little bit more inquiry.  So --

22                   **MR. SYKES:**  I need about another two or three minutes

23   and I'm done with this witness.

24                   **THE COURT:**  Right.  Is there a way of just asking

25   what happened that morning without reading through this

document?  Because I think under the circumstances, where it's effectively been lodged but not been admitted into evidence, and there's a pretty strenuous objection, I'm not inclined to let you proceed further reading with it at this time.

**MR. SYKES:**  Can I proffer what it says?  It's pretty important, Judge, right to the heart of the document, right to the heart of the matter.

**THE COURT:**  Okay, Mr. Sykes, I'm having trouble understanding why you can't just ask him what happened.

**MR. SYKES:**  Well, because he's going to lie.  He's going to lie, Your Honor.  And I mean he's already lied, he said --

**MS. WHITE:**  Your Honor, that's offensive.

**MR. SYKES:**  Let me finish.  Heather, let me finish. I don't interrupt you, okay?

**MS. WHITE:**  Yeah, well, I don't call you --

**MR. SYKES:**  He's already lied about it.  He's -- he said several times, including August of this year, that he was on his way to work and that's why he didn't have his camera, but this document shows he was at work.  And the next thing I'm going to read is about the camera that he saw on his way out the door, allegedly.  And, you know, this is extremely important.

**THE COURT:**  Why don't you proffer the document and I will -- why don't you even proffer it and highlight what you

1  think is important and I will look at it.  And then I will

2  allow Mr. Davies's counsel an opportunity to address whether or

3  not it would be improper to admit that.  But rather than read

4  it on the record, why don't you just -- you can take that

5  document, you can highlight what you want me to read and you

6  can proffer that.  And I'll -- you know, you can lodge it with

7  the Court and I'll look at it and decide.

8        **MR. SYKES:**  Okay.  Let me ask Officer Davies this.

9  **BY MR. SYKES:**

10 **Q.**   Is it true that you were in the station that morning,

11 getting dressed and getting ready for work, before you heard

12 about Zane James?

13 **A.**   I'm sorry, you broke up.  Can you repeat?

14 **Q.**   Isn't it true that you were in the station that morning,

15 getting ready for work, getting dressed, when you heard the

16 call come out about Zane James?

17 **A.**   Yes, sir.

18 **Q.**   Okay.  Why did you tell -- state in your earlier

19 declaration that you were on your way to work when you knew you

20 were already at work?  Why?

21 **A.**   Like I already told you, I misunderstood that paragraph.

22 I was under the impression it was talking about picking up the

23 body camera.

24 **Q.**   Okay.  Isn't it true that on your -- when you heard the

25 statement about the chase and the alleged armed robbery, okay,

1  that you rushed to get out of there and you saw your camera in

2  the dock, your statement; is that true?

3  **A.**   That's not true.

4          **MR. SYKES:**  Well, may I read this?

5          **THE COURT:**  You may not if it's from the report.  You

6  may highlight it and lodge it.

7          **MR. SYKES:**  All right.

8  BY MR. SYKES

9  **Q.**   Now, is it true that as you were chasing Zane James, you

10  pulled up parallel to his motorbike several times --

11         **MS. WHITE:**  Objection, Your Honor, this goes beyond

12  the scope of the --

13         **MR. SYKES:**  It's very, very, very, very important.

14         **THE COURT:**  Why?

15         **MR. SYKES:**  Why?  Because --

16         **THE COURT:**  I understand it's important to your case,

17  but why is it important to whether or not he had his body

18  camera or there's a video?

19         **MR. SYKES:**  Because, Your Honor, he intentionally --

20  he intended to use -- he says it, and you won't let me read it

21  but he says it in here, on page 7, that he intended to use

22  deadly force and knock him off of his bike and did it.  He did

23  it, knocked him off of his bike, intended to kill him.  He used

24  deadly force.  Okay?

25             That never appears anywhere in any of the other

1   records at all.  It's totally silent.  That was withheld from

2   us and everybody else.  Okay?  I learned about it yesterday.

3   Okay?

4           **THE COURT:**  You can lodge the document, you can

5   highlight anything in it you want, and you can ask him

6   questions today, but you may not quote from the document today.

7   **BY MR. SYKES:**

8   **Q.**  Did you intend to run him over?

9           **MR. JENSEN:**  Objection, Your Honor.  This does not go

10  to what Your Honor indicated would be permitted at the outset

11  of the hearing.  Questions specific to that body cam had

12  nothing to do with running anybody over.

13          **THE COURT:**  All right.  Can you tie that to the body

14  camera, Mr. Sykes?

15          **MR. SYKES:**  Yes, I can.

16          **THE COURT:**  Please try and ask him in a way that does

17  that.

18          **MR. SYKES:**  Okay.

19  **BY MR. SYKES**

20  **Q.**  You intended to run him over, and then, when he was

21  injured, he got up and staggered away and you caught it all on

22  your body camera; isn't that true?

23  **A.**  I didn't have a body camera so I'm not sure what you're

24  talking about.

25  **Q.**  And then you stated -- or did you -- did you state to

1  anybody that you wanted to finish the job that you didn't

2  succeed in doing when you hit him?

3         MR. JENSEN:  Objection, Your Honor, he's not going to

4  answer.

5  BY MR. SYKES

6  Q.   Isn't that what you said?

7         THE COURT:  That objection is sustained.

8         MR. SYKES:  Judge, I need about two minutes to

9  consult with my fellow counsel.  I think I'm done.

10        THE COURT:  Sure.

11        (A brief recess was taken while still connected to

12 Zoom.)

13        MR. SYKES:  Back on the record, Judge.

14        THE COURT:  Yes.  Please proceed.

15 BY MR. SYKES:

16 Q.   Is it true that your camera, body camera video, starts

17 with a crumpled motorcycle?

18 A.   No, sir.  I didn't have a body camera.

19 Q.   All right.

20        MR. SYKES:  No further questions.

21        THE COURT:  All right.  Thank you.

22        Ms. White, do you have any redirect?

23        MS. WHITE:  Just a few, Your Honor.

24

25

1  ## <u>REDIRECT EXAMINATION</u>

2  **<u>BY MS. WHITE</u>:**

3  **Q.**  Officer Davies, we've gone through your August 14, 2020,

4  declaration, what you said, and it was pointed out on

5  cross-examination that there was a statement in there that

6  wasn't accurate.  And I think you've already explained how that

7  occurred.

8  Did you do anything subsequently to correct that mistake?

9  **A.**  Yeah.  Yes.  We filed a different one that fixed the

10  verbiage to make it more clear that I was at the office.

11  **Q.**  Okay.  And are you referring to the November 4th, 2020,

12  declaration?

13  **A.**  I'd have to see it but I believe that was the day.

14  **Q.**  Let me have you turn to the Plaintiffs' Exhibit 7 here and

15  ask you if that was it.

16  **A.**  Yes, ma'am.

17  **Q.**  And is that -- what paragraph do you see that correction

18  in?

19  **A.**  Number three.

20  **Q.**  Okay.  And what did you explain?

21  **A.**  On this one, I clarified that I -- while I was -- oh,

22  sorry.  I was not yet on duty and had not yet picked up my body

23  camera from its docking cradle at the police station.

24  **Q.**  Okay.  And did you ever have a body camera on from the

25  time that you got to work that morning through the shooting

1   incident with Zane James?

2   **A.**   No.  Immediately after the incident occurred, I was

3   sequestered by the sergeant and then taken to kind of a room

4   similar to this, kind of a briefing room.  And the sergeant --

5   and Sergeant Dailey maintained visual, I guess I should say --

6   **Q.**   Uh-huh.

7   **A.**   -- until my attorney could get present.

8   **Q.**   Okay.

9   **A.**   So, no, I never had the camera there.

10   **Q.**   Okay.  And did you have a dash camera recording in your

11   car?

12   **A.**   At the time I was in a loaner car, so I don't know if

13   there was a camera or not.  If there was, I wouldn't have

14   access to it.

15   **Q.**   Okay.  And do you recall anything -- do you recall ever

16   hearing about or being told about a dash cam or a recording or

17   anything?

18   **A.**   No.  I'm going off my memory, but I don't even believe

19   there was a camera in that car.

20   **Q.**   Okay.  You don't recall there being a camera in that car?

21   **A.**   Yeah, I don't recall.

22   **Q.**   Okay.

23        **MS. WHITE:**  Okay.  I don't have anything further.

24   Thank you.

25        **THE COURT:**  All right.  Thank you.

1          Mr. Sykes, do you have any recross specific to what
2     Ms. White asked?
3          **MR. SYKES:** No.
4          **THE COURT:** All right. Thank you.
5          Officer Davies, I have just one question for you.
6          **THE WITNESS:** Yes, sir.
7          **THE COURT:** I'm trying to understand the factual
8     sequence a little bit. Is it fair to say -- and just tell me
9     yes or no, and if it's no, explain why.
10          Is it fair to say that you'd arrived at the police
11    station and were in the process of getting ready for work when
12    the call came in, that you were getting in your uniform and so
13    forth? Is that what happened?
14          **THE WITNESS:** Yes, sir. We have a locker room and at
15    that time, I was accustomed to responding to work in civilian
16    clothes and then I'd switch into my uniform. And then at the
17    end of the shift, I would shower and clean up and then drive
18    home in my civilian clothes.
19          **THE COURT:** Okay. So what you're telling me is what
20    was going on when this call came in, was you were in the
21    process of getting changed into your uniform; is that correct?
22          **THE WITNESS:** Yes, sir. And I had the radio on that
23    was in my locker at the time.
24          **THE COURT:** All right. Okay. Thank you.
25          All right. Well, thank you for your testimony, and I

1    think you can be excused now.

2         **THE WITNESS:**  Thank you, Your Honor.

3         **THE COURT:**  And I guess if -- do we still have

4    Mr. Davies's attorney?  Was it -- is he still here with us,

5    Ms. White?

6         **MS. WHITE:**  Yes.  Yes, he's still here.

7         **THE COURT:**  Okay.  What I'm going to request for both

8    you and Mr. Sykes is, I think I will give you until next

9    Wednesday, Mr. -- again, I wrote too small, is it Mr. Jensen or

10   Johnson?

11        **MR. JENSEN:**  It's Jensen, Your Honor.

12        **THE COURT:**  All right, thank you.  Mr. Jensen, I will

13   give you until Wednesday to explain in writing your basis for

14   thinking that any reference to or use of the interview notes,

15   or the transcript of that interview, would be improper in this

16   proceeding.  Is that something you could do?

17        **MR. JENSEN:**  Yes, Your Honor.

18        **THE COURT:**  All right.  Thank you.

19        And, Mr. Sykes, I will give you until December 7th,

20   an opportunity to respond to whatever arguments Mr. Jensen

21   makes and explain why you think that the Court can and should

22   consider that interview.

23        **MR. SYKES:**  Thank you, Judge.

24        **THE COURT:**  All right.

25        And in terms of the actual interview, you are welcome

1    to lodge with the court -- in fact, why don't you e-mail to my

2    chambers, copying Ms. White and Mr. Jensen, so that

3    everybody -- so it's not in any way ex parte, kind of a

4    marked-up version of that interview, where you highlight just

5    what you think the key statements are.  And I'm not going to

6    admit it until after I hear from both of you and decide -- you

7    know, decide about whether it's properly admitted, but I'd at

8    least like to see what it is that you think is important.  So

9    if you could submit it to me in that manner.

10          **MR. SYKES:**  Judge, why don't I submit you both a

11   marked-up version and an unmarked version, so you have both of

12   them?

13          **THE COURT:**  That's fine.

14          **MR. SYKES:**  Mr. Jensen, if you could send me your

15   e-mail, I don't know you personally, bob@sykesinjurylaw.com,

16   okay, or bob@countrylawyer.com probably, too, but

17   sykesinjurylaw is a better one.  If you'll send an e-mail and I

18   will have your contact information, I'll send a copy of

19   whatever I send to you.  There's lots of Jensens around so I

20   want to get to the right guy.

21          **THE COURT:**  All right.  Very well.  And why don't you

22   submit that as soon as possible so that Mr. Jensen has in front

23   of him specifically what you're trying to use, when he submits

24   his brief.

25          **MR. SYKES:**  Yeah, I can get that out tomorrow, Judge.

1          **THE COURT:** Okay. Please do.

2          **MR. SYKES:** It's kind of late tonight, people are

3    going home in a few minutes, but I'll get it out tomorrow.

4          **THE COURT:** Right. Well, we hope they're going home

5    in few minutes but we still have a few witnesses, I gather.

6          **MR. SYKES:** Yeah.

7          **THE COURT:** All right. Thank you.

8          Okay. Who do you want next, Mr. Sykes?

9          **MR. SYKES:** Chief Robby Russo.

10         **THE COURT:** All right.

11         **THE COURTROOM DEPUTY:** Raise your right hand, please.

12         You do solemnly swear that the testimony you shall

13    give in the case now before the Court to be the truth, the

14    whole truth and nothing but the truth, so help you God?

15         **THE WITNESS:** I do.

16         **THE COURTROOM DEPUTY:** Thank you. If you'll state

17    your full name, please, and spell it for the record.

18         **THE WITNESS:** Ernest Robert Russo, R-U-S-S-O.

19         **THE COURTROOM DEPUTY:** Thank you.

20         **MR. SYKES:** Chief, good to see you. How are you?

21         **THE WITNESS:** I'm well, sir. How are you?

22         **MR. SYKES:** Good.

23                  **ERNEST ROBERT RUSSO,**

24    called as a witness for and on behalf of the plaintiffs, being

25    first duly sworn, was examined and testified as follows:

**CROSS-EXAMINATION**

**BY MR. SYKES:**

**Q.**   I have just one question for you and maybe Ms. White -- is Ms. White representing you today?

**A.**   Yes, sir.

**Q.**   Okay.

          **MR. SYKES:**   Heather, could you turn to our Exhibit 5.

**BY MR. SYKES**

**Q.**   I'll represent to you that we did a search, Internet search, consulted Dr. Google and found references to various stories about this.  This one is KUTV by Cristina Flores. Okay?  October 9, 2018.

      Can you see that on page 1?

**A.**   I do.

**Q.**   Okay.  And I think that they attached a link to the video -- the video number three, which is the post-shooting video.  And it says, "No criminal charges for Cottonwood Heights officers who fatally shot robbery suspect."

      Are you with me so far, Chief?

**A.**   Yes, sir.

**Q.**   Okay.  And then go to page -- and I think, if I'm not mistaken, Chief, that this story was done in response to Sim Gill's letter of the same day, I believe, indicating there would be no criminal charges filed.

**A.**   I believe that's correct, sir.

1    **Q.**    Okay.  And on page 3 it says, "Cottonwood Heights Police

2    Chief Robby Russo," which is you, "said Davies was on his way

3    to work when the shooting happened.  He'd not yet made it to

4    the police station to pick up his camera."

5        Did you tell the reporter something to that effect that

6    day?

7    **A.**    Yes, sir, I did.

8    **Q.**    Okay.  Were you aware -- by the way, at this point,

9    October, I think it's 8th -- 9th, 2018, were you aware that

10   Officer Davies had attempted to run over and kill Zane Davies

11   with his car?  Were you aware of that?

12        **MS. WHITE:**  Objection, Your Honor, this again

13   references the statement that has previously been ruled not to

14   be referred to I think at this point.

15        **MR. SYKES:**  I'm not referencing any statement.  I'm

16   just asking him if he's aware of that.

17        **THE COURT:**  How is it relevant, Counsel --

18        **MR. SYKES:**  Well --

19        **THE COURT:**  -- to whether or not there was a body

20   camera, as opposed to, you know, the actual underlying lawsuit,

21   of, you know, Mr. Davies's liability?

22        **MR. SYKES:**  That's a very good question.  I think

23   it's relevant because it shows that Davies is probably lying

24   about a lot of stuff, including whether he was on his way to

25   work or not.  And the fact that he tried to use deadly force

1    prior to shooting, okay, is highly relevant.  So that's why.

2          **MS. WHITE:**  Your Honor, this goes beyond the scope as

3    well for the hearing.

4          **THE COURT:**  Yeah, I think -- I understand what you're

5    getting at for credibility, Mr. Sykes, and I think we'll handle

6    it through the procedures we discussed with the underlying

7    document and the briefing from Mr. Jensen and from you, rather

8    than asking about that.  Because it is -- as I said, it may go

9    to credibility and you can make that argument, but it also

10   goes, you know, potentially to the merits of the lawsuit, which

11   you're not entitled to discovery on at this point.

12         It also potentially raises issues of possibly

13   criminal liability or whatever with the -- and waiving the

14   privilege.  So let's not -- let's get to that through other

15   ways.

16         **MR. SYKES:**  Fair enough.  I have no further

17   questions.  Thank you.

18         **THE COURT:**  All right.  Thank you.

19         **THE WITNESS:**  May I be excused?

20         **THE COURT:**  All right.  Thank you for your testimony.

21   And you're excused, Chief Russo.

22         I guess, Ms. White, I actually didn't give you an

23   opportunity for redirect.  Did you want any?

24         **MS. WHITE:**  I don't think I had any redirect because

25   I don't -- I think there was maybe one question asked.

1    **THE COURT:**  There was one question, so I assumed the

2    answer was no, but I should have asked before I excused the

3    witness.

4    **MS. WHITE:**  Thank you, Your Honor.  No, the witness

5    may be excused.

6    **THE COURT:**  All right.  Thank you.

7    **MR. SYKES:**  Your Honor, Ms. White is in a hurry to

8    get home.  She's got TV programs to watch.

9    **THE COURT:**  I thought we all watched a streaming

10   service so we could decide what time to watch them now.

11   All right.  Mr. Sykes, do you have another witness?

12   **MR. SYKES:**  Just one second, Judge.  Just one second.

13   Your Honor, we are done with our questions.  I'd like

14   to take a five-minute break to kind of reorganize things here.

15   I think the only other witness we have, I don't know, is

16   Tiffany James.  She's here.  But we're done with the direct

17   examination of our witnesses.

18   We were going to call Officer Betenson but I think

19   some of the things I would ask him you've already kind of ruled

20   on, that you don't want to hear right now, like about Zane

21   being hit -- being struck by the car and stuff like that.  So I

22   think we're going to just pass on Officer Betenson.

23   **THE COURT:**  All right.  Thank you.  And so if you

24   need it, we will take a brief break, but, Ms. White, do you

25   intend to call Ms. James for cross-examination?

1          **MS. WHITE:** Yes, Your Honor.

2          **THE COURT:** Okay. Why don't we take a five-minute

3    break. Let's be back at -- let's see, my -- let's be back at

4    5:18.

5          **MR. JENSEN:** And, Your Honor, this is J.C. Jensen. I

6    believe I need to move the Court to extend my notice of limited

7    appearance now to include this brief. Can I do that just on

8    the record at this time?

9          **MS. WHITE:** Oh, I froze up.

10         **MR. SYKES:** No objection.

11         **MR. JENSEN:** I'm sorry, Your Honor, we lost audio for

12   a minute.

13         **THE COURT:** Yes. So there's no objection from

14   Mr. Sykes. Is there any objection from Ms. White to that?

15         **MS. WHITE:** No, Your Honor.

16         **THE COURT:** All right. That request is granted.

17         **MR. JENSEN:** Thank you.

18         **THE COURT:** All right. And now we will -- now we'll

19   take our recess.

20             (A recess was taken.)

21         **THE COURT:** All right. Ms. White, it sounds like you

22   can proceed.

23         **MS. WHITE:** Your Honor, we'd call Tiffany James to

24   the stand.

25         **THE COURT:** All right. The courtroom deputy will

1   swear her in.

2         **MR. SYKES:** You better say something so they'll see

3   you. Hello? Hello?

4         **THE COURTROOM DEPUTY:** Raise your right hand, please.

5         You do solemnly swear that the testimony you shall

6   give in the case now before the Court to be the truth, the

7   whole truth and nothing but the truth, so help you God?

8         **THE WITNESS:** I do.

9         **MR. SYKES:** Louder.

10         **THE WITNESS:** I do.

11         **THE COURTROOM DEPUTY:** Thank you. If you'll please

12   state your full name and spell it for the record.

13         **THE WITNESS:** It's Tiffany James, T-I-F-F-A-N-Y,

14   J-A-M-E-S.

15         **THE COURTROOM DEPUTY:** Thank you.

16                        **TIFFANY JAMES**,

17   called as a witness for and on behalf of the defendants, being

18   first duly sworn, was examined and testified as follows:

19                  **CROSS-EXAMINATION**

20   **BY MS. WHITE:**

21   **Q.** Ms. James, do you have a copy of your August 25th, 2020,

22   affidavit?

23   **A.** August 25th? Is that it on the screen?

24   **Q.** Yes.

25         Sorry. Do you have it?

1  **A.**    I do.  Yes.

2  **Q.**    Okay.  We're going to go to paragraph 6.  And it may be

3  easier for you to look at the hardcopy that you have or on the

4  screen, whatever is better for you.  Tell me when you're ready

5  for me to ask you some questions.

6  **A.**    I'm on paragraph 6, yes.  I'm ready.

7  **Q.**    In paragraph 6, you reference an August 4th, 2020,

8  conversation you had with Council Member Christine Mikell.

9        Do you see that?

10 **A.**    I do.

11 **Q.**    And in paragraphs 6 through 8, you discuss issues that

12 aren't related to your son Zane's shooting; right?

13 **A.**    We do.

14 **Q.**    Okay.  And then when we get down to paragraph 9, you talk

15 about a conversation you had with Ms. Mikell on that date,

16 about a recording related to Zane's shooting; correct?

17 **A.**    I did.  Yes.

18 **Q.**    And in that August 25th, 2020, declaration, you claim in

19 that conversation, Ms. Mikell said, "So you have not seen the

20 video"; correct?

21 **A.**    Yes.

22 **Q.**    All right.  And she responded to you, and you've heard her

23 testimony about that.  And after she responded to you, then in

24 this August 25th, 2020 declaration, you say, "Oh, yeah, there

25 is a video."  Correct?

| | |
|---|---|
| 1 | **A.** Yes. |
| 2 | **Q.** Now, let's go to your November 6th, 2020, declaration, |
| 3 | which is paragraph 7. |
| 4 | Are you there? |
| 5 | **MR. SYKES:** One second. |
| 6 | BY MS. WHITE: |
| 7 | **Q.** And go to paragraph 7(c). |
| 8 | **A.** Ready. 7(c)? |
| 9 | **Q.** Yes. |
| 10 | **A.** Yes. |
| 11 | **Q.** Okay. |
| 12 | **MS. WHITE:** And, Jennifer, can you scroll down a |
| 13 | little bit more on that, please. Keep going. |
| 14 | **THE WITNESS:** Is this paragraph 5 -- or page 5? |
| 15 | Right? Yes. I'm there. |
| 16 | BY MS. WHITE |
| 17 | **Q.** I may have a wrong reference here. I'm looking for the |
| 18 | part in your declaration -- |
| 19 | **A.** It's "e." |
| 20 | **Q.** It has that same conversation? |
| 21 | **A.** Yeah, page 6. |
| 22 | **Q.** Okay. Thank you. |
| 23 | **A.** Scrolling down. We've got two different -- |
| 24 | **Q.** In that declaration, and it's in the November 9th |
| 25 | declaration, too, I believe, you changed your testimony to say |

1  that you added the word "actual shooting" when you were talking

2  to Ms. Mikell about the video; correct?

3  **A.**   I didn't change my testimony.  I added to my testimony,

4  which I think I was asked to do.

5  **Q.**   You added the word "actual"; correct?

6  **A.**   Not in quotes.  Can you show me, because you're looking at

7  a different version than I am, the exact sentence that you're

8  thinking of?

9         **MS. WHITE:**  Jennifer, can you scroll -- I think you

10  need to scroll down just a little, Jennifer.  Where it says

11  "the actual shooting," do you have that, where she has the

12  conversation?  Let me look.

13         **THE COURT:**  It looks like it's showing up now.  It

14  looks like it's highlighted on the screen.

15  **BY MS. WHITE:**

16  **Q.**   There we go.  So you added the words "actual" --

17  **A.**   I added a full sentence, yes.

18  **Q.**   Okay.  And you did that because you recognized that

19  without them, it was unclear whether you were referencing a

20  recording of the actual shooting or the events showing the

21  immediate aftermath; correct?

22  **A.**   No.  You can clearly see that it says, "We were told there

23  was no video of the actual shooting, just after the shooting,"

24  which was in my first declaration.  I added the additional

25  sentence because I was under the impression that the Judge

1    wanted us to file a new declaration that was more precise from

2    the first one.  And so I added the full conversation.

3    **Q.**    Okay.  And that was -- that declaration occurred on

4    August 25th, 2020, if you turn back to that.

5            **MS. WHITE:**  Jennifer, you don't need to do that.

6    **BY MS. WHITE**

7    **Q.**    But turn back to that one.  And both times you say

8    something to Ms. Mikell, you say, "the shooting," not the

9    "actual shooting"; correct?

10   **A.**    And this is the former?

11   **Q.**    Yeah, the August 25th one.

12   **A.**    Are you not going to show it?

13   **Q.**    No, can you just turn to it?  Do you have a hardcopy of it

14   there right with you?

15   **A.**    I had it.

16           **MS. WHITE:**  Jennifer, is that too much trouble to put

17   that back up on the screen?

18   **BY MS. WHITE:**

19   **Q.**    There you go.  It's back up on the screen now.

20   **A.**    Yeah.

21   **Q.**    So both of the comments that you made to Ms. Mikell, that

22   you reference in the August 25th, 2020, declaration say, "the

23   video" or she says "the video" -- "a video"; correct?

24   **A.**    Would you repeat your question.  I'm sorry.

25   **Q.**    Yes.  Okay.

1    So we're going back to the August 25th, 2020, declaration.

2  **A.**   I'm with you, yeah.

3  **Q.**   Okay.  And you said that Ms. Mikell told you, said, "You

4  have not seen the video."

5    And you responded, "of the shooting?"

6  **A.**   Yes.

7  **Q.**   And then she responded, "Oh, yeah, there is a video."

8  Correct?

9  **A.**   Yes.

10  **Q.**   All right.  Now, let's go back to the later, November 6th,

11  2020, declaration.  And you added the words --

12  **A.**   "Actual."

13  **Q.**   -- "actual"?

14  **A.**   Yes.  And an additional sentence, yes.

15  **Q.**   Right.  And that's because you recognized without those

16  words, it was unclear whether you were referencing a recording

17  of the actual shooting or the events showing the immediate

18  aftermath?

19  **A.**   No.  As I said, I was being more precise.

20  **Q.**   Well, you did it in response to Ms. Mikell's August 20th

21  declaration, right, stating you may have misunderstood her

22  reference to the incident or the shooting?

23  **A.**   No, I don't think so.  I have read Ms. Mikell's -- I've

24  read her statements, her declarations, but I'm going to -- my

25  declarations are based on my memory.  I also am an honest

1  person, and also take really good notes. And so I have a

2  record of all my conversations.

3  **Q.** So why didn't you include the word "actual shooting" in

4  your first declaration?

5  **A.** When we filed our first declaration, there was an

6  understanding to be brief. And I had one even before that

7  where I didn't even name Ms. Mikell or Tali Bruce, Ms. Bruce.

8  It didn't have as much detail either. So as we've been asked

9  to provide more detail, I've gone back to my notes and my

10  records and my memory and I've put down what I remember.

11  **Q.** Okay. And Ms. Mikell, when she responded to you, she said

12  nothing about what the recording showed; right?

13  **A.** She didn't.

14  **Q.** Okay.

15  **A.** She --

16  **Q.** That's the answer to my question.

17       She said nothing about when she saw it; correct? She said

18  nothing about when she saw it? You didn't identify her saying

19  anything about when she saw it?

20  **A.** No. The whole conversation was unsolicited. She --

21  **Q.** That's -- you're going beyond my question so I'm just

22  going to --

23       **MR. SYKES:** Well, Your Honor, Your Honor, I object.

24  I think the witness should be able to answer it the way she

25  wants to answer it, not the way Ms. White wants it to come out.

1  So I'd appreciate it if we would let her answer the question.

2  **THE COURT:**  You're welcome to follow up on that on

3  redirect, but during cross-examination, I will let the counsel

4  control the questioning.

5  **BY MS. WHITE:**

6  **Q.**  Okay.  And you didn't include any of those details in your

7  August 25th, 2020, or November 6, 2020, affidavits, did you?

8  **A.**  Which details?  The additional details in

9  each declaration?

10  **Q.**  About Ms. Mikell saying anything about what the recording

11  showed or when she saw it.

12  **A.**  No.  Her emphasis on "the video" is what I keyed off of.

13  **Q.**  Okay.

14  **A.**  She said, "And you've not seen the video," and so I was

15  concerned, because I'm remembering Tali Bruce on August 2nd,

16  before the protest or the march, say the exact same thing to

17  me.  So when I recognized --

18  **Q.**  Well, let me stop you there.

19  So even you interpreted what Ms. Mikell said as referring

20  to the events of --

21  **A.**  No, I didn't interpret it.

22  **Q.**  I wasn't finished with my question.  I wasn't finished

23  with my question.

24  **A.**  Oh, I apologize.  Sorry.

25  **Q.**  All right.  So even you, right there, you felt confused

1  and thought that she was referring to the video recording after

2  the shooting?

3  **A.** I asked for clarity.

4  **Q.** Okay.

5  **A.** And she gave it to me.

6  **Q.** Okay.

7  **A.** I said --

8  **Q.** All right. I think that answers my question.

9      Now, I want to go to the conversations that you had with

10  Tali Bruce about what she claims the recording of the actual

11  shooting she claims to have seen show, okay?

12      So let's go to paragraph 10 of your August 25th, 2020,

13  affidavit. And that references, in paragraph 10, a

14  conversation you had with Ms. Bruce on August 6th, 2020;

15  correct?

16  **A.** Let's see. Give me -- what one are you on again?

17  **Q.** Paragraph 10 of the August 25th. It's up on the screen,

18  if that's helpful to you.

19  **A.** That is helpful, but I know we had to file a revised one

20  so I want to make sure we're on the right one.

21  **Q.** I'm referring to the August 25th right now.

22  **A.** Okay.

23  **Q.** Paragraph 10.

24  **A.** Okay. I'll just go with what's on the screen.

25  **Q.** Yeah. Okay. And you called to ask her if she was aware

1   of a recording of the shooting; correct?  That's what you said

2   in here?

3   **A.**   I did.  I wanted to confirm that I'd heard this from the

4   council and then --

5   **Q.**   So I'm going to ask you a bunch of questions that are yes-

6   or-no questions that I don't really think involve explanation.

7   I just want to know -- I just want to confirm that that's

8   what's there.  Okay?

9       And she also expressed concern about disclosing to you

10   information she had received in a closed city council meeting,

11   you included that; correct?

12   **A.**   She did, yes.

13   **Q.**   And despite that, you asked her, "If hypothetically there

14   was a video and what would it show?"  Correct?

15   **A.**   Yes.

16   **Q.**   Okay.  So read to me what she told you that is in bold.

17   **A.**   "She said that it would show an officer pull up, get out

18   of his car and shoot four times at a person running away.  I

19   asked if the person had a gun in his hands and she said he did

20   not."

21   **Q.**   So I want to dissect that a little bit.

22       So she told you -- and I'm going to do a list here for

23   you -- that she saw on this recording an officer pull up -- and

24   I'm just waiting for this list to come up.  It will take just a

25   minute to populate.

1    **MS. WHITE:**  Jennifer, can you pull that up, please.

2    **BY MS. WHITE**

3    **Q.**   So it showed an officer pull up and then an officer get

4    out of his car, an officer shoot four times at a person running

5    or at a person with a -- with no gun in his hands and that

6    person was running away.

7        Did I get all those things that she said it would show?

8    **A.**   Yes.

9    **Q.**   Okay.  Now I want to go to your complaint, and I need to

10   have you look at a hardcopy of that that we delivered

11   yesterday, because I'm going to put some information on the

12   screen about that.  So can you get a copy of that complaint

13   that we delivered yesterday from your counsel, please.

14   **A.**   Sure.

15       **MR. SYKES:**  I don't know that I have that handy.  You

16   delivered a lot of things yesterday, less than 24 hours from

17   this hearing.  Now, I have a -- is it document 25 on 5/16/19?

18       **MS. WHITE:**  Just the complaint, the complaint in this

19   action.

20       **MR. SYKES:**  Okay.  I have a copy.  It's not the one

21   you gave yesterday, but I have a copy.

22       **THE WITNESS:**  What page?

23   **BY MS. WHITE:**

24   **Q.**   I want you to go to paragraph 34 of your complaint.

25       Do you have that?

1    **A.**    Not yet.  Okay.

2    **Q.**    All right.  So it states -- can you read paragraph --

3    well, maybe I'll read this.  It will be a little bit faster.

4    And you can confirm if I read this correctly or not.

5         Paragraph 34 states, "As Officer Davies pulled up, Zane

6    was running away and his back was to Officer Davies."

7         Did I read that correctly?

8    **A.**    Yes.

9    **Q.**    Okay.  And in paragraph 35, you allege, "Officer Davies

10   stopped his police vehicle, got out to pursue, then went back

11   to his car.  Davies then fired four shots fired at Zane."

12        Did I read that correctly?

13   **A.**    Yes.

14   **Q.**    And in paragraph 60(b), you allege, "Officer Davies pulled

15   his car to a stop and shot Zane in the back, as he was running

16   away."

17        Did I read that correctly?

18   **A.**    Yes.

19   **Q.**    In paragraph 63 it alleges, "Davies drew his handgun and

20   fired four shots at Zane while Zane was running away from him."

21        Did I state that correctly?

22   **A.**    Yes.

23   **Q.**    And in paragraph 29, "The BB or airsoft gun was not in

24   Zane's hands, but was tucked away in his clothing."

25        Did I read that correctly?

1    **A.**    Yes.

2    **Q.**    In paragraph 30, you allege, "Zane did not have any

3    weapons in his hands as he ran."

4          Did I read that correctly?

5    **A.**    What paragraph?

6    **Q.**    Paragraph 30.  "Zane did not have any weapons in his hands

7    as he ran."

8          Did I read that correctly?

9    **A.**    Yes.

10   **Q.**    And then paragraph 60(a), tell me when you're ready for me

11   to read that.

12   **A.**    Ready.

13   **Q.**    "Zane did not have a visible weapon."

14   **A.**    Yes, it does say that.

15   **Q.**    Okay.  So what this list shows is all the things that

16   Ms. Bruce told you, that we just went through in your

17   testimony, and then what was alleged in the complaints.  So as

18   you look at that list, all of the events Ms. Bruce told you the

19   hypothetical recording would show are included in your

20   complaint; correct?

21   **A.**    They are.  They're surprisingly consistent, which is what

22   has me concerned.

23   **Q.**    Okay.

24          **MS. WHITE:**  So, Your Honor, I'll move for the

25   admission of this PowerPoint list as demonstrative of

1   Ms. James's testimony.

2               **THE COURT:**  As a demonstrative only?  All right.

3               Mr. Sykes, do you object to that?

4               **MR. SYKES:**  No objection.

5               **THE COURT:**  All right.  I'll allow that.

6   **BY MS. WHITE:**

7   **Q.**   Now, let's turn now to paragraph 11 of your August 25th,

8   2020, affidavit.  And Jennifer will put that on the screen so

9   you can see that.

10              **MR. SYKES:**  I'm sorry, Heather, what are you looking

11   at here?

12              **MS. WHITE:**  The August 25th, 2020, affidavit.  We're

13   going to paragraph 11.

14              **THE WITNESS:**  I can see it on the screen.

15              **MR. SYKES:**  I'm sorry, what was the date on that

16   August again?

17              **MS. WHITE:**  Twenty-fifth.

18              **MR. SYKES:**  Twenty-fifth.  Okay.  Gotcha.

19              **MS. WHITE:**  Jennifer, can you scroll down there for

20   us.

21   **BY MS. WHITE:**

22   **Q.**   And then as you read through that, in paragraph 11, you

23   claim Ms. Bruce told you, on August 11th, 2020, that the

24   recording she saw "looked like first-person shooter video."

25        Correct?

1 **A.** Yes.

2 **Q.** Okay. And then other than details about what the houses

3 looked like, she really didn't provide any other details about

4 what the recording would show of Zane or Officer Davies, their

5 actions; correct?

6 **A.** No, the conversation was more detailed. She talked about

7 the neighborhood and she talked about looking like a first-

8 person shooter video.

9 **Q.** Right, but we just talked about the first person and we

10 talked about what houses it would show, but she didn't say

11 anything else about what the recording would show Officer

12 Davies doing or Zane doing in that conversation on August 11th;

13 correct?

14 **A.** She reiterated in that conversation the previous

15 conversation, yes.

16 **Q.** Okay. So no new details, other than the first-person

17 video?

18 **A.** The first statement to me, about first person, was my

19 question to her.

20 **Q.** I'm not asking you who said it, I'm just asking you the

21 detail that she gave you.

22 And she told you it looked like a first-person shooter

23 video; right?

24 **A.** Yes, she did.

25 **Q.** All right. Now I want you to go to paragraph 12. We'll

1   just scroll down there.  And why don't you read that

2   highlighted portion for us.

3   **A.**   Sure.

4      "She said the officer pulled up in his car, got out and

5   fired four times at Zane without warning as he ran away.  I

6   asked her to confirm again that she did not see a gun in Zane's

7   hand, and she said there was no gun in his hand, he was

8   hobbling as he ran away, and that his hands were moving as he

9   was trying to run away injured."

10   **Q.**   And that was in a conversation the next day, August 12,

11   2020, that you had with her; correct?

12   **A.**   It is.

13   **Q.**   Okay.  So I want to again digest that.  And I'm going to

14   just have you -- we'll just confirm that she told you there

15   that the officer pulled up and got out of his car in that

16   August 12th conversation.  So do you have that -- do you have

17   that affidavit in front of you for paragraph 12?  Because I'm

18   going to do another list.

19   **A.**   No.  Which one is it, the one we just looked at?

20   **Q.**   August 25th, 2020, affidavit at paragraph 12.

21   **A.**   Go ahead and start doing your list and I'll find it.

22   **Q.**   Okay.  So I'm just going to recap the details that she

23   provided you in that conversation, and that was, "The officer

24   pulled up and got out of his car."

25      That was one of them; right?

1    **MR. SYKES:**  Let her find the hardcopy, if you could.

2    **MS. WHITE:**  Okay.  I'd prefer that, too.

3    **THE WITNESS:**  This is August 25th.  Yeah, I've got

4    the August 25th.

5    **BY MS. WHITE:**

6    **Q.**    Now go to paragraph 12.

7    **A.**    Okay.  Thanks.  It says, "Not Mistaken, No Warning & No

8    Gun"?

9    **Q.**    Go down to where you just read, and the information that

10   she gave you was, "The officer pulled up and got out of his

11   car"; right?

12   **A.**    Yes.

13   **Q.**    And Zane was hobbling as he ran away from the officer?

14   **A.**    Yes.  A couple of sentences down, yes.

15   **Q.**    Okay.  And Zane was injured?

16   **A.**    Yes.

17   **Q.**    And Zane did not have a gun in his hand?

18   **A.**    Yes.  Above that, yes.

19   **Q.**    Okay.  And Zane's hands were moving as he was running

20   away?

21   **A.**    Yep.

22   **Q.**    The officer did not warn Zane as he was going to shoot?

23   **A.**    Yes.

24   **Q.**    And the officer shot four times at Zane?

25   **A.**    Yes.

1    **Q.**    Okay.  So now I'm going to do the same thing that we did

2    before and have you turn back to the complaint.  And I'm going

3    to read allegations in your complaint for you and ask you if I

4    read them correctly.  Okay?

5         So go to paragraph 35 of your complaint and tell me when

6    you're there.

7    **A.**    I'm here.

8    **Q.**    Okay.  Paragraph 35 says, "Officer Davies stopped his

9    police vehicle, got out to pursue, then went back to his car."

10        Did I read that correctly?

11   **A.**    Yes.

12   **Q.**    Okay.  And paragraph 28 says, "Zane was limping seriously

13   as he tried to get away."

14        Did I read that correctly?

15   **A.**    Yes.

16   **Q.**    I'm sorry.  Did I -- I didn't give you enough time to turn

17   to 28.

18   **A.**    Yes.

19   **Q.**    Okay.  Now go to 60(f) and tell me when you're there.

20   That's a little bit down further.

21   **A.**    I did not hear the number.

22   **Q.**    60(f), as in Frank.  Are you there?

23   **A.**    Yes.

24   **Q.**    "Zane appeared to be injured and limping as he ran"?

25   **A.**    Yes.

1   **Q.**   Okay.  Now go back to paragraph 29.

2   **A.**   Yes.

3   **Q.**   "The BB or airsoft gun was not in Zane's hands but was

4   tucked away in his clothing."

5      Is that right?

6   **A.**   Yes.

7   **Q.**   Okay.  And now paragraph 30, "Zane did not have any

8   weapons in his hands as he ran."

9      Did I read that right?

10   **A.**   It says, "It was obvious, or would have been obvious to

11   any reasonable officer, that Zane did not have a weapon, or

12   weapons, in his hand as he ran," yes.

13   **Q.**   Okay.  Great.  Now, turn to paragraph 75.

14      **MR. SYKES:**  Now, is this paragraph 75 of the

15   complaint?

16      **MS. WHITE:**  Yeah, paragraph 75 of the complaint.

17      **THE WITNESS:**  Yes.

18   **BY MS. WHITE:**

19   **Q.**   "When Defendant Davies fired the shots, Zane had no weapon

20   in either hand"?

21   **A.**   This is 72, "Before Davies fired the shots, Davies knew or

22   suspected that Zane had been seriously injured in the crashing

23   and skidding of the motorbike"?

24   **Q.**   No.  Seventy-five.

25   **A.**   I'm searching.

**Q.**   That's all right.

**A.**   "When Defendant Davies fired the shots, Zane had no weapon in either hand."

**Q.**   Okay.  And now go to paragraph 82.

**A.**   Okay.

**Q.**   "Zane was not reaching for anything, but was trying to run after a serious injury from the motorbike crash"?

**A.**   Yes, it says that.

**Q.**   Now paragraph 60(c), so 6-0, C.

           **MR. SYKES:**  Your Honor?

           **THE COURT:**  Yes.

           **MR. SYKES:**  I would object at this point.  I don't see any point to this.  You know, comparing a complaint -- that's not something that my client drafted, it's something that we drafted based upon what we thought the evidence would provide.  I don't see any point to going through and laboriously comparing complaint paragraphs to the -- you know, to the declaration.  So we're just wasting time, so I would --

           **THE COURT:**  Ms. White, I think your point -- let me ask you and make sure I understand what you're trying to do.  I think you're trying to show that all of the details about the shooting that were described by Ms. Bruce can be found in the complaint.  Is that what you're trying to establish?

           **MS. WHITE:**  That's correct.  All these conversations that she had with Ms. Bruce, where Ms. Bruce supposedly, and as

1    she testified today, witnessed this video that allegedly

2    exists, what it showed.

3         **THE COURT:**  All right.

4         Mr. Sykes, are you willing to stipulate that the

5    details that describe -- the details listed in the Ms. James's

6    declaration of what she was told about the video by Ms. Bruce

7    can all be found in the complaint?

8         **MR. SYKES:**  I don't know that as I sit here.  All I

9    know is that when we drafted the complaint, we made good faith

10   assumptions based upon what we knew, you know.  We had an

11   eyewitness to the actual shooting.  I relied heavily on that

12   eyewitness.

13        Now, the eyewitness didn't see, you know, Zane get

14   hit by the police car, but the eyewitness saw the officer

15   crouch down and shoot.  And that eyewitness told us that there

16   was no weapon in his hand, that he wasn't, you know,

17   aggressive.  So we relied upon that.

18        Now, that was not drafted by Tiffany.  Okay?

19        **THE COURT:**  Of course.  Of course.

20        But, Ms. White, how many more of these statements are

21   you going to walk through?  Is this the last one or are there

22   more?

23        **MS. WHITE:**  There are about five or six more,

24   Your Honor.

25        **THE COURT:**  That's going to take a while.

1          But your point is that every detail that Ms. Bruce

2     says has a counterpart in the complaint; correct?

3          **MS. WHITE:**  Yes.  That's correct.  And I can show the

4     Court the list for each of these with all of the

5     paragraph references as demonstrative of what Ms. James's

6     testimony would be.

7          **THE COURT:**  Right.  Now, I think Ms. James, based on

8     her declaration, my understanding is she probably won't dispute

9     that.  In fact, she found what Ms. Bruce said concerning

10    precisely because it was consistent with what the eyewitnesses

11    said, whose testimony is -- whose statements are tracked in the

12    complaint.

13          Am I misunderstanding that, Mr. Sykes?

14          **MR. SYKES:**  I think that's what she's getting at.

15    You know, I -- I think that, you know, that -- the point that

16    we believe here, Judge, I mean it's pretty obvious, we did not

17    have confirmation of any of the things that we had in the

18    complaint.  We believed it in good faith to be true, but Tali

19    Bruce confirmed that there was indeed a shooting.  And that --

20          **THE COURT:**  Yeah, maybe we can just cut this short by

21    saying, you know -- maybe, Ms. White, you could just ask

22    Ms. James, is she aware of any details that Ms. Tali -- that

23    Ms. Bruce provided that are not in the complaint.

24          **MS. WHITE:**  Yes.  Let me do that.

25

**BY MS. WHITE:**

**Q.** So, Ms. James, are you aware of any details that were provided by Ms. Bruce, when she saw this recording, that were not included in your complaint?

    **MR. SYKES:** Your Honor, I object to that question in the sense that it calls for a speculative conclusion that she may or may not know the answer to. You know, I don't know that she -- she probably doesn't know that.

    **MS. WHITE:** Then I think I --

    **THE COURT:** Okay. She can -- I mean, Mr. Sykes, you basically have the choice of letting her ask that question or having her walk through each of these quotes.

    **MR. SYKES:** Okay. Let her walk through them, I guess. Sorry.

    **THE COURT:** Okay.

    **MR. SYKES:** I think it's a waste of time but, you know -- I mean I don't -- I don't -- I don't object if Ms. White wants to proffer what she thinks it would be, you know.

    **THE COURT:** Okay. I mean -- well, I mean I don't know -- I think I might overrule your objection in any event. I mean the witness may not know the answer, but I mean if the question was phrased as is she aware of any details. So I'm going to overrule that and let you ask that question and let the witness answer it.

1   **MS. WHITE:** Okay.

2   **BY MS. WHITE:**

3   **Q.** So, Ms. James, are you aware of any details that Ms. Bruce

4   provided, that said were shown in the recording of the

5   shooting, that are not included in your complaint?

6   **MR. SYKES:** And I'll make the objection that it's

7   overly broad.

8   **THE COURT:** Overruled.

9   **MR. SYKES:** And there is no foundation. You're going

10  to overrule it, but I'll make the objection.

11  **THE COURT:** I've already overruled it. Yes.

12  **MR. SYKES:** Thank you.

13  **THE WITNESS:** Yes. The details were that it was a

14  first-person video of the shooting, when you could see an

15  officer get out of his car and shoot my son. And she had

16  details that were very specific and she used language and

17  phrases and recollections and feeling and emotion when she said

18  them that were very similar, if not identical, to what we heard

19  our witness, Heather Dodds, say on video, that Tali hasn't seen

20  because no one has seen it.

21  **MS. WHITE:** So, Your Honor, I think I need to go

22  through this then and continue going through the details that

23  she provided in her affidavit about what Ms. Bruce told her and

24  then what the allegations included in the complaint are.

25  **THE COURT:** [Inaudible].

1     **MS. WHITE:**  I'm sorry, did you say "All right"?

2     **THE COURT:**  I did.

3     **MS. WHITE:**  Okay, sorry.

4  **BY MS. WHITE:**

5  **Q.**   So let's go to 60(c).  Are you at paragraph 60(c)?

6     And it said, "No effective warning or opportunity to stop

7  was given by either Officer Davies or Officer Betenson."

8     Did I read that right?

9  **A.**   Yes.

10  **Q.**   Okay.  And go to paragraph 64.  "Davies did not issue any

11  warning to Zane to 'stop or I'll shoot' before firing four

12  shots."

13     Did I read that right?

14  **A.**   "Based on information and belief, Davies did not issue any

15  warning to Zane to 'stop or I'll shoot' before firing four

16  shots."

17  **Q.**   So I read that right; correct?  I'm sorry, I'm having a

18  hard time hearing you now.

19  **A.**   Yeah.  I said you did.  You did.

20  **Q.**   Okay.  Now --

21     **THE WITNESS:**  Can I ask a question to you?

22     **MR. SYKES:**  To me?  No, not during the examination.

23     **THE WITNESS:**  Okay.

24     **MR. SYKES:**  But you can ask her.

25     **THE WITNESS:**  Can I ask you a question, Heather?

1    **MS. WHITE:**  No.

2           **THE WITNESS:**  Okay.

3    BY MS. WHITE:

4    **Q.**   Now go to paragraph 35.

5    **A.**   Okay.

6    **Q.**   It states, "Davies then fired four shots fired at Zane."

7           Did I read that right?

8    **A.**   Paragraph again?

9    **Q.**   Paragraph 35.

10   **A.**   Yes.  It does say that.

11   **Q.**   All right.  And then go back to paragraph 63, please.

12   **A.**   Okay.

13   **Q.**   "Davies drew his handgun and fired four shots at Zane

14   while Zane was running away from him."

15   **A.**   Yes.

16   **Q.**   Okay.  So you see the list of all the things that Tali

17   told you would be shown in the recording corresponded up with

18   the allegations in your complaint.  Do you see that on the

19   screen?

20   **A.**   I do.

21          **MS. WHITE:**  Okay.  Your Honor, I would move for the

22   admission of this second list, this demonstrative, of

23   Ms. James's testimony as well.

24          **THE COURT:**  Mr. Sykes, objection to admitting this

25   only as a demonstrative?

1      **MR. SYKES:**  You know, I -- are these

2   paragraph numbers from the complaint, is that what they are?

3      **MS. WHITE:**  Yes.

4      **MR. SYKES:**  Okay.  And you're saying these summarize

5   what the complaint says?

6      **MS. WHITE:**  Those -- the items on the screen on the

7   list, "The officer pulled up and got out of his car, Zane was

8   'hobbling,'" those are, when we went through the affidavit,

9   what Tali told -- what Ms. Bruce told Ms. James.  And

10  then [inaudible due to audio interference] those up with

11  paragraphs where the allegations are made in the complaint.

12     **MR. SYKES:**  I don't have any objection to this as

13  demonstrative of what Ms. White is claiming here for this

14  examination.  I don't know that they're all accurate -- I don't

15  have the stuff in front of me.  I gave it to my client, but I

16  don't have a problem -- if she says this is demonstrative, I'll

17  take her word for it.

18     **THE COURT:**  Yeah, I mean it's -- obviously, it stands

19  for a demonstrative of what Ms. White is trying to establish.

20  I mean the paragraphs say what they say and they either match,

21  you know, those statements or they don't.  And those statements

22  either track what Ms. Bruce said or they don't.

23         So I mean this isn't going to establish the truth of

24  any of those underlying -- you know, we're not taking this as

25  necessarily an accurate summary or accurate conclusions.  We're

1    taking this as a demonstrative, walking through Ms. White's

2    argument.  That's my understanding.  And on that understanding,

3    I'll admit it.

4           **MR. SYKES:**  Now, another thing, Judge, by way of an

5    objection here, I don't see how this goes to the existence of a

6    video.  You know, I just don't -- I don't get it.  And maybe

7    I'm just a simple country lawyer here, but I don't get that and

8    I just think it's wasting time.  So I object to anymore

9    examination along this line.

10          **MS. WHITE:**  Your Honor, it relates to some of the

11    other issues that the Court has asked us to talk about, and

12    that is whether there was spoliation, what it might show, was

13    it done in bad faith, and all of those other issues.  So it's

14    critical to those issues that the Court has to determine on

15    Mr. Sykes's motion.  It's Mr. Sykes who has asked for those

16    sanctions, and what we're doing is providing the Court with the

17    evidence that relates to those -- our defenses that relate to

18    those.

19          **MR. SYKES:**  Let me respond to that briefly, Judge, if

20    I could.  I didn't mean to interrupt you.

21           **THE COURT:**  No, that's fine.  Go ahead.

22          **MR. SYKES:**  Yeah.

23        In your minute entry, which I've got -- my client

24    has, you made it very clear that we weren't going to talk about

25    spoliation.  Okay?  The issue was -- and I've got your summary

here, Eric, somewhere.  The issue was whether or not there was

sufficient -- whether there was a reasonable likelihood -- I'm

paraphrasing, Judge, but I think it's pages 20 and 21 of the

minute entry or the transcript, whether there is a reasonable

likelihood.  You said -- this is a direct quote.

          "If you persuade me, Mr. Sykes, based on that

hearing, that there's a reasonable likelihood, you know, that

the tapes probably do exist, I have to figure out what we're

going to do about that."  Okay?

          Then you say, "On the other hand, if Ms. White

persuades me that, you know, Tali Bruce is mistaken and

Christine Mikell is correct, that there is a different video or

something like that, then, you know, maybe we can move

forward."

          And so you talked about a reasonable likelihood, a

basis in the evidence, a basis to inquire further, those are

your words from the hearing.  And so I took that at face value

and we have addressed it like that.

          Now, I know that my original motion talked about

spoliation.  Okay?  But I don't read you as saying we're going

to discuss that here.  So if this is all about spoliation, I

don't think we have to discuss it.  The issue is whether I get

more discovery before you rule on any motion, and the standard

you gave us was reasonable likelihood, okay, or a basis to

inquire further.

1    And so I think that's where we are and I don't see

2  how any of this helps us with that.

3    **THE COURT:**  All right.  Thank you.

4    I think -- it seems to me that this is cumulative at

5  this point.  And that given the nature of how this is

6  proceeding and how it proceeded for these first two statements,

7  this could simply be addressed through briefing, if you want to

8  just line up the statements, you know, one by one, you know,

9  line up the Bruce statements and line up the allegations of the

10  complaint.  It seems like you could just do that in writing

11  without -- I don't know that walking -- you know, doing this

12  through the witness is really accomplishing anything

13  significant.

14    **MS. WHITE:**  Sure.  I'm more than happy to do that.

15    **THE COURT:**  Why don't we do that, and then you can

16  explain why you think that's relevant.  And my understanding is

17  that what you were getting at is the idea that, you know,

18  Ms. Bruce could have, you know, perhaps misremembered the video

19  or something.  That's what I understood you were getting at

20  but...

21    **MS. WHITE:**  Right.

22    **THE COURT:**  Why don't you just do that in writing.  I

23  think Mr. Sykes's point is well-taken, that this probably isn't

24  particularly useful to just kind of read through paragraph by

25  paragraph.  I don't think there's any real disputes about what

1    the declaration says or what the complaint says.  I mean we can

2    just look at those on paper.

3         **THE WITNESS:**  Can I say there's one more thing that

4    Tali says that's not in our motion?

5         **THE COURT:**  If Ms. White asks you or if Mr. -- I'm

6    pretty confident your attorney will ask that on redirect, so

7    just hold that thought.  I'm confident you'll have the chance

8    to say that, but right now, it's Ms. White's turn.

9         **MS. WHITE:**  Your Honor, we just need to confirm that

10   there won't be anything additional added from this point on

11   that Ms. James could submit.  Her testimony is already in and

12   there can be no new additions to that subsequently.

13        **THE COURT:**  Well, you had the chance to ask her, I

14   let you over Mr. Sykes's objection.  She mentioned the fact

15   that it was a first-person video.  And I think it sounds like

16   she has some other ideas that perhaps you could ask or Mr. --

17   you know, Mr. Sykes could ask about and, you know, at that

18   point, I think the record will be closed.

19        **MS. WHITE:**  All right.  So I just have a few other

20   questions that then go to conversations she claims to have had

21   with Ms. Bruce and Ms. Mikell.

22   **BY MS. WHITE:**

23   **Q.**   In your November 6th, 2020, affidavit, Ms. James, you

24   testified that you corresponded with council members Bruce and

25   Mikell numerous times between June 8th, 2020, and August 4th,

1    2020, through e-mail and text message.

2        Do you recall that?

3    **A.**    Yes.

4    **Q.**    Do you have copies of those texts and e-mails?

5    **A.**    I do.

6    **Q.**    And what e-mail accounts did you send your e-mails from?

7    **A.**    For mine?  I sent them from my e-mail accounts, cardinal,

8    I think.  I have a number of them.

9    **Q.**    To what e-mail addresses did you send e-mails to

10   Ms. Bruce?

11   **A.**    My --

12            **MR. SYKES:**  Your Honor, I object.  This is ordinary

13   discovery.  That can take place -- I'm hoping you'll rule in

14   our favor, and the time to get into this type of stuff is

15   during discovery.  We're talking about is there a video, video

16   number two or not, that's the question you asked us to address.

17            **THE COURT:**  All right.  Ms. White, do you want to

18   explain the relevance?

19            **MS. WHITE:**  Yes.  I mean she's claimed that she's had

20   all these conversations about it and I think we're entitled to

21   know what those conversations entailed, whether they could

22   relate to the existence of a video, what their testimonies are,

23   and we are entitled to know if any of those referenced video

24   recordings.

25            **THE COURT:**  Well, you could probably ask that.

1    That's different from what the e-mail account was sent to and

2    so forth.

3    **BY MS. WHITE:**

4    **Q.**    Do any of those e-mails to Ms. Bruce relate to the

5    potential existence of a recording of the actual shooting?

6    **A.**    After August 2nd, or actually after August 4th, when

7    Christine -- I may have e-mails that relate to that with Tali.

8    **Q.**    And do you recall what the dates of those e-mails were?

9    **A.**    I've given the dates of the conversations I had with Tali

10   specifically about the video.  Those are --

11   **Q.**    You provided those in your affidavits?

12   **A.**    Yes.  Those are my principal conversations with --

13   **Q.**    Okay.  And so that's where you got the information that

14   you included in your declarations?

15   **A.**    Yes.  My previous conversations that you referenced, that

16   I had with them between June 8th, when I first e-mailed Tali to

17   ask if she would help us with police reform, putting police

18   reform policy suggestions before the council, and August 2nd.

19   Those e-mails between Tali and I, as well as those e-mails and

20   texts between Christine and I, were all about police reform.

21   **Q.**    Okay.  And then after August 4th, they became about

22   this --

23   **A.**    Not necessarily.  Yeah, not necessarily.

24   **Q.**    Did some of them?

25   **A.**    I think I mostly corresponded with Tali Bruce in

1  conversation we're happy to provide.

2  **Q.**  Okay.  In your affidavits, you have several quotations

3  from Ms. Bruce and Ms. Mikell.  How did you obtain those quotes

4  as opposed to what the -- just what the substance of the

5  statement was?

6  **A.**  Where I wasn't -- where I had just the substance of the

7  conversation, I didn't put a quote around it.  The very

8  specific statements about the shooting in the video are my

9  recollection of what I heard them say and that's why I quoted

10 it.

11 **Q.**  Okay.  So you don't have them in writing somewhere that

12 shows that that's the actual quote they made?

13 **A.**  I have notes.

14 **Q.**  But you don't have it in -- a statement from them in

15 written form?

16 **A.**  I do not have a statement from them in written form.

17 **Q.**  Okay.  And do you have any recordings that establish those

18 quotations are what they actually said and the words they

19 actually used?

20 **A.**  No.  Christine asked me specifically not to record her,

21 which I told her I wouldn't do that anyway.  So I don't have a

22 recording of Christine.  I know I recorded Tali.

23 **Q.**  So those quotations are your best recollection of what

24 they said, is that what I understand?

25 **A.**  No.  Those two statements that Christine made, and my

1   statement in response to her, as well as the statement that

2   Tali has, they were pretty crystal clear in my mind and that's

3   why I put quotes around them.

4   **Q.**   And that's based on your recollection?

5   **A.**   That's based on my unequivocal belief that is exactly what

6   they said to me.

7   **Q.**   Okay.  Did you memorialize those statements in the exact

8   quotations in writing when they were made to you?

9   **A.**   I did after.

10  **Q.**   Okay.  And then why didn't you use the words "actual" in

11  your August 25th declaration and the May 3rd and November 6th

12  and 9th affidavits, when you had the August 25th in quotes?

13       **MR. SYKES:**  Your Honor, I object.  This is

14  repetitive, cumulative, and it doesn't get us to the point of

15  whether there's a video or not.  So I object.

16       **THE COURT:**  I'll let you get an answer to that

17  question.  Go ahead, but I think it's close to asked and

18  answered.  It's not quite asked and answered.  So I'll let you

19  try one more time to get an answer to that, but you've

20  certainly discussed that before.

21  **BY MS. WHITE:**

22  **Q.**   Could you answer that question, please, Ms. James?

23  **A.**   Yes.

24       Between the two, I went back to my notes, as I said

25  earlier, and I wanted to make sure I was precise in what I put

1  in my declaration.

2  **Q.**  And just to be clear, you have never seen a recording of

3  Zane being shot; correct?

4  **A.**  No, I haven't.

5        **MS. WHITE:**  Okay.  I don't have any further

6  questions.  Thank you.

7        **THE COURT:**  Thank you.

8        Mr. Sykes, you can do some redirect.  And I think

9  your client had something she wanted to say, so you might want

10  to elicit that as well.

11        **MR. SYKES:**  Thank you, Judge.

12                      **REDIRECT EXAMINATION**

13  **BY MR. SYKES:**

14  **Q.**  I think -- well, what is it you want to say in response?

15  I'm sorry.

16        **MS. WHITE:**  Your Honor, I'm a little confused with

17  that.  I think that is not exactly the way that questions are

18  supposed to be asked under the --

19        **MR. SYKES:**  I'll rephrase.  I think Ms. White has a

20  good point here.

21        I was trying to be a little bit humorous at the late

22  hour.  Okay?

23        **THE COURT:**  Be more precise.

24  **BY MR. SYKES:**

25  **Q.**  Is there anything else that Tali Bruce said that's not in

the complaint?

**A.** Yes.

**Q.** What is it?

**A.** It is the fact that there was no one else -- there were no other officers on the scene when the shooting occurred, which was the same that Heather Dodd said.

So Betenson says he was on scene, and that's what we read in the evidence, in the GRAMA records, but when we talked with Heather Dodd, who is the witness that was not included in the GRAMA records, her statements, she said that Officer Betenson, or the second officer, arrived on scene after the shooting occurred. And Tali Bruce also confirmed that after Zane was shot and laying on the ground is when the other officer showed up.

**MR. SYKES:** No further questions. Thank you.

**THE COURT:** All right. Thank you. Anything -- any final words for this witness, any final questions, Ms. White?

**MS. WHITE:** No, Your Honor.

**THE COURT:** All right. Well, thank you, Ms. James, for your testimony. We appreciate it. And I think you're excused.

**THE WITNESS:** Thank you. You're welcome.

**THE COURT:** All right. Now, I think that concludes the witnesses, does it not? Was there anyone else we need to discuss?

1    **MS. WHITE:** No, Your Honor. That concludes everyone

2    from defense's point.

3    **THE COURT:** All right. Now I'd intended to talk

4    about kind of logistics and where we go from here. It's gotten

5    quite late, though, so I think -- I've requested some briefing

6    as we've gone along. And I suggested just now, Ms. White, that

7    you make the argument on paper that you were making, walking

8    the witness through, you know, where you identify -- basically

9    lining up statements that Ms. James testified that Ms. Bruce

10   made to her with things in the complaint.

11        And I don't know how you'd like to -- how much time

12   do you think you'd need to do that, to just prepare that? You

13   could do it as a brief or you could even just submit it as a

14   table, as far as I'm concerned, if you wanted to do that.

15   **MS. WHITE:** Probably -- with the Thanksgiving

16   holiday, probably a couple of weeks, just --

17   **THE COURT:** Okay. Why don't we say a couple of

18   weeks, then. Let's do two weeks from today.

19        And then, Mr. Sykes, if you want about a week

20   after -- so that would be December 2nd. And, Mr. Sykes, if you

21   want another week to just point out any disagreements or any

22   inconsistencies or things of that sort, you're welcome to do

23   that.

24   **MR. SYKES:** I'm sure I would never disagree with my

25   friend Heather White. I couldn't imagine I would do that.

1    Maybe.  You never know.

2    **THE COURT:**  Well, the other thing I wanted to ask is,

3    it seems to me that -- you know, this has been an interesting

4    evidentiary hearing.  It seems like both of you have raised,

5    you know, credibility issues about Ms. Bruce on Ms. White's

6    side and Officer Davies on Mr. Sykes's side, involved in prior

7    statements and so forth, that ended up getting into some pretty

8    complicated separate legal issues, with Ms. White's pending

9    litigation and with the Garrity interview from Mr. Davies.  So

10    that was a little bit tricky.

11    And in a way, both of those things are quite

12    tangential because they were essentially both attempts to

13    discuss credibility, but I guess it seems to me that both sides

14    have suggested that this system software that's used for the

15    body camera is pretty foolproof.  And it seems like it ought to

16    be possible just to look at the data and tell whether the video

17    was made.  And if it was made, if it was deleted or what

18    happened to it.

19    Am I misunderstanding that, Mr. Sykes?

20    **MR. SYKES:**  No.  I think -- you know, we -- our

21    expert is Chief Chris Burbank, who was police chief in Salt

22    Lake for about eight or ten years, until he was wrongfully

23    terminated I might add, but I would think that that could

24    easily -- if you want to let us do limited discovery, that

25    should be high on the list.  Okay?

1  Obviously, you know, I'd like to depose the officer
2  but, you know, if -- what I'm told -- now, see, I will say this
3  about Chief Burbank, and I don't know if it came across in his
4  affidavit.  He said some departments don't use the databank
5  that Axon provides, some do not use it.
6  I got the impression that Cottonwood Heights did use
7  it.  If Cottonwood Heights did use it, there will be a digital
8  footprint, an audit trail.  Like they say in medical
9  malpractice cases, there will be an audit trail.  If they
10  didn't use it, there may not be an audit trail, but we could do
11  a lot of discovery on that, Your Honor, probably pretty
12  quickly.
13  As you notice, I don't ask a lot of long questions
14  here so I think we could come to a realization of that.  There
15  may be an audit trail, there may not be, you know.  In which
16  case, you're going to have to make a decision on whether you
17  want to go for more discovery.
18  But I'd like to depose Officer Davies, obviously, on
19  the things we've talked about.  I'm going to write you a brief
20  about that, you know, about the Garrity interviews, but that's
21  for another day, but that's what I want.
22  In other words, I want you to deny this motion to
23  dismiss without prejudice.  She could raise it again in a
24  motion for summary judgment.  I think there's enough evidence
25  here that there is a video.  You've got a person testifying

1  believably that she saw it, okay?

2         And it's not -- as you know, it's not the number of

3  witnesses in litigation, it's their credibility.  She's very

4  credible.

5         **MS. WHITE:**  Your Honor, we're getting into argument

6  now.

7         **THE COURT:**  I wanted to just stay focused on the

8  question I was asking.  So I understand your position,

9  Mr. Sykes, I believe, on the merits of it.

10        Ms. White, do you have any insight?  I mean is

11 this -- does Cottonwood Heights use the software system and is

12 it essentially foolproof?

13        **MS. WHITE:**  Your Honor, I was actually thinking about

14 this yesterday and today and thinking how simple it would be.

15 Yes, it does use the evidence.com, which has that footprint.

16 In fact, we included that information in the declaration of

17 Candace Terry.  And that's why we're not cross-examining Chris

18 Burbank either, is he looked at that data, too, and it shows

19 that there is nothing there that has been deleted.

20        And, you know, the plaintiffs have had an opportunity

21 to look at that and provide it to an expert and did nothing

22 with respect to that.

23        **MR. SYKES:**  That's inaccurate.  That's inaccurate.

24        **MS. WHITE:**  It shows --

25        **THE COURT:**  Let her finish.  I'll give you a chance

1    to respond.

2            **MS. WHITE:**  The logs were provided with Ms. Terry's

3    declaration.  And what they show is that the last recording

4    that was on Officer Davies's camera was made the day before the

5    shooting, on May 28th, ending at 3:12 p.m., and the next

6    recording made was not until June 30th, 2018, at 7:56 a.m.,

7    which was more than a month later.  That evidence is attached

8    to Ms. Terry's declaration.  And it conclusively establishes

9    there is no body camera recording for Officer Davies.

10           **THE COURT:**  All right.

11           **MR. SYKES:**  Your Honor --

12           **THE COURT:**  You may respond, Mr. Sykes.

13           **MR. SYKES:**  We disagree with that.  The data was not

14   provided.  We need to get an expert to look at it to get to the

15   bottom of it.  So we disagree with that.

16           And Chief Burbank, I think, told us, too, that there

17   needs to be more done.  We need to see the original data, not

18   somebody's, what do you call them, spreadsheet of it, you know.

19           **MS. WHITE:**  We have a suggestion perhaps that if the

20   Court wanted to appoint an independent expert to take the data

21   from the camera and extract that and look and see what it

22   shows, then the Court would have its answer.  It wouldn't be

23   from a defense perspective or the plaintiffs' perspective.

24   That is the proof.

25           **THE COURT:**  Do I have the authority to appoint an

1    independent expert for this?

2          **MS. WHITE:**  We certainly would stipulate to it.

3          **THE COURT:**  Mr. Sykes, do I, do you think?

4          **MR. SYKES:**  I don't think so, Judge.  I think we have

5    a right to prove our case.  I'd like to get somebody that I can

6    rely on.  And not that -- that you wouldn't do it fairly, I'm

7    sure you would, you know, but I think we need to get someone in

8    there that can look at this data and tell us what's going on.

9    Now, I don't know that Chris Burbank is the guy.  I mean I

10   think there's got to be a specialist that can do that.  He can

11   tell us who can do it, but I want to get my own expert to look

12   at it at some point.

13         Now, that's discovery.  We're asking for discovery,

14   but, you know, I want our person to look at it so I can talk to

15   him, talk him through it and find out what's going on.  I don't

16   necessarily trust an "independent expert."

17          **THE COURT:**  Let's take that in pieces.

18         If there were an independent expert, who would pay

19   for it?

20          **MS. WHITE:**  I think the parties would jointly pay for

21   it.  And I'm informed by the chief that Axon, the maker of the

22   camera and that does the software, they have people that do

23   this.  And the problem with what Mr. Sykes is asking for is

24   it's getting into discovery.  And what we're just trying to

25   establish here, Your Honor, is, number one, is there a

1 recording?  And if there isn't, then the Court is back to the

2 motion to dismiss and whether that should be granted or not.

3        **THE COURT:**  I understand.

4        **MR. SYKES:**  Judge, let me just say I could wax

5 philosophical for a minute, that's why so many courts have

6 commented on, you know, how difficult it is to rule on a motion

7 to dismiss before discovery's been done.  We need discovery

8 here to get to the bottom of this very difficult issue.  And,

9 you know, I know that's not necessarily why we're having this

10 evidentiary hearing, but you can see the breadth of issues that

11 are important here, you know.  I mean so, you know, I think you

12 deny the motion to dismiss and let's go get discovery.

13        **THE COURT:**  And that's your position, Mr. Sykes.

14        **MR. SYKES:**  Yeah.

15        **THE COURT:**  Do you have any -- I mean if the Court

16 were to appoint an expert, would it be possible to, you know,

17 provide a procedure where the parties both had to agree to the

18 expert and then the parties agree to split the cost of the

19 analysis, and then we could see what they did and decide

20 whether there's any reasonable ground for dispute?  Does that

21 sound --

22        **MR. SYKES:**  Well, I object to that, but if you impose

23 that, we will work in good faith with Ms. White to try to find

24 somebody, you know.  But I can tell you this, having litigated

25 cases for 44 years, it's not often we can agree on that kind of

1    a person, you know.  It's possible, but I don't think it's

2    likely.  I think you'd probably end up having to make a

3    decision on who to appoint, both of us arguing for our -- you

4    know, our particular person.

5         **THE COURT:**  Right.  What about Ms. White's

6    suggestion, though, about somebody from the company itself?

7         **MR. SYKES:**  I think that would be helpful, I do.  You

8    know, but the problem is, I don't know -- you know, personally,

9    I have never encountered this issue before in my career, you

10   know.  And I don't know enough to know what to ask that person

11   or what to say.

12        Now, you know, I would want to be certain that the

13   person is going to tell us fairly what happened.  Cottonwood

14   Heights is apparently a client of Axon, which is owned by

15   Taser, you know.  And, you know, that's one of the reasons why

16   I want to get our own expert, because, you know -- I mean my

17   clients, I'm sure, being nonlawyers, would wonder if we went to

18   Axon, if they're giving us, you know, an answer that their

19   client wants us to hear, and I'm concerned about that.

20        **THE COURT:**  All right.  So that's -- I understand.

21        Ms. White, what -- is your client -- I mean --

22        First of all, Mr. Sykes, if you had the expert of

23   your choice, would it be the -- it's getting late enough -- the

24   former Salt Lake police chief whose declaration you submitted,

25   is he the one you'd want to look at the data?

1    **MR. SYKES:**  I don't think so, because he knows a lot

2  about it.  He's expert enough to comment on what the data --

3  what data is available generally, but whether or not he's

4  competent to look at the details of it, I'll have to ask him.

5  I doubt it.  I mean he was the general, you know.  He didn't go

6  out and do intelligence work himself, you know.  So I doubt,

7  but I don't know for sure.  I doubt he'd be the one that would

8  be the expert we choose, but I'm certain he would know someone

9  that would know.

10    **THE COURT:**  All right.

11    Ms. White, would your client have a problem, would

12  they object, would you object, to providing in some kind of an

13  electronic format the relevant data to an expert of defendants

14  just to analyze --

15    **MR. SYKES:**  Plaintiffs, plaintiffs.

16    **THE COURT:**  Plaintiffs, excuse me, yes.

17    **MS. WHITE:**  I mean we'd have to assess that.  To me,

18  I just -- I don't understand Mr. Sykes's reticence in having an

19  independent person take a look at it and tell us -- someone

20  from the company -- and tell us whether it's been recorded and

21  deleted or ever existed or whatever.  I just keep hearing over

22  and over, "I want to do discovery.  I want to depose Officer

23  Davies.  I want to do all these things," and we are on a motion

24  to dismiss.

25    **THE COURT:**  Yeah.  Just to be clear, none of that's

1  on the table right now.  The only thing that's potentially on

2  the table right now, until I decide what to make of the

3  testimony I've heard today, is doing more with this data.

4  Because it does seem to me that if the data is as represented,

5  it ought to be able to provide a definitive answer one way or

6  the other.  And that seems to me like the cleanest, easiest way

7  to just figure this out, with the minimum of additional

8  inquiry.

9           **MS. WHITE:**  Yeah.  The natural people that would do

10 that, to me, would be the people that build the software and do

11 that.  I mean their reputation is on the line across the

12 country.  I mean they don't have any basis for, you know, doing

13 some kind of a favor for Cottonwood Heights, one tiny city

14 within multiple jurisdictions throughout the United States.

15 There's no interest in being biased for anyone.

16           And they're the ones that write the software, they're

17 the ones that know how it works, they're the ones who know how

18 the cameras work.  To me, it just makes the most sense for them

19 to do it.

20           **THE COURT:**  Okay.  It sounds like -- why don't you

21 and Mr. Sykes talk about it and see if you can come up with a

22 proposal.  We're not going -- okay, for court purposes, we're

23 not going to be deposing Officer Davies.  We're not going to be

24 doing discovery.  We're not going to be doing document

25 requests.  What we might be doing is some way of getting an

analysis of this data.

And I don't know whether the best way to do it is something like what Ms. White proposes, of having an independent expert, or whether it's having each of you have your own expert and both have the data and look at it. But I think -- I'd like the two of you to consult about that and see if you can come up with any common ground at all on that. Is that something you two could talk about?

**MS. WHITE:** Certainly. I mean just one proposal might be what if we had someone from the company do it and if either side disagreed with what the conclusion were, then they could -- you know, both sides could get their own expert to try to point out what the problems with that analysis was.

**THE COURT:** Mr. Sykes, any thoughts about that?

**MR. SYKES:** Well, for all the reasons I've already said, I'm very nervous about that because, you know, it would be like me calling as an expert, you know, an economist who does a lot of our cases for us, you know. Maybe involve this and say, well, he's independent. I mean Cottonwood Heights would be asking, you know -- I mean they're a customer and probably a well-paying customer. So, yeah, I'm nervous about that. I am. I don't want to do that.

**THE COURT:** Right. I mean I suspect that they're a very minor customer, but -- in the overall scheme of things.

**MR. SYKES:** Yeah. It's hard to know.

1    **MS. WHITE:** I think you can see with this proposal

2    I've even made, that we have someone from them. And if they

3    disagree with it, they can get their own expert. We're not

4    going to be able to come to any kind of an agreement and the

5    Court is just going to have to make a decision as to what to

6    do.

7         **THE COURT:** Sounds like it.

8         Ms. White, why don't you talk to your client and let

9    me know whether you have objections to letting -- you know,

10   possibly subject to a protective order, if there's a need for

11   that, I don't know, letting an expert of the plaintiffs to have

12   access to the data to analyze it.

13        **MS. WHITE:** I do have a problem with that, I can tell

14   you. I just -- without even knowing who that person might be,

15   I can't agree to that.

16        **THE COURT:** All right. Well, I'm going to put it on

17   the two of you to try and see if there's any kind of framework

18   that you can negotiate. And if there isn't, you know, maybe

19   you can kind of specifically both kind of figure out what

20   position you can live with, and I'd like you to get back to me

21   on that.

22        **MS. WHITE:** Thank you, Your Honor.

23        **MR. SYKES:** By what date, Judge?

24        **THE COURT:** How long do you think would be helpful?

25   I don't know how -- I mean it's -- obviously, if you both

1    approach it that you're not going to budge an inch, you could

2    probably get me something tomorrow, but I would like to at

3    least have you engage in a good faith discussion, realizing

4    that this really ought to be able to resolve this issue.

5         This is one of those cases that -- this is one of

6    those discrete issues that we really ought to be able to figure

7    out a solution to.  It doesn't seem like it should be that

8    insurmountable of a problem.

9         **MS. WHITE:**  Perhaps if Mr. Sykes could propose the

10   name of someone to us within seven days, we could take a look

11   at that and see if that's something that we might agree to or

12   not.

13        **THE COURT:**  Why don't we do that.  Mr. Sykes, why

14   don't you come up with a list of names that you would like and

15   see if any of them are acceptable to the defendants.

16        **MR. SYKES:**  All right.

17        **THE COURT:**  And the idea would be if we can find an

18   expert that they're willing to provide the data to, they will

19   do that and that expert can provide some analysis.

20        And, you know, I have read the data, Ms. White, and

21   honestly, I -- I mean I can't completely make heads or tails of

22   it, honestly.  I see what your point -- I see where it says

23   that, you know, the recordings were made on certain dates and I

24   see where it says that they're deleted on certain dates, but

25   it's not something that I was able to just understand clearly

1    on the face of it.  But I'm not surprised it's driving my

2    questions here.

3            **MS. WHITE:**  I think that's fair, Your Honor, to have

4    an expert who can delve more deeply into the metadata and all

5    of that to provide that information to the Court.

6            **THE COURT:**  All right.  So let's -- why don't you --

7    Mr. Sykes, within seven days, why don't you give Ms. White a

8    list of names and see if there's someone that -- I mean I guess

9    we could potentially -- if it's somebody that Ms. White could

10   accept, perhaps that could even be like an independent expert

11   and we could have them mutually hired or -- perhaps both

12   parties will need their own expert, I don't know.  But in any

13   event, it sounds like there's at least a possibility that you

14   might be able to identify some experts she'd be willing to turn

15   the data over to; right?

16           **MR. SYKES:**  Well, the only thing we've ever been able

17   to agree on is what a wonderful man her father is, but that's

18   about it.

19           **THE COURT:**  That's a start, Mr. Sykes.

20           **MR. SYKES:**  It's a start, and her mother.

21           **MS. WHITE:**  And Bob's daughter, I think we both agree

22   is an exceptional woman, so there you go.

23           **THE COURT:**  We have some common ground already.  All

24   right.  Well, I think we've gone on long enough.  I think what

25   I would like to do is before I try and resolve some of the very

difficult issues of credibility and even admissibility,

candidly, given some of the collateral legal implications of

some of the evidence, I would at least like to explore whether

there's a way we can resolve this dispute through the data.  So

let's proceed along the lines we discussed.

        But apart from that, is there anything else we need

to discuss at this time?

        **MS. WHITE:**  I'm wondering if it makes sense just to

push back all these other deadlines, these briefing deadlines

that we have on the admissibility and credibility issues, in

light of the expert, or if you want us to go ahead and still do

that.

        **THE COURT:**  We could do that.  Any concern about

that, Mr. Sykes, with my saying, we'll try and get this expert

thing resolved before we worry about the other things?

        **MR. SYKES:**  Sure.  You know, and your clerk is very

good about doing a minute entry that kind of tells us where to

go.  Maybe it's the -- Ms. Peart, maybe Mr. Zhang, but you

know, I think if you could put a minute entry together, Judge,

and tell us what to do and when to do it, that would be very

helpful.

        **THE COURT:**  I think that is, too, and I'll make

clear -- if it overrides any of the dates I've set during the

hearing, I'll make clear in the minute order, and I'll make

clear now, that whatever the minute order says for the dates,

1    that will control anything that I said for dates here.

2         But I think, Ms. White, that suggestion is

3    well-taken, that it may make sense to hold off on some of that

4    briefing until we see if we can figure this out, if there's a

5    pathway to figure this out through the metadata and the data.

6         All right.  Anything else that we need to discuss at

7    this rather late hour, Mr. Sykes?

8         **MR. SYKES:**  It's been a good full day of trial.  I

9    mean it's been more than a full day in federal court.  So thank

10   you for setting this up.  I mean we could have waited another

11   year, you know, to get an in-person hearing, but I think that

12   these Zoom things work fairly well.  You know, I'm pretty happy

13   with them.  And, you know, maybe we couldn't do a jury trial, I

14   don't know, but thanks for setting this up.  You did a lot of

15   work to get this set up.  Thank you for that.

16        **THE COURT:**  All right.  Thank you, Mr. Sykes.

17        **MR. SYKES:**  Thank you for cooperating.

18        **THE COURT:**  Ms. White, any other business from

19   Cottonwood Heights or Officer Davies?

20        **MS. WHITE:**  No.  Thank you, Your Honor.

21        And thank you, Bob.

22        **THE COURT:**  All right.  Thank you all.  With that,

23   court will be adjourned.

24        **MR. SYKES:**  Thank you.

25        (Concluded at 6:45 p.m.)

# CERTIFICATE OF COURT REPORTER

This is to certify that the proceedings in the foregoing matter were reported by me in stenotype and thereafter transcribed into written form;

That said proceedings were taken at the time and place herein named via Zoom;

That the utmost care was taken in the preservation of and accurate transcription thereof, understanding the myriad of different factors that could potentially disrupt the audio feed during Zoom proceedings;

I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

In witness whereof I have subscribed my name this 18th day of November 2020.

_Teena Green_

Teena Green, RPR, CSR, CRR, CBC