Sam Meziani (9821)
Seamus Appel (17783)
GOEBEL ANDERSON PC
405 South Main Street, Suite 200
Salt Lake City, UT  84111
Telephone:  801.441.9393
smeziani@gapclaw.com
sappel@gapclaw.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AARON JAMES and TIFFANY JAMES, Heirs and Personal Representatives of the Estate of Zane James and in their individual capacities;<br><br>     Plaintiffs,<br><br>vs.<br><br>CASEY DAVIES, and CITY OF COTTONWOOD HEIGHTS,<br><br>     Defendants. | **AMENDED COMPLAINT**<br><br>Case No. 2:19-cv-00341<br><br>District Judge Howard C. Nielson, Jr.<br>Magistrate Judge Dustin B. Pead |

## <u>INTRODUCTION</u>

On May 29, 2018, Casey Davies shot 19-year old Zane James in the back.

Zane did not pose a threat to Davies or others at the moment Davies decided to shoot.

When Davies fired the fatal shots, Zane was reeling from a car accident— a car accident caused

by Davies when Davies tried to run Zane over.  Zane was injured; he was not fleeing and he did

not take any action that would cause a reasonable officer to believe Zane was an imminent threat.

## <u>ZANE JAMES</u>





2



## PARTIES

1.      Aaron James is a citizen of the United States and a resident of Salt Lake County, Utah.

2.      Tiffany James is a citizen of the United States and a resident of Salt Lake County, Utah.

3.      Aaron and Tiffany James are the heirs and representatives of the Estate of Zane James.  Aaron and Tiffany also assert claims herein in their individual capacities.

4.      Casey Davies is a resident of Salt Lake County, Utah, and a former officer of the Cottonwood Heights police department.  Davies was acting within the course and scope of his employment and under color of state law.  Davies is sued in his individual capacity.

5.      The City of Cottonwood Heights is a political subdivision of the State of Utah and is a body corporate and politic.  The City of Cottonwood Heights is responsible for training

3

police officers in its police department.  The City of Cottonwood Heights is responsible for implementing and enforcing use of force policies.

## JURISDICTION AND VENUE

6.     This court has subject matter jurisdiction under 28 U.S.C. §1331 and §1343, and supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

7.     Venue is proper under 28 U.S.C. §1391.

## ALLEGATIONS

**First Use of Deadly Force**

8.     On May 29, 2018, minutes before 6:10 a.m. Davies heard on the police radio there was a pursuit of a motorcycle in progress.

9.     Cottonwood Heights Officer Betenson reported a motorcycle failed to yield. Betenson recognized the motorcycle; he reported the motorcycle had "*fled from us before.*"

10.    Betenson was reportedly not wearing a body worn camera and did not have a car camera.

11.    Upon information and belief, Betenson and Davies recognized the motorcycle driver as Zane James.  Other officers on the radio, including Officer Jamie Croft, also recognized the driver as Zane James.

12.    The Cottonwood Heights Police Department knew Zane James as a non-violent young man from a strong family that was struggling with opioid addiction.

13.    Betenson reported the motorcycle was going 40 miles per hour.

14.    Cottonwood Heights police Sergeant Ricks ordered the pursuit "*shut down*."

4

15.     30 seconds later, an officer from Sandy City, an adjacent suburban municipality, appeared on the Cottonwood Heights radio and reported the motorcycle driver was an armed robbery suspect.   Sandy City reported the motorcycle driver was a suspect in an earlier grocery store robbery.

16.     There was no report of shots fired.

17.     There was no report of physical harm to any person.

18.     There was no report of burglary or trespass to property.

19.     Less than one minute after the report from Sandy City, and although the pursuit was ordered shut down, Officer Betenson reported "*I'm behind him again*."

20.     Betenson reported he was on Castle Hill Drive going approximately 35 miles per hour.

21.     Davies was armed with a Glock 17 handgun with hollow point bullets and a Taser.

22.     Davies heard the report of the pursuit and decided to join.

23.     Davies did not announce over the radio he had joined the pursuit. Officer Betenson called out over the radio "*. . . I'll be car two . . .*" because Davies had joined the pursuit as primary vehicle. Ex. 1 at 2:43-2:46.

24.     GPS data show Davies joined the pursuit at 6:10:40 a.m.

25.     Seconds after joining the pursuit, Davies told Betenson that Davies would be the primary officer on the pursuit: "*... you call this, I'll maintain primary*."  Davies thus decided he would be the primary officer in a pursuit that had been ordered shut down.

26.     In his employer statement, discussed below, Davies described the mini-bike as a poor-performing motorcycle capable of reaching speeds of only 30-40 miles per hour, while going downhill.  "*...it was a... shitty bike. I mean, it wasn't going anywhere fast.  It was going maybe 30, 40 miles an hour, top speed, down the hills what I remember*."

27.     Davies stated he removed his Glock from its holster when he crossed Fort Union Boulevard.

> Q:  "*Did you pull your gun out, just so I can kind of get the timeline down....?*
>
> A:  *It was actually- I pulled it out on Fort Union*."

28.     Drawing a gun is appropriate only when the use of the gun is justified or likely to be justified in the immediate future.

29.     Davies placed his Glock loaded with hollow point bullets by the steering wheel and windshield and continued to drive.

30.     Davies was contemplating and anticipating using deadly force within seconds of joining the pursuit.

31.     GPS data show from the time Davies began the pursuit to the time he removed his gun from its holster at Fort Union Boulevard, underline only 60 seconds elapsed.

32.     The thought of shooting Zane was beginning to gel in Davies' mind.

33.     After crossing Fort Union Boulevard, with his Glock on the dashboard and with thoughts of using deadly force swelling in his mind, Davies came on the radio and stated: "*confirm he was armed on the armed robbery*."  Ex. 1 at 3:22-3:26.

34.     Davies asked for confirmation because he wrongly believed he was allowed to use deadly force against a fleeing felon, qua a fleeing felon.

35.     In his employer statement, Davies claims Zane reached into his pocket during the pursuit.  However, that statement is false.

36.     Zane did not reach into his pocket.

37.     Zane did not reach into his pocket because he had only a toy airsoft gun.

38.     Zane did not have a firearm.

39.     Zane knew Davies, like all officers, carried a firearm while on duty.

40.     A reasonable officer would have understood Zane did not have the ability to harm Davies during the pursuit by any type of vehicle impact because Zane was driving a lightweight mini-bike at low to moderate speeds in a residential area, and Davies was behind him.

41.     A reasonable officer would have understood there was no harm to motorists from a lightweight slow speed mini-bike and given the context the suspect was likely a teenager. Davies stated in his employer statement there was no one on the road and Betenson reported "*no traffic.*"

42.     At no point during the pursuit was Zane driving his mini-bike towards Davies.

43.     Zane did not have the opportunity to harm Davies during the pursuit because Davies was behind and following him while under the cover of his police cruiser.

44.     Zane did not have the desire to harm Davies or anyone else during the pursuit.

45.     Zane did not have the intention to harm Davies or anyone else during the pursuit.

46.     Davies could have increased his distance to create additional space and reaction time and to eliminate any theoretical opportunity for attack.

47.     Zane did not make any aggressive or hostile movements toward Davies or any other officer during the pursuit.

48.     Zane did not make any threats to Davies during the pursuit.

49.     At no time during the pursuit did Zane take any action that a reasonable officer would perceive as a threat.

50.     Davies never saw Zane's hands touch a gun or any other object.

51.     The pursuit continued northbound on 2300 East.  Then, Zane made a left turn to head West onto 6675 South.

52.     6675 is a residential street with multiple speed bumps.

53.     At this point, according to Davies' statement, Zane was driving approximately 15-20 miles per hour.

54.     Other officers were in the immediate vicinity and were engaged in the pursuit. Davies did not coordinate a response with the other officers who were actively engaged in the pursuit.

55.     Without communicating with other officers on the radio, Davies impulsively and unilaterally decided he was going to use deadly force.

56.     Davies told the investigator: "***So I made the decision I'm gonna run him over***."

57.     Davies did not give Zane a warning over the car loudspeaker before deciding to crash into him.

58.     At that early hour, there were no other vehicles on the street and no pedestrians. Indeed, Officer Betenson appeared on the radio during the pursuit and said "*no traffic*." Ex. 1 at 2:50-2:52.  Similarly, in his employer statement, referencing 6675 South, Davies stated "*there's nobody on the street*."

59.     Davies told the investigator, "***So I floored it, hit him as we- as he was going over that second speed bump or that third, right in front of where we, uh, my car ended***."

60.     GPS data show that at the time or immediately before Davies hit Zane he was going approximately 48 miles per hour.  (GPS at 6:12:28 a.m.).   Davies' police car slammed into Zane going more than 40 miles per hour.

61.     Intentionally hitting a driver on a lightweight mini-bike with a police cruiser at speeds greater than 40 miles per hour is likely to cause serious bodily injury or death.

62.     The impact caused Zane to lose control of the mini-bike and caused a severe crash.

63.     Officer Betenson reported on the radio that Zane crashed.  Although he was following directly behind Davies, Betenson did not report over the radio that Davies caused the crash.

64.     GPS data show that from the moment Davies joined the pursuit at 6:10:40 a.m., to the time he stopped his car on 6675 South at 6:12:30, <u>only one minute and 50 seconds elapsed</u>.

65.     The entire pursuit lasted 110 seconds— less than two minutes.

66.     From the moment he joined the chase, Davies intended to use deadly force against Zane.  Davies pulled out his Glock within one minute of giving chase.  Davies did not think about his Taser.  Davies asked for confirmation of an armed robbery within 15 seconds of removing his Glock.  Contrary to what he told the investigating officer, Davies never told any other officer over the radio that Zane was reaching into his pocket or anything remotely similar.  Davies stated he wanted to shoot Zane from the window of his car, but decided against it.

67.     Without consulting with other officers or Sergeant Ricks, Davies hit Zane at more than 40 miles per hour.

68.     After being hit by Davies' car going more than 40 miles per hour, Zane slammed into the asphalt at high speeds and in a violent collision.  Zane was not wearing a helmet.

69.     Hitting asphalt at high speeds is severely painful and is likely to cause injury.

70.     Zane was injured, in pain, and disoriented from being hit by Davies' car, and by hitting the asphalt.

71.     Zane sustained injuries including to his hand, wrist, and shoulder.   Zane had just been hit by a car going more than 40 miles per hour and was disoriented and likely concussed.

72.     Zane knew he could no longer run.

73.     Zane did not want to lay in the asphalt so he hobbled to the nearest lawn to compose himself, take care of his injuries, and wait for his inevitable arrest.

74.     As shown from this aerial view, the lawn at 2209 East 6675 South where Davies shot Zane is the closest lawn to the crash.  There are hard surfaces in every other direction.



75.     A reasonable person experiencing the shock and trauma of a car crash would head to a nearby lawn, instead of laying on the asphalt or trying to sit or lay down on a hard surface.

76.     The lawn was closer to Davies than alternative escape routes.  For example, if Zane was purely interested in fleeing, he would have kept his same course westbound on 6675 South.  Or, alternatively, he would have run down 2200 East in an attempt to escape.  Travel along both these routes would have been *away* from Davies.  But Zane, unarmed and holding no object in his hands, chose to head towards the lawn.  *See* diagram in Paragraph 74.

11

77.     Based on these facts, a reasonable jury could correctly conclude Zane was trying to get to a safe spot after the shock and trauma of being hit by a car and therefore was no longer trying to escape from Davies.

78.     After the car crash, Zane was no longer fleeing from Davies.

79.     Zane was visibly injured and appeared injured to any reasonable officer.

80.     Although he hit him with a car, Davies did not take the time to consider that Zane was injured and was no longer trying to escape.

81.     After being hit by a car, Zane knew he could no longer outrun the police.  Zane believed he was going to be arrested.  He believed he was headed to jail.

82.     Zane did not know he was about to die.

**Second Use of Deadly Force**

83.     Although Davies: (a) chose not to wear his body worn camera in order to keep his actions secret, or (b) destroyed body cam video evidence reported to exist, there is an eyewitness.

84.     On May 29, 2018 Heather Dodd lived on the northwest corner of 6675 South and 2200 East.

85.     Dodd was in her house preparing for work in the early morning of May 29, 2018.

86.     She heard sirens so she walked to the front window to see what was going on.

87.     This is a photograph taken from the front of the house, showing the view from the window:



88.     Dodd had a clear and unobstructed view.

89.     Dodd saw Zane limping or hobbling towards her neighbor's front lawn.

90.     Dodd's first impression was that Zane was injured.

91.     Dodd observed Zane's hands.  One hand was hanging near his body as if it was
injured, and the other hand was pressed to his lower stomach below the belly button near the top
of his pants.

92.     Dodd's initial impression was the young man was hurt in the area near his pants,
or was trying to keep his pants from falling down.

93.     Seconds later, Dodd saw Davies stop his police car.

94.     Zane's back was to Davies.

95.     Zane did not make any verbal threats to Davies.

96.     Zane did not make any aggressive physical moves toward Davies.

97.     Zane did not point anything at Davies.

98.     Zane did not make any moves as if he was reaching into his pockets or anything similar.

99.     Zane's hands were not in his pockets.

100.    Zane did not make any hostile motions towards Davies.

101.    Zane was on the lawn and moving away from Davies.

102.    Zane was far enough from Davies that Davies, combined with the cover provided by his police car, had no objective reason to believe Zane could threaten him.

103.    Davies did not order Zane to show his hands.

104.    According to Davies' employer statement, Zane was not holding any object and did not point any object at Davies.

105.    Zane posed no immediate threat to Davies.

106.    Davies opened the car door with his gun drawn.  He was holding his Glock handgun with both hands.

107.    Davies did not wait for his back up, Betenson, who was following immediately behind Davies, before making the decision to take Zane's life.

108.    Although he carried a Taser and was in range to use a Taser, Davies decided he would not use his Taser.

109.    Davies did not pick up his Taser because he had already decided early in the pursuit he was going to shoot his Glock; the same Glock that he removed from its holster within 60 seconds of joining the pursuit and that remained on his dashboard.

110.    Davies took one or two steps, positioned himself behind the cover of his car door, and within 2-3 seconds of opening the door, fired multiple shots.

111.    Davies did not order Zane to show his hands before shooting.

112.    Davies did not give a warning before shooting Zane in the back.

113.    In his employer statement, Davies did not identify any specific facts that would cause a reasonable officer to believe there was an imminent threat of serious bodily injury or death.

114.    Davies' employer statement reveals Zane was not holding any object; Zane did not point any object at Davies; Davies never saw an object in Zane's hand, much less a gun; and Zane did not make any hostile movements towards Davies.

115.    Instead, Zane was in shock and tending to his injuries, as a reasonable officer who had just hit a kid on a motorcycle would easily understand.

116.    Davies did not wait for additional information or assistance, and he did not allow additional time to fully assess the situation and evaluate whether the crash he caused changed his assessment of using deadly force.

117.    Acting deliberately, immediately, and in line with his plan and desire to use deadly force, Davies fired shots within only 2-3 seconds of stopping his car.

118.    After hitting a young man with his car, 2-3 seconds was not enough time for Davies to re-assess the changed facts and circumstances.  No reasonable officer would have fired

15

within 2-3 seconds, and in less than two minutes after joining a pursuit.  A reasonable officer would have known that a victim of a car accident may hold his body differently, particularly extremities impacted from slamming into the asphalt after being hit by a car going more than 40 miles per hour.  For example, football players may get up slow and hold their bodies after a particularly hard hit.

119.    A reasonable officer would have known Zane was disoriented and injured from the crash and was moving and holding his hands and body accordingly.

120.    After crashing into Zane, Davies did not take the time to re-assess the situation. He acted rashly and in line with his previous thoughts and intent of using deadly force.

121.    Although Davies' idea to shoot Zane was formed in less than two minutes, it was premeditated.

122.    A reasonable officer would have evaluated Zane's actions in light of the fact he had just been hit by a car.

123.    But Davies' behavior is worse than merely failing to consider the new facts and circumstances after crashing into Zane, Davies' decision to shoot was the result of the firm decision reached in his mind to use deadly force.  Once made, this decision influenced every step of the pursuit in Davies' mind.

124.    According to Davies' employer statement, Davies was thinking about shooting Zane from the window of his car while the two were moving.  Davies stated in his employer statement: "*So I-I-I mean deadly force is deadly force no matter which type you look at using. So I figured if I was justified in shooting him through the window for the same thing I'm justified in running him over.*"

125.    When Davies saw that Zane was hobbling and not dead after the violent car crash, Davies was surprised his use of deadly force did not work. Davies then opened his car door, and without thinking or evaluating new facts, pulled the trigger within 2-3 seconds to finish the job.

126.    No reasonable officer would have fired within 2-3 seconds of crashing into a driver at more than 40 miles per hour, and no reasonable officer would have fired his weapon without issuing a verbal warning to Zane.

127.    According to Davies' employer statement, after Zane was hit with the first round, he began to fall to the ground.  At this point, he was no longer capable of moving.  Thus, the second round was not necessary, and itself was excessive.  Davies' employer statement shows he was trained to deliver multiple rounds even if a previous round neutralized any threat, or he was not trained that rounds fired after a suspect no longer poses a threat are excessive.

128.    Just as Davies ignored Utah law requiring him to wear a body worn camera while using force, Davies ignored the Utah statute requiring a warning before use of deadly force.

129.    The "Zane reached into a pocket" theory was an ex post excuse to justify Davies' illegal shooting.  But even reaching into a pocket does not justify the use of deadly force within 2-3 seconds under these circumstances.

130.    Courts may consider facts learned after the use of force to evaluate the information that was available to the officer prior to the use of force.  The objective facts learned after the shooting show Davies' employer statement claims that Zane was reaching into his pocket are false.

131.    Dodd, an eyewitness, will testify Zane did not reach into his pockets.

17

132.     Dodd's testimony is consistent with the other facts and circumstances.  Zane did not reach into his pocket when he was driving the mini-bike or after the crash because Zane would never have pointed any weapon at any officer.  In addition, there was nothing in his pocket that could have offered any protection or that could have been used against Davies.  Zane did not believe his airsoft gun could have offered any protection against Davies and he did not reach for it during the pursuit or after Davies crashed into him.

133.     Two rounds from Davies' Glock hit Zane.

134.     One of the rounds paralyzed Zane from the neck down.

135.     Davies and other officers continued to injure Zane and caused pain and trauma by handling his body roughly and aggressively, worse than hunters treat a dead deer, as he lay shot and bleeding on the lawn. *See* Ex. 2.

136.     For example, Davies is seen on video picking up Zane's head by his hair and then slamming it into the ground. *See* Ex. 2 at 1:56-2:00.

137.     Davies and other officers did not treat Zane with respect or even in accordance with basic first aid principles of treating a patient with a potential spinal injury.

138.     Officers treated Zane aggressively and with little regard for his injuries. They rolled him around and shook him. Officers kept Zane face down in the grass even though his breathing was labored. *See* Ex. 2 at 4:00-8:38.

139.     While officers were mistreating Zane, they kept paramedics away who were ready and waiting to render aid.

140.     Once transported to the hospital, Zane was diagnosed with permanent paralysis from the neck down.

141.    Zane was disoriented and likely concussed after this accident.

142.    A reasonable officer would have known that there was high likelihood of a head injury after this crash and a resulting inability of crash victim to immediately comprehend situation.

143.    Imaging taken at the hospital showed Zane had a bullet lodged in his spinal canal. This rendered Zane a quadriplegic.

144.    Zane was unable to survive without a ventilator and external life support.

145.    Zane died on May 31, 2018 at 2:48 pm.

146.    This is a photograph of Davies taken at the scene after he shot Zane.



147.    As shown in the photograph, Davies has the clip to hold his body worn camera firmly and properly affixed to his shirt.  Davies affixed the clip after fastening the buttons to his shirt.

**Immediate Defense and Cover Up**

148.    Russo and Bartlett heard about the shooting immediately after it happened.

149.    Russo and Bartlett learned the victim was Zane James.

150.    Russo and Bartlett knew and disliked Zane and the James Family.

151. Although they knew Zane was shot and was taken to the hospital, Russo and Bartlett did not call the family.

152. Russo and Bartlett did not have the integrity, class, or courage to call the James Family and report their son was shot.

153. Russo and Bartlett were scrambling and scheming to protect Davies and the police department from criticism, bad publicity, and liability.

154. In the aftermath of the shooting Russo and Bartlett were in contact with Davies to work on stories and influence his statement.

155. Aaron James contacted the police on the morning of May 29, because Zane did not return home the night before.

156. When Aaron arrived at the station, the staff was eerily quiet.

157. The front office person told Aaron someone would be with him shortly.

158. Several minutes later Bartlett emerged and told Aaron that Zane had been shot and was taken to the hospital.

159. Bartlett did not tell Aaron and Tiffany the name or location of the hospital where Zane was being treated.

160. Aaron and Tiffany James finally located their son at Intermountain Medical Center.

161. Aaron and Tiffany tried to visit Zane at the hospital. Officers would not allow Aaron and Tiffany access to the intensive care unit where Zane was being treated.

162.     Doctors, nurses and medical staff pressed law enforcement to allow Aaron and Tiffany access to Zane because Zane was paralyzed from the neck down and not in a stable condition.

163.     The police department tried to prevent access to Zane. Officer Olsen eventually granted Zane's family temporary access to Zane before kicking them out of the ICU.

164.     Aaron and Tiffany had to use an attorney, Robert Miner, to persuade Cottonwood Heights officers to allow permanent access to their son.

165.     Hours passed before the family had access to Zane.  By the time the family was granted access, Zane's condition was unstable.  These actions also prevented the family from consulting with physicians on surgery options.

166.     At the hospital, Cottonwood Heights officers treated the James family with hostility and disrespect.

167.     In the wake of the shooting of Zane, Cottonwood Heights knowingly spread false information regarding the shooting, including that Zane's condition was "fair but stable" and that Zane was a violent offender, rather than a 19-year old struggling with opioid addiction after sports injuries, like many victims of the opioid epidemic in Utah.

168.     On June 13, 2018, Bartlett called the James family and told them the video of the shooting was going to be released.  On June 13, 2018, the City released body cam video, but the video showed only the aftermath of the shooting.

169.     On or about June 13, 2018, in response to media inquiries, Bartlett told reporters there was no body cam video of the shooting.

170.     Bartlett told reporters there was no video because Davies did not have the opportunity to grab his body worn camera.

171.     Bartlett, with the full knowledge, approval, and mandate of Russo, told reporters Davies did not have the opportunity to wear his body worn camera because Davies was not present at the police station that morning: "*I wish we could plan for everything and be able to say we had a bulletproof plan.  We don't.  It's unfortunate it happened at this time in the morning*."

172.     Russo also told reporters Davies was on his way to work when he joined the pursuit.

173.     These statements were false.

174.     Bartlett and Russo lied to the public.

175.     Bartlett and Russo lied to protect the police department from inquiry, criticism and liability.

**Employer Statement**

176.     The Cottonwood Heights police department required Davies to give a statement after the shooting.

177.     The ostensible purpose of the statement was to allow Davies' employer to evaluate his actions.

178.     On June 18, 2018, Davies, represented by counsel, gave a statement to Ryan Shosted, who was employed by the Cottonwood Heights police department, and was anything but an unbiased investigator.

179.     Prior to the meeting, Davies met with counsel and had the opportunity to prepare for the statement.

180.    The purpose of the interview by a fellow Cottonwood Heights police officer was not an objective and genuine investigation into the use of deadly force.  Rather, it was an opportunity for Davies to respond to leading and softball questions and to put forward a purported justification for the shooting.

181.    Despite this, Davies' statements are damning.  Davies told the officer investigator he was in the Cottonwood Heights police department listening to radio traffic on the morning of May 29, 2018 before joining the pursuit.

> *So that morning, I think it was Tuesday morning **I came in, uh, a little bit earlier than normal** on my day off to work a ten hour, uh, seatbelt shift.  So I was – all my – all my gear and my uniform I keep in the **locker room**."*

182.    GPS data confirm Davies' car was at the Cottonwood Heights police station in the early morning of May 29, 2018.

183.    Davies, however, submitted sworn testimony to the court that he had not yet arrived at the station, and that is why he did not have his body worn camera.  Davies signed a Declaration submitted in this case.[1]

184.    In his Declaration Davies stated under penalty of perjury: "*I was not wearing my body camera during the incident involving Zane James on the morning of May 28, 2019.  **I had been on my way to work at the time and <u>had not yet gotten to the police station</u> to pick up my body camera**.*"[2]

185.    This statement is false.

---

[1] (Dkt. No. 31-3)
[2] (Davies Decl., at ¶ 3)

186.     Davies told the investigator he was inside the police station the morning of the shooting.   Davies' presence at the station is confirmed by GPS data.

187.     The knowing submission of false testimony by Davies is a second degree felony. See Utah Code Ann. 76-8-502(1).

188.     The Davies Declaration does not contain the name of its outside counsel on the caption suggesting the Declaration was drafted by the City Attorney, as influenced by Russo and other high-level City employees, all as part of an agreement to cover up and withhold facts from the public.

189.     Davies knowingly presented false testimony to the court.  He should be held in criminal contempt, and referred for prosecution.  Given the stakes of this case, all persons and attorneys who aided in the knowing submission of false testimony should be treated similarly.

190.     Data show that Davies' body worn camera was <u>removed from its docking station before 5:50 a.m.</u> on May 29, 2018.

191.     In his employer statement, however, Davies told the investigator the camera was <u>in the docking station</u> when he left on the pursuit.   "*At that time I hurried and rushed.  I – so **my camera was still in the docking station** at this point and so my belt was hanging- I was in my uniform at this time so I just grabbed my belt, threw it on, ran out….*"

192.     Davies lied to the investigator about the location of his camera in the docking station.

193.     Davies told the investigator that as Zane allegedly reached into his pocket, he called it out on the radio to inform officers.  "*Yeah.  **At this time I – I <u>called out on the radio,</u>***

*'Hey, he keeps reaching for something up in that front.  I thought I said front left but I know I got on the radio and said- told everybody that he is reaching for something.'*"

194.   This statement is false.

195.   The dispatch radio recording of Davies does not contain any report of Zane reaching for anything.  A true and correct copy of the dispatch recording is submitted as **Exhibit 1**.

196.   Davies lied to the biased investigating officer about a highly critical element of this case.  Indeed, Davies lied about the most critical aspect of this case.

197.   Although a warning is required by Utah statute and Supreme Court precedent, Davies' employer statement reveals he did not give a warning to Zane before firing the deadly shots.

198.   At this time, Plaintiffs do not know whether the statement was intentionally or inadvertently produced in advance of an evidentiary hearing in this case.  In any event, because both Bartlett and Russo made public statements that Davies had not yet arrived at the station, Plaintiffs believe Defendants intended to suppress Davies' employer statement and intended to rely on the false narrative that Davies was not present at the police station that morning in order to present an excuse to the public for his failure to wear a body worn camera in violation of Utah law and in an attempt to suppress evidence and obstruct justice.

199.   Davies knowingly violated Utah law by destroying body camera evidence or by not wearing his body camera during a pursuit and while using deadly force.

200.   Davies submitted false testimony to the court.

201.   Davies lied to the investigator about the pursuit.

202.     Davies is not an honest witness and his account of the shooting is not credible.

203.     Knowing this, the City continues to defend Davies and his actions as justified. The City has not appointed separate counsel for Davies.  The City's failure to acknowledge, and indeed approval and defense of, the numerous violations of law and policy emphasize the compelling need for punitive damages.

204.     Davies, through counsel and before this court, has stated he will exercise his Fifth Amendment rights in response to questions about his actions in running over and then shooting Zane.

**Body Camera Video**

205.     Defendants claim there is no body camera video of the shooting of Zane.

206.     It is unacceptable and itself a violation of law that the Cottonwood Heights police department did not require officers to wear body worn cameras when engaged in dispatched vehicle pursuits and use of force.

207.     There either is or is not a body camera video of Davies shooting Zane.

208.     Plaintiffs have developed substantial evidence a video exists.  This evidence includes: (a) Davies submitted false testimony regarding his presence at the police station the morning of the shooting as a way to excuse his alleged failure to wear a camera; (b) Davies' employer statement is not credible; and (c) Council Member Natalie Bruce testified under oath she saw the video at a closed meeting of the Cottonwood Heights City Council on June 12, 2018, at which no recordings or minutes were taken as required by Utah law.[3]

---

See Utah Code Ann. §52-4-206(1).

209.    Bruce testified the video was taken from a first person standpoint, similar to a body camera.

210.    Bruce testified Davies did not give Zane a warning he was going to shoot. "*There was no verbal command*."

211.    Bruce testified Zane was shot in the back.

212.    Bruce testified Zane was not holding any weapon.

213.    Bruce testified Zane appeared injured.  "*He was clearly injured*."

214.    Bruce testified Zane did not make any aggressive or hostile moves towards Davies, and did not take any action that would cause Davies or a reasonable officer to believe he/she was an immediate threat.

215.    In the event a video exists and it has been hidden or destroyed, Defendants and any persons who have knowledge or aided and abetted are not only guilty of spoliation in this case, but are guilty of obstruction of justice.

216.    There are multiple cameras outside of the Cottonwood Heights police department. The cameras record views of the cage area where police cars are securely stored, as well as the streets and parking lot in front of the station.  These cameras recorded Officer Davies as he left on the pursuit.  These cameras likely contain a definitive record of whether Davies was wearing a body worn camera on May 29, 2018.

217.    By email on July 22, 2021, Plaintiff asked Defendants what they have done to preserve this pivotal video evidence.  Defendants refused to answer the question of whether such video exists and refused to disclose the efforts, if any, to preserve this critical evidence.

218.   Even if Davies was not wearing a body worn camera, Davies acted in violation of the law.

219.   On May 29, 2018, Utah law required officers to wear a body worn camera prior to an enforcement stop, a dispatched call, a traffic stop, and most importantly, <u>prior to use of force</u>. Utah Code Ann. §§77-7a-103; 77-7a-104(4) ("*An officer* **shall** *activate a body-worn camera prior to any law enforcement encounter….*").[4]  The statute is mandatory not permissive.

220.   In the event a video does not exist, when Davies began the pursuit he knew he was violating Utah law but he did not care.

221.   Davies knew that because he was not wearing a camera, there would be no visual or audio record of any of his actions.

222.   When he made the decision to hunt Zane down and execute him, Davies knew that without a camera, his statement would be the only version of the events relied on by his employer and biased investigators seeking above all to protect the officer and the police department.

223.   Davies knew Russo did not care about failure to wear body cameras and he knew he would face no adverse employment action.  Davies did not suffer any sanctions for failing to activate his body worn camera prior to use of force as required by Utah statute.  Instead, he was granted an award and commendation in a ceremony on August 29, 2018, and received an award noted in the October 2018 Cottonwood Heights newsletter.

---

[4] Utah Code Ann. §77-7a-103 was effective on May 10, 2016.  The version of §77-7a-104 effective in 2017 and 2018 required officers to wear body worn cameras prior to any "*law enforcement encounter*."

224.    Before the pursuit even started, Davies determined he would decide when he would follow the law and when he would not.

**Death of Zane James and Plea for Reform**

225.    The James Family's agony and loss from the death of their son and brother Zane cannot be put into words and cannot be expressed in a legal pleading.

226.    Aaron and Tiffany were distressed by Davies' decision to shoot Zane in the back without justification, and by the City's obstinate, false, and misleading cover-up.  They wanted something positive to come from these horrible events.

227.    They refused to accept that the death of their son would be meaningless.

228.    Like many others across the United States, Aaron and Tiffany believed there was a need for better police training in use of force, de-escalation, and proportionality.

229.    Aaron and Tiffany are certainly not "anti-police."  As citizens, they wanted to participate in a conversation with police officers and they wanted the loss of their son to bring about some positive change.

230.    On October 24, 2018, Aaron and Tiffany met with the Salt Lake County District Attorney.  When asked why the District Attorney's investigation did not address Davies' use of lethal force when he had other non-lethal alternatives like a Taser, and other officers in close proximity to provide assistance, Sim Gil stated his role was not to determine if an officer followed policies and procedures.  Gil told the James family the City is the appropriate party to address procedures and any findings resulting from the City's internal investigation.

231.    After meeting with Gil, Aaron and Tiffany met with the Cottonwood Heights Mayor and City Manager on November 12, 2018.

232.    Aaron and Tiffany told the Mayor and City Manager they were not interested in filing a lawsuit.  Instead, they were interested in understanding how this could have happened and in working cooperatively to obtain some type of meaningful reform.

233.    During this meeting the James asked why Davies and the responding officers were not wearing body worn cameras and why Davies decided to shoot Zane instead of using a Taser, and if an internal investigation had been completed.  They also asked if the City would be willing to discuss policy reform and training based on lesson's learned from Zane's case.

234.    The City Mayor and Manager explained they did not know if there were policies and procedures for an internal investigation.  The Mayor and Manager told the Jameses they could file a GRAMA request to find out.

235.    The City Mayor and Manager told Aaron and Tiffany they did not know the specifics of any mandatory camera policy or de-escalation policy, and that while the City was looking at police reform, they were not sure they could engage in a policy discussion due to the risk of litigation.

236.    The Mayor and Manager committed to speaking with the City attorney and "getting back" to the James.

237.    The Mayor and Manager did not make any good faith efforts to communicate with the James Family, and rebuffed Aaron and Tiffany's good faith offer to discuss policies and training instead of litigation.

238.    This lawsuit followed.

**COUNT 1**
***Wrongful Death***
***Violation of Due Process***
***Constitution of the State of Utah***
***Article XVI, Section 5***
***Article I, Section 7***
***(Davies, City of Cottonwood Heights)***

239.    Plaintiffs repeat the foregoing allegations.

240.    Article XVI, section 5, of the Utah Constitution provides:

> *The right of action to recover damages for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation….*

241.    Article XVI, Section V of the Utah Constitution is self-executing.

242.    Article I, Section 7 of the Utah Constitution provides:

> *No person shall be deprived of life, liberty, or property without due process of law.*

243.    Davies shot and killed Zane.

244.    Davies did not act in self-defense or with legal justification.

245.    Davies was the aggressor and Zane was the victim.

246.    Davies was acting within the course and scope of his employment when he unlawfully shot Zane.

247.    The City of Cottonwood Heights failed to train Davies properly in the use of force and implemented and maintained policies that allowed shootings where there was no imminent threat of harm.

248.    As a result of the shooting, Zane was deprived of his life without due process.

249.    As a result of the shooting, Plaintiffs have suffered damages in an amount to be determined.

250.     As a result of the shooting, Aaron and Tiffany James have suffered loss of society, love, companionship, protection and affection in an amount to be determined.

## COUNT 2
### Implementation and Maintenance of Unlawful Use of Force Policies
### And
### Failure to Train
### 42 U.S.C. §1983
### (City of Cottonwood Heights)

251.     Plaintiffs repeat the foregoing allegations.

252.     As shown by his employer statement, Davies did not understand the law governing use of force.

253.     Davies erroneously believed deadly force can be used to stop a fleeing suspect that does not pose an immediate threat to public or officer safety.

254.     Robert Russo is the chief policy making official of the Cottonwood Heights police department.

255.     Russo was in charge of developing and overseeing all aspects of officer training.

256.     Russo developed and/or approved of all Cottonwood Heights police training materials.

257.     The City's officer training programs were inadequate in that they did not adequately teach the law and standards set forth by *Garner*, *Graham v. Connor* and *Scott v. Harris*, among other precedents.

258.     Russo and the City's officer training programs did not contain sufficient materials on use of deadly force, de-escalation and proportionality of the use of force.

259.    Under established law enforcement standards, an officer shall use de-escalation techniques whenever possible and appropriate before resorting to force and to reduce the need for force.

260.    The goal of de-escalation is to slow down the situation so that the subject can be guided toward a course of action that will not necessitate the use of force, reduce the level of force necessary, allow time for additional personnel to arrive, or all three.  When de-escalation techniques are not effective or appropriate, an officer should consider the use of non-lethal force to control an actively resistant individual.  The City's training materials did not teach these principles.

261.    The City's training materials did not include standard use of force models that make these principles easy to understand for officers, such as the Federal Law Enforcement Training Center model:



262.    The City of Cottonwood Heights has chosen to have its own independent police force.  Conversely, the majority of municipalities in the Salt Lake Valley are part of the Unified Police Department.  The City of Cottonwood Heights is directly responsible for training the officers in its own police department and for the drafting, implementation, maintenance and enforcement of use of force policies.

263.    Russo and the City did not train on use of force on an annual basis.

264.    Russo and the City did not train on proportionality of use of force.

265.    Russo and the City did not train on de-escalation.

266.    Russo and the City maintained a culture where ego and control dominated officers' thoughts and actions and where unlawful use of force was rewarded in the name of public perception.

267.    Russo and the City were deliberately indifferent to citizens' rights in adopting outdated and deficient training practices.

268.    The Supreme Court has explained, "…*city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force…can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights*."[5]

269.    Davies' mistaken beliefs and lack of understanding of proper use of force is a direct result of the City's failure to properly train its officers and caused the Constitutional violations in this case.

270.    Davies believed he could use deadly force against a fleeing felon, even if there is no imminent threat to the officer or the public.

271.    Based on a deep misunderstanding of *Garner*, maintained to date by its counsel in pleadings and arguments before the court, the City maintained an official policy and practice and custom of training its officers that they may use deadly force at any time to stop a fleeing suspect, even a suspect that does not pose an imminent threat to public or officer safety.

---

[5] *City of Canton v. Harris*, 489 U.S. 378, 390 n. 10 (1989)

272.    The policy, practice, and custom was created by the City's failure to train on use of force, and its evident improper training erroneously taught officers they may use deadly force against a fleeing suspect that does not present an imminent threat.

273.    Russo and City willingly ignored Davies' violations of law and policy because they determined they must stand behind police employees whether or not they violate the law.

274.    The City and Russo have an established unwritten policy and practice of ignoring and/or downplaying legal and ethical violations by its officers.

275.    The City and Russo did not sanction Davies for violation of policy and Utah law. Indeed, they reward officers despite violations, as they did here with Davies.

276.    As a result of Russo and the City's failure to train and its maintenance of unlawful policies, Plaintiffs have been damaged in an amount to be determined.

## COUNT 3
### *Violation of Fourth Amendment*
### *Excessive Use of Force*
### *United States Constitution, Amendment No. 4*
### *42 U.S.C. §1983*
### *(Casey Davies)*

277.    Plaintiffs repeat the foregoing allegations.

278.    The Fourth Amendment to the United States Constitution provides:

> *The right of the people to be secure in their persons…against unreasonable…seizures, shall not be violated….*

279.    The Supreme Court has held the shooting of a reported fleeing felon is

unreasonable if the person does not pose an imminent threat of harm to the officer or the public.[6]

280.    Zane did not pose an imminent threat to Davies or the public that justified the use

of deadly force.

281.    Davies and all the other officers involved in the pursuit had vehicles capable of

traveling at much higher speeds than Zane's poor-performing mini-bike.

282.    Davies and other officers could have employed any number of de-escalation

tactics or alternative measures to terminate the low-speed pursuit without the use of deadly force.

283.    Sergeant Ricks previously terminated the same pursuit before Davies joined.

284.    After Davies attempted to run Zane over, Zane was injured and did not have the

ability or intent to cause harm.

285.    Zane had just suffered a car/motorcycle crash that slammed his body against the

asphalt.

286.    Zane suffered injuries including to his hand, wrist, and shoulder.

287.    Zane was in shock and physically unable to harm Davies, and he was not armed

with a firearm capable of matching Davies' firepower.

288.    Because he knew he was not armed with a real gun, Zane did not intend to

threaten Davies.

289.    Zane would never harmed an officer, or anyone else.

290.    Zane was not armed; he had no ability or intent to harm Davies.

---

[6] *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Reavis v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) ("district court correctly concluded that Deputy Frost had fair notice that opening fire at a fleeing vehicle that no longer posed a threat to himself or others was unlawful.")

291.   Zane was not holding anything in his hand.

292.   Zane made no hostile motions towards Davies.

293.   As shown by the eyewitness testimony of Heather Dodd, Zane was clutching his hand to his lower stomach because he was visibly injured.   A reasonable officer would have considered a suspect's physical condition after a car crash where an officer tried to run him over.

294.   Zane did not reach into his pocket because there was nothing in his pocket that could have provided any assistance in that moment.

295.   Zane did not make any hostile motions to Davies.

296.   Zane's hands were not in his pockets.

297.   Davies' claim Zane reached one hand into a pocket is false.

298.   Zane was trying to reach the lawn to rest from his crash and injuries.

299.   A person who was hit by a car and was injured and disoriented would not continue to lay in the road on the asphalt but would reasonably seek refuge on the closest green space.

300.   Davies did not take the time to assess the extent of Zane's injuries and his manifest intentions in moving towards the lawn.

301.   Davies did not warn Zane that he was about to be shot with a hollow point round in violation of Utah law and Supreme Court precedent.

302.   Zane did not take any actions that would cause a reasonable officer to believe Zane presented an immediate threat to public or officer safety.

303.   In evaluating whether use of deadly force is unreasonable, the Tenth Circuit considers whether an officer's own conduct created a situation where deadly force was

necessary.[7]  In this case, Davies' "*own reckless and deliberate conduct during the seizure unreasonably created*" the alleged need to use force.

304.    It was established on May 29, 2018 by the United States Supreme Court and the Tenth Circuit that an officer may not use deadly force to stop a fleeing suspect where a reasonable officer would have perceived he was in no imminent danger at the time he fired his weapon.

305.    By first hitting Zane with his car in an attempt to run him over, and then shooting Zane in the back causing his death, Davies seized and murdered Zane in violation the Fourth Amendment.  Davies' use of deadly force in this case was objectively unreasonable.

306.    As a result of Davies' violation of the Fourth Amendment, the Estate of Zane James has been damaged in an amount to be determined.

### COUNT 4
*Excessive Use of Force*
*Utah Constitution, Article I, Section 14*
*(Casey Davies)*

307.    Plaintiffs repeat the foregoing allegations.

308.    Article I, Section 14 of the Utah Constitution provides:

*The right of the people to be secure in their persons against….unreasonable searches and seizures shall not be violated.*

309.    This provision is self-executing.

310.    At the time of the shooting, Utah law and Cottonwood Heights policy did not allow the use of deadly force absent an imminent threat to the officer or the public.

---

[7] *Allen v. Muskogee, Oklahoma*, 119 F.3d 837, 840 (10th Cir. 1997).

311.    Unlike the federal qualified immunity doctrine, which has no basis in the text or history of Section 1983, the Utah Supreme Court has held there are instances that will support personal liability against an officer "*where a defendant's conduct will be so egregious and unreasonable that it constitutes a flagrant violation of a constitutional right even in the absence of controlling precedent.*"[8]

312.    Upon information and belief, the policy in effect in May 2018 provided: "*An officer may use deadly force to protect him/herself from what he/she reasonably believes is an imminent threat of death or serious bodily injury.*"

313.    Davies' knowing violation of law and policy was flagrant.

314.    For the reasons set forth above, Davies' use of deadly force was unreasonable and a violation of Article I, Section 14 of the Utah Constitution.

## PUNITIVE DAMAGES

Plaintiff is entitled to punitive damages pursuant to Utah law and 42 U.S.C. §1983 as Defendants' conduct, acts, and omissions alleged herein constitute malicious, wanton, reckless and callous indifference to Plaintiffs' rights.  Defendant's continued defense of Davies despite the obvious violations of law call for severe punitive damages.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.  Fed. R. Civ. P. 38.

---

[8] *Jensen v. Cunningham*, 250 P.3d 465, 482 (Utah 2011)

## JUDGMENT

Plaintiffs seek judgment as follows:

1.      Actual and compensatory damages;

2.      Punitive damages;

3.      Attorney fees and costs as allowed by 42 U.S.C. §1988(b);

4.      Expert fees as allowed by 42 U.S.C. §1988(c);

5.      An order holding Davies in criminal contempt for his knowing submission of

false testimony;

6.      Permanent injunctive relief including ordering the City of Cottonwood Heights to

eliminate its defective training programs; create legally compliant training programs; referring

this matter to the Department of Justice with the recommendation to appoint a supervisor or

independent monitor of the Cottonwood Heights police department; appointing a supervisor over

the police department to audit the department's training and ethical standards; and for such other

equitable relief as is appropriate given the grave legal violations and profound injustice of Zane's

homicide.

DATED:  August 5, 2021

/s/ Sam Meziani
Sam Meziani
Seamus Appel
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of August, 2021, I electronically filed a true and correct copy of the foregoing **AMENDED COMPLAINT** via the court's electronic filing system which sent notification to counsel of record.

*/s/ Sam Meziani*